**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> and <br><br> AMERICAN FEDERATION OF TEACHERS, <br><br>           Plaintiffs, <br><br>       v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as the U.S. Attorney General; LEO TERRELL, in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism; UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as the U.S. Secretary of Education; THOMAS E. WHEELER, in his official capacity as Acting General Counsel of the U.S. Department of Education; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as the U.S. Secretary of Health and Human Services; SEAN R. KEVENEY, in his official capacity as Acting General Counsel of the U.S. Department of Health and Human Services; NATIONAL INSTITUTES OF HEALTH; MATTHEW J. MEMOLI, in his official capacity as the Acting Director of the National Institutes of Health; UNITED STATES GENERAL SERVICES ADMINISTRATION; STEPHEN EHIKIAN, in his official capacity as Acting Administrator of the U.S. General Services Administration; JOSH GRUENBAUM, in his official capacity as Commissioner of the Federal Acquisition Service, <br><br>           Defendants. | Case No. _____ <br><br> **COMPLAINT** |

## INTRODUCTION

1.      "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and . . . is therefore a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967). "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

2.      This action challenges the Trump administration's unlawful and unprecedented effort to overpower a university's academic autonomy and control the thought, association, scholarship, and expression of its faculty and students. The Trump administration is coercing Columbia University to do its bidding and regulate speech and expression on campus by holding hostage billions of dollars in congressionally authorized federal funding—funding that is responsible for positioning the American university system as a global leader in scientific, medical, and technological research and is crucial to ensuring it remains so. The Trump administration claims it is enforcing Title VI of the Civil Rights Act, but neither Title VI nor any other law authorizes the Trump administration's coercive tactics, which are in plain violation of statutory requirements.

3.      This suit comes in the wake of a rapid escalation of punitive measures the Trump administration has imposed on Columbia University beginning earlier this month. Columbia is in the crosshairs because of the Trump administration's disagreement with the perceived political views of students and faculty at the university. Over the course of ten days, and in direct contravention of the relevant law, the administration (1) announced it was commencing an investigation of Columbia for its asserted but unspecified failure to address antisemitism on campus, (2) summarily canceled approximately $400 million in critical federal research funding without prior notice, explanation, or any form of due process, and (3) demanded that the University

adopt a list of sweeping programmatic and structural changes within one week as "a precondition" for the University's "continued financial relationship with the United States government," valued at approximately $5 billion. Columbia—like all American universities—depends on federal funding to conduct its scientific research. Threats like these are an existential "gun to the head" for a university. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012).

4.    Although Defendants purport to be enforcing Title VI, the anti-discrimination law covering institutions that receive federal funds, their disregard for the statute's requirements belie that claim. Under Title VI, the government may terminate funding for a recipient only after complying with specific statutory and regulatory requirements: making an effort to obtain voluntary compliance and determining that voluntary compliance is impossible; giving notice to both the university and Congress; providing a hearing for the university; and waiting a specified amount of time. These restrictions exist precisely because Congress recognized that in a system where institutions depend on federal funds, letting federal agencies withhold funding cavalierly would give them dangerously broad power.

5.    Defendants did not follow any of these required steps here. Instead, Defendants summarily terminated $400 million in federal grants and contracts and is threatening to withhold billions more unless Columbia agrees to "play ball" by acceding to the Trump administration's demands. Far from enforcing this civil rights statute, the Trump administration has instead weaponized Title VI, using the threat of massive and indiscriminate funding cuts as a cudgel to coerce universities into policing free speech and academic inquiry.

6.    The Trump administration's "precondition" letter to Columbia exemplifies the abuses Congress sought to guard against. In exchange for the possibility of a "continued financial relationship with the United States government," Trump administration officials have demanded

an extraordinary federal intrusion into protected expression and academic freedom. Through this letter, federal officials purport to have the authority to dictate to a private university the circumstances under which students and faculty can wear facial coverings; to order that a politically disfavored academic department be placed into receivership; to mandate *ex ante* that students who participated in campus protests must receive expulsion or multi-year suspensions as punishment; and to impose a series of undefined reforms to admissions processes. Each of Defendants' demands unconstitutionally inserts the federal government as managers of a private academic institution.  And each demand is backed by threat of the loss of billions in federal research grants—a threat on which Defendants have already begun to make good.

7.    Under the circumstances, it should come as little surprise that Columbia last week acceded to the Trump administration's demands. That concession demonstrates the federal government's immense financial leverage and underscores the threat to academic freedom where such leverage is exercised unlawfully. A remarkable component of that concession was Columbia's agreement to "expand intellectual diversity" and alter its procedures for hiring faculty. By revoking $400 million in grant funds and threatening to cancel more, the Trump administration has been able to accomplish through financial pressure what the First Amendment forbids it from doing directly: punish protesters based on their viewpoint, regulate the admissions process, and alter the ideological makeup of faculty. Just last year the Supreme Court unanimously held such coercion to be unconstitutional. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

8.    Defendants have also made clear that they will continue to withhold funding as leverage to extract still further concessions from Columbia. In a March 24, 2025 press release addressing Columbia's accession to their initial set of demands, Defendants stated that was only

the "first step in the university maintaining a financial relationship with the United States government."

9.    The Trump administration's unlawful actions have already caused severe and irreparable damage by halting academic research and inquiry, including in areas that have no relation whatsoever to the charges of antisemitism. The funding cancelation has hobbled crucial public health efforts including research to prevent Alzheimer's Disease, to ensure fetal health in pregnant women, and to cure cancer. And the damage seeps deeper. Plaintiffs American Association of University Professors (AAUP), American Federation of Teachers (AFT), and their members can attest to the pervasive climate of fear and self-censorship that has arisen in the wake of the government's sweeping funding cuts and threats to impose even more. This chilling effect extends beyond Columbia to faculty at other institutions of higher education—60 of which have already been identified by the Trump administration as the next targets. Self-censorship is not an unintended side-effect of canceled funding; it is by design.

10.    Defendant Leo Terrell, the head of a Trump administration task force established to investigate institutes of higher education, has made clear this is just the beginning: "We're going to bankrupt these universities. We're going to take away every single federal dollar. … If these universities do not play ball, lawyer up, because the federal government is coming after you."

11.    Columbia has a fundamental obligation to protect all its students from harassment and discrimination, with special attention to historically marginalized groups including Jewish students. It must balance that obligation with another central to its mission: Columbia must create an environment that encourages free speech, dialogue, and the exchange of opposing views. Defendants' actions are not calculated to help Columbia strike that careful balance. Instead, they aim to grant the federal government control over the content of campus speech and to punish the

entire Columbia community because some of its members have expressed views the Trump administration disfavors.

12.    Robust debate and academic freedom are central to America's exceptional success as both a democracy and a generator of useful ideas. Tolerating the Trump administration's actions here risks transforming institutions of higher learning, private or public, into servile arms of the government, advancing only the political preferences of the latest president in order to secure federal funding. That is a dangerous proposition and one that Congress anticipated by limiting any administration's ability to cancel funding for noncompliance with Title VI. Absent relief, Defendants' actions will continue to damage AAUP, AFT, and their members and infringe on their free speech and academic freedom rights guaranteed by the Constitution.

**PARTIES**

**A. Plaintiffs**

13.    Plaintiff **American Association of University Professors ("AAUP")** is a 501(c)(6) membership association and labor union of faculty and academic professionals throughout the country. AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. The AAUP has about 44,000 members on college and university campuses across the country, including a large number of faculty members who rely on federal grants to support their work across a range of academic disciplines. The Columbia University Chapter of AAUP was founded in December 2021 and is open to all current and retired Columbia faculty members and graduate students who are national members of the AAUP. As of January 2025, the Columbia University Chapter of AAUP has members in 14 different schools and 27 different departments within Columbia's main Arts and Sciences faculty.

14.     AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. The AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

15.     Plaintiff **American Federation of Teachers ("AFT")** is a national labor organization headquartered in Washington, D.C. and representing over 1.8 million members, including more than 400,000 members who are employed as higher education faculty and professional staff, primarily in research and teaching positions; federal, state, and local government employees; pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; as well as  nurses and other healthcare professionals. AFT has many members who receive funding, training, classroom resources, and other opportunities made possible by federal grants and contracts. AAUP is an affiliate of AFT. As a result, all current AAUP members are also AFT members. AFT's mission is to champion fairness, democracy, economic opportunity and high-quality public education, healthcare and public services for students, families, and communities.

### B.  Defendants

16.     Defendant the **U.S. Department of Justice ("DOJ")** is a federal agency headquartered in Washington, D.C. The DOJ is an agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551(1), 701(b)(1).

17.     Defendant **Pamela Bondi** is sued in her official capacity as the U.S. Attorney General.

18.     Defendant **Leo Terrell** is sued in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism.

19.     Defendant the **U.S. Department of Health and Human Services ("HHS")** is a federal agency headquartered in Washington, D.C. HHS is an agency within the meaning of the APA.

20.     Defendant **Robert F. Kennedy, Jr.** is sued in his official capacity as the U.S. Secretary of Health and Human Services.

21.     Defendant **Sean R. Keveney** is sued in his official capacity as the Acting General Counsel of HHS.

22.     Defendant the **National Institutes of Health ("NIH")** is a federal agency within HHS and is headquartered in Bethesda, Maryland. NIH is an agency within the meaning of the APA.

23.     Defendant **Matthew J. Memoli** is sued in his official capacity as the Acting Director of the NIH.

24.     Defendant the **U.S. Department of Education ("ED")** is a federal agency headquartered in Washington, D.C. ED is an agency within the meaning of the APA.

25.     Defendant **Linda McMahon** is sued in her official capacity as the U.S. Secretary of Education.

26.     Defendant **Thomas E. Wheeler** is sued in his official capacity as Acting General Counsel of the ED.

27.     Defendant **Craig Trainor** is sued in his official capacity as Acting Assistant Secretary for the Office for Civil Rights, U.S. Department of Education.

28.     Defendant the **U.S. General Services Administration ("GSA")** is a federal agency headquartered in Washington, D.C. GSA is an agency within the meaning of the APA.

29.     Defendant **Stephen Ehikian** is sued in his official capacity as Acting Administrator of the GSA.

30.     Defendant **Josh Gruenbaum** is sued in his official capacity as Commissioner of the Federal Acquisition Service within the GSA.

## JURISDICTION & VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1), including because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

**I.     Defendants' Campaign to Undermine Academic Freedom**

33.     In a democracy, institutions of higher education exist not only as places for research, teaching and learning, but as core civic spaces in which ideas—about science, literature, politics, and society—are formed, tested, and debated.

34.     By contrast, autocratic governments consider independent inquiry and thought to be a threat. Authoritarian governments in Hungary,[1] Turkey,[2] and Brazil[3] have each attempted to place universities under the control of the central government.

35.     President Trump's 2024 campaign website included numerous statements describing his intention to curtail academic freedom and alter the viewpoints expressed on campuses.

36.     That website included President Trump's plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs."[4]

37.     It singled out private universities, stating "we will take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments, and we will then use that money to endow a new institution called the American Academy."[5]

38.     The Trump Administration is particularly focused on suppressing views that challenge (1) its preferred narrative with respect to the Israeli-Palestinian conflict, and (2) its preferred narratives with respect to race and gender—what it refers to as "diversity, equity, and inclusion," or "DEI," or sometimes "wokeness."

---

[1] Lydia Gall, *Hungary Continues Attacks on Academic Freedom*, Human Rights Watch (Sept. 3, 2020), https://www.hrw.org/news/2020/09/03/hungary-continues-attacks-academic-freedom, https://perma.cc/Q96R-2S52.
[2] Muzaffer Kaya, *Turkey's Purge of Critical Academia*, Middle East Research and Information Project (2018), https://merip.org/2018/12/turkeys-purge-of-critical-academia/, https://perma.cc/C4CJ-CBT8.
[3] Pedro Salgado, *The Crisis of Brazilian Universities: Higher Education Under Bolsonaro*, International Research Group on Authoritarianism and Counter-Strategies (July 21, 2021), https://irgac.org/articles/the-crisis-of-brazilian-universities-higher-education-under-bolsonaro/, https://perma.cc/4H5U-RMPM.
[4] *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DonaldJTrump.com (July 17, 2023) , https://www.donaldjtrump.com/agenda47/agenda47-protecting-students-from-the-radical-left-and-marxist-maniacs-infecting-educational-institutions, https://perma.cc/7HZN-5MW8.
[5] *Agenda47: The American Academy*, DonaldJTrump.com (Nov. 1, 2023), https://www.donaldjtrump.com/agenda47/agenda47-the-american-academy, https://perma.cc/B66V-ZXMT.

39.    President Trump's campaign website highlighted that such viewpoints would be prohibited at the American Academy, stating that "there will be no wokeness or jihadism allowed—none of that's going to be allowed."[6]

40.    Vice President JD Vance has stated that "[t]he professors are the enemy"[7] and that "the universities are the enemy."[8] He has praised Hungarian President Victor Orbán's aggressive strategy to make Hungarian universities better reflect Orbán's own ideology.[9]

41.    These sentiments have recently been repeated by Defendant Leo Terrell, the head of the DOJ "Task Force to Combat Anti-Semitism" ("DOJ Task Force"). Defendant Terrell stated on Fox News on or about March 9, 2025: "The academic system in this country has been hijacked by the left, has been hijacked by the marxists. They have controlled the mindset of our young people . . . and we have to put an end to it."[10]

42.    In a March 19, 2025 interview, Defendant Terrell was asked if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, a new department of history, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks." Terrell answered, "Yes, yes, and yes."[11]

---

[6] *Id.*
[7] Henry Reichman, "'*The Professors Are the Enemy*'", The Chronicle of Higher Education (Dec. 14, 2021), https://www.chronicle.com/article/the-professors-are-the-enemy.
[8] National Conservatism, J.D. Vance I The Universities are the Enemy I National Conservatism Conference II, YouTube (Nov. 10, 2021), https://www.youtube.com/watch?v=0FR65Cifnhw, https://perma.cc/WQF6-QU6V.
[9] Rob Dreher, "*I would like to see European elites actually listen to their people for a change*": An Interview with J.D. Vance," The European Conservative (Feb. 22, 2024), https://europeanconservative.com/articles/dreher/i-would-like-to-see-european-elites-actually-listen-to-their-people-for-a-change-an-interview-with-j-d-vance/, https://perma.cc/5WJK-KC8P.
[10] Mark McMillan, *Leo Terrell with Mark Levin- How we'll defeat antisemitism in the USA* (Mar. 9, 2025) https://www.youtube.com/watch?v=NOFIKRr2Sco, https://perma.cc/5V4R-M692.
[11] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus, https://perma.cc/6YHF-VZKG.

43. Trump Administration officials have taken repeated action aimed at bringing universities under governmental control.

44. For example, on February 17, 2025, Acting United States Attorney for the District of Columbia Edward Martin sent a letter to Georgetown University Law School stating that it was "unacceptable" for the private Jesuit university to "teach and promote" diversity, equity, and inclusion, and seeking to pressure the institution to remove such content from its "curriculum," "courses," and "teaching."[12]

45. The purported Title VI enforcement actions against Columbia and threats against at least 60 other colleges and universities (*see infra* ¶¶ 53–91, 274–285) represent a profoundly dangerous escalation of these efforts.

## II. Federally Funded Research and Scholarship at Columbia

46. Columbia University is a research university, including 17 schools where research takes place, as well as four additional affiliated schools. These institutions include a medical school, a dental school, a nursing school, a public health school, an engineering school, and Teachers College, as well as the Faculty of Arts and Sciences, which houses Columbia College and several graduate schools.

47. Research and scholarship at Columbia explore a wide range of topics in health, science, social science, and the humanities, among others. Columbia researchers have recently worked on identifying comatose patients who have hidden consciousness and may recover;[13]

---

[12] Letter from Edward R. Martin, United States Attorney for the District of Columbia, to William M. Treanor, Dean , Georgetown Law Center, (Feb. 17, 2025), https://www.ncronline.org/files/2025-03/3.7.24%20Ed%20Martin%20letter%20%20to%20Georgetown%20law.pdf, https://perma.cc/JBE9-UJZK.

[13] *Sleep Patterns May Reveal Comatose Patients with Hidden Consciousness*, Columbia University Irving Medical Center (Mar. 3, 2025), https://news.columbia.edu/news/sleep-patterns-may-reveal-comatose-patients-hidden-consciousness.

exploring how stomach cancers grow;[14] and using machine learning to identify patients who unknowingly suffer from underdiagnosed liver disease.[15]

48.    More than 1,800 physicians, surgeons, dentists, and nurses affiliated with Columbia also provide patient care.

49.    Forty percent of Columbia's budget goes to patient care and research, with nearly the same share spent on instruction.[16]

50.    Columbia is one of the ten largest non-government employers in New York State.[17] Columbia employs 16,600 full-time workers in addition to its 4,000 faculty members.[18] Two-thirds of the jobs at Columbia are middle-income, non-faculty jobs.[19]

51.    Federal funding supports a large part of not only Columbia University's research, but of all university research across the country since the 1950s, with decisions about what research is conducted made by the scientific community itself. Universities have built graduate programs and research labs to meet this national research mission, which has led directly to innumerable scientific and technological advances over the last seventy years.[20]

---

[14] *Nerves Electrify Stomach Cancer, Sparking Growth and Spread*, Columbia University Irving Medical Center (Feb. 19, 2025), https://www.cuimc.columbia.edu/news/nerves-electrify-stomach-cancer-sparking-growth-and-spread, https://perma.cc/AE3J-R87L.

[15] *Training Your Electronic Record to Think Like a Liver Doctor*, Columbia University Irving Medical Center (Feb. 20, 2025), https://www.cuimc.columbia.edu/news/training-your-electronic-health-record-think-liver-doctor, https://perma.cc/B5LC-BU5H.

[16] *Financial Overview*, Columbia University, https://www.columbia.edu/content/financial-overview (last visited March 23, 2025).

[17] Economic Engine for New York, Columbia University, https://economicimpact.columbia.edu/ (last visited Mar. 23, 2025).

[18] *Id.*

[19] *Id.*

[20] Ian Bogost, *A New Kind of Crisis for American Universities*, The Atlantic (Feb. 10, 2025), https://www.theatlantic.com/health/archive/2025/02/nih-trump-university-crisis/681634/?utm_campaign=atlantic-daily-newsletter&utm_content=20250320&utm_source=newsletter&utm_medium=email&utm_term=The+Atlantic+Daily, https://perma.cc/4PD3-8SY4.

52.     In 2024, government grants made up about 20 percent of Columbia's operating revenue.[21]

### III.     Defendants' Summary Termination of $400 Million in Federal Funds and Threat to Withhold All Future Federal Funding from Columbia

53.     The most recent chapter in the Israeli-Palestinian conflict has inflamed pre-existing tensions on the issue, sparking widespread campus protest both domestically and internationally.[22] Within the United States, institutions of higher education have struggled to balance the need to protect free speech and free expression with the need to protect Jewish, Muslim, Israeli, and Palestinian students on campus from illegal harassment and discrimination.

54.     Columbia, where protests have been robust, is no exception. Columbia has a long history of student protest, a tradition which many community members value.

55.     At the same time, as described in more detail below, Columbia reports taking a range of actions to respond to complaints of antisemitic harassment and discrimination on campus.

56.     On January 29, 2025, President Trump signed an executive order titled "Additional Measures to Combat Anti-Semitism."[23]

57.     The executive order required the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions

---

[21] Financial Overview, Columbia University, https://www.columbia.edu/content/financial-overview (last visited March 23, 2025).
[22] Willem Marx, *Campus Protests over the war in Gaza have gone international*, Nat'l Public Radio (May 3, 2024), https://www.npr.org/2024/05/03/1248661834/student-protests-gaza-universities-international, https://perma.cc/WES8-P4Z5. [22] Willem Marx, *Campus Protests over the war in Gaza have gone international*, Nat'l Public Radio (May 3, 2024), https://www.npr.org/2024/05/03/1248661834/student-protests-gaza-universities-international, https://perma.cc/WES8-P4Z5.
[23] Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025).

of higher education alleging civil rights violations related to or arising from post-October 7, 2023, campus anti-Semitism."[24]

58.     The executive order made no mention of the First Amendment or the need to balance protection of free speech with the imperative to eradicate illegal discrimination and harassment.

59.     On February 3, 2025, Defendant DOJ announced the creation of the multi-agency DOJ Task Force, led by Defendant Terrell, to carry out the mandate of the executive order.[25] The DOJ Task Force includes representatives from Defendant DOJ, Defendant ED, and Defendant HHS.

60.     Later that day, Defendant ED announced new Title VI investigations into Columbia and four other private and state universities (Northwestern University, Portland State University, the University of California at Berkeley, and the University of Minnesota, Twin Cities) where ED stated that "widespread antisemitic harassment has been reported."[26]

61.     The announcement did not point to any specific allegations of antisemitic harassment, nor did it ask or advise Columbia to take any particular steps to deter or remedy such harassment.

---

[24] *Id.*
[25] Office of Public Affairs, *Justice Department Announces Formation of Task Force to Combat Anti-Semitism*, U.S. Dept. of Justice (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism, https://perma.cc/KCF4-LB52.
[26] *U.S. Department of Education Probes Cases of Antisemitism at Five Universities*, U.S. Department of Education (Feb. 3, 2025) https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities, https://perma.cc/M547-JNKP.

62.    Columbia responded that same day, stating that "Columbia strongly condemns antisemitism and all forms of discrimination, and we are resolute that calling for, promoting, or glorifying violence or terror has no place at our University."[27]

63.    Columbia's response detailed numerous actions that the university had taken since August to address antisemitism, including "strengthening and clarifying our disciplinary processes," establishing "a centralized Office of Institutional Equity to address all reports of discrimination and harassment, appoint[ing] a new Rules Administrator, and strengthen[ing] the capabilities of our Public Safety Office."[28] The response concluded by expressing openness to "ongoing work with the new federal administration to combat antisemitism and ensure the safety and wellbeing of our students, faculty, and staff."[29]

64.    Four weeks later, on March 3, 2025, Defendants HHS, ED, and GSA announced a "comprehensive review of Columbia's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act."[30]

65.    The announcement referred to "Columbia's ongoing inaction in the face of relentless harassment of Jewish students," and declared that, as a result, "Stop Work Orders for $51.4 million in contracts between Columbia University and the Federal Government" were being considered. It further stated that the task force would "conduct a comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities."[31]

---

[27] *Statement on Notice From U.S. Department of Education Office of Civil Rights*, Columbia University Office of Public Affairs (Feb. 3, 2025), https://communications.news.columbia.edu/news/statement-notice-us-department-education-office-civil-rights.
[28] *Id.*
[29] *Id.*
[30] *HHS, ED, and GSA announce additional measures to end anti-Semitic harassment on college campuses*, U.S. General Services Administration (March 3, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025, https://perma.cc/7QHZ-E4KU.
[31] *Id.*

66.     The announcement did not point to any specific allegations of antisemitic harassment, nor did it ask or advise Columbia to take any particular steps to deter or remedy such harassment.

67.     The announcement made no mention of the First Amendment or the need to balance protection of free speech with the imperative to eradicate illegal discrimination and harassment, nor did it identify any legal authority for taking the threatened actions against Columbia.

68.     The following day, on March 4, 2025, President Trump posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter."[32]

69.     Under First Amendment doctrine, the category "illegal protests" is carefully circumscribed. Nevertheless, the post did not say how federal officials would identify "illegal protests" or "agitators" for purposes of implementing the President's stated policy, nor did it otherwise provide guidance to faculty, students, or administrators seeking to exercise (or allow others to exercise) First Amendment rights while avoiding the risk of imprisonment, deportation, expulsion, arrest, or loss of "[a]ll" federal funding.

70.     Just three days later, on March 7, 2025, Defendants DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and

---

[32] Donald Trump (@realDonaldTrump), Truth Social (Mar. 4, 2025, 7:30AM),
https://truthsocial.com/@realDonaldTrump/posts/114104167452161158.

contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students" (the "March 7 Funding Withdrawal").[33]

71.     No reasoning was provided for the particular sanction of immediately canceling $400 million in federal funding throughout various university programs, but it has been reported that $400 million is the same amount that now-President Trump tried to demand from Columbia in real estate negotiations back in 2000, then as a private real estate developer.[34]

72.     The March 7 announcement stated that these cuts "represent the first round of action and additional cancellations are expected to follow."[35]

73.     The March 7 announcement further stated without explanation or reference to any specific incidents that "[c]haos and anti-Semitic harassment have continued on and near campus" since the March 3 Title VI investigation announcement and claimed that Columbia had not responded to the DOJ Task Force regarding the investigation in the four days since the investigation had been announced.[36]

74.     On information and belief, Defendants also sent Columbia a letter on March 7 informing it of the $400 million in immediately withdrawn funding.

---

[33] *DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Services Administration (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025, https://perma.cc/6GA5-JSB5.

[34] Matthew Haag and Katherine Rosman, *Decades Ago, Columbia Refused to Pay Trump $400 Million*, New York Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/nyregion/trump-columbia-university-400-million.html.

[35] *DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Services Administration (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025, https://perma.cc/2VS2-ZA4T.

[36] *Id.*

75.     Later on March 7, 2025, Columbia's interim president Katrina Armstrong issued a response stating that Columbia remains "committed to working with the federal government to address their legitimate concerns" and combatting anti-Semitism.[37]

76.     Less than a week later, on March 13, 2025, Defendants HHS, ED, and GSA sent another letter to Columbia (the "March 13 Letter") stating that Columbia should "consider this a formal response to the current situation on the campus of Columbia University and a follow up to our letter of March 7, 2025, informing you that the United States Government would be pausing or terminating federal funding.[38] The letter was signed by Defendants Josh Gruenbaum, Sean Keveney, and Thomas E. Wheeler. The letter stated, without reference to any specific facts or events, that Columbia "has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964. Pursuant to your request, this letter outlines immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government."[39]

77.     The March 13, 2025 Letter provided no further definition of the "current situation on the campus of Columbia University," did not explain its reference to Columbia's "other alleged violations of Title VI and Title VII," and invoked no statutory or regulatory authority other than Title VI and Title VII.[40]

---

[37] Katrina Armstrong, Responding to Federal Action, Columbia, Office of the President, (Mar.7, 2025), https://president.columbia.edu/news/responding-federal-action.
[38] Josh Gruenbaum, Sean Keveney, Thomas Wheeler, *March 13, 2025 Formal Response Letter*, (Mar. 13, 2025) https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf, https://perma.cc/6ZZE-HRFF.
[39] *Id.*
[40] *Id.*

78.     The March 13, 2025 Letter then listed nine demands for Columbia to meet by the close of business on "Wednesday, March 20, 2025" (March 20, 2025 was a Thursday), that is, within a week:[41]

- "Enforce existing disciplinary policies. The University must complete disciplinary proceedings for Hamilton Hall and encampments. Meaningful discipline means expulsion or multi-year suspension."

- "Primacy of the president in disciplinary matters. Abolish the University Judicial Board (UJB) and centralize all disciplinary processes under the Office of the President. And empower the Office of the President to suspend or expel students with an appeal process through the Office of the President."

- "Time, place, and manner rules. Implement permanent, comprehensive time, place, and manner rules to prevent disruption of teaching, research, and campus life."

- "Mask ban. Ban masks that are intended to conceal identity or intimidate others, with exceptions for religious and health reasons. Any masked individual must wear their Columbia ID on the outside of their clothing (this is already the policy at Columbia's Irving Medical Center)."

- "Deliver plan to hold all student groups accountable. Recognized student groups and individuals operating as constituent members of, or providing support for, unrecognized groups engaged in violations of University policy must be held accountable through formal investigations, disciplinary proceedings, and expulsion as appropriate."

---

[41] *Id.*

- "Formalize, adopt, and promulgate a definition of antisemitism. President Trump's Executive Order 13899 uses the IHRA definition. Anti-'Zionist' discrimination against Jews in areas unrelated to Israel or Middle East must be addressed."

- "Empower internal law enforcement. The University must ensure that Columbia security has full law enforcement authority, including arrest and removal of agitators who foster an unsafe or hostile work or study environment, or otherwise interfere with classroom instruction or the functioning of the university."

- "MESAAS Department – Academic Receivership. Begin the process of placing the Middle East, South Asian, and African Studies department under academic receivership for a minimum of five years. The University must provide a full plan, with date certain deliverables, by the March 20, 2025, deadline."

- "Deliver a plan for comprehensive admissions reform. The plan must include a strategy to reform undergraduate admissions, international recruiting, and graduate admissions practices to conform with federal law and policy."[42]

79.     The March 13, 2025 Letter did not provide any constitutional, statutory, or regulatory authority for the government's imposition of these conditions on a private university. Nor did the Letter explain whether or how implementation of the federal government's preferred admissions policy, placing a department in academic receivership, or any of the other demanded actions would deter or remedy antisemitic harassment or any "other alleged violations" of Title VI or Title VII. Nor did it address whether there were less intrusive means of ensuring compliance with those laws.

---

[42] The March 13, 2025 Letter did not say what federal "policy" requires over and above federal law, nor did it allege any specific violations of federal law.

80.     The March 13 Letter made no mention of the First Amendment or the need to balance protection of free speech with the imperative to eradicate illegal discrimination and harassment.

81.     On March 21, 2025, Columbia shared updated policies appearing to give in to nearly all of Defendants' demands.[43]

82.     For example, Defendants demanded that Columbia abolish the UJB and centralize proceedings in the Office of the President. Columbia stated that it would relocate the UJB within the Office of the Provost (who reports to the President), restrict participation to faculty and administrators, institute "rigorous vetting and conflict review process to ensure objectivity, impartiality, and commitment to following and enforcing our community's rules and policies," and give the Provost final approval over all panel members and appellate Deans.

83.     Defendants demanded that Columbia "empower internal law enforcement," including ensuring officers have full authority to arrest and remove "agitators who foster an unsafe or hostile work or study environment, or otherwise interfere with classroom instruction or the functioning of the university." Columbia announced that it has hired 36 "special officers"—it is unclear whether this is in addition to the 117 public safety officers the University had already hired in the past 16 months—who will "have the ability to remove individuals from campus and/or arrest."

84.     Defendants demanded that Columbia place the MESAAS Department in an "academic receivership" for a "minimum of five years." It is very rare for a university to decide to place an academic department under receivership, and a demand by the federal government that a

---

[43] *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia*, Columbia Office of the President (Mar. 21, 2025),
https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf,
https://perma.cc/3FFS-4NR4.

university place an academic department in receivership is entirely unprecedented. Nevertheless, in response to Defendants' demands, Columbia announced the appointment of a new Senior Vice Provost who will "conduct a thorough review of the portfolio of programs in regional areas across the University, starting immediately with the Middle East. This review will include the Center for Palestine Studies; the Institute for Israel and Jewish Studies; Middle Eastern, South Asian, and African Studies; the Middle East Institute; the Tel Aviv and Amman global hubs; the School of International and Public Affairs Middle East Policy major; and other University programs focused on the Middle East (together, the 'Middle East Programs')." The new Senior Vice Provost will take steps including "ensur[ing] the educational offerings are comprehensive and balanced," reviewing "leadership and curriculum," creating a new process for hiring faculty in these programs, reviewing the process for "approving curricular changes," and making recommendations about "necessary changes" and "academic restructuring" to "ensure academic excellence and complementarity" in Columbia's Middle East programs.

85.    In a move that makes the First Amendment stakes here especially stark, the March 21 response also made explicit that Columbia will engineer the ideological balance of speech on campus in response to the federal government's demands. Columbia stated that it will expand "intellectual diversity among faculty." It explained, "Faculty searches have begun and will be expanded to ensure intellectual diversity across our course offerings and scholarship."

86.    On March 24, 2025, Defendants HHS, ED, and GSA issued a press release "welcom[ing] the statement by Columbia University outlining actions the university is taking in response to the Joint Task Force to Combat Anti-Semitism's March 13th letter detailing 9

preconditions for formal negotiations to restore canceled federal grants and contracts."[44] The March 24 letter celebrates "[t]he decisive steps the Task Force has taken with Columbia" that "have yielded positive results."

87.     The March 24 press release does not state that Columbia's federal funding will be restored, however. To the contrary, the letter states that "Columbia's compliance with the Task Force's preconditions is only the first step in rehabilitating its relationship with the government, and more importantly, its students and faculty."[45]

88.     Defendants' March 24 press release makes clear that Columbia's accession to the demands in the March 13 Letter is only the "first step in the university maintaining a financial relationship with the United States government."[46]

89.     Defendants' March 24 press release does not specify what additional "steps" will be required, but the letter makes clear that Defendants expect Columbia to continue to comply with whatever demands Defendants impose as "preconditions" of restoring the $400 million and of granting or continuing additional federal financial assistance.

90.     The press release states that "Columbia's early steps are a positive sign, but they must continue to show that they are serious in their resolve to end anti-Semitism and protect all students and faculty on their campus through permanent and structural reform."[47]

91.     As of the time of filing of this Complaint, Defendants have not reinstated or restored the $400 million in terminated federal funding. Nor have they withdrawn their threats to take additional coercive action and/or terminate or withhold additional funding to Columbia.

---

[44] U.S. Department of Health and Human Services, *HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions*, (Mar. 24, 2025), https://www.hhs.gov/about/news/columbia-comply-anti-semitism-task-force-preconditions-met.html
[45] *Id.*
[46] *Id.*
[47] *Id.*

IV.    **Impacted Funding**

92.    There is no full public accounting of the $400 million in withdrawn funding, but $250 million of that funding consists of grants from Defendant NIH.

93.    On March 10, 2025, NIH posted on the internet platform X that it "is terminating more than $250 million in funding—including more than 400 grants—to Columbia University following directives from the Trump Administration's Joint Task Force to Combat Anti-Semitism."[48]

94.    On or about March 10, 2025, Defendant NIH sent Columbia a list of grants being terminated.[49]

95.    HHS, the parent agency of NIH, has released a list of grants terminated.[50] It lists 161 grants to Columbia University that were terminated between March 10 and March 14, 2025. Terminated grants on that HHS list include "Alzheimer's Disease Genetic Risk and Microglial Innate Immune Memory," "Prenatal exposure to phthalates and associations with gestational weight gain and fetal growth trajectories," "Training in Pediatric Infectious Diseases," and "Cancer Center Support Grant."[51]

96.    NIH terminated 232 grants for scientific research at Columbia University Irving Medical Center, which includes the medical school, dental school, and school of public health. The withdrawn grants make up about a quarter of the center's research portfolio.[52]

---

[48] National Institutes of Health, @NIH, Twitter (Mar, 10, 2025) https://x.com/nih/status/1899196680270238173?s=42, https://perma.cc/USJ7-74AS.
[49] Caroline Lewis, *Hundreds of research grants at Columbia canceled following Trump edict, administrator says*, Gothamist (Mar. 11, 2025), https://gothamist.com/news/hundreds-of-research-grants-at-columbia-canceled-following-trump-edict-administrator-says, https://perma.cc/H7E3-TVKY.
[50] https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf, https://perma.cc/CZJ6-LDP9
[51] *Id.*
[52] Lewis, *supra* n. 49.

97.     With respect to the medical school in particular, NIH terminated nearly 30 percent of grants, including training grants and fellowships. Specifically, as the head of the psychiatry department shared, "All of our training grants and many fellowships have been terminated."[53]

98.     Training grants are particularly crucial for training and developing the careers of the country's next generation of leading physicians and scientists.

99.     Sources inside NIH shared with *Nature* that "the lists of cancelled grants come from the agency's Office of Extramural Research, which is in turn receiving them from the NIH's parent agency, the US Department of Health and Human Services, in coordination with the US Department of Government Efficiency (DOGE)."[54]

100.    According to public reporting cited below, a wide variety of health researchers have seen their funding canceled. The following are just some examples:

101.    The head of the pediatrics department at Columbia's Medical School reportedly lost funding for a project that involved the search for a nasal spray that would block the entry of viruses and reduce infections.[55]

102.    A professor who leads research in the obstetrics department on high-risk pregnancies reportedly lost a $16.6 million grant that she had used to build a maternal health center. Its goal was to lower America's maternal mortality rate.[56]

---

[53] Ryan Quinn, *Trump's Columbia Cuts Start Hitting Postdocs, Professors*, Inside Higher Ed. (Mar. 13, 2025) https://www.insidehighered.com/news/faculty-issues/research/2025/03/13/trumps-columbia-cuts-start-hitting-postdocs-professors; Humberto Basilio, *'My career is over': Columbia University scientists hit hard by Trump team's cuts*, Nature (Mar. 14, 2025), https://www.nature.com/articles/d41586-025-00812-x.
[54] Humberto Basilio, *'My career is over': Columbia University scientists hit hard by Trump team's cuts*, Nature (Mar. 14, 2025), https://www.nature.com/articles/d41586-025-00812-x, https://perma.cc/4CPK-PHDZ.
[55] Joseph Goldstein, *Medical Research at Columbia Is Imperiled After Trump Terminates Funding*, New York Times, (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/nyregion/columbia-research-grants-trump.html.
[56] Jason Mast, *Columbia scientists reel as Trump administration cancels grants, hitting broad suite of research*, STAT News, (Mar. 11, 2025) https://www.statnews.com/2025/03/11/columbia-scientists-reel-grant-cancellations-hit-broad-suite-research/, https://perma.cc/RQM9-849C.

103.    A lab leader at the School of Public Health reportedly received a stop work order for her grant aimed at reducing maternal mortality. The grant supported twenty people.[57]

104.    According to *Nature*, a PhD student who studies fibroids in the uterus had her fellowship terminated. Her terminated grant was an F31 fellowship from NIH.[58]

105.    A postdoctoral researcher had a grant canceled concerning risk factors that predispose children to develop eating disorders, depression, and suicidal thoughts and behaviors, according to *Inside Higher Ed*. His terminated grant was a T32 training grant from NIH. As he told *Inside Higher Ed*, "'as a Jew,' it's 'particularly outrageous' to hear the Trump administration justifying the cuts by saying it's fighting antisemitism . . . 'I certainly don't feel protected,' he said."[59]

106.    A neurologist and professor at Columbia's medical school had two grants terminated this month, according to the *New York Times*. His research focuses on health disparities and how to narrow them. One grant addressed stroke recovery and the other concerned screens for colorectal cancer, which is rising among younger adults.[60]

107.    A spokesman for Columbia University Medical Center stated that other canceled studies include one on treatments for chronic illnesses, including long COVID, and one on reducing maternal mortality in New York.[61]

108.    Many of the Columbia grant cancelations are being felt at universities across the United States and around the world. Large-scale studies are often collaborative efforts involving

---

[57] Basilio, *supra* n.54.
[58] *Id.*
[59] Ryan Quinn, *Trump's Columbia Cuts Start Hitting Postdocs, Professors*, Inside Higher Ed., (Mar. 13, 2025) https://www.insidehighered.com/news/faculty-issues/research/2025/03/13/trumps-columbia-cuts-start-hitting-postdocs-professors, https://perma.cc/6TCM-EBZF.
[60] Joseph Goldstein, *Medical Research at Columbia Is Imperiled After Trump Terminates Funding*, New York Times, (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/nyregion/columbia-research-grants-trump.html.
[61] *Id.*

multiple researchers with different expertise and resources at different universities with a single grant administered through a lead university like Columbia.[62]

109.    For example, a Harvard Medical School professor told the *New York Times* he had a grant cut for a large diabetes research project, which followed a group of 1,700 people over more than 25 years, because the grant flowed through Columbia.[63] One nurse who had participated in the diabetes study for twenty-five years told the *New York Times* that when she found out, "Honestly, I wanted to cry."[64]

110.    The grant cuts have also shut down the Center for Solutions for ME/CFS, a large research program into myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS), a condition believed to affect millions of Americans, according to *STAT*.[65] The center had funded projects not only at Columbia but also at the University of California Davis, Harvard, and the University of Edinburgh, according to *STAT*.[66]

111.    A number of grants to Columbia University that were terminated were listed among the Department of Government Efficiency (DOGE)'s "savings" on its website.[67] On the same day that NIH stated on X that it would cancel 400 grants, DOGE updated its savings page to include nearly 400 new grants terminated by Defendant HHS (Defendant NIH's parent agency), which could be matched by exact dollar amount to grants previously awarded by the NIH to Columbia University.[68]

---

[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] Isabella Cueto, *ME/CFS research program shuts down at Columbia after Trump cuts*, STAT News (Mar. 19, 2025), https://www.statnews.com/2025/03/19/myalgic-encephalomyelitis-chronic-fatigue-syndrome-columbia-program-shutdown/, https://perma.cc/QY7T-L5X4.
[66] *Id.*
[67] Jeremy Barr, *Robert Allbritton's new mission is creating more journalists. Why?*, Wash. Post (May 20, 2024), https://www.washingtonpost.com/style/media/2024/05/30/robert-allbritton-notus-journalism/.
[68] Mark Alfred, The Trump Administration Cut Cancer and Alzheimer's Research Funding at Columbia University, NOTUS, (Mar. 18, 2025), https://www.notus.org/health-science/columbia-university-grant-cuts.

112.    On March 7, Teachers College announced that it had "received notice that a number of [its] faculty grants are also being cut as part of" the government's cancelation of $400 million in grants and contracts. Teachers College stated in this announcement that this was "[e]ven though Teachers College is an independent institution, guided by a separate Board of Trustees and President, one that enforces its own set of anti-harassment and anti-discrimination policies."[69] The statement continues, "These wholesale cuts to vital research endeavors will have lasting and devastating impacts on the public good, to which our university system is devoted: from public health, to K-12 teachers and students, mental health and counseling, community colleges, and much more."[70]

113.    Some researchers received formal cancelation notices that stated that funding was terminated "due to unsafe antisemitic actions that suggest the institution lacks concern for the safety and wellbeing of Jewish students."[71] Others have not yet received any government notice of their grant cancelation, but Columbia University has informed them that their funding has stopped.

## V.    Defendants' Actions Inconsistent with Title VI

114.    Section 601 of Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in all programs receiving federal funding. 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

---

[69] Thomas Bailey, Announcement: *Update in Light of March 7 Federal Announcement*, Teachers College Columbia University (Mar. 7, 2025) https://www.tc.columbia.edu/articles/2025/march/update-in-light-of-march-7-federal-announcement/, https://perma.cc/Z9G7-N2ZY.
[70] *Id.*
[71] Jocelyn Kaiser, *After Columbia's 'nightmare,' dozens more universities brace for Trump NIH cuts*, Science (Mar. 18, 2025), https://www.science.org/content/article/after-columbia-s-nightmare-dozens-more-universities-brace-trump-nih-cuts.

115.    Although Defendants invoked Title VI as a purported justification for the March 7 Funding Withdrawal and the March 13 Letter, their actions do not comport with the requirements of the statute or Defendants' own regulations.

**A.    Defendants' Failure to Follow Title VI Statutory and Regulatory Requirements for Terminating or Refusing to Grant or Continue Federal Funding**

116.    Section 602 of Title VI prescribes specific procedural requirements that federal agencies must follow before taking "any action terminating, or refusing to grant or continue, [federal financial] assistance because of failure to comply with [Section 601]." 42 U.S.C. § 2000d-1.

117.    Section 602 provides that terminating or refusing to grant or to continue assistance may be done only after "an express finding on the record, after opportunity for hearing, of a failure to comply with [Section 601]." *Id.*

118.    Section 602 further provides that "the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and that "[n]o [terminating] action shall become effective until thirty days have elapsed after the filing of such report." *Id.*

119.    Section 602 further provides that any "termination or refusal [to grant or to continue assistance under Title VI] shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.*" *Id.* (emphasis added).

30

120.    In addition, Congress made that limited authority to terminate or refuse grants subject to an additional proviso "[t]hat no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id.*

121.    These stringent procedural requirements for termination or refusal to grant or continue assistance reflect congressional intent to safeguard against the potential exploitation of Title VI funding leverage as a "vindictive or punitive" measure against federal funding recipients.[72] From the very inception of the Civil Rights Act of 1964, lawmakers were aware of and concerned about the far-reaching authority Title VI grants the federal government over programs receiving federal funds. The congressional notice requirement, presidential approval of agency regulations implementing Title VI (discussed below), and requirement for a hearing on the record were all introduced as amendments to the original bill and were expressly aimed at preventing abuses of power.[73]

122.    Senator John Pastore from Rhode Island, who was the floor manager in the Senate for the Civil Rights Act of 1964, explained that "Failure of a recipient to comply with a rule, regulation, or order issued by an agency may ultimately lead to a termination or refusal of Federal assistance. Cutoff of assistance is not the object of title VI, however. I wish to repeat: Cutoff of assistance is not the objective of title VI. Fund cutoff is a last resort, to be used only if all else fails

---

[72] See Senator Pastore, Congressional Record from April 7, 1964, page 7063,
https://www.congress.gov/88/crecb/1964/04/07/GPO-CRECB-1964-pt6-1-1.pdf, https://perma.cc/95VE-5QL8.
[73] *See* Rep. Willis, Congressional Record from February 7, 1964,
https://www.congress.gov/88/crecb/1964/02/07/GPO-CRECB-1964-pt2-8-2.pdf;    Rep. Lindsay,    Congressional Record from February 7, 1964, https://www.congress.gov/88/crecb/1964/02/07/GPO-CRECB-1964-pt2-8-2.pdf; Rep. Lindsay, Congressional Record from February 7, 1964, https://www.congress.gov/88/crecb/1964/02/07/GPO-CRECB-1964-pt2-8-2.pdf, https://perma.cc/WJK5-8K7G.

to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds."[74]

123.    Senator Pastore further elaborated on the importance of the statutory and regulatory safeguards in ensuring that revocation of funding was "a last resort" rather than a "punitive or vindictive measure," noting that "cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available."[75]

124.    Section 602 "direct[s]" federal agencies to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1. Agencies are required to seek approval of those regulations from the President, *id.*, who has delegated that authority to the Attorney General. The Attorney General oversees and coordinates enforcement of Title VI among federal agencies. *See, e.g.*, Exec. Order No. 12250 (1980) at §§ 1–2; Exec. Order 11764, 3A C.F.R. § 124 (1974 Comp.); Exec. Order 11247, 3 C.F.R. 1964–1965 Comp. 348 (Sept. 24, 1965).

125.    Pursuant to Section 602, and consistent with this legislative intent, each of the defendant agencies has promulgated regulations imposing additional procedural requirements on the termination of federal funding for alleged noncompliance with Section 601.

126.    These regulations, which are effectively the same across the defendant agencies, provide that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be

---

[74]    Senator Pastore, Congressional Record from April 7, 1964, page 7059, https://www.congress.gov/88/crecb/1964/04/07/GPO-CRECB-1964-pt6-1-1.pdf, https://perma.cc/KGN2-86X9.
[75]    Senator Pastore, Congressional Record from April 7, 1964, pages 7059, 7063, https://www.congress.gov/88/crecb/1964/04/07/GPO-CRECB-1964-pt6-1-1.pdf, https://perma.cc/KGN2-86X9.

secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part, (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action." 34 C.F.R. § 100.8(c) (ED); *see* 45 C.F.R. § 80.8(c) (HHS); 28 C.F.R. § 42.108(c) (DOJ); 41 C.F.R. § 101-6.211-3 (GSA).

127.    On information and belief, Defendants failed to comply with the foregoing requirements before terminating funding on March 7 and before refusing to grant or continue financial assistance to Columbia unless, as a precondition to future negotiations, Columbia acceded to the demands set forth in the March 13 Letter. Among other things, Defendants did not provide an opportunity for hearing or make an express finding on the record as to the University's noncompliance with Title VI. Nor did any "responsible Department official" determine that the University's compliance could not be secured by voluntary means. Moreover, no head of any Federal department or agency has filed with any committees of the House and Senate a "full report of the circumstances and the grounds" for the action terminating or refusing to grant or continue federal assistance to the University because of a failure to comply with Title VI. Nor have thirty days elapsed after the filing of any such report.

128.    The defendant agencies' regulations also impose requirements on the conduct of investigations for alleged Section 601 violations. Among other requirements, where such investigation "indicates a failure to comply with [Section 601], the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible." 34 C.F.R. § 100.7(d); *see* 45 C.F.R. § 80.7(d); 28 C.F.R. § 42.107(d); 41

C.F.R. § 101–6.210–4(a). Only where "it has been determined that the matter cannot be resolved by informal means" shall terminating "action . . . be taken." 34 C.F.R. § 100.7(d); *see* 45 C.F.R. § 80.7(d); 28 C.F.R. § 42.107(d); 41 C.F.R. § 101–6.210–4(a).

129.    On information and belief, no "responsible Department official or his designee" sought to resolve the University's alleged violations of Section 601 through informal means before termination of funding, even though such informal resolution may have been possible.

130.    Additionally, the defendant agencies' Title VI regulations impose requirements on the conduct of pre-termination hearings. Among other requirements, "[w]henever an opportunity for a hearing is required . . . reasonable notice shall be given by registered or certified mail, return receipt requested, to the affected applicant or recipient. This notice shall advise the applicant or recipient of the action proposed to be taken, the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for this action, and either (1) fix a date not less than 20 days after the date of such notice within which the applicant or recipient may request of the responsible Department official that the matter be scheduled for hearing or (2) advise the applicant or recipient that the matter in question has been set down for hearing at a stated place and time." 34 C.F.R. § 100.9(a); *see* 45 C.F.R. § 80.9(a); 28 C.F.R. § 42.109(a); 41 C.F.R. § 101–6.212–1.

131.    The same regulations further provide that "[t]he hearing, decision, and any administrative review thereof shall be conducted in conformity with sections 5–8 of the Administrative Procedure Act," and that "[b]oth the Department and the applicant or recipient shall be entitled to introduce all relevant evidence on the issues as stated in the notice for hearing or as determined by the officer conducting the hearing at the outset of or during the hearing." 34 C.F.R. § 100.9(d)(1); *see* 45 C.F.R. § 80.9(d)(1); 28 C.F.R. § 42.109(d)(1); 41 C.F.R. § 101–

6.212–4(a). All such evidence "shall be open to examination by the parties and opportunity shall be given to refute facts and arguments advanced on either side of the issues," and "[a] transcript shall be made of the oral evidence except to the extent the substance thereof is stipulated for the record." 34 C.F.R. § 100.9(d)(2); *see* 45 C.F.R. § 80.9(d)(2); 28 C.F.R. § 42.109(d)(2); 41 C.F.R. § 101–6.212–4(b).

132. On information and belief, Defendants failed to comply with the foregoing procedures governing pre-termination hearings. Among other things, Defendants did not conduct a hearing at all or provide any notice.

133. The defendant agencies' regulations also impose requirements regarding post-hearing termination decisions and notices. For example, "[a]fter a hearing is held by a hearing examiner such hearing examiner shall either make an initial decision, if so authorized, or certify the entire record including his recommended findings and proposed decision to the reviewing authority for a final decision, and a copy of such initial decision or certification shall be mailed to the applicant or recipient and to the complainant, if any." 34 C.F.R. § 100.10(a); *see* 45 C.F.R. § 80.10(a); 28 C.F.R. § 42.110(a); 41 C.F.R. § 101–6.213–1.

134. Moreover, "[e]ach decision of a hearing examiner or reviewing authority shall set forth a ruling on each finding, conclusion, or exception presented, and shall identify the requirement or requirements imposed by or pursuant to this part with which it is found that the applicant or recipient has failed to comply." 34 C.F.R. § 100.10(d); *see* 45 C.F.R. § 80.10(d); 28 C.F.R. § 42.110(d); 41 C.F.R. § 101–6.213–4. And "[w]henever a record is certified to the reviewing authority for decision or it reviews the decision of a hearing examiner . . . the applicant or recipient shall be given reasonable opportunity to file with it briefs or other written statements of its contentions, and a copy of the final decision of the reviewing authority shall be given in

writing to the applicant or recipient and to the complainant, if any." 34 C.F.R. § 100.10(b); *see* 45 C.F.R. § 80.10(b); 28 C.F.R. § 42.110(b); 41 C.F.R. § 101–6.213–2.

135.    On information and belief, Defendants failed to issue a decision consistent with the foregoing regulations. Among other things, Defendants did not provide the University with a reasonable opportunity to file briefs or other written statements of its contentions.

136.    The defendant agencies' Title VI regulations provide that "[a]ny action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 34 C.F.R. § 100.8(c); *see* 45 C.F.R. § 80.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101–6.211–3.

137.    Defendants did not limit the March 7 funding withdrawal to any particular program, or part thereof, in which noncompliance has been found. Nor was such withdrawal limited in its effect to any particular program, or part thereof, in which noncompliance has been found. Rather, the withdrawal—and the effect of such withdrawal—is widespread and reaches departments and individuals, including Plaintiffs' members, as to whom there has been no finding of noncompliance. Likewise, Defendants did not limit to "any particular program or part thereof in which noncompliance has been found" their refusal to grant or continue federal financial assistance to Columbia unless, as a precondition to future negotiations, Columbia acceded to the demands set forth in the March 13 Letter.

138.    Defendants' failure to comply with Section 602 and the Defendant agencies' respective regulations is not authorized by any law.

**B.        Defendants' Failure to Follow Agency Practices and Procedures**

139.        Within Defendant the Department of Education, the Office for Civil Rights ("OCR") is responsible for ensuring compliance with Title VI.

140.        As of January 14, 2025, OCR had at least 3,281 open Title VI investigations into educational institutions, 649 of which are focused on post-secondary institutions.[76] Eighty of those specifically focus on discrimination on the basis of national origin involving religion.[77]

141.        Claims of religious discrimination, including antisemitism, fall within Title VI where they overlap with race or national origin discrimination and are investigated as discrimination "on the basis of national origin involving religion."[78]

142.        Despite the number of open Title VI investigations, there is no record of any cancelation or revocation of funding to educational institutions due to Title VI noncompliance.

143.        A 2019 Congressional Research Service analysis could not find any termination orders issued under Title VI by OCR in the prior 25 years.[79]

144.        The Title VI scheme contemplates that voluntary compliance and negotiated resolutions are the enforcement norm. Section 602 requires that no action to terminate or revoke funding may be taken "until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and *has determined that compliance cannot be secured by voluntary means*." 42 U.S.C. § 2000d-1 (emphasis added).

---

[76] Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools, Office for Civil Rights (last updated Jan. 14, 2025), https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_discrimination=All&items_per_page=20&field_ois_institution=&field_ois_institution_type=752&field_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3=, https://perma.cc/V66H-8WJW.

[77] *Id.*

[78] Abigail A. Graber, *Religious Discrimination at School: Application of Title VI of the Civil Rights Act of 1964*, Congressional Research Service, Sept. 17, 2024, https://www.congress.gov/crs-product/LSB11129.

[79] Jared Cole, *Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964*, Congressional Research Service at 19 n. 154, April 4, 2019, https://www.congress.gov/crs-product/R45665.

145.     Codified Department of Justice guidelines reiterate the importance of voluntary compliance. "Title VI requires that a concerted effort be made to persuade any noncomplying applicant or recipient voluntarily to comply with title VI. Efforts to secure voluntary compliance should be undertaken at the outset in every noncompliance situation and should be pursued through each stage of enforcement action. Similarly, where an applicant fails to file an adequate assurance or apparently breaches its terms, notice should be promptly given of the nature of the noncompliance problem and of the possible consequences thereof, and an immediate effort made to secure voluntary compliance." 28 C.F.R. § 50.3.

146.     The OCR has developed a Case Processing Manual ("CPM") laying out the proper procedures for handling discrimination cases, including Title VI cases, which further describe the relevant procedures.[80]

147.     The CPM states that "[w]hen OCR opens a complaint for investigation, it will issue letters of notification to the complainant and the recipient" containing details about the allegations and information about mediation options.

148.     Regardless of the conclusions of the investigation, the CPM requires OCR to "issue a letter of finding(s) explaining the reason(s) for its decision to both the recipient and the complainant."

149.      If, after the investigatory process, OCR determines that an educational institution is not in compliance with Title VI based upon the preponderance of the evidence, the OCR CPM states that OCR will "negotiate a resolution agreement and issue a letter of finding(s)." The resolution agreement in that case functions like proposed settlement terms, laying out "action steps

---

[80] Case Processing Manual, U.S. Department of Education Office for Civil Rights, February 19, 2025, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf, https://perma.cc/3KZL-DJQG.

that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur."

150.    OCR and the non-compliant education institution then have 90 calendar days to negotiate a final agreement.

151.    If the negotiations have reached an impasse and/or the 90 day window has elapsed, OCR will then issue an "Impasse Letter" that includes a description of the unsuccessful attempts to resolve the complaint and "informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period. The case processing manual includes specific details and language about what must be included in the letter of impending enforcement action.

152.    Resolution agreements are quite common. According to OCR's public database, OCR resolved eight Title VI investigations specifically related to national origin discrimination claims involving religion in January 2025 and twenty-six in 2024.[81]

153.    Defendants' actions targeting Columbia deviate drastically from OCR's usual practice and do not comply with the statutory or regulatory requirements for termination of federal funding.

154.    According to the OCR website, there are seven open investigations into Columbia University on the basis of race and national origin discrimination. Three of those claims are for denial of benefits, three are for national origin discrimination involving religion, and one is for

---

[81] Office for Civil Rights Recent Resolution Search (last visited Mar. 24, 2025), https://ocrcas.ed.gov/ocr-search?race_and_national_discrimination%5B%5D=549&title_vi=526&sort_order=DESC&sort_by=field_resolved, https://perma.cc/JB9C-YB9M.

retaliation. Two of the investigations were opened in late 2023 and the remainder were opened in 2024.[82] This data was last updated on January 14, 2025.

155.    On February 3, 2025, OCR opened a new investigation under Title VI into five universities, including Columbia, for "widespread antisemitic harassment" on campus.[83] It is unclear based on the public record how that investigation relates to the multiple Title VI investigations already underway; however, unlike the prior investigations, OCR did not publicly release any notice to Columbia detailing the complaints and investigatory next steps. Had regular procedures been followed, that notice would also have informed Columbia of its right to pursue mediation to resolve the investigation.

156.    If, following an investigation, OCR had determined that Columbia was failing to meet its obligations under Title VI, the CPM states that the proper next step would be to send a letter detailing the investigatory findings along with a proposed resolution agreement. Columbia should then have had at least 90 days to negotiate a final agreement with OCR, again including the option for mediation and a potential extension of time if necessary.

157.    It is Plaintiffs' understanding and belief that no finding of a violation, proposed resolution agreement, or negotiations occurred in accordance with this process prior to the March 7 Funding Withdrawal. There were 32 days between the February 3, 2025 opening of this investigation and the March 7 Funding Withdrawal.

---

[82] Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools, Office for Civil Rights (last updated Jan. 14, 2025), https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_discrimination=All&items_per_page=20&field_ois_institution=Columbia+University&field_ois_institution_type=All&field_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3=/, https://perma.cc/TLZ4-8LCH.

[83] U.S. Department of Education Probes Cases of Antisemitism at Five Universities, U.S. Dep't of Education (Feb. 3, 2024), https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities, https://perma.cc/UCQ6-2Z9B.

158.    Furthermore, if such negotiations had been attempted and proven unsuccessful, OCR should have issued an "Impasse Letter," detailing the specific unsuccessful attempts to attain voluntary compliance and informing Columbia that it would pursue enforcement action after 10 calendar days if a resolution was not reached. If, following negotiation and an impasse letter, voluntary compliance proved unattainable, only then could OCR even begin enforcement proceedings. Department of Education regulations and the CPM require OCR to provide institutions with specific notice of the proposed enforcement action and the opportunity for a hearing on the record with counsel. 34 C.F.R. § 100.9.

159.    On information and belief, no such communication occurred.

160.    After a determination of noncompliance on the record, OCR is then required to submit a report to the relevant House and Senate committees detailing the circumstances giving rise to the enforcement action and grounds for the revocation of funds. 34 C.F.R. § 100.8(c). OCR must then wait 30 calendar days after the submission of the Congressional reports before any enforcement action begins.

161.    On information and belief, no such reports have been submitted.

**C.    Defendants' Failure to Provide a Reasoned Decision for Terminating $400 Million in Funding and Refusing to Grant or Continue All Federal Funding**

162.    Beginning in October 2023, Columbia has issued a number of statements, studies, reports, and policy changes in response to complaints of antisemitism and discrimination on campus.

163.    On information and belief, Defendants have not made a reasoned determination whether Columbia's responses to complaints of antisemitism and discrimination on campus were or were not sufficient under Title VI, and did not make any such determination prior to terminating $400 million in funding on March 7 or refusing all future federal financial assistance absent

Columbia's accession to the March 13 demands. Rather, upon information and belief, Defendants' investigations into those complaints were still ongoing at the time of Defendant's March 7 funding termination and March 13 Letter.

164.    On information and belief, prior to terminating $400 million in funding on March 7 or refusing all future federal financial assistance absent Columbia's accession to the March 13 demands, Defendants did not address whether the following responses publicly reported by Columbia were or were not sufficient to comply with Title VI:

165.    On October 18, 2023, in response to the early weeks of the campus upheaval caused by the October 7 attacks and subsequent protests, then-president of Columbia Minouche Shafik issued a statement on "Upholding Our Shared Values" addressing student concerns about personal safety and noting that Columbia had increased public safety officers across campus, hired outside security firms for support, and was in regular contact with the New York City Police Department.[84] The letter also stated that "antisemitism, Islamophobia, bigotry against Palestinians and Israelis, and various other forms of hate" are "antithetical to Columbia's values" and that "[w]hen this type of speech is unlawful or violates University rules, it will not be tolerated."[85]

166.    On October 27, 2023, then-president Shafik issued another letter expressing "shock" at "several antisemitic incidents" in the preceding days.[86] Shafik wrote that, "[t]he perpetrators of these incidents are not only attacking members of our community, they are attacking the values it is built on—respect for our shared humanity. I want to reiterate that antisemitism, like any form of bigotry, is an assault on everything we stand for at Columbia."[87]

---

[84] Minouche Shafik, *Upholding Our Values*, Columbia University Office of the President (Oct. 18, 2023), https://president.columbia.edu/news/upholding-our-values.
[85] *Id.*
[86] Minouche Shafik, *Standing in Solidarity*, Columbia University Office of the President (Oct. 27, 2023), https://president.columbia.edu/news/standing-solidarity.
[87] *Id.*

167.    On November 1, 2023, then-president Shafik announced a new Task Force on Antisemitism to "address the harmful impact of rising antisemitism on Columbia's Jewish community and to ensure that protection, respect, and belonging extends to everyone."[88] In her letter announcing the task force Shafik wrote that "We want to reiterate that we will not tolerate such [antisemitic] actions and are moving forcefully against antisemitic threats, images, and other violations as they are reported, and we will continue to provide additional resources to protect our campuses."[89]

168.    The task force was tasked with identifying "practical ways for our safety and inclusion work to enhance support for all members of the Columbia, Barnard, and Teachers College communities, particularly our Jewish students" as well as recommendations for "more ambitious changes related to academic and extracurricular offerings and student, faculty, and staff training programs."[90]

169.    More concretely, the task force was assigned three specific projects.

170.    First, it was tasked with engaging in a "serious and honest assessment of the sources and extent of the discomfort that many Jewish members of the Columbia community feel."[91] It was to carry out this objective via listening sessions with students, faculty, and staff and then share its learnings "so everyone in the Columbia community can gain a deeper understanding of the relevant challenges and the dynamics contributing to them."[92]

---

[88] Task Force on Antisemitism, Columbia University, https://www.columbia.edu/content/task-force-antisemitism.
[89] Minouche Shafik, Laura Ann Rosenbury, Thomas R. Bailey, *Announcing Task Force on Antisemitism*, Columbia University Office of the President (Nov. 1, 2023), https://president.columbia.edu/news/announcing-task-force-antisemitism.
[90] Task Force on Antisemitism, Columbia University, https://www.columbia.edu/content/task-force-antisemitism.
[91] About the Task Force on Antisemitism, Columbia University, https://www.columbia.edu/content/about-task-force-antisemitism.
[92] *Id.*

171.     Second, the task force was directed to "review University policies, rules, and practices that impact the campus climate to make sure they protect the University's core commitment to free speech, as well as to a safe and inclusive environment for all Columbians, including Columbia's Jewish community."[93]

172.     Third, the task force was directed to "propose various other ways to sensitize the entire community to antisemitism, to counter it more effectively, and to support Jews at Columbia."[94]

173.     The task force has issued two reports.

174.     The first report, released in March 2024, focused on Columbia's rules regarding campus demonstrations and made numerous recommendations as to how Columbia's time, place and manner rules for peaceful protest could be improved.[95]

175.     Shafik noted that she was "pleased that the task force strongly endorses the new Interim University Policy for Safe Demonstrations that was announced last month, and appreciate the task force's many other suggestions about reporting, enforcement, anti-discrimination, and other issues."[96]

176.     The Task Force on Antisemitism released a second report in August 2024 and focused on Columbia students' shared experiences with antisemitism on campus and "recommendations for promoting shared values and inclusion."[97]

---

[93] *Id.*
[94] *Id.*
[95] Report # 1: Task Force on Antisemitism,  Columbia University (March 2024), https://www.columbia.edu/content/report-1-task-force-antisemitism.
[96] *President Shafik Welcomes the First Set of Recommendations From the Task Force on Antisemitism*, Columbia University Office of the President (March 4, 2024), https://president.columbia.edu/news/president-shafik-welcomes-first-set-recommendations-task-force-antisemitism.
[97] Report # 2:  Task Force on Antisemitism,  Columbia University (August 2024), https://www.columbia.edu/content/report-2-task-force-antisemitism.

177.    The Office of the President recently released a statement entitled "Combatting Antisemitism," which includes "a comprehensive overview of the ongoing efforts taking place at Columbia to combat antisemitism and nurture a campus environment that is welcoming to all students and free from harassment and discrimination."[98]    According to the statement on Combatting Antisemitism, Columbia has hired 117 additional public safety officers and increased staffing to ensure around-the-clock monitoring on campus including expanded coverage of the Kraft Center for Jewish Life.[99] Columbia also increased training for public safety officers including regarding enforcement of the University's Rules and strengthened rapid response capabilities.[100]

178.    The statement on Combatting Antisemitism also reports that Columbia reviewed and updated the school discipline procedures to "ensure that the processes are enforced on a timely basis."[101] Columbia also updated the University's antidiscrimination and discriminatory harassment policy for students and groups including to note that "antizionism can be antisemitism."[102]

179.    According to the statement on Combating Antisemitism, Columbia established a new Office of Institutional Equity to serve as a central point for discrimination complaints—including alleged violations of Title VI—and simplified the reporting process with a new "one-click" method for filing a complaint.[103] Columbia also more than doubled the number of full time

---

[98] Combatting Antisemitism, Columbia University Office of the President, https://president.columbia.edu/content/combatting-antisemitism.
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*

employees handling equity issues and now has a team of more than 57 full time employees including multiple professional investigators.[104]

180.    Columbia reported that it had "added staff members to the Center for Student Success and Intervention and that office has returned to its original purpose of assessing potential violations of academic standards or student conduct policies and imposing Dean's Discipline."[105]

181.    Columbia also announced that it launched the Campus Climate Collaborative which "facilitates small discussions between students and their respective schools and creates opportunities for student groups to meet with President Armstrong and senior leaders."[106]

182.    Finally, the statement on Combatting Antisemitism reported that over 30,000 faculty, staff, and contractors have completed mandatory Title VI training, and over 5,000 students had completed mandatory Title VI training, with a deadline for all students to complete the training by March 24, 2025.[107]

183.    On March 13, 2025, Columbia announced that it had expelled or suspended multiple students involved in the protests and temporarily revoked the diplomas of students who have since graduated.[108]

184.    The Anti-Defamation League, which works to combat antisemitism, produces an annual Campus Antisemitism Report Card for many American universities. In 2025, ADL assessed that there is a "high" level of concern regarding the campus climate at Columbia; however, it gave Columbia an "above expectations" grade for its publicly disclosed administration actions to combat antisemitism and assessed that Jewish life on campus is "excellent."[109]

---

[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] University Statement Regarding UJB Determinations, Columbia University Office of Public Affairs, March 13, 2025, https://communications.news.columbia.edu/news/university-statement-regarding-ujb-determinations.

VI.    **Impact of Defendants' Actions on Plaintiffs**

    A.  **Impacts of Funding Withdrawal**

185.    AAUP and AFT members have lost funding as a result of the government's actions. This complaint provides a few examples.

186.    One member of AAUP and AFT is a faculty member in the Mailman School of Public Health.

187.    Their research focuses on mental health disorders, like schizophrenia.

188.    Several of their grants have been terminated. They are the lead or co-lead on two of the terminated grants. There is at least one more terminated grant on which they were a researcher but was not the lead or co-lead.

189.    NIH sent Columbia a notification that the grant on which they are listed as the principal investigator (PI) at Columbia was terminated, which Columbia forwarded to them. The notice stated, "This project has been terminated due to unsafe antisemitic actions that suggest the institution lacks concern for the safety and well-being of Jewish students."

190.    This terminated grant for which they are the lead had funded a large project to study the genomics of schizophrenia, in partnership with the University of Washington and the University of Cape Town. The study focused on a population in South Africa, because there is more genetic variety in Africa than on any other continent, and thus the results of this genomic study may have critical implications for an understanding of schizophrenia around the world, including in the US.

191.    This project has been funded by the NIH for more than 10 years, and the team would have finished the genomic sequencing required for the analysis of the data in about a year. The project has now stopped.

192.     The cessation of this research represents an enormous loss for this AAUP/AFT member's research and for the understanding of schizophrenia. No other research group is poised to step into this critical research. Whether or not it will ever be completed is now uncertain in light of Defendant's termination of funding.

193.     The termination in grant funding and resulting halt of the work also breaks the relationship of trust between this AAUP member and their project's collaborators outside of Columbia University, and that harm would persist even if this project were to restart. It is also detrimental to this AAUP/AFT member's reputation and overall work.

194.     This AAUP/AFT member coordinated the project and their team played the central data management role. Funds are not available at other sites for others to assume this role.

195.     The grant supported a subcontract to a researcher at the University of Pennsylvania and their team. Because of this grant termination, their funding has also stopped.

196.     The grant also partially supported the salaries of this AAUP member and five other team members at Columbia University. Over time, the grant supported about 20-25% of this AAUP member's salary.

197.     Without funding, this AAUP/AFT member will likely need to lay off at least one but probably several people from this team. That will be a loss of expertise and knowledge for the project, even if this project could be re-continued in the future.

198.     This AAUP/AFT member was also the co-lead on a grant that funded a training program that has been in existence continuously since 1972 and that trained many of the leaders in psychiatric epidemiology in the country.

199.     Another AAUP/AFT member is a faculty member in the Mailman School of Public Health and also a co-lead of this training program.

200.    The leads of the program received notice from Columbia University that the federal funding for this training grant has stopped.

201.    The loss of such a training grant is a loss of the ability to train the next generation of psychiatric epidemiologists, an important part of this AAUP/AFT member's career.

202.    There were three post-docs in the program, and they now have no guarantee of funding from the federal government.

203.    The March 7 Funding Withdrawal also creates enormous uncertainty about the future. Since scientific research typically involves long-term multi-year commitments, the March 7 Funding Withdrawal irrevocably complicates the planning necessary to undertake this AAUP/AFT member's work.

204.    Another member of AAUP and AFT is a faculty member in the School of Social Work. Their research focuses on community and global health.

205.    This AAUP/AFT member is a researcher on a team that has had multiple grants terminated as a result of the $400 million cuts. They supervise work on this team and is the faculty mentor of the principal investigator.

206.    One of the grants was an approximately $3.5 million NIH grant categorized as a P20, a 3-year center grant. Another was an over $370,000 NIH grant categorized as an R21, a research grant.

207.    The grants support research on how extreme weather and climate change influence health, mental health, and well being among women in East Africa. The implications of this work are far-reaching and inform the understanding of health in low resourced US areas experiencing extreme weather as well.

208.    Because the approximately $3.5 million NIH grant was awarded recently, hiring had not yet begun for the US-based team of that part of the project.

209.    There were at least 20 staff hired in East Africa, who will need to be laid off due to the grant termination.

210.    It would be very detrimental to this AAUP/AFT member's research on this project to lose the expertise of these individuals.

211.    Stopping this work and laying off these individuals also breaks the trust of the community. Community trust is vital for rigorous, relevant, productive research.

212.    As a result of the loss in expertise and trust, even if it were possible to eventually get funding again, this AAUP/AFT member and the research team could not bring this center together with the same quality and comprehensiveness.

213.    For the over $370,000 NIH grant, the work has also stopped. For example, efforts to share the substantive results with stakeholders in the regions and for them to make use of findings have been unable to continue.

214.    Stopping this sharing of knowledge will also harm the trust and long-standing relationship with the local stakeholders critical to this research.

215.    It will be difficult for this AAUP/AFT member and the project team to establish future projects in that area as a result of this damaged trust and relationship.

216.    This AAUP/AFT member cannot do long-term planning for their work. They have no idea what to expect in terms of access to resources. The member does not know why these grants were selected for termination, as the grants have no conceivable connection to concerns over antisemitism. They do not know how best to move forward with future grants.

217.     Another member of AAUP and AFT is a faculty member in the School of Social Work. Their research focuses on HIV-prevention science.

218.     They are the mentor of a pre-doctoral graduate student who lost a T32 training program grant as part of the March 7 Funding Withdrawal. The student works on data analysis for this AAUP/AFT member's research.

219.     This AAUP/AFT member is concerned that in the future, they will not have any more pre-doctoral students to work with, given all the training grant cuts. Pre-doctoral students benefit this AAUP/AFT member's research because the students do work on their projects.

220.     Furthermore, training program grants are critical to the development of future scientists in HIV-prevention and in research generally—the cutting of training program funding risks decimating a generation of scientists. This has huge negative ramifications to the work that this AAUP member has dedicated their career.

221.     The March 7 Funding Withdrawal has harmed this AAUP/AFT member's ability to do any long-term planning. They have no way to know what funds might be terminated without warning in the future. This uncertainty has both affected the research and also taken a significant emotional toll on them and their team.

222.     Another member of AAUP and AFT is a member of the faculty at the Mailman School of Public Health. This AAUP/AFT member is Jewish.

223.     This AAUP/AFT member's research focuses on adolescent health, mental health and substance use.

224.     This AAUP/AFT member had an approximately $2.5 million NIH R01 grant terminated as part of the government's announced $400 million cuts. The R01 is the NIH's most commonly used grant program for independent research projects. It funded a five-year project, at

about $500,000 a year. Only two out of the five years had been completed before the termination.

225.    The project that was funded by the terminated grant focused on modifiable community and school factors that influence student mental health and substance use. The project involved a collaboration with a New York City agency and was poised to directly inform city policy.

226.    As a result of the grant termination, the work on the grant has stopped. All meetings with the New York City agency have stopped, and the team has stopped all new data analysis.

227.    The termination of this research may have long-term ramifications harming adolescent health policy and education policy, issues that have been very important to this AAUP/AFT member and their career.

228.    Even if this AAUP/AFT member is able to eventually secure other funding and this project could resume, the pause will create a significant delay in the completion of data analysis and publication of research findings, which may then harm this AAUP/AFT member's ability to obtain new grants and expand their research in a timely manner. This is because securing funding to expand a research program generally requires building on previous findings.

229.    This AAUP/AFT member is concerned that the halting of this funding will affect their relationship with current and future research partners. This AAUP/AFT member has learned of potential research partners being reluctant to provide letters of support or join projects after the funding cuts, because they did not want to be associated with Columbia.

230.    The grant supported about 30% of this AAUP/AFT member's salary.

231.    The loss of this R01 grant also puts this AAUP/AFT member's career in jeopardy. R01 grants are important grants, and universities like Columbia generally want faculty to have one or two of these grants to obtain tenure. Now that the AAUP/AFT member no longer has this grant, this AAUP/AFT member is at risk of not being able to obtain tenure.

232.    The grant also funded researchers from other universities, whose funding has now also been terminated. One researcher is at the University of Minnesota, and the other researcher is at the University of North Carolina School of Public Health. The researcher at the University of Minnesota is an AAUP/AFT member. This terminated grant made up a percentage of both of their salaries.

233.    This terminated grant also supported a researcher at Teachers College, which is affiliated with Columbia University but is an independent institution.

234.    In addition, the grant also supported the salaries of two other faculty members in the School of Public Health, one full time project coordinator, about half the salary of a data analyst, and about half the salary of a postdoctoral research fellow.

235.    For multiple of these individuals supported by this grant, their jobs and careers are at risk because of this grant termination.

236.    This AAUP/AFT member may be forced to lay off the project coordinator after a few months as a result of the cancelation of funding.

237.    Laying off this project coordinator would be very detrimental for this AAUP/AFT member's research. The project coordinator received significant training and credentialing by the New York City Department of Health and Mental Hygiene in order to work with the New York City agency that is the partner of this research project. This includes rare training that happens

once or twice per year and which is vital for the continuity of this research project. It will create significant delays to the research project to lose this expertise.

### B. Impacts of Threat to Academic Freedom and Free Speech

238.    Plaintiffs' members have experienced and are experiencing manifold harms to their First Amendment rights as a result of Defendants' actions.

239.    Defendants' March 7 Funding Withdrawal and March 13 Letter have chilled the speech of Plaintiffs' members and infringed upon their academic freedom in scholarship and outside of the classroom. Now, Plaintiffs' members are fearful that their scholarship, if not aligned with the views or priorities of the Trump administration, could lead to even further incursions on the academic freedom of their own departments. As a result, some are engaging and will engage in self-censorship on topics they perceive to be in tension with Defendants' preferred viewpoint.

240.    All members of the Columbia AAUP chapter are employed by Columbia, which was threatened with the March 7 Funding Withdrawal and the March 13 Letter, and as a result are impacted by additional policies promulgated on March 21 that restrict academic freedom on campus.

241.    All Plaintiffs' members at Columbia are employed by a university that will host less speech as a result of Defendants' actions.

242.    Some have engaged in self-censorship around the Israel-Palestine conflict, including opting not to participate in discussion in academic settings.

243.    An AAUP/AFT member who is a faculty member in the School of Social Work feels chilled in their speech as a result of the Defendants' actions. Due to the federal government's actions, they are uncertain what they can and cannot say in the classroom or in public. They must now consider what they say and are afraid of people recording them, and photographing them in

spaces that may be in proximity to a rally or protest. They have to be careful about what they write publicly and privately. They are concerned in the classroom, at the School of Social Work, and on the main campus. They are also concerned in private and social media spaces. This AAUP/AFT member is very careful and mostly does not post on social media at all anymore. They observe that many others at the University feel similarly.

244.    This AAUP/AFT member seeks to join with other professors and students to promote Palestinian freedom and an anti-war perspective. They believe this viewpoint is very different from antisemitism. Nevertheless, they have perceived how Defendants' actions have equated any support for Palestinian freedom and an anti-war perspective with antisemitism. They feel that Defendants' actions have prevented them from expressing what should be a valid and legal viewpoint in the United States.

245.    This AAUP/AFT member teaches a class on reproductive justice. Following the March 7 Funding Withdrawal, they assigned a self-reflection asking students to write about how they perceive reproductive justice issues based on their own experiences and identities. A student refused to complete the assignment because it needed to be uploaded to the course website, and the student was afraid that the government would be able to access the answer and target the student.

246.    This AAUP/AFT member had taught that class for a number of semesters. No student has ever before expressed that concern.

247.    This also impacts what this AAUP/AFT member teaches, as they are concerned about students and their confidentiality. Now they must consider what is safe to ask their students so what the student says in the classroom doesn't make the student a target if repeated outside of

the classroom. This applies to the questions they ask in class and the materials they post for the course.

248.    This AAUP/AFT member finds themself second-guessing how their words may be taken out of context, particularly where funding and reputational harm can follow from even principled, professional speech.

249.    This AAUP/AFT member feels that their academic freedom is chilled. They now hesitate before speaking on issues of race, equity, or global human rights, even when such topics are directly relevant to the curriculum they are responsible for delivering.

250.    Another member of AAUP and AFT, a faculty member in the School of Social Work, is concerned that they will not be allowed to write grants in the future that use words that the government bans. For example, many words that this AAUP/AFT member understands the government to have deemed as related to "DEI" are core to their HIV research. Furthermore, speaking authentically, including in grant proposals, is an important part of being an HIV-prevention researcher and HIV-prevention activist; being open and honest themself is necessary to destigmatizing HIV and asking people to engage in health-maintaining behavior.

251.    This AAUP/AFT member now no longer talks freely in their work building. They and their colleagues look around to see who's around before speaking and speak in lower voices. They are afraid of people they do not know. For example, if someone hears them complaining about the way things are being handled, this AAUP/AFT member is afraid that the unknown person will report them.

252.    This AAUP/AFT member has also made a change to a reproductive health rights information session event that they were organizing. It was originally going to be in person, but then they made the decision to move it online for participant safety. Now they have decided that

they are just going to do the info-sharing as the only speaker, and everyone's cameras will be off and names hidden. They have taken the Columbia logo off the event, and they will not use the Columbia videoconferencing Zoom account. The March 7 Funding Withdrawal has contributed to these decisions.

253.    After the March 7 Funding Withdrawal, this AAUP/AFT member is concerned that if they speak out, they will lose funding or others close to them will lose funding, and then their patients will be harmed.

254.    Another member of AAUP and AFT is a faculty member in the Graduate School of Architecture, Planning and Preservation.

255.    This AAUP/AFT member has noticed that students and faculty are far more self-conscious in the classroom. The AAUP member believes that in the classroom, it is important for robust discussions to have a degree of spontaneity. That has noticeably lessened now. This AAUP/AFT member also tends to pause more in the classroom themselves now, and reflect on how their words may be misrepresented or taken out of context—almost like talking to a reporter.

256.    This AAUP/AFT member, who also has substantial experience working in the humanities across campus, believes that in the humanities, it is crucial that people are able to dispute openly the meaning of certain facts. They believe that it is important to be able to look at a fact or an artwork or a text and debate its meaning openly—a debate that is now severely constrained.

257.    This AAUP/AFT member tries not to let their concerns affect their speech and their teaching, but they do find themself hesitating sometimes. For example, when they teach about Israeli architecture and urban planning, they find it much more difficult to fully explain how that planning has been interpreted differently by different groups.

258.    This AAUP/AFT member is concerned that feeling constrained in the classroom will harm teaching in the humanities well beyond the areas mentioned above. They believe in the mantra "teach don't preach," and in the science of scholarly interpretation. They therefore believe that professors should be able to share challenging interpretations of controversial artworks, objects, processes, and facts, independent of outside influence.

259.    This AAUP/AFT member also feels chilled in their speech while advising students, because they are concerned about any harms that might befall a student if they encourage a student's ideas when those ideas may engage disfavored interpretations.

260.    This AAUP/AFT member believes that the March 7 funding withdrawal has contributed to the chilling of speech. They felt that the classroom environment, for example, has become noticeably more chilled than before. This is a harm to students, who are challenged less frequently to think openly about difficult subjects.

261.    There is also the case of students who propose to reflect on what is happening at Columbia University for their class assignments. This AAUP/AFT member wants to encourage them to work freely with their ideas, but they also are concerned that doing so would encourage them to be taking on a risk to themselves.

262.    Another AAUP/AFT member who is a faculty member in the Mailman School of Public Health feels chilled in their speech. They feel that they need to be more careful in what they say in teaching and around the university.

263.    Defendants' actions are likely to deter similarly situated faculty of ordinary firmness from exercising their First Amendment rights.

C.    **Harms to AAUP and AFT**

264.    AAUP and AFT have themselves suffered harms as a result of the March 7 Funding Withdrawal and the March 13 Letter.

265.    As part of their core organizational activities, Plaintiffs regularly consult, work with, and represent local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between university employees and their employers, including but not limited to collective bargaining. Through their local chapters, Plaintiffs also provide for the representation of individual members regarding academic freedom, shared governance, and due process issues in proceedings before their university employers. Plaintiffs perform these activities on behalf of members at Columbia, including the MESAAS Department. Investigations of individual complaints of institutions violating academic freedom principles in relationship to AAUP members are authorized by the Executive Director and conducted by a subcommittee appointed by the Executive Director.

266.    The AAUP also specifically maintains a standing committee, known as Committee A on Academic Freedom and Tenure, which "[p]romotes principles of academic freedom, tenure, and due process in higher education through the development of policy documents and reports relating to these subjects and the application of those principles to particular situations that are brought to its attention."

267.    As another example, in 2024, the AFT launched a multi-year, million-dollar campaign to support its higher-education chapters in promoting increased public investment in higher education, safeguarding free speech and academic freedom on campuses, and establishing meaningful job security for higher-education workers while ending contingent employment for academic workers. As part of this campaign, the AFT has hosted a series of organizing webinars,

providing its higher education members with the skills they can use to shape and strengthen their own campaigns to support academic freedom, make higher education more accessible, and ensure contingent faculty have appropriate job security and a livable wage.

268.    The AFT also administers the AFT Defense Fund, which provides funding to members for legal proceedings involving, among other subjects, violations of academic freedom, enforcement of tenure rights, and other threats to job security.

269.    Defendants' actions have directly impaired these and other activities of Plaintiffs.

270.    Defendants' actions have undermined and eroded the longstanding principles of academic freedom, shared governance, and due process that Plaintiffs previously helped secure at Columbia and other institutions where their members are employed. As a direct result of Defendants' actions, Columbia and other universities no longer adhere to these principles.

271.    Defendants' actions have made it more difficult and resource-intensive for Plaintiffs to carry out their representation of individual members. Because Defendants have pressured Columbia and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, Plaintiffs must now expend more time and money to ensure that their members' rights in these regards are adequately protected. In particular, AFT anticipates that it will have to make significantly more expenditures from the AFT Defense Fund to provide for the legal representation of individual members as a direct result of Defendants' actions and Columbia's capitulation to Defendants' demands.

272.    Defendants' actions have also made it more difficult and resource-intensive for Plaintiffs to provide accurate and effective guidance to their chapters and members regarding these principles. Plaintiffs have had to divert staff and financial resources to address the significant influx of inquiries from chapter leaders and members regarding the effect of such actions on

members' academic freedom, shared governance, and due process rights, and to ensure that individual members are adequately represented before their university employers. In addition to responding to such individual requests, staff for Plaintiffs have had to conduct nationwide calls and virtual meetings with chapter leaders regarding Defendants' actions and how to represent individual members in the face of such actions. The AAUP has also redirected staff to be present physically on Columbia's campus to respond to Defendants' actions and Columbia's recent capitulation to Defendants' demands. The AAUP's Committee A in particular has spent countless hours speaking with members of Plaintiffs at Columbia and responding to Defendants' demand that Columbia place stricter controls on the MESAAS Department.

273.    Defendants' actions have also caused a pervasive sense of fear and intimidation among Defendants' members. Because of Defendants' actions and the threats of further cuts to research funding, some AAUP/AFT members no longer feel comfortable participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights.

## VII.    Threats Beyond Columbia

274.    Defendants have made clear that, while Columbia is the first school to have its funding terminated for purported Title VI violations, it will not be the last.

275.    On February 3, 2025 when Defendants announced their Title VI investigation into Columbia, they also announced they were investigating four other universities.[110]

276.    On February 28, 2025 the DOJ Task Force to Combat Anti-Semitism announced it would visit ten university campuses including Columbia to investigate unlawful discrimination

---

[110] U.S. Department of Education, U.S. Department of Education Probes Cases of Antisemitism at Five Universities, Press Releases (Feb.3, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities, https://perma.cc/3PBU-YYMS.

against Jewish students and "consider[] whether remedial action is warranted." The list of campuses included Columbia and nine others, six of which had not been named in the February 3 announcement.[111]

277.    In Defendants' March 7 press release announcing the immediate cancelation of $400 million in federal grants and contracts to Columbia University, Defendants stated in no uncertain terms that the measure was intended to send a message "to Columbia and other universities."[112]    The March 7 press release stated, "The decisive action by the DOJ, HHS, ED, and GSA to cancel Columbia's grants and contracts serves as a notice to every school and university that receives federal dollars that this Administration will use all the tools at its disposal to protect Jewish students and end anti-Semitism on college campuses."[113]

278.    On or about March 9, Defendant Terrell appeared on Fox News and stated, "We're going to bankrupt these universities. We're going to take away every single federal dollar. . . . If these universities do not play ball, lawyer up, because the federal government is coming after you."[114]

279.    On March 10, as the Columbia funding withdrawal was in progress, Defendants sent letters to Columbia and 59 other universities "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish

---

[111] U.S. Department of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism, Press Releases (Feb.28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced, https://perma.cc/LPX4-URGP.
[112] U.S. Department of Health and Human Services, *DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts to Columbia University Worth $400 Million,* (Mar. 7, 2025), https://www.hhs.gov/about/news/2025/03/07/doj-hhs-ed-gsa-announce-initial-cancellation-grants-contracts-columbia-university-worth-400-million.html.
[113] *Id.*
[114] Mark McMillan, Leo Terrell with Mark Levin- How we'll defeat antisemitism in the USA, (March 9, 2025), https://www.youtube.com/watch?v=NOFIKRr2Sco (Mar. 9, 2025), https://perma.cc/9586-B2EP.

students on campus."[115] The targeted universities include a mix of private and public universities in a total of 24 states and Washington DC.

280.    Defendants also issued a press release to ensure publicity concerning these letters. The press release explicitly stated that Defendants had "announced the immediate cancellation of $400 million in federal grants and contracts to Columbia University due to the school's continued inaction to protect Jewish students from discrimination."[116]

281.    The clear import of the press release was to threaten that all 59 other universities who received it should assume that they, too, might be subject to "immediate cancellation" of federal grants and contracts, outside of the required Title VI procedures.

282.    On March 19, Defendant Terrell appeared on a podcast in which he stated, "what we did was we basically gave them noticed [sic], and we stopped providing the funding. And I've got news for you. To Harvard, to NYU, to Michigan, same thing's happening to them. It's going to happen, because we're going to look at the numbers of federal dollars, and Hugh, it totals in the hundreds of millions of dollars. And we're going after them."[117]

283.    The interviewer later asked, "Who's the next target? I want it to be Harvard, and I want it to be Michigan, and I want it to be UCLA, but I don't get to pick the targets . . . . Who's the next target?" Defendant Terrell answered, "It's one of those three schools. I can't disclose it right now, because I'll get in trouble. But one of those three schools. I just gave you some breaking news."[118]

---

[115] *U.S. Department of Education, U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, Press Releases (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment, https://perma.cc/KK4X-39Q9.
[116] *Id.*
[117] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus, https://perma.cc/6YHF-VZKG.
[118] *Id.*

284.    On March 24, 2025, Defendants HHS, ED, and GSA issued a press release applauding Columbia's submission to the federal government's demands and confirming Defendants' intent to replicate their proven strategy of coercion with other universities. The press release stated, "The decisive steps the Task Force has taken with Columbia have yielded positive results that should serve as a roadmap for universities with similar problems across the country."[119]

285.    In that press release, Defendant Gruenbaum warned "[o]ther universities that are being investigated by the Task Force" that they "should expect the same level of scrutiny and swiftness of action if they don't act to protect their students and stop anti-Semitic behavior on campus."[120]

## CAUSES OF ACTION

### COUNT I

### First Amendment Freedom of Speech

286.    Plaintiffs incorporate paragraphs 1 to 285 above as if fully set forth herein.

287.    The First Amendment secures Plaintiffs' and Plaintiffs' members' right to free speech and academic freedom, including the right to pursue research and express different viewpoints and political beliefs.

288.    "[A]cademic freedom . . . is of transcendent value to all of us and . . . is therefore a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603. "[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the

---

[119] *Id.*

[120] U.S. Department of Health and Human Services, *HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions*, (Mar. 24, 2025), https://www.hhs.gov/about/news/columbia-comply-anti-semitism-task-force-preconditions-met.html.

classroom." *Dube v. State Univ. of New York*, 900 F.2d 587, 598 (2d Cir. 1990) (quoting *Keyishian*, 385 U.S. at 603).

289.    The First Amendment prohibits the government from using threats of legal sanction and other means of coercion to achieve the suppression of disfavored speech or academic freedom. Nor may the government coerce a private party to punish, suppress, or control speech on the government's behalf. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). The First Amendment likewise precludes the government from attempting to control academic thought and discourse on university campuses, and from interfering with a university's curriculum or decisions concerning who may teach or areas of research.

290.    Defendants' actions have the purpose and effect of establishing a system of both direct and indirect censorship and content-based viewpoint discrimination against faculty and students at Columbia University. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against Plaintiffs' members' core speech and academic freedom rights.

291.    Defendants have imposed financial sanctions, threats of additional financial sanctions, and conditions on future funding with the purpose and effect of infringing on free speech and academic freedom rights. Each of these actions standing alone constitutes an independent First Amendment violation.

292.    Defendants have terminated hundreds of millions of dollars in funding, including for Plaintiffs' members' research, without any hearing or process in violation of Title VI and without any other statutory or other legal authority. The First Amendment protects an academic's ability to pursue research and scholarship free from arbitrary interference by the government. Independent of any other action, the unjustified halting of Plaintiffs' members' research and

scholarship on an unlawful basis violates the First Amendment. President Trump and Trump administration officials have threatened government retaliation for universities and students that engage in disfavored speech.

293.    Defendants' March 13 letter used the threat of further financial sanctions against the University to infringe on the core freedoms of Plaintiffs' members as well as other faculty and students. Defendants' unlawful threats include but are not limited to: mandating "expulsion or multi-year suspension" as punishment in student disciplinary proceedings to chill the viewpoint expressed by protesters, dictating policies for anonymous speech on campus, ordering that the University's Middle East, South Asian, and African Studies department be placed on a system of academic receivership for a minimum of five years, and requiring a plan to reform Columbia's admission processes, among other unlawful demands.

294.    Defendants' unlawful threats and actions infringe on the constitutional right of an academic institution "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).

295.    The First Amendment also protects the right to make expressive choices about what third-party speech to host, even if the host does not agree or disagree with the particular views it opts to allow or exclude. *See, e.g., Moody v. NetChoice LLC*, 603 U.S. 707, 740 (2024) (social media platforms make "expressive choices" that receive "First Amendment protection" in "decid[ing] which third-party content [their] feeds will display" regardless of whether the platforms agree or disagree with the views at issue). Defendants' actions infringe on Plaintiffs' and Plaintiffs' members rights to host and provide a forum for speech, debate, and opinion with which they do not necessarily agree or disagree.

296.    Defendants' concerted efforts to suppress disfavored expression on the University's campus has already resulted in a sweeping chilling effect on the speech of Plaintiffs' members as well as other faculty and students.

297.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

### COUNT II

### Unconstitutional Conditions

298.    Plaintiffs incorporate paragraphs 1 to 297 above as if fully set forth herein.

299.    Pursuant to the "unconstitutional conditions" doctrine, "the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011).

300.    In addition, "[i]n some cases, a funding condition can result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

301.    Defendants have infringed and impermissibly burdened the constitutional rights of Columbia and its faculty and students, including Plaintiffs' members, by imposing unconstitutional conditions on the receipt of federal funds.

302.    Defendants' conditions do not just "define the limits of the government spending program" by "specify[ing] the activities [the government] wants to subsidize"; rather, they seek to "leverage funding" to regulate unrelated aspects of campus life, including activities protected by the First Amendment, "outside the contours" of any discrete federal program. *See id.* at 214–15.

67

303.    Plaintiffs and Plaintiffs' members have been, and are being, harmed by Defendants' actual and threatened imposition of unconstitutional conditions on the receipt of federal funding.

### COUNT III

**APA – Procedural Violations with respect to March 7, 2025 Funding Withdrawal**

304.    Plaintiffs incorporate paragraphs 1 to 303 above as if fully set forth herein.

305.    Plaintiffs and their members are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' March 7, 2025 withdrawal of funds for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2.

306.    Defendants' March 7 funding withdrawal constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704. The cancelation of grants and contracts is the ultimate step in the Title VI enforcement process and alters the rights and obligations of the parties with respect to the terms of those grants and contracts, with legal and concrete consequences for Columbia, Plaintiffs, and Plaintiffs' members.

307.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

308.    The APA further directs courts to hold unlawful and set aside agency actions that are without observance of procedure required by law. *Id.* § 706(2)(D).

309.    No lawful grant or contract condition authorized the March 7 funding withdrawal. Nothing in Title VI, Title VII, or any other law authorized the funding withdrawal.

310.    Section 602 and applicable, binding regulations with the force of law set forth procedural requirements that must be followed in order to terminate federal funding for alleged

noncompliance with Title VI's substantive requirements. *See, e.g.*, 42 U.S.C. § 2000d-1; 34 C.F.R. §§ 100.6 (ED); 45 C.F.R. §§ 80.6–80.11 (HHS); 28 C.F.R. §§ 42.106–111 (DOJ); 41 C.F.R. §§ 101–6.211–3, 101–6.212–1 to –4, 101–6.213–1 to –7, 101–6.214 (GSA).

311.    Because Defendants failed to follow these requirements before terminating funding to the University on March 7, Defendants' actions were contrary to law, arbitrary and capricious, and without observance of procedure required by law.

312.    Prior to the March 7 funding withdrawal, Defendants did not provide an opportunity for a hearing or make an express finding on the record as to the University's alleged noncompliance with Title VI. Nor did any "responsible Department official" determine that the University's compliance could not be secured by voluntary means. Moreover, no head of any Federal department or agency filed with any committees of the House and Senate a "full report of the circumstances and the grounds" for the action terminating or refusing to grant or continue federal assistance to the University because of a failure to comply with Title VI. Nor did thirty days elapse after the filing of any such report. *See, e.g.*, 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.8(c); 45 C.F.R. § 80.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101-6.211-3.

313.    Prior to the March 7 funding withdrawal, no "responsible Department official or his designee" sought to resolve the University's alleged violations of Title VI through informal means, even though such informal resolution may have been possible. *See, e.g.*, 34 C.F.R. § 100.7(d); 45 C.F.R. § 80.7(d); 28 C.F.R. § 42.107(d); 41 C.F.R. § 101–6.210–4(a).

314.    Prior to the March 7 funding withdrawal, Defendants did not provide notice of a hearing or conduct any hearing, much less conduct a hearing that conforms with their own regulations or sections 5–8 of the APA. *See, e.g.*, 34 C.F.R. § 100.9; 45 C.F.R. § 80.9; 28 C.F.R. § 42.109; 41 C.F.R. §§ 101–6.212–1, 101–6.212–4.

315.    Prior to the March 7 funding withdrawal, Defendants failed to provide the University with a reasonable opportunity to file briefs or other written statements of its contentions and further failed to issue a decision consistent with the applicable regulations before terminating funding on March 7. *See, e.g.*, 34 C.F.R. § 100.10; 45 C.F.R. § 80.10; 28 C.F.R. 42.110; 41 C.F.R. § 101–6.213–1 to –4.

316.    Defendants did not limit the March 7 funding withdrawal to any particular program, or part thereof, in which noncompliance has been found. Nor was such withdrawal limited in its effect to any particular program, or part thereof, in which noncompliance has been found. *See, e.g.*, 42 U.S.C. § 2000d-1; § 34 C.F.R. § 100.8(c); 45 C.F.R. § 80.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101-6.211-3.

317.    Defendants' March 7 funding withdrawal is not authorized by any law, and no department or agency determined that compliance could not be secured by voluntary means prior to initiating the March 7 funding withdrawal.

318.    The Department of Education has promulgated a Case Processing Manual for the Office of Civil Rights that binds the agency to follow certain procedures governing investigations and enforcement actions arising under Title VI. The Department of Education failed to follow these binding procedures before withdrawing funding from the University on March 7, and such action must therefore be set aside as arbitrary and capricious. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). For example, the Case Processing Manual requires issuing letters of notification to the University upon opening an investigation, issuing a letter of finding and seeking to negotiate a resolution agreement within 90 days upon finding noncompliance, and issuing an impasse letter if the negotiations are unsuccessful containing particular information. But

prior to the March 7 funding withdrawal, Defendant ED failed to take any of these steps required by its own regulations.

## COUNT IV

**APA – Substantive Violations with respect to March 7, 2025 Funding Withdrawal**

319.    Plaintiffs incorporate paragraphs 1 to 318 above as if fully set forth herein.

320.    Plaintiffs and their members are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' March 7, 2025 withdrawal of funds for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2.

321.    Defendants' action in terminating the grants and contracts at issue constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. § 704,  and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704. The cancelation of grants and contracts is the ultimate step in the Title VI enforcement process and alters the rights and obligations of the parties with respect to the terms of those grants and contracts, with legal and concrete consequences for Columbia, Plaintiffs, and Plaintiffs' members.

322.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

323.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). This standard requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An action is also arbitrary and capricious if the agency

"failed to consider . . . important aspect[s] of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020).

324. Defendants' action of "immediate cancellation of approximately $400 million in federal grant and contracts to Columbia University" was arbitrary and capricious because that decision was not objectively reasonable and Defendants failed to provide a reasoned explanation for that decision.

325. Defendants' press release—the only public record of Defendants' action—failed to provide any reasoned explanation regarding whether Columbia had "fail[ed] to comply" with any specific requirement of Title VI or its implementing regulations that would justify termination of assistance under 42 U.S.C. §2000d-1.

326. On information and belief, Defendants also failed to provide any reasoned explanation for the particular sanction imposed on Columbia, and failed to provide any reasoned explanation as to whether any purported Title VI violations had been found to have occurred in any of the programs or activities that were the recipients of the $400 million in summarily terminated funds. Title VI requires that termination of funding be "limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. § 2000d-1. Contrary to this requirement, Defendants terminated "$400 million" in federal grants and contracts—the same amount that now-President Trump tried to demand from Columbia in real estate negotiations back in 2000, then as a private real estate developer—without any explanation of whether those grants and contracts had any relation to the programs (or parts of programs) in which the unidentified Title VI violation or violations occurred, or of why those grants and contracts in particular were targeted for termination. Nor did Defendants identify any statutory or contractual basis for canceling these unspecified grants and contracts. Any rationale asserted by

Defendants for canceling these grants and contracts is pretextual, unsupported, and offers no legitimate basis for Defendants' actions.

327.    Defendants' action was also arbitrary and capricious because Defendants failed to identify any legal authority for the "immediate cancellation" of funds to Columbia in violation of the detailed procedural requirements set out by Title VI and Defendants' implementing regulations. *Supra* ¶¶ 304–318.

328.    Defendants' action was arbitrary and capricious for the further reason that they failed to consider or address the enormous reliance interests implicated by Defendants' cancelation of hundreds of millions of dollars of funds supporting critical research and other activities. *See, e.g.*, 28 C.F.R. § 50.3(a) (acknowledging reliance interests in federal funding subject to Title VI). Nor did Defendants address or consider any of the significant harms that will unavoidably flow from this cancelation of funds.

329.    The APA also directs courts to hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

330.    Defendants' conduct in "immediately cancelling" $400 million in grant and contract funding was action in excess of Defendants' statutory authority. Besides violating virtually all of the procedural requirements set forth by Title VI and Defendants' own regulations, Defendants' actions also exceed their substantive statutory authority by terminating federal funding to Columbia without any finding of a violation of Title VI's substantive guarantees, and on the basis of vague and conclusory statements regarding "continued inaction" articulated in a press release. Defendants' termination of funds is also fundamentally overbroad in light of Defendants' failure to tie the $400 million in canceled funding to any particular program or part of a program that is out of compliance with Title VI. *See* 42 U.S.C. §2000d-1.

331.    The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights. 5 U.S.C. § 706(2)(B).

332.    Defendants' termination of $400 million in grant and contract funding without any statutory basis is unconstitutionally coercive and seeks to obstruct, chill, deter, and retaliate against Plaintiffs members' fundamental First Amendment rights of free speech and academic freedom (*see supra* ¶¶ 286–297), and is thus contrary to constitutional rights, in violation of 5 U.S.C. § 706(2)(B).

333.    Defendants' termination of $400 million in grant and contract funds without statutorily required or other reasonable notice and an opportunity to be heard is contrary to Plaintiffs' members' constitutional due process rights, in violation of 5 U.S.C. § 706(2)(B).

## COUNT V

### APA – Procedural Violations with respect to March 13, 2025 Letter

334.    Plaintiffs incorporate paragraphs 1 to 333 above as if fully set forth herein.

335.    Plaintiffs and their members are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' March 13, 2025 Letter for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2.

336.    Defendants' March 13, 2025 Letter constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704; 42 U.S.C. § 2000d-2 (providing judicial review for actions "refusing to grant or to continue financial assistance" under Title VI). Given the enormity of the funding cuts Defendants had already summarily imposed on Columbia, and the billions more they were threatening to impose—threatening, in Defendants' words, to "bankrupt" Columbia—Defendants' letter imposed conditions on Columbia that Columbia was forced to comply with by

Defendants' one-week deadline. Defendants' March 24, 2025 Letter confirmed the legally binding effect of the March 13 Letter, describing the March 13 Letter's demands as the "Trump Administration's requirements" and "9 preconditions for formal negotiations to restore canceled federal grants and contracts."

337.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

338.    The APA further directs courts to hold unlawful and set aside agency actions that are without observance of procedure required by law. 5 U.S.C. §706(2)(D).

339.    Defendants' March 13, 2025 Letter, which followed soon after Defendants' cancelation of $400 million in funding for Columbia, imposed a March 20, 2025 deadline for "ensur[ing] and document[ing] compliance" with a host of substantive requirements that the letter stated were "a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." Defendants reiterated in the March 13 Letter that they "expect[ed] [Columbia's] immediate compliance with these critical next steps." By its terms, the March 13 Letter conveyed to Columbia that compliance with the demands stated therein was a "precondition" for any "continued" federal funding, and thus conveyed that failure to comply with those demands would result in the total discontinuation of federal financial assistance to Columbia, which Defendants stated in their March 7 funding freeze announcement totals more than $5 billion.

340.    Title VI and applicable, binding regulations that have the force of law set forth procedural requirements that must be followed before a federal agency may "refus[e] to grant or to continue assistance" under a program or activity for alleged noncompliance with Title VI's

75

substantive requirements. 42 U.S.C. § 2000d-1; *see* 34 C.F.R. § 100.8; 45 C.F.R. § 80.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101-6.211-3.

341.    Defendants failed to follow these requirements before refusing to grant or to continue assistance to Columbia absent the University's compliance with their demands. Defendants also did not limit their refusal to grant or to continue assistance, and did not limit the effect of their refusal to grant or to continue assistance, to only the particular program, or part thereof, as to which there had been an express finding on the record of noncompliance, after opportunity for hearing. No other law authorizes Defendants' refusal to grant or continue federal financial assistance. Defendants' March 13 Letter therefore was contrary to law, arbitrary and capricious, and without observance of procedure required by law in violation of 42 U.S.C. § 2000d-1.

## COUNT VI

### APA – Substantive Violations with respect to March 13, 2025 Letter

342.    Plaintiffs incorporate paragraphs 1 to 341 above as if fully set forth herein.

343.    Plaintiffs and their members are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' March 13, 2025 Letter for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2.

344.    Defendants' March 13, 2025 Letter constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704; 42 U.S.C. § 2000d-2.

345.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

346.    The APA further directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights. 5 U.S.C. § 706(2)(B).

347.    The APA further directs courts to hold unlawful and set aside agency actions that are found to be "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

348.    Defendants' March 13, 2025 Letter, which followed soon after Defendants' cancelation of $400 million in funding for Columbia, imposed a March 20, 2025 deadline for "ensur[ing] and document[ing] compliance" with a host of substantive requirements that the letter stated were "a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." Defendants reiterated in the March 13 Letter that they "expect[ed] [Columbia's] immediate compliance with these critical next steps." As a result of these obligations imposed on Columbia, Columbia agreed on March 21, 2025 to take a host of actions implementing Defendants' demands in order to meet the "precondition for formal negotiations" regarding continued federal funding established by Defendants' letter.

349.    The March 13 Letter was contrary to law and exceeded Defendants' statutory authority. The March 13 Letter cites Title VI and Title VII of the Civil Rights Act of 1964 as its sole sources of authority. But neither Title VI, Title VII, nor any other law grants Defendants the authority, for example, to demand "expulsion or multi-year suspension" of particular students; or to dictate a fundamental restructuring of a university's disciplinary system; or to require unspecified "comprehensive admissions reform"; or to mandate putting a particular academic department in "academic receivership." Defendants' letter cited no authority for making such demands, whether as a "precondition for formal negotiations" or otherwise. In addition, these demands taken together represent a wholesale incursion by the federal government into virtually

every aspect of university policy and operations—from admissions, to academics, to student life, to discipline, to human resources, to campus security. Nothing in Title VI, Title VII, or any other law authorizes such an unprecedented and unjustified step.

350.    The March 13 Letter was also arbitrary and capricious. The letter failed to provide a factual or legal basis for any of the conditions it imposed on Columbia. In many cases—such as the demand to "Deliver a plan for comprehensive admissions reform"—it failed to even explain what the nature of its demand was, much less the basis for the demand. Nor did the letter draw any connection between these conditions and any purported noncompliance with Title VI's requirements by Columbia or any component of the University.

351.    The March 13 Letter was also unconstitutionally coercive and sought to obstruct, chill, deter, and retaliate against Plaintiffs' members' fundamental First Amendment rights of free speech and academic freedom (*see supra* ¶¶ 286–297), and was thus contrary to constitutional rights.

## COUNT VII

### Separation of Powers / Ultra Vires - March 7, 2025 Funding Withdrawal

352.    Plaintiffs incorporate paragraphs 1 to 351 above as if fully set forth herein.

353.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

354.    The Constitution vests the legislative power, including the spending power and the authority to place conditions on federal spending, in Congress. U.S. Const., art. I. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. *Id.*; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

355.    The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

356.    The President and Executive Branch have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998). The declared purpose of separating and dividing the powers of government was to "diffuse[] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'...." The Federalist No. 47, p. 325 (J. Cooke ed. 1961).").

357.    Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts that Defendants canceled in the March 7, 2025 Funding Withdrawal.

358.    Congress also exercised its authority to adopt the carefully defined rules and procedures set forth in Title VI that set forth the procedural requirements for termination of federal financial assistance. Defendants did not comply with these statutory requirements before summarily terminating $400 million in federal funding. *Supra* ¶¶ 304–318.

359.    Neither Title VI nor any other statutory provision authorized the Executive Branch to cancel the federal grants and contracts in the March 7 Funding Withdrawal.

360.    No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including both Title VI and appropriations approved and signed into law.

361.    Defendants' immediate cancelation of federal grants and contracts in the March 7 Funding Withdrawal was not authorized by statute, overrode the direct Congressional authorization of federal funding, and overrode the express statutory limitations in Title VI that Congress has placed on the cancelation of duly authorized federal funding.

362.    Defendants' actions were not authorized by any Article II Executive power, because no Article II constitutional power authorizes Defendants to cancel duly authorized federal funding on grounds not authorized by statute.

363.    Therefore, Defendants' cancelation of federal grants and contracts were actions taken without legal authority and are ultra vires.

## COUNT VIII

### Separation of Powers / Ultra Vires – March 13, 2025 Letter

364.    Plaintiffs incorporate paragraphs 1 to 363 above as if fully set forth herein.

365.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

366.    Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts that the March 13, 2025 Letter declares will be canceled or otherwise not renewed if Columbia University does not comply with Defendants' sweeping demands as a "precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government."

367.    None of the funds received by Columbia University have a congressionally authorized condition requiring them to comply with any of the demands in the March 13, 2025 Letter.

368.     Nor does Title VI or any other statute require Columbia to comply with the demands in the March 13, 2025 Letter. The demands in the March 13, 2025 Letter are not necessary to ensure compliance with Title VI's nondiscrimination requirements.

369.     Congress also exercised its authority to adopt the carefully defined rules and procedures set forth in Title VI that set forth the procedural requirements for refusal to grant or to continue federal financial assistance. Defendants did not comply with these statutory requirements before refusing to grant or continue federal financial assistance to Columbia absent the University's compliance with the demands set forth in the March 13 letter. *Supra* ¶¶ 304–318. None of the demands in the March 13, 2025 Letter are limited to the particular program, or part thereof, in which an express finding of noncompliance has been found on the record, after the opportunity for a hearing.

370.     The March 13, 2025 Letter, which conditions federal funds by Columbia University on compliance with demands that are not necessary to ensure compliance with Title VI's prohibition on discrimination, is an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend Congressional appropriations by attaching conditions not contemplated by Congress, and a violation of the separation of powers. It is therefore ultra vires.

## COUNT IX

### Fifth Amendment Due Process Clause

371.     Plaintiffs incorporate paragraphs 1 to 370 above as if fully set forth herein.

372.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires due process of law before the deprivation of a constitutionally protected interest.

373.     Plaintiffs' members have constitutionally protected property interests in grant and contract funding that supports their salaries and stipends, as well as in their ongoing research. Plaintiffs' members have relied on this funding, and the protections of federal law governing this

funding, in pursuing their research, hiring staff, making commitments to research partners, and in many other ways. Plaintiffs' members also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

374.    Defendants did not provide the university or Plaintiffs' members fair notice or a reasonable opportunity to be heard before they decided to immediately terminate $400 million in federal funding at Columbia, including funding on which Plaintiffs' members rely for their work.

375.    Title VI outlines procedural safeguards and substantive criteria for the recission of funds. *Supra* ¶¶ 116–161, 304–318. Defendants failed to comply with those safeguards and criteria, and thereby violated Plaintiffs' members' right to due process of law.

376.    The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required.

377.    Defendants' March 7 Funding Withdrawal announced the termination of $400 million in federal funding and stated that "[t]hese cancellations represent the first round of action and additional cancellations are expected to follow." Yet the announcement invoked only Columbia's "continued inaction" regarding antisemitism on campus—an unconstitutionally vague standard for determining whether grants and contracts should be terminated—and did not tie the cancelation of grants and contracts to specific alleged acts or omissions, much less specific conduct reasonably related to the grants and contracts at issue. Nor did the announcement provide any adequate notice to Plaintiffs' members or to Columbia regarding what conduct was forbidden or required to avoid the threatened "additional cancellations."

## COUNT X

## Tenth Amendment & Spending Clause

378.    Plaintiffs incorporate paragraphs 1 to 377 above as if fully set forth herein.

379.    The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

380.    As the text of the Tenth Amendment makes clear, the Constitution created a federal government of limited and enumerated powers. *See NFIB v. Sebelius*, 567 U.S. 519, 533-34 (2012) (opinion of Roberts, C.J.) ("In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder.").

381.    No provision of the Constitution delegates to the federal government the power to take over day-to-day management of a private or state university or to control core aspects of its academic mission. For example, the federal government's limited powers do not include the authority to determine, in lieu of a private or state university's administration, whether:

    a.  to place a particular department of study under an "academic receivership";

    b.  to "hold student groups accountable for … providing support" for "unrecognized groups";

    c.  to empower or require campus security officers (not federal law-enforcement officers) to effectuate the "arrest and removal of agitators who," as federal officials see it, "interfere with classroom instruction or the functioning of the university";

    d.  to expel or suspend students alleged to have violated particular university policies while engaged in a protest held on campus property; or

    e.  to "[a]bolish" a private or state university's judicial board, "centralize all disciplinary processes under the" office of the university president, and "empower" that office–rather than the adjudicatory body created by the university to administer

discipline—"to suspend or expel students with an appeal process" controlled by the university's executive arm.

382.    "The Spending Clause of the Federal Constitution … provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." *Agency for Int'l Dev.*, 570 U.S. at 213.

383.    "That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Id.* However, the federal government cannot use funding limits to circumvent constitutional constraints on the scope of federal power, such as those imposed by the First and Tenth Amendments. *See id.* at 214; *NFIB*, 567 U.S. at 575-81 (opinion of Roberts, C.J.).

384.    Federal attempts to regulate via purported funding inducements raise heightened constitutional concerns when, as here, the amount of funding at issue is so large as to be coercive, purported funding conditions are not tied to particular programs directly utilizing those funds, and program recipients are unfairly surprised by post-acceptance or "retroactive" conditions. *See NFIB*, 567 U.S. at 580-81, 584 (explaining that a purported "financial inducement" to participate in a federal program exceeds the scope of the federal government's Spending Clause power where it is "so coercive as to pass the point at which 'pressure turns into compulsion,'" and concluding that the inducement there at issue was unconstitutionally coercive because, as a practical matter, it resembled "a gun to the head" instead of offering "relatively mild encouragement" to adopt and implement a federal regulatory program).

385.    Thus, even if Congress had authorized Defendants' ongoing attempt to effectively seize control of Columbia University, backed up by overt threats to summarily and indiscriminately terminate billions of dollars in funding en masse, any such coercion contravenes

the principle of federalism embodied in the Tenth Amendment and exceeds the scope of the federal

government's authority under the Spending Clause.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A. Declare unlawful and set aside Defendants' termination of federal financial assistance to Columbia University announced on March 7, 2025;

B. Declare unlawful and set aside the demands set forth in Defendants' March 13, 2025 Letter;

C. Declare that Defendants' cancelation of federal grants without observance of Title VI's statutory and regulatory requirements and imposition of demands upon threat of withholding future federal funding violate the First, Fifth, and Tenth Amendments to the United States Constitution, violate the separation of powers, are ultra vires, and constitute an unconstitutional condition on federal financial assistance;

D. Enter a preliminary and permanent injunction requiring Defendants to immediately reinstate or restore all grants and contracts to Columbia University and Plaintiffs' members that were unlawfully terminated, canceled, or paused, and prohibiting Defendants, their agents, representatives, employees and servants and all persons and entities in concert or participation with them from:

    (i) Terminating, canceling, pausing, issuing stop-work orders, or otherwise interfering with grants or contracts purportedly in response to Title VI violations, except pursuant to the processes required by Title VI and its implementing regulations;

    (ii) Engaging in any purported Title VI investigation involving grants or contracts except in compliance with Title VI, its implementing regulations, the APA, and the Constitution of the United States; or

    (iii) Enforcing the demands made in Defendants' letter dated March 13, 2025, or from insisting on the fulfillment of any or all of those demands or any other demands as a precondition for providing any benefit or avoiding any sanction under Title VI, except upon findings required by, and pursuant to the processes required by, Title VI and its implementing regulations.

E.  Award damages, including compensatory and nominal damages, to redress the deprivation by Defendants of the rights secured to Plaintiffs and their members under the Constitution and laws of the United States;

F.  Award Plaintiffs their reasonable attorneys' fees and costs in accordance with law; and

G.  Award such other relief as the Court deems just and proper.

Dated: March 25, 2025                    Respectfully submitted,

By:  S/ Orion Danjuma
     Orion Danjuma
     Rachel Goodman
     Deana K. El-Mallawany*
     The Protect Democracy Project, Inc.
     82 Nassau Street, #601
     New York, NY 10038
     Tel: (202) 579-4582
     Fax: (202) 769-3176
     orion.danjuma@protectdemocracy.org
     rachel.goodman@protectdemocracy.org
     deana.elmallawany@protectdemocracy.org

     Anna Dorman*
     Catherine Chen*
     Amit Agarwal*
     The Protect Democracy Project, Inc.
     2020 Pennsylvania Ave. NW, Suite #163
     Washington, D.C. 20006
     Tel: (202) 579-4582
     Fax: (202) 769-3176
     anna.dorman@protectdemocracy.org
     catherine.chen@protectdemocracy.org
     amit.agarwal@protectdemocracy.org

     Eve H. Cervantez*
     Stacey M. Leyton*
     Matthew J. Murray*
     Connie K. Chan*
     Juhyung Harold Lee*
     Jonathan Rosenthal*
     ALTSHULER BERZON LLP
     177 Post St., Suite 300
     San Francisco, CA 94108

Tel: (415) 421-7151
Fax (415) 362-8064
ecervantez@altber.com
sleyton@altber.com
mmurray@altber.com
cchan@altber.com
hlee@altber.com
jrosenthal@altber.com


*Pro hac vice* application forthcoming

**Counsel for Plaintiffs**