**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,<br><br>and<br><br>AMERICAN FEDERATION OF TEACHERS,<br><br>              Plaintiffs,<br><br>         v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>            Defendants. | Case No. 1:25-cv-02429-MKV<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

    A.   Columbia depends on federal funding for scientific and medical research. ...................... 3

    B.   Defendants summarily terminated $400 million in federal funds to Columbia. ................. 3

    C.   Defendants refused to grant or continue *any* future federal funding to Columbia unless it complied with a series of "preconditions" and other unspecified demands. ............................ 5

    D.   Defendants' actions are part of a campaign to undermine academic freedom. .................. 7

    E.   Defendants' actions harm Plaintiffs and their members. ................................................... 8

STANDING ................................................................................................................................... 9

LEGAL STANDARD .................................................................................................................. 10

ARGUMENT ............................................................................................................................... 10

    I.   Plaintiffs Are Likely to Succeed on the Merits. .............................................................. 10

        A.   Plaintiffs are likely to succeed on their claims that the March 7 funding withdrawal violated the APA. ...................................................................................................................... 11

        B.   Plaintiffs are likely to succeed on their claims that the March 13 "preconditions" for continued federal funding violated the APA. ....................................................................... 17

        C.   Plaintiffs are likely to succeed on their separation of powers / ultra vires claims. ........ 19

        D.   Plaintiffs are likely to succeed on their First Amendment claims. ............................... 21

        E.   Defendants' threats likely exceed their authority under the Spending Clause. ............ 25

        F.   Plaintiffs are likely to succeed on their Due Process claims. ...................................... 26

    II.   Plaintiffs Will Suffer Irreparable Harm Without an Injunction. ...................................... 27

    III.   The Balance of Harms and Public Interest Support Preliminary Injunctive Relief. ......... 28

CONCLUSION ............................................................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967)...............................................................17
*Agency for Int'l Dev. v. All For Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)......................23, 24
*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020)........................................29
*Alexander v. Sandoval*, 532 U.S. 275 (2001)..................................................................11
*Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency of Int'l Dev.*, 651 F.3d 218 (2d Cir. 2011) 9, 23
*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 2025 WL 833917 (D. Md. Mar. 17, 2025)16
*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ...........................................21
*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ............................................21
*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)..........................................................23
*Barnes v. Gorman*, 536 U.S. 181 (2002) ........................................................................25
*Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068 (5th Cir. 1969)...............14
*Bennett v. Spear*, 520 U.S. 154 (1997) ..........................................................................11
*California v. U.S. Dep't of Educ.*, 2025 WL 878431 (1st Cir. Mar. 21, 2025) ...........................17
*Cappetta v. Comm'r of Soc. Sec. Admin.*, 904 F.3d 158 (2d Cir. 2018).................................13
*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) ..............................................................28
*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) ...........................................................................................................10
*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)......................................21
*Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430 (D.C. Cir. 1986) ...........................................17
*City and Cty. of San Francisco v. Sessions*, 372 F.Supp.3d 928 (N.D. Cal. 2019) ..................20
*City and Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ..............................20
*Climate United Fund v. Citibank, N.A.*, 2025 WL 842360 (D.D.C. Mar. 18, 2025)...................16
*Clinton v. City of New York*, 524 U.S. 417 (1998)............................................................19
*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) ......................................25
*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ...............15, 16
*Do No Harm v. Pfizer Inc.*, 126 F.4th 109 (2d Cir. 2025)......................................................9
*Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997)..............................................29
*F.C.C. v. Fox Television Stations*, 567 U.S. 239 (2012).................................................26, 27
*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)..................................10
*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ............................................................14
*Grayned v. City of Rockford*, 408 U.S. 104 (1972).............................................................27
*Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023) .............................................................1, 22
*Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786 (6th Cir. 2018).................................................13
*In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013)................................................................20
*Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838).................................................20
*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967).............................21
*L.V.M. v. Lloyd*, 318 F.Supp.3d 601 (S.D.N.Y. 2018).........................................................29
*Moody v. NetChoice LLC*, 603 U.S. 707 (2024)................................................................24
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 16
*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ..............................................2, 21, 22
*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)...................................29
*New York v. Trump*, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ..............................................21
*New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019)............20

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020)................................ 10, 29

*NFIB v. Sebelius*, 567 U.S. 519 (2012)......................................................... 2, 25, 26

*Nnebe v. Daus*, 644 F.3d 147  (2d Cir. 2011) .................................................... 10

*Ohio v. EPA*, 603 U.S. 279 (2024)............................................................... 15

*Perry v. Sindermann*, 408 U.S. 593 (1972)....................................................... 23

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ................................................. 24

*RFE/RL, Inc. v. Lake*, 2025 WL 900481 (D.D.C. Mar. 25, 2025)............................. 16

*Schlafly v. Volpe*, 495 F.2d 273  (7th Cir. 1974) ................................................ 11

*Snyder v. Phelps*, 562 U.S. 443 (2011)........................................................... 25

*Stark v. Wickard*, 321 U.S. 288 (1944).......................................................... 21

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957)......................................... 1, 2, 22

*T.C. v. New York State Dep't of Health*, 2022 WL 17689841 (S.D.N.Y. Dec. 15, 2022)........... 28

*TikTok Inc. v. Trump*, 507 F.Supp.3d 92  (D.D.C. 2020) ........................................ 29

*Train v. City of New York*, 420 U.S. 35 (1975) .................................................. 20

*U.S., Dep't of Interior v. 16.03 Acres of Land, More or Less, Located in Rutland Cnty., Vt.*, 26 F.3d 349 (2d Cir. 1994)....................................................................... 21

*Velasaca v. Decker*, 458 F.Supp.3d 224 (S.D.N.Y. 2020)........................................ 29

*Washington v. Trump*, 2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ........................ 21

*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) ...................................... 2

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ........................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................ 20

**Statutes**

42 U.S.C. § 2000d-1 ........................................................................ *passim*

42 U.S.C. § 2000d-2 ................................................................. 11, 17, 18

5 U.S.C. § 551 .............................................................................. 11

5 U.S.C. § 554 .............................................................................. 13

5 U.S.C. § 557 .............................................................................. 14

5 U.S.C. § 702 ......................................................................... 11, 18

5 U.S.C. § 704 ..................................................................... 11, 17, 18

5 U.S.C. § 706 ..................................................................... 11, 15, 18

**Regulations**

2 C.F.R. § 200 et seq........................................................................ 15, 18

28 C.F.R. § 42 et seq........................................................................ *passim*

28 C.F.R. § 50 et seq................................................................. 12, 16, 18

34 C.F.R. § 100 et seq,...................................................................... *passim*

34 C.F.R. § 101 et seq, ..................................................................... 13

41 C.F.R. § 101 et seq. ..................................................................... *passim*

45 C.F.R. § 80 et seq. ...................................................................... *passim*

45 C.F.R. § 81 et seq....................................................................... 13

**INTRODUCTION**

This case involves a sweeping and unprecedented assault on the freedom and independence of faculty at one of our nation's leading universities. On March 7, 2025, Defendant executive branch agencies and officials announced the summary termination of $400 million in federal grants and contracts to Columbia University, in defiance of Congress's carefully crafted statutory constraints on the termination of federal funding and Defendants' own regulations. Then, on March 13, 2025, Defendants announced that Columbia must immediately comply with a series of invasive demands as "preconditions" to *any* continued federal financial assistance—threatening to terminate more than $5 billion. The immediate loss of hundreds of millions of dollars and Defendants' looming threat of far greater harm violate statutes, regulations, and the Constitution and are causing severe irreparable harm to Plaintiffs and their members. Defendants' unlawful actions should be preliminarily enjoined.

Defendants' demands are stunning in their breadth, intrusiveness, and disregard for America's long-cherished principle that private institutions of higher education may decide for themselves, "on academic grounds," how to exercise the "essential freedoms of a university," such as "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Heim v. Daniel*, 81 F.4th 212, 230-31 (2d Cir. 2023) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)). Defendants have declared that faculty must no longer control a government-disfavored department of study, which must instead be placed into an "academic receivership"; students alleged to have violated the private university's disciplinary code must be subject to "expulsion or multi-year suspension"; the university's "admissions practices" must be revised to "conform with" the executive branch's preferred "policy"; and the private university must refuse to tolerate certain (government-disapproved) political protests on its property.

Although Defendants have sought to justify their overreach with reference to Title VI of the Civil Rights Act, any genuine Title VI enforcement action aimed at combatting antisemitism would follow the procedural requirements set forth in the statute and its implementing regulations.

Here, in announcing their coercive threats and crippling sanctions, Defendants have not even acknowledged those requirements and have violated virtually all of them.

As a cross-ideological group of distinguished scholars analyzing Defendants' actions has explained, the "well-established procedural rules" of Title VI that Defendants failed to follow require fair procedures, methodical decision-making, and careful "program-by-program evaluation" in federal investigations touching sensitive areas of academic freedom, precisely to ensure that federal agencies seeking to enforce Title VI do not violate constitutional rights.[1] Those rights include the one "fixed star in our constitutional constellation … that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

Defendants' failure to follow Congress's carefully crafted procedures has caused a severe "intrusion into the intellectual life" of Columbia. *Sweezy*, 354 U.S. at 261 (Frankfurter, J., concurring). Defendants' actions also contravene the Administrative Procedure Act (APA), and the constitutional separation of powers, First Amendment, Spending Clause, and Due Process Clause. *Congress* may impose reasonable limits on congressionally appropriated funds, but federal *executive* officials charged with enforcing the law may not cast congressional commands aside. Nor may executive branch officials coerce a private university into suppressing academic freedom and free speech, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024), by leveraging the vast financial power of the federal government to effectively put "a gun to the head" of a private university, *NFIB v. Sebelius*, 567 U.S. 519, 581 (2012) (opinion of Roberts, C.J.). To prevent irreparable harm while this litigation proceeds, Plaintiffs' motion for a preliminary injunction should be granted.

---

[1] Eugene Volokh, Michael C. Dorf, David Cole, et al., *A Statement from Constitutional Law Scholars on Columbia*, The New York Review of Books (March 20, 2025), attached as Exhibit 61 to the Declaration of Jonathan Rosenthal. Unless otherwise indicated, cites to "Ex." are to exhibits to the Rosenthal Declaration.

**FACTUAL BACKGROUND**

**A.  Columbia depends on federal funding for scientific and medical research.**

Columbia University faculty research and scholarship covers a broad range of topics in health, science, social science, and the humanities. *E.g.*, Exs. 10-12. More than 1,800 physicians and other professionals affiliated with Columbia also provide patient care. ECF 1 ("Compl.") ¶48. Like all other major research universities, Columbia has long depended on federal funding. In 2024, government grants made up about 20% of Columbia's operating revenue. Ex. 13. Federal funding includes grants that support multi-year projects, critical training, and care for patients enrolled in ongoing clinical studies. Ex. 15.

**B.  Defendants summarily terminated $400 million in federal funds to Columbia.**

On January 29, 2025, President Trump directed executive departments to submit reports identifying "all pending administrative complaints … against or involving institutions of higher education alleging civil rights violations related to or arising from post-October 7, 2023, campus anti-Semitism." Ex. 17. Defendant DOJ then announced on February 3, 2025, the creation of a multi-agency DOJ Task Force, led by Defendant Leo Terrell with representatives from Defendants the Departments of Justice (DOJ), Education (ED), and Health & Human Services (HHS). Ex. 18. Later that day, Defendant ED announced new Title VI investigations into Columbia and four other universities at which, ED stated, "widespread antisemitic harassment has been reported." Ex. 19. Columbia responded the same day detailing numerous actions the university had taken since August to address antisemitism and expressing openness to "ongoing work with the new federal administration to combat antisemitism[.]" Ex. 20.

On March 3, 2025, Defendants HHS, ED, and the General Services Administration (GSA) announced a "comprehensive review of Columbia's federal contracts and grants in light of ongoing investigations for potential violations of Title VI." Ex. 21. The announcement referred to "Columbia's ongoing inaction in the face of relentless harassment of Jewish students," declared that, "Stop Work Orders for $51.4 million in contracts between Columbia University and the Federal Government" were being considered, and stated that the Task Force would "conduct a

3

comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities." *Id.* The announcement did not identify any specific allegations of harassment or any particular steps Columbia could take to deter or remedy such harassment, mention the First Amendment, or acknowledge any of the actions Columbia previously announced it had taken to address reported antisemitism.

The following day, President Trump posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS!" Ex. 22.

Just three days later, on March 7, 2025, Defendants DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students." Ex. 23; Martin Decl. Ex. A (same rationale in letter sent to Columbia). The announcement stated that these cuts "represent the first round of action and additional cancellations are expected to follow." Ex. 23.

The termination of $400 million in federal funding by multiple agencies was dictated by the DOJ Task Force. *See* Exs. 23, 29; 28 C.F.R. §42.401 *et seq.* On March 10, Defendant NIH posted that it was "terminating more than $250 million in funding—including more than 400 grants—to Columbia University following *directives from the Trump Administration's Joint Task Force to Combat Anti-Semitism*." Ex. 29. NIH terminated 232 grants for scientific research at Columbia's Irving Medical Center—grants that make up about a quarter of the center's research portfolio. Ex. 30.

Public reporting has identified a wide variety of health researchers whose funding was summarily canceled. Exs. 32-35. Some researchers received cancelation notices stating that funding was terminated "due to unsafe antisemitic actions that suggest the institution lacks concern for the safety and wellbeing of Jewish students." Ex. 40; Martin Decl. ¶¶27, 50; Witte Decl. ¶8;

Witness-A Decl. ¶8; Witness-B Decl. ¶10.[2] Others have not yet received any government notice, but Columbia has informed them their funding has stopped. Martin Decl. ¶19, 33.

**C.  Defendants refused to grant or continue *any* future federal funding to Columbia unless it complied with a series of "preconditions" and other unspecified demands.**

Less than a week after the funding withdrawal, on March 13, 2025, Defendants HHS, ED, and GSA sent another letter to Columbia stating that Columbia should "consider this a formal response to the current situation on the campus of Columbia University and a follow up to our letter of March 7, 2025, informing you that the United States Government would be pausing or terminating federal funding." Ex. 26. The March 13 letter stated, without reference to any specific events, that Columbia "has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964. Pursuant to your request, this letter outlines immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." *Id.*

The letter listed nine demands for Columbia to meet within one week, including that Columbia must: (1) "complete [identified] disciplinary proceedings" resulting in "expulsion or multi-year suspension"; (2) "[a]bolish the University Judicial Board (UJB)" and "centralize all disciplinary processes" in Columbia's President; (3) "[i]mplement permanent, comprehensive time, place, and manner rules" on campus; (4)"[b]an masks" with limited exceptions; (5) "[d]eliver a plan to hold all student groups accountable" for certain acts; (6) "[f]ormalize, adopt, and promulgate a definition of antisemitism"; (7) "ensure that Columbia security has full law enforcement authority, including arrest and removal of agitators"; (8) "[b]egin the process of placing the Middle East, South Asian, and African Studies [MESAAS] department under academic receivership for a minimum of five years"; and (9) "[d]eliver a plan for comprehensive admissions

---

[2] Citations to "Witness-A" through "Witness-I" are to declarations filed under seal to protect third-party professors and students who reasonably fear retaliation and harassment if their participation in this case is made public.

reform" including "reform[ing] undergraduate admissions, international recruiting, and graduate admissions practices." *Id.*

Before summarily terminating $400 million and setting these "preconditions" for any "continued" federal funding to Columbia, Defendants did not comply with any of the detailed procedural requirements imposed by Title VI and its implementing regulations. *See infra* Sections I.A.-I.B; Ex. 8 at 2; Rosenthal Decl. ¶3; Martin Decl. ¶¶6-8, 28, 40, 51; Hirsch Decl. ¶18; Witte Decl. ¶28; Frye Decl. ¶13; Witness-A Decl. ¶19-20; Witness-B Decl. ¶33. Columbia had issued several statements, studies, reports, and policy changes in response to complaints of antisemitism and discrimination on campus. Compl. ¶¶63, 165-84; Exs. 20, 46-55. Defendants did not address any of these actions or provide any reasoning as to whether those responses were or were not sufficient under Title VI. Exs. 23, 26.

On March 21, 2025, Columbia shared updated policies complying with virtually all of Defendants' demands. Ex. 27. Among other things, Columbia relocated the UJB to within the Office of the Provost (who reports to the President); announced the hiring of 36 "special officers" with "the ability to remove individuals from campus and/or arrest"; appointed a new Senior Vice Provost who will "conduct a thorough review of the portfolio programs in regional areas across the University, starting immediately with the Middle East," including the MESAAS Department; and committed to expand "intellectual diversity among faculty." *Id.*

In a call with faculty, then-Columbia president Katrina Armstrong acknowledged the coercive power of Defendants' actions, stating, "[t]he ability of the federal administration to leverage other forms of federal funding about us in an immediate fashion is really potentially devastating to our students in particular." Ex. 58. Within days, Dr. Armstrong stepped down as Columbia's president. Ex. 59. Defendants' Task Force applauded Dr. Armstrong's removal as "an important step toward advancing negotiations as set forth in the pre-conditional understanding reached last Friday between the University and the Task Force...." Ex. 60.

Despite Columbia's compliance with the March 13 demands, Defendants have not restored the $400 million in federal funding. On March 24, 2025, Defendants HHS, ED, and GSA issued a

press release reiterating that the nine demands in the March 13 letter were only "preconditions for formal negotiations to restore canceled federal grants and contracts." Ex. 28. The release states that "Columbia's compliance with the Task Force's preconditions is only the first step in rehabilitating its relationship with the government" and only the "first step in the university maintaining a financial relationship with the United States government." *Id.* The press release indicates that, to regain access to federal funding, Columbia must agree to unspecified "permanent and structural reform." *Id.*

**D.  Defendants' actions are part of a campaign to undermine academic freedom.**

Although Defendants have cited complaints of antisemitism and invoked Title VI as the purported basis for their actions, their disregard for the procedural and substantive requirements of Title VI and its implementing regulations belie that claim. *See also* Ex. 37. Rather, the Trump administration's own statements demonstrate that Defendants' attacks on Columbia are the first stage of the administration's broader campaign to curtail academic freedom and snuff out viewpoints with which it disagrees. Ex. 23 (cutting $400 million is "only the beginning").

President Trump's 2024 campaign website declared his plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs," Ex. 4; to financially cripple private universities and then "take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments … to endow a new institution called the American Academy," Ex. 5; and to suppress views that challenge the administration's preferred perspective on the Israeli-Palestinian conflict and on issues of race and gender, *id.* (at the American Academy, "there will be no wokeness or jihadism allowed—none of that's going to be allowed"). Vice President Vance has stated that "[t]he professors are the enemy" and praised Hungarian President Victor Orban's aggressive strategy to make Hungarian universities better reflect Orban's own ideology. Rosenthal Decl. ¶10; Ex. 7 at 10-11.

Defendant Leo Terrell, head of the DOJ Task Force, reiterated these objectives recently in an interview: "The academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people ... and we have to put an

end to it." Rosenthal Decl. ¶12. In another interview, Defendant Terrell was asked if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, a new department of history, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks." Terrell answered, "Yes, yes, and yes." Ex. 8.

Defendants have also made clear that Defendants intend to use the same funding termination tactics at other universities, too. Compl. ¶¶60, 276-85; Exs. 8, 19, 28, 56-57. Defendant Terrell said so explicitly: "We're going to bankrupt these universities. We're going to take away every single federal dollar.... If these universities do not play ball, lawyer up, because the federal government is coming after you." Rosenthal Decl. ¶12.

**E. Defendants' actions harm Plaintiffs and their members.**

Defendants' $400 million funding withdrawal and "preconditions" on all future federal funding have harmed Plaintiffs and their members. The AAUP and AFT are membership organizations of faculty and academic professionals. Wolfson Decl. ¶¶4-9; Schmid Decl. ¶¶3-5. Their missions include advancing academic freedom and championing economic opportunity and fairness in higher education. Wolfson Decl. ¶7; Schmid Decl. ¶¶4, 13–15. All current AAUP members are also AFT members. Schmid Decl. ¶5.

Plaintiffs' members at Columbia have lost funding for their work. Wolfson Decl. ¶10; Schmid Decl. ¶7; Martin Decl. ¶¶13, 22, 31-32, 43; Witte Decl. ¶¶6-7; Frye ¶6; Hirsch ¶¶8-9; Witness-A Decl. ¶¶6-11; Witness-B Decl. ¶8. The funding terminations caused research to cease, harmed Plaintiffs' members' reputations and ability to work, and will likely require layoffs on members' research teams. They will prevent members from training the next generation of scientists and researchers, cripple members' ability to plan for their future work and careers, harm longstanding relationships with research collaborators, cause significant emotional tolls, and prevent the discovery of new knowledge. Wolfson Decl. ¶¶10-12; Schmid Decl. ¶¶7-11; Martin Decl. ¶¶14-15, 17-18, 23-26, 35-38, 44-49; Witte Decl. ¶¶9-26; Frye Decl. ¶¶7-11; Hirsch Decl. ¶¶12-15; Witness-A Decl. ¶¶9-15; Witness-B Decl. ¶¶11-25. Additional funding terminations will

inflict new injuries. *Id.*

Defendants' actions have also chilled the speech of Plaintiffs' members and infringed on their academic freedom. Plaintiffs' members fear that their speech and scholarship, if not aligned with the Trump administration, could trigger additional punitive funding freezes *en masse* and further demands by Defendants that their academic departments, too, be placed in academic receivership. Wolfson Decl. ¶¶12-14, 28; Schmid Decl. ¶¶9-11, 25; Martin Decl. ¶¶56-60; Witte Decl. ¶29-37; Frye Decl. ¶14-18; Hirsch Decl. ¶¶19-29; Witness-C Decl. ¶¶9-10; Witness-A Decl. ¶17; Witness-B Decl. ¶34-35. As a result, some are engaging and will engage in self-censorship on topics they perceive to be in tension with Defendants' preferred viewpoint. *Id.*

Defendants' actions have also harmed the AAUP and AFT themselves, by directly impairing Plaintiffs' missions and requiring them to divert substantial financial and staff resources to respond to Defendants' actions. Wolfson Decl. ¶¶15-28; Schmid Decl. ¶¶12-25.

## STANDING

Each Plaintiff has associational standing because "(a) at least one of the association's members would otherwise have standing to sue in its own right—i.e., has constitutional standing; (b) the interests the association seeks to protect are germane to its purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency of Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011), *aff'd*, 570 U.S. 205 (2013)); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025). Individual AAUP/AFT members are suffering numerous concrete and particularized injuries from Defendants' conduct. *Supra* 8-9. Protecting the academic freedom, speech and due process rights, and professional interests of faculty against Defendants' actions is plainly germane to Plaintiffs' purposes. Wolfson Decl. ¶¶7-8, 16-20, 22-24; Schmid Decl. ¶¶4, 13-14, 18-21. And Plaintiffs' claims and the preliminary injunctive relief sought turn on the lawfulness of Defendants' conduct and do not require the participation of individual members.

Each Plaintiff independently has organizational standing because Defendants' actions have "directly affected and interfered with [Plaintiffs'] core business activities," not merely their

"abstract social interests," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95 (2024), and required Plaintiffs to divert resources from other activities, *see Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 120-21 (2d Cir. 2017) ("[E]ven the slight diversion of resources to remedy some harm or to fight some harmful conduct or policy can constitute an injury-in-fact sufficient to confer [organizational] standing if the injury is perceptible, concrete, and demonstrable."); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011). Defendants' actions have forced Plaintiffs to divert resources, including sending staff to Columbia's campus, to assist members responding to Defendants' demands; respond to a surge of inquiries from chapter leaders and members across the country with guidance; hold weekly meetings and calls with affiliate leaders and members to coordinate responses in real time; draft and provide sample contract and policy language for affiliates to address the ramification of federal funding cancelation; and provide increased financial support for members defending themselves against Defendants' actions. *Supra* 8; Wolfson Decl. ¶¶20, 23, 25-27; Schmid Decl. ¶¶19-20, 22, 24.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on their claims under the APA, separation of powers, First Amendment, Spending Clause, and Due Process Clause. Likelihood of success on any one of those claims is sufficient to support preliminary injunctive relief.

**A. Plaintiffs are likely to succeed on their claims that the March 7 funding withdrawal violated the APA.**

Defendants' decision to terminate $400 million in federal funding is "agency action made reviewable by statute." 5 U.S.C. §704. Title VI provides for judicial review under the APA of any action "terminating … financial assistance upon a finding of failure to comply with" Title VI. 42 U.S.C. §2000d-2. Even absent that express provision, the termination of funds would be reviewable "final agency action," 5 U.S.C. §704, since it is the "ultimate sanction[]" in the Title VI enforcement process, 28 C.F.R. §50.3; see Bennett v. Spear, 520 U.S. 154, 178 (1997). Defendants DOJ, ED, HHS, NIH, and GSA are also all "agenc[ies]" subject to the APA, 5 U.S.C. §551(a), and Plaintiffs and their members have been "adversely affected or aggrieved" by Defendants' withdrawal of funds to Columbia. *See supra* at 9-10; 5 U.S.C. §§702, 704; 42 U.S.C. §2000d-2.

**1. Defendants failed to follow any of the procedures required by Title VI, the APA, and Defendants' own regulations for terminating funding.**

Congress wrote into Title VI detailed procedural requirements that are prerequisites to the drastic step of terminating federal funding. 42 U.S.C. §2000d-1; *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (Title VI places "elaborate restrictions" on agency enforcement); Exs. 41-42 (legislative history). Defendants DOJ, HHS, ED, and GSA then promulgated regulations setting further procedural requirements for Title VI enforcement. *See, e.g.*, 45 C.F.R. §§80.6–80.11 (HHS); 34 C.F.R. §§100.6–11 (ED); 28 C.F.R. §§42.106–111 (DOJ); 41 C.F.R. §§101–6.211–3, 101–6.212–1 to –4, 101–6.213–1 to –7, 101–6.214 (GSA). Defendants' action here—terminating $400 million in one fell swoop, purportedly on the basis of Columbia's noncompliance with Title VI—is remarkable for having failed to adhere to *any* of these procedures. Plaintiffs are therefore overwhelmingly likely to succeed on their claim that Defendants' termination of funding violated the APA—including its prohibitions on agency actions taken "without observance of procedure required by law," actions "not in accordance with law," actions "in excess of statutory …

limitations," and "arbitrary [and] capricious" actions. 5 U.S.C. §706(2)(A), (C), (D); *see, e.g.*, *Schlafly v. Volpe*, 495 F.2d 273, 276 (7th Cir. 1974) (plaintiff stated claim under APA where agency froze funding under Title VI without following procedures in 42 U.S.C. §2000d-1).

    i. *Notice and voluntary compliance.* Title VI provides that no action terminating federal funding "shall be taken until the department or agency concerned [1] has advised the appropriate person or persons of the failure to comply with [Title VI], and [2] has determined that compliance cannot be secured by voluntary means." 42 U.S.C. §2000d-1. Defendants' regulations confirm these requirements. 45 C.F.R. §80.8(c); 34 C.F.R. §100.8(c); 28 C.F.R. §42.108(c); 41 C.F.R. §101-6.211-3. Agencies must make every effort to secure voluntary compliance rather than terminate funding. 45 C.F.R. §80.6(a) (agency "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance … and shall provide assistance and guidance to recipients to help them comply voluntarily"); id. §80.7(d)(1); 34 C.F.R. §§100.6(a), 100.7(d)(1); 28 C.F.R. §§42.106(a), 42.107(d)(1); 41 C.F.R. §§101-6.209-1, 101-6.210-4. Title VI "requires that a concerted effort be made to persuade any … recipient voluntarily to comply," and such efforts "should be undertaken at the outset" and "pursued through each stage of enforcement[.]" 28 C.F.R. §50.3.

    Here, Defendants never "advised the appropriate person or persons of the failure to comply with" Title VI. 42 U.S.C. §2000d-1. As of March 3, 2025, Defendants had not concluded that Columbia was out of compliance with Title VI, because Defendants released a press release that day referring only to "ongoing investigations of potential violations of Title VI." Ex. 21. Although Defendants' announcement four days later on March 7 referred vaguely to Columbia's "continued inaction in the face of persistent harassment of Jewish students," it nowhere stated that Columbia had failed to comply with Title VI, and to the contrary referred only to "ongoing investigations under Title VI[.]" Ex. 23; Martin Decl. Ex A.

    Even if Defendants had advised Columbia sometime between March 3 and 7 of noncompliance, however, that timeframe makes clear that Defendants failed to give Columbia an opportunity to come into voluntary compliance—a process that necessarily would take more than

four days—before terminating federal funding.

ii. *Opportunity for hearing.* After a notice of noncompliance is sent and the agency determines that voluntary compliance "cannot be secured," the agency must then provide the recipient with an "opportunity for hearing," followed, if supported by the record, by an "express finding on the record … of a failure to comply" with Title VI. 42 U.S.C. §2000d-1. The statute's reference to a finding "on the record" after a hearing triggers the agency's obligation to comply with the formal adjudication requirements of the APA. Cappetta v. Comm'r of Soc. Sec. Admin., 904 F.3d 158, 160 n.1 (2d Cir. 2018); see 5 U.S.C. §§554–557 (requirements for formal adjudication under APA).[3]

Defendants have promulgated detailed regulations governing the conduct of hearings to which funding recipients are entitled before any termination, including regarding notice, procedure, access to documents, and cross-examination. 45 C.F.R.§80.9; 34 C.F.R. §100.9; 28 C.F.R. §42.109; 41 C.F.R. §§101-6.212 –1 to –5. Defendants HHS and ED go further, providing highly detailed procedural rules for these hearings. 45 C.F.R. §§81.1–81.131; 34 C.F.R. §§101.1–101.131. These regulations provide that all records in the hearing shall be public, 45 C.F.R. §81.2; 34 C.F.R. §101.2, and that "[a]ny interested person or organization" may seek to participate in the proceedings as an *amicus curiae*, 45 C.F.R. §81.22(a); 34 C.F.R. §101.22(a).

Defendants complied with none of these provisions before terminating funding to Columbia. See, e.g., Ex. 8 at 2 (Defendant Leo Terrell stating, with respect to Columbia, "what we did was we basically gave them notice[], and we stopped providing the funding."); cf. Hicks v. Comm'r of Soc. Sec., 909 F.3d 786, 805 (6th Cir. 2018) (agency failed to comply with requirements of formal adjudication).

---

[3] Under Title VI, this mandatory formal hearing process applies if the agency wishes to pursue "termination of or refusal to grant or to continue [federal financial] assistance." 42 U.S.C. §2000d-1. Agencies also may seek to enforce Title VI's guarantees by "any other means authorized by law." *Id.* This latter provision, as Defendants' regulations explain, refers to methods such as enforcement by DOJ through litigation, or proceedings under state or local law. *See* 45 C.F.R. §80.8(a); 34 C.F.R. §100.8(a); 28 C.F.R. §42.108(a); 41 C.F.R. §101-6.211-1. This "any other means authorized by law" provision is not at issue here, since Defendants pursued enforcement via termination and refusal to continue funding.

iii. *Express finding of Title VI noncompliance on the record.* After the formal hearing, Title VI requires the agency to make "an express finding on the record … of a failure to comply with" Title VI before any funding termination. 42 U.S.C. §2000d-1. Under the APA, the record must "show the ruling on each finding, conclusion, or exception presented" by the parties, including "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record," and "the appropriate rule, order, sanction, relief, or denial thereof." 5 U.S.C. §557(c). Defendants' regulations specify that the agency must "identify the requirement or requirements imposed by or pursuant to [Title VI] with which it is found that the … recipient has failed to comply." 45 C.F.R. §80.10(d); 34 C.F.R. §100.10(d); 28 C.F.R. §42.110(d); 41 C.F.R. §101-6.213-4.

Defendants made no express findings on the record of Columbia's failure to comply with Title VI. Even if they had, Defendants did not articulate their "findings and conclusions, and the reasons or basis therefore, on all material issues of fact, law, or discretion," and never specified the legal grounds for finding Columbia out of compliance. *See Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("When a statute requires an agency to make a finding as a prerequisite to action, it must do so.").

iv. *Tailoring of sanction.* Title VI places substantive limits on an agency's authority to terminate federal funding: termination (1) must be "limited to the particular political entity, or part thereof, or other recipient as to whom such a finding [of noncompliance] has been made," and (2) must also be "limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. §2000d-1; accord 45 C.F.R. §80.8(c); 34 C.F.R. §100.8(c); 28 C.F.R. §42.108(c); 41 C.F.R. §101-6.211-3. Because Defendants never explained the nature of any Title VI violation or made any on-the-record finding of noncompliance, they necessarily did not limit their termination of funding to the particular entities (whether Columbia as a whole, or some subcomponent of the university) that are out of compliance, or limit the termination "in its effect" to the particular program, "or part thereof," in which such

noncompliance was found. 42 U.S.C. §2000d-1; see Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch, 414 F.2d 1068, 1078 (5th Cir. 1969).

v. *Congressional notification and wait period.* Finally, Title VI provides that to terminate federal funding, "the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." 42 U.S.C. §2000d-1. Furthermore, "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." Id.; accord 45 C.F.R. §80.8(c); 34 C.F.R. §100.8(c); 28 C.F.R. §42.108(c); 41 C.F.R. §101-6.211-3. Defendants filed no report with Congress, and cannot have waited the required 30 days, since Defendants only began their investigation into Columbia on February 3, 2025, and as of March 3—four days before the termination decision—Defendants referred to their investigations of "potential" violations as "ongoing." Ex. 21. Yet Defendants made their March 7 termination decision effective "immediately." Ex. 23.

This is not a close question. Defendants' March 7, 2025 termination of funding violated every procedural rule and therefore is likely to be held unlawful and set aside under the APA. 5 U.S.C. §706(2)(A), (C), (D).[4]

**2. Defendants provided no reasoned explanation for withdrawing funding.**

Defendants' withdrawal of funding also violated the cornerstone rule of administrative law that agencies must "engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). Decisions that are not "reasonable and reasonably explained" must be set aside as "arbitrary" and "capricious" under the APA, 5 U.S.C. §706(2)(A). *Ohio v. EPA*, 603 U.S. 279, 292–93 (2024).

The issue here is not whether Columbia is out of compliance with Title VI. The issue is

---

[4] Some notices sent to Columbia faculty by Defendants HHS and NIH cited 2 C.F.R. §200.340, an Office of Management and Budget regulation governing termination of federal awards generally, as purported authority for terminating some of the grant funding here. But Section 200.340 provides no authority for ignoring Title VI's statutory procedures. Its neighboring regulation, 2 C.F.R. §200.342, makes clear that to terminate funding, a federal agency "must comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved."

that Defendants failed to provide any reasoned basis for their apparent (if unstated) conclusion to that effect, and their simultaneous cancelation of funding. *First*, Defendants' announcement refers to no specific evidence of any antisemitic harassment to which the University was deliberately indifferent. It therefore fails to explain how any events or conduct constitute noncompliance with Title VI. *Cf. Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *7–8 (D.D.C. Mar. 18, 2025) (termination of grants improper where agency "Defendants did not and have not identified a violation of any applicable regulation or any of the grant's terms" and only "vaguely reference[d] 'multiple ongoing investigations'").

*Second*, Defendants failed to explain the basis for the particular sanction they imposed on Columbia—the "immediate cancellation" of "$400 million" in federal funding. The APA requires agencies to "articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants have never explained why termination of funding rather than seeking voluntary compliance was necessary, why $400 million was terminated rather than some other amount, what grants were selected for termination and on what basis, or whether those grants have any connection to the (as-yet unspecified) Title VI violation. These explanatory failures are particularly significant in light of Title VI's requirement, discussed above, that termination of funding be "limited in its effect to the particular program, *or part thereof*, in which such noncompliance has been so found." 42 U.S.C. §2000d-1 (emphasis added). This is textbook arbitrary and capricious action under the APA. *Cf. Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) ("likelihood of success on … APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards"); *RFE/RL, Inc. v. Lake*, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025).

*Third*, Defendants never considered the enormous reliance interests implicated by their immediate cancelation of hundreds of millions of dollars supporting critical research and other activities. DOJ's guidelines state that "in each case" of Title VI enforcement, the objective is to

secure compliance "so that needed Federal assistance may commence or continue." 28 C.F.R.
§50.3(a). The Supreme Court has repeatedly emphasized the significance of considering reliance
interests when an agency changes course, like Defendants did here in choosing to terminate
previously granted funding. *See Regents of the Univ. of California*, 591 U.S. at 30–31 (citing
cases). Yet Defendants took their action without any regard for the incalculable damage they would
cause—to patients whose clinical trials are ending, faculty whose careers will be derailed,
employees around the world whose livelihoods are in jeopardy, and the public who will no longer
benefit from the research those federal grants supported. *Cf. California v. U.S. Dep't of Educ.*,
2025 WL 878431, at *4 (1st Cir. Mar. 21, 2025) (agency failed to consider "reliance interests of
grant recipients and program participants" or "account[] for all relevant impacts of cutting off
funding to programs already in place").

**B. Plaintiffs are likely to succeed on their claims that the March 13 "preconditions" for continued federal funding violated the APA.**

Defendants' March 7 termination of $400 million was also part of an unlawful act of
coercion that culminated in Defendants' March 13 letter demanding that Columbia accede, within
one week, to Defendants' instructions for running the university—on pain of losing billions more.
This demand by the federal government was unprecedented in our history, and it violated the APA.

The March 13 letter is "agency action made reviewable by statute" and therefore subject
to judicial review under the APA. 5 U.S.C. §704. The letter was an action "refusing to … continue
financial assistance" upon a finding of Title VI noncompliance unless Columbia adopted
Defendants' demands. 42 U.S.C. §2000d-2. Even absent that express judicial review provision,
the March 13 letter would be reviewable "final agency action" under the APA. 5 U.S.C. §704. By
March 13, Defendants had already cut hundreds of millions of dollars to Columbia and were
threatening, in Defendant Terrell's words, to "bankrupt" the university, *supra* at 8, if it did not
comply with Defendants' conditions. Defendants' letter demanded "immediate compliance." *Cf.
Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 437 (D.C. Cir. 1986) (letter that "emphatically
required … 'immediate compliance'" was final agency action); *Abbott Lab'ys v. Gardner*, 387

U.S. 136, 152 (1967) (similar). Defendants' later March 24, 2025 announcement confirmed the legally binding effect of the March 13 letter, describing the March 13 letter's demands as the "Trump Administration's requirements" and "9 preconditions for formal negotiations to restore canceled federal grants and contracts." Ex. 28. Plaintiffs' members are also "adversely affected or aggrieved" by Defendants' demands issued on March 13. *Supra* Standing; *see* 5 U.S.C. §§702, 704; 42 U.S.C. §2000d-2.

      **1.  Defendants failed to follow the procedures for refusing to continue funding.**

Defendants' March 13 letter demanded "immediate compliance" with a host of substantive requirements that the letter stated were "a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." Ex. 26. Defendants therefore conveyed that failure to comply with those demands would result in discontinuation of federal financial assistance to Columbia.

Defendants' conduct defies the entire statutory framework for Title VI enforcement designed by Congress and applied by Defendants themselves for decades. No provision of Title VI permits an agency first to terminate funding without process, and then to communicate to the recipient that unless the recipient immediately complies with the agency's specific instructions for how to operate a private university, not only will that funding not be restored, but more funding will be cut—again outside the statutory process. This unprecedented, coercive procedure flies in the face of Congress's design, and is therefore "not in accordance with law," "in excess of statutory … authority, or limitations, or short of statutory right," and "without observance of procedure required by law." 5 U.S.C. §706(2)(A), (C), (D); *see* 28 C.F.R. §50.3 ("[O]nce a particular program grant … has been made or an application … has been approved, no funds due and payable pursuant to that grant … may normally be deferred or withheld without first completing the procedures prescribed in [42 U.S.C. §2000d-1].").[5]

---

[5] The Office of Management and Budget also issues regulations governing awards of federal financial assistance generally, and Defendants' conduct is equally inconsistent with those regulations, which provide that "[a]gencies may only impose legally binding requirements on recipients… through (1) Notice and public comment procedures through an approved agency process … or (2) Incorporating requirements into the terms and conditions of a Federal award as permitted by [law.]" 2 C.F.R. §200.105. Defendants did neither.

The same statutory and regulatory procedures required before funds can be terminated apply equally to actions "refus[ing] to … continue" financial assistance. 42 U.S.C. §2000d-1; *supra* I.A.1 The March 13 letter was just such an action, as it announced that there would be no "continued financial relationship with the United States" absent Columbia's immediate compliance with Defendants' demands. Ex. 26. Yet Defendants issued that letter without following any of the required procedures, such as providing opportunity for a hearing, a decision on the record, notifying Congress, or waiting thirty days—plain violations of Title VI, and therefore violations of the APA.

### 2. The March 13 demands were unreasoned.

The March 13 letter was also arbitrary and capricious because it failed to provide a reasoned explanation for refusing to continue financial assistance unless Columbia agreed to its demands. 5 U.S.C. §706(2)(A). The letter listed nine demands for "immediate compliance," but did not provide a factual or evidentiary basis to support *any* of those demands. Nor did the letter even attempt to explain how those demands would bring Columbia into compliance with Title VI—or whether the demands had any connection to Title VI compliance at all. *Cf.* 45 C.F.R. §80.10(f) (*after* full Title VI hearing procedure is completed, agencies can condition future federal funding on the recipient having "correct[ed] its noncompliance" through means "consistent with," and that "will effectuate the purposes of," Title VI). For instance, the letter demanded "a plan for comprehensive admissions reform," but explained neither what manner of "reform" was required, nor how such reform would address any issues under Title VI. Similarly, the letter demanded Columbia "abolish" its University Judicial Board, without any reasoning for why Columbia must do so. Nor did the letter cite a single provision of Title VI or otherwise attempt to explain the procedural basis for its action. This was not reasoned decision-making; it was arbitrary abuse of the government's power.

### C. Plaintiffs are likely to succeed on their separation of powers / ultra vires claims.

Defendants' summary termination of Congressionally authorized funding to Columbia, without any statutory or constitutional authorization, also violates the Constitution's separation of

powers and is ultra vires. The Constitution vests the spending power, including the authority to place conditions on federal spending, in Congress. U.S. Const., art. I. The Executive branch has no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes, including spending statutes. *Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998). Rather, the President must "take Care that the Laws be faithfully executed." U.S. Const., art. II; *cf. Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838). The purpose of the constitutional scheme was to "diffuse[] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

Under the constitutional separation of powers, "[a]n agency may not withhold funds in a manner, or to an extent, unauthorized by Congress." *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 562 (S.D.N.Y. 2019) (citing *Train v. City of New York*, 420 U.S. 35, 44-46 (1975)).[6] Yet that is precisely what Defendants have done. *Supra* I.A-B.

Congress exercised its spending power to authorize the federal grants and contracts that Defendants canceled. Congress also exercised its authority to adopt Title VI's procedural and substantive requirements for termination of federal financial assistance. *Supra* I.A-B. Defendants did not comply with these statutory requirements before terminating $400 million in federal funding. No other statute or provision of the Constitution authorized the funding withdrawal.

Defendants similarly lack any statutory or constitutional authority to dictate that federal funding will not be restored, and other federal funding will be canceled or not renewed, if Columbia does not comply with Defendants' sweeping demands in the March 13 letter. Ex. 26. The demands thus constitute an unconstitutional usurpation of Congress's spending power, an unconstitutional effort to amend Congressional appropriations by attaching conditions not adopted by Congress, and a violation of the separation of powers.

---

[6] *See City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals [without violating the separation of powers].")); *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *City and Cty. of San Francisco v. Sessions*, 372 F.Supp.3d 928, 947 (N.D. Cal. 2019) (DOJ's funding conditions violated separation of powers because Congress had not authorized DOJ to impose such conditions), *aff'd in relevant part*, 42 F.4th 1078, 1084 (9th Cir. 2022).

"When an executive acts *ultra vires*," as is the case here, "courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).[7] As courts have recognized in similar circumstances, injunctive relief is necessary to prevent Defendants' violation of the separation of powers. *See, e.g.*, *Washington v. Trump*, 2025 WL 659057, at *12 (W.D. Wash. Feb. 28, 2025) (executive orders that "purport to condition congressionally appropriated funds in a manner that effectively rewrites the law … usurp Congress's legislative role and thus amount to an end run around the separation of powers"); *New York v. Trump*, 2025 WL 357368, at *3, 5 (D.R.I. Jan. 31, 2025) (enjoining executive branch "pause" on federal funding as not authorized by Congress).

### D.  Plaintiffs are likely to succeed on their First Amendment claims.

#### 1.  Defendants' coercion of Columbia to suppress the speech and association of faculty and others is unconstitutional.

Last year, the Supreme Court unanimously affirmed that a "government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190. Yet that is what Defendants have done by leveraging billions of dollars in federal funding to force Columbia to "play ball," Rosenthal Decl. ¶12, and acquiesce to sweeping, unprecedented demands that will suppress the most sensitive First Amendment rights of faculty and students. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) ("academic freedom ... is a special concern of the First Amendment").

The government "violate[s] the First Amendment through coercion of a third party" by engaging in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress … speech." *Vullo*, 602 U.S. at 191.

---

[7] *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 27 (2015) (federal courts have authority to enjoin "violations of federal law by federal officials"); *Stark v. Wickard*, 321 U.S. 288, 309-10 (1944); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *U.S., Dep't of Interior v. 16.03 Acres of Land, More or Less, Located in Rutland Cnty., Vt.*, 26 F.3d 349, 354 (2d Cir. 1994) ("[T]here is no place in our constitutional system for the exercise of arbitrary power, and, if [an Executive branch official] has exceeded the authority conferred upon him by law, then there is power in the courts to restore the status of the parties aggrieved by such unwarranted action.") (citation omitted).

There can be no question that Defendants conveyed a threat of adverse government action by summarily canceling $400 million in federal funding and declaring that *all* federal funding was at stake if Columbia did not immediately accede to Defendants' demands. It is hard to imagine a more coercive directive than a summary cutoff of hundreds of millions of dollars in federal funding followed by a demand from the highest levels of the Executive branch to immediately take specified actions as "preconditions" for any continued federal funding, directed at an institution that relies on *$5 billion* in federal funds. Further, President Trump explicitly threatened that "All Federal Funding will STOP" if universities like Columbia continued to "allow[] illegal protests" on private campuses or did not ban masks. Ex. 22. Columbia's response also demonstrates the coercive force of Defendants' actions. *Supra* at 7; *cf. Vullo*, 602 U.S. at 193 (regulated entity's reaction indicated presence of coercion).

A reasonable person would understand Defendants' actions to be directed squarely at suppressing speech, association, and academic freedom rights, including those of Plaintiffs' members. *Vullo*, 602 U.S. at 191; Exs. 22, 23, 26. Academic scholarship is protected speech under the First Amendment. *See Heim*, 81 F.4th at 229 (recognizing special First Amendment protections for academic scholarship because it "serves a broad public purpose" (cleaned up)); Martin Decl. ¶¶13, 17, 22, 31-32, 43; Witte Decl. ¶¶6-7; Hirsch Decl. ¶¶8-9; Witness-A Decl. ¶¶6-11; Witness-B Decl. ¶¶8-9. The March 13 demands are directed at restricting scholarship, protest, association, and academic independence, by: (a) placing a specific department into academic receivership, (b) suspending or expelling students who participated in encampment protests, (c) prohibiting anonymous speech through a ban on facial coverings, (d) demanding new time, place, and manner restrictions on demonstrations, and (e) creating an undefined "plan for comprehensive admission reform," including regarding "international recruiting" and graduate admissions. Ex. 26. Each demand infringes on "the four essential freedoms of a university," making the government the unconstitutional regulator of "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring). Each demand also operates to punish or suppress the constitutionally protected

activities of Plaintiffs' members. Martin Decl. ¶¶13, 17, 22, 31-32, 43; Witte Decl. ¶¶6-7; Hirsch Decl. ¶¶8-9; Witness-A Decl. ¶¶6-11; Witness-B Decl. ¶¶8-9; Witness-C Decl. ¶¶7-10.

Defendants' coercive efforts to suppress speech violate the First Amendment even if motivated by a desire to regulate unprotected speech or conduct. Even accepting Defendants' representations that they are motivated by a desire to enforce Title VI, the coercive methods they have deployed are unconstitutional. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 65 (1963) (cleaned up), the Supreme Court held that a commission that threatened booksellers for distributing what it believed to be obscene publications violated the First Amendment even though "obscenity is not constitutionally protected speech." The Court found that in response to the commission's coercive tactics, booksellers would likely self-censor out of fear, cutting courts out of determining whether targeted material was actually unprotected. *Id.* at 70-71. Likewise here, even if Defendants sought only to target discriminatory conduct or "illegal protests," Exs. 22, 23, their efforts to leverage billions of dollars to coerce Columbia in service of that goal are unconstitutional. Columbia's swift accession to Defendants' demands without even being advised what speech or conduct the government believed was unlawful exemplifies "the hazards to protected freedoms" caused by such systems of "informal censorship." *Bantam Books*, 372 U.S. at 70-71.

## 2. Defendants' March 13 demands unconstitutionally condition federal funding on the forfeiture of First Amendment rights.

"[T]he government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Open Soc'y*, 651 F.3d at 231; *see Perry v. Sindermann*, 408 U.S. 593 (1972). The government may "define the limits of [a] government spending program," but it may not impose "conditions that seek to leverage funding to regulate speech outside the contours of the program." *Agency for Int'l Dev. v. All For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

After summarily halting Plaintiffs' members' First Amendment protected research and scholarship on March 7, Defendants imposed in their March 13 letter a battery of conditions on

resuming funding. Nearly all of those conditions require either compelled speech or a forfeiture of First Amendment rights. Ex. 26. For instance, Defendants have pressured Columbia to adopt a particular definition of antisemitism, citing President Trump's use of the "IHRA definition," a definition that would then be imposed on Plaintiffs' members. *Id*. But the government may not "compel[] a grant recipient to adopt a particular belief as a condition of funding"—such conditions by their "very nature affect protected conduct outside the scope of the federally funded program." *Open Soc'y*, 570 U.S. at 218 (cleaned up). Similarly, Defendants have demanded that Columbia directly suppress faculty speech, scholarship, and association by placing an academic department into receivership. Further, Defendants have made continued funding contingent on Columbia banning anonymous speech and enacting new restrictions on public protest—requiring the university to forfeit its own right to determine how best to strike a balance between competing interests when serving as a forum for speech and debate and harming Plaintiffs' members as a result.[8] The unconstitutional conditions doctrine clarifies that the government cannot, as Defendants have here, use funding as a cudgel to compel speech or suppress expression.

### 3. Defendants' targeting of protected expression based on viewpoint violates the First Amendment.

Defendants' actions also constituted unlawful viewpoint discrimination. "Ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). That maxim holds "[e]specially" true where government action "suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978). Even when regulating unprotected expression, "[t]he government may not regulate … based on hostility—or favoritism—towards the underlying message expressed". *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

---

[8] The First Amendment protects the right to host different types of speech even if the host does not agree or disagree with the particular views being hosted. *See Moody v. NetChoice LLC*, 603 U.S. 707, 740 (2024).

Defendants' public statements demonstrate their intent to target protestors generally, and universities perceived as "left" or "Marxist" in particular. *Supra* at 8-9; Ex. 4; Rosenthal Decl. ¶12. That is the case here. In terminating funding on March 7 (and therefore directly suppressing the protected scholarship of Plaintiffs' members), Defendants referenced Columbia's purported inaction regarding "radical" protesters. Ex. 23; *see Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (noting "bedrock principle" that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive"). Defendants' subsequent demands targeted a specific academic department for receivership, Ex. 26, and Columbia's response demonstrated it understood the goal of this targeting was to alter the ideological makeup of that department. Ex. 27 (committing to expand "intellectual diversity among faculty"). Furthermore, Plaintiffs have submitted under seal additional evidence relevant to this claim. Dubal Decl. ¶9 & Ex. A. Defendants' efforts to suppress those viewpoints violate the First Amendment.

**E.  Defendants' threats likely exceed their authority under the Spending Clause.**

Defendants' coercive actions also violate the Spending Clause. "Title VI invokes Congress's power under the Spending Clause," and the "legitimacy" of conditions attached to federal action under this power "rests on whether the [recipient] voluntarily and knowingly accepts the terms" imposed on it. *Barnes v. Gorman*, 536 U.S. 181, 185-86 (2002); *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022); *NFIB*, 567 U.S. at 584 (spending power "does not include" the power to "surpris[e]" funding recipients "with post-acceptance or 'retroactive' conditions"). Columbia and Plaintiffs' members agreed to comply with Title VI when they accepted federal funding. They did not agree that the Executive branch could summarily cut hundreds of millions of dollars in funding without following any of Title VI's mandatory procedures, or that the Executive branch could suddenly impose sweeping and invasive new demands on virtually every aspect of university activities—from admissions, to academics, to student life, to discipline, to human resources, to campus security—as "preconditions" for the continuation of all federal funding. Defendants' actions exceed the federal government's power

by retroactively rewriting the funding terms that Columbia and Plaintiffs' members had accepted, casting aside the settled understandings on which funding recipients have relied in structuring their operations.

Defendant's imposition of *new* conditions such as these on the continuation of *all* ongoing federal funding constitutes coercion prohibited by the Spending Clause because Columbia as a practical matter has no choice but to accede to the new conditions. Defendants' overt threat of crippling economic punishment if Columbia and Plaintiffs' members do not comply with those new terms–"a gun to the head" if ever there was one–goes far beyond the "relatively mild encouragement" permitted under the Spending Clause, and amounts to impermissible "economic dragooning" in violation of the Constitution. *NFIB*, 567 U.S. at 581-82. Government grants make up about 20% of Columbia's operating revenue and the withdrawn grants make up about a quarter of the university medical center's portfolio, far more than the proportion of threatened funding the Court held to be impermissibly coercive in *NFIB*. *See* Exs. 13, 30; *NFIB*, 567 U.S. at 582 (threatened loss of over 10% of budget leaves recipient with "no real option but to acquiesce"). Defendants' demands seek to dramatically "transform" the relationship between the federal government and Columbia, effectuating "a shift in kind, not merely degree." *NFIB*, 567 U.S. at 583-84. The Spending Clause bars such "post-acceptance" coercion. *Id.* at 584.

**F. Plaintiffs are likely to succeed on their Due Process claims.**

Defendants' March 7 withdrawal of funding and March 13 imposition of "preconditions" to continued federal funding also violate the Fifth Amendment's guarantee of due process. Specifically, Defendants' actions are void for vagueness because Defendants issued sanctions and demands that failed to provide Columbia or Plaintiffs' members with fair notice of what conduct is forbidden or required, and that invite arbitrary and unpredictable enforcement. *See F.C.C. v. Fox Television Stations*, 567 U.S. 239, 253 (2012) ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). When summarily terminating $400 million in funding on March 7—and warning of "additional cancellations" in the future—Defendants failed to provide any constitutionally adequate basis for these terminations,

relying entirely on unexplained assertions regarding Columbia's "continued inaction" regarding antisemitism. Defendants then amplified the confusion on March 13 by demanding adherence to "preconditions" (a concept unmoored from Title VI law or procedure) that established no clear standards for compliance (such as "admissions reform"). Defendants thus provided no constitutionally adequate notice regarding the grounds on which funding had been revoked or would be subject to revocation in the future. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (citation omitted). The vagueness of Defendants' regulatory actions is particularly concerning because they suppress protected speech, as explained above. *Fox Television*, 567 U.S. at 253-54 (vagueness doctrine must be applied rigorously "[w]hen speech is involved … to ensure that ambiguity does not chill protected speech.").

## II.    Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

Absent immediate injunctive relief, Plaintiffs and their members will continue to suffer irreparable harm. Defendants' conduct will continue to interfere with Plaintiffs' members' academic freedom and will continue to chill faculty and student speech not only at Columbia but at colleges and universities across the country, in violation of the Constitution. Wolfson Decl. ¶¶12-14, 28; Schmid Decl. ¶¶9-11, 25; Witness-D Decl. ¶¶7-22; Martin Decl. ¶¶13, 17, 22, 31-32, 43; Witte Decl. ¶¶6-7; Hirsch Decl. ¶¶8-9; Witness-A Decl. ¶¶6-11; Witness-B Decl. ¶¶8-9; Witness-C Decl. ¶¶7-10; Witness-E Decl. ¶¶4-10; Witness-G Decl. ¶¶4-9; Witness-F Decl. ¶¶5-9; Witness-H Decl. ¶¶5-15; Witness-I Decl. ¶¶5-9. Defendants' actions are also causing extensive self-censorship on campus by AAUP members, Martin Decl. ¶¶54-60, 62-65; Witte Decl. ¶¶29-37; Frye Decl. ¶¶15-18; Hirsch Decl. ¶¶23-24; Witness-C Decl. ¶9 , and Columbia students, Witness-E Decl. ¶¶4-10; Witness-G Decl. ¶¶4-9; Witness-F Decl. ¶¶5-9; Witness-H Decl. ¶¶5-15; Witness-I Decl. ¶¶5-9. Self-censorship is affecting discussion inside the classroom. Witness-C Decl. ¶¶7-10; Witte Decl. ¶¶32-34. Students and faculty working on human rights feel especially surveilled and scrutinized. Witness-E Decl. ¶¶5-10; Witness-F Decl. ¶¶5-9; Witness-C Decl. ¶¶8-

9. This "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "the Second Circuit has held that ***any*** alleged violation of a constitutional right triggers a finding—not merely a rebuttable presumption—of irreparable harm…." *T.C. v. New York State Dep't of Health*, 2022 WL 17689841, at \*7 (S.D.N.Y. Dec. 15, 2022) (citation omitted).

Furthermore, the termination of $400 million in federal grant funding is causing and will continue to cause irreparable harm. Wolfson Decl. ¶¶10-12; Schmid Decl. ¶¶7-11. Researchers are uncertain how they will continue to pay staff, Martin Decl. ¶¶24, 36-37; Witness-A Decl. ¶¶12-15; Witness-B Decl. ¶¶18-20, and some have already had to lay off staff at partner institutions, Martin Decl. ¶¶37-38; Witte Decl. ¶¶11-15. Many faculty face reduction in their own salaries. Martin Decl. ¶¶7-8, 26; Witness-B Decl. ¶18; Witness-A Decl. ¶¶6-7. Departments are scaling back on new admissions of PhD and postdoctoral students which will both limit the research those departments can engage in and likely harm future admissions. Martin Decl. ¶18; Hirsch Decl. ¶14. Columbia faculty who previously held training grants will lose out on essential early career technical development. Martin Decl. ¶¶17, 25-26; Frye Decl. ¶¶8-9; Witness-A Decl. ¶ 11-12. One young faculty member who held a training grant explains that they will miss out on "training programs, data access, seminars, travel to coordinate with other research institutions and professionals" which "will have an immediate impact" on their career. Martin Decl. ¶¶25-26; *see Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 n.16 (1981) (irreparable harm based on being "denied specific job opportunities and the training and competitive advantages that would come with those opportunities"). Plaintiffs' members are also suffering irreparable damage to their reputations and relationships with colleagues and research subjects around the world from the abrupt cancelation of projects. Martin Decl. ¶38; Witte Decl. ¶¶11-14, 17. If Defendants are allowed to implement additional cuts without following statutory requirements, as they have threatened, even more irreparable harm will result.

## III.    The Balance of Harms and Public Interest Support Preliminary Injunctive Relief.

The balance of equities and public interest also strongly favor preliminary relief.

"[S]ecuring First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("[A] direct and severe constitutional violation weighs heavily in favor of granting injunctive relief."). And where an agency "has acted in derogation of the APA and its own regulations, … there can be no doubt that the public interest favors requiring the government to comply with the law." *Velasaca v. Decker*, 458 F.Supp.3d 224, 241 (S.D.N.Y. 2020); *TikTok Inc. v. Trump*, 507 F.Supp.3d 92, 115 (D.D.C. 2020) (government "cannot suffer harm from an injunction that merely ends an unlawful practice"); *L.V.M. v. Lloyd*, 318 F.Supp.3d 601, 620 (S.D.N.Y. 2018).

The public also has a strong interest in the continuance of robust scientific and medical research at one of America's leading research institutions. The public has an especially strong interest in seeing to fruition the investments of public monies already committed to multi-year projects that will now not be completed absent injunctive relief. *See, e.g.*, Witness-B Decl. ¶¶12, 21; Witness-A Decl. ¶10; Exs. 30, 32, 33, 34, 35, 36, 38; *U.S. Dep't of Homeland Sec.*, 969 F.3d at 87 (preliminary injunction where challenged rule would "likely result in '[w]orse health outcomes … and [r]educed productivity and educational attainment'"). No public interest is served by allowing continued violations of Title VI, the APA, and the Constitution.[9]

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

For the foregoing reasons, the Court should order preliminary injunctive relief.

---

[9] No security should be required, as Defendants will suffer no harm from the absence of a bond. *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997).

Dated: April 3, 2025      Respectfully submitted,

      By: <u>S/ Orion Danjuma</u>
        Orion Danjuma
        Rachel Goodman
        Deana K. El-Mallawany*
        The Protect Democracy Project, Inc.
        82 Nassau Street, #601
        New York, NY 10038
        Tel: (202) 579-4582
        Fax: (202) 769-3176
        orion.danjuma@protectdemocracy.org
        rachel.goodman@protectdemocracy.org
        deana.elmallawany@protectdemocracy.org

        Anna Dorman*
        Catherine Chen*
        Amit Agarwal*
        The Protect Democracy Project, Inc.
        2020 Pennsylvania Ave. NW, Suite #163
        Washington, D.C. 20006
        Tel: (202) 579-4582
        Fax: (202) 769-3176
        anna.dorman@protectdemocracy.org
        catherine.chen@protectdemocracy.org
        amit.agarwal@protectdemocracy.org

        Eve H. Cervantez*
        Stacey M. Leyton*
        Matthew J. Murray*
        Connie K. Chan*
        Juhyung Harold Lee*
        Jonathan Rosenthal*
        ALTSHULER BERZON LLP
        177 Post St., Suite 300
        San Francisco, CA 94108
        Tel: (415) 421-7151
        Fax (415) 362-8064
        ecervantez@altber.com
        sleyton@altber.com
        mmurray@altber.com
        cchan@altber.com
        hlee@altber.com
        jrosenthal@altber.com

Richard Primus*
The University of Michigan Law School
(institutional affiliation provided for identification
purposes only; not representing the University)
625 S. State Street
Ann Arbor, MI 48109
Tel: (734) 647-5543
Fax: (734) 764-8309
PrimusLaw1859@gmail.com

*Pro hac vice application granted, pending, or
forthcoming

**Counsel for Plaintiffs**

## CERTIFICATE OF COMPLIANCE

As required by Local Civil Rule 7.1(c), I certify that the document is 10,430 words in length, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c), and the document is less than 30 pages in length, as permitted by the Court's order. ECF 23.

S/ Orion Danjuma
Orion Danjuma