UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,<br><br>and<br><br>AMERICAN FEDERATION OF TEACHERS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-02429-MKV |

# Declaration of Reinhold Martin

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,

and

AMERICAN FEDERATION OF TEACHERS,

    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE. et al.,

    Defendants.

Case No.1:25-cv-02429-MKV

## Declaration of Reinhold Martin

I, Reinhold Martin, declare as follows:

1. I am a Professor of Architecture at the Graduate School of Architecture, Planning, and Preservation at Columbia University.

2. I am the President of the American Association of University Professors Columbia chapter ("Columbia AAUP"). I have voluntarily served in this role since the Columbia University Chapter of American Association of University Professors ("AAUP") announced the election of a new Executive Committee on May 22, 2024. I have been an AAUP member since 2021.

3. As a chapter of the AAUP, Columbia AAUP advocates for policies at Columbia which promote the AAUP's mission of advancing academic freedom and shared government, defining fundamental professional values and standards for higher education, ensuring higher education's contribution to the common good, and safeguarding the economic security of faculty,

academic professionals, graduate students, post-doctoral fellows, and others all those engaged in teaching and research in higher education.

4. Columbia AAUP is not aligned with any political party or ideology. Our members have diverse political and personal beliefs, and we welcome that diversity.

5. All Columbia AAUP members are members of the AAUP. AAUP is an affiliate of the American Federation of Teachers ("AFT"). As a result, all current AAUP members are also AFT members.

6. I understand that Title VI and its implementing regulations require the government to provide notice and opportunity for a hearing, followed by a finding on the record, before terminating federal funding to any program or part thereof based on a violation of Title VI. I am not aware of any such notice having been provided to any AAUP member or any such hearing occurring prior to the termination of $ 400 million in federal funding to Columbia. I received the document attached to this declaration as Exhibit A from former Interim President Katrina Armstrong on March 7, 2025. It is my understanding that this email communication was sent to all Columbia faculty, staff, and students.

7. If the government had provided notice and provided opportunity for a hearing as required, I would have notified AAUP members of the opportunity and likely would have organized our participation in that hearing directly or as an amicus curiae, as permitted by the applicable regulations, to protect the federal funding that supports our work.

8. I understand that Title VI requires federal agencies to provide a full report to Congress thirty days before terminating federal funds under Title VI. I am not aware of any federal agencies providing any such report to Congress regarding funding to Columbia. If any such report had been filed, I would have notified AAUP members of the report and likely would

have organized communications to Congress by AAUP members opposing termination of the federal funding that supports our work.

9. I am over the age of 18 and competent to testify as to the matters set forth in this affidavit based on my own personal knowledge.

10. As President of the Columbia AAUP chapter, I have heard from dozens of our members about how federal funding cuts have severely disrupted their ability to conduct essential academic research. Many of them, including the AAUP members discussed below, are afraid to publicly testify about the impacts of these cuts because they fear retaliation from Columbia University and the federal government.

11. Members, including those discussed below, have expressed fear that they will be blacklisted from future federal grant funding, denied tenure or academic promotion, and/or face retaliation against other members of their department or the students they advise. Certain members, including some discussed below, have expressed concern that because they or their family members are noncitizens, their visas or green cards could be revoked in retaliation for their participation in this litigation. This declaration discusses the experiences of AAUP members without providing names because of the reasonable fears of retaliation these members have expressed.

### *AAUP Member # 1*

12. An AAUP and AFT member is part of the faculty at the Mailman School of Public Health. Their research focuses on the development of biostatistical methods and data science tools for the analysis of public health data.

13. This AAUP member is a co-investigator on an approximately $1.7 million NIH U2R grant terminated as part of the government's announced $400 million cuts. This grant

funded a project to train data scientists in Africa on the collection and processing of public health data. It funded a 5-year project, at about $350,000 a year. Only 3.5 out of the 5 years had been completed before the grant's termination.

14. Cancellation of this grant will have substantial impacts for Columbia's external partners. Planned collaborative research and training activities involving Columbia affiliates and scientists/trainees at institutions abroad will be interrupted.

15. As a result of the termination, the AAUP member will lose a portion of their funded research effort and so must increase effort on unrelated projects funded by other sources in order to maintain their full sponsored effort allocation (the 80 percent of their salary that is funded by sponsored projects).

16. None of the work funded by this grant was related to Israel, Palestine, Judaism, or any topic related in any way to antisemitism. The program has never faced any investigation or complaint related to antisemitism.

17. This AAUP member also mentors multiple PhD students who have lost T32 training grants as a result of the termination of $400 million in federal grants and contracts. To complete their PhD, these students received guaranteed funding for 5 years. It will substantially burden the school to have to find alternative sources of funding for these students. In addition to the harms of the loss in funding, T32 grants also help provide crucial training support to young researchers. Due to funding termination, this member is concerned that their mentees are now going to lose out on vital early career skill development including mentoring and skills training that were only possible as a result of the NIH funding.

18. Every year the biostatistics PhD program admits a new cohort of students. The program is very selective and competitive, admitting only 7 or 8 students per year. This year due

to the loss of funding and resulting financial uncertainty, the size of the cohort was reduced: only 4 new PhD students were admitted. A smaller cohort of doctoral trainees leads to substantially reduced research productivity for faculty, since these trainees contribute to education and research as teaching assistants and research assistants. It is this member's understanding that other doctoral training programs in the public health school, housed in other departments, were similarly affected.

19.     This member has not received any official communications from NIH regarding the termination of funding. It is this member's understanding that Title VI and its implementing regulations require the government to provide notice and opportunity for a hearing, followed by a finding on the record, before terminating federal funding to any program or part thereof based on a violation of Title VI. They were not provided any such notice, and are not aware of any such notice having been provided or any such hearing occurring prior to the termination of $ 400 million in federal funding to Columbia.

20.     This AAUP member – who is Jewish and was previously a student at Columbia – has always taken pride in the political engagement and activism across its campuses. They feel that there has been a substantial shift in that culture of political engagement and debate as a result of the Administration's actions against Columbia. They feel these attacks have had a chilling effect on everyone at Columbia regardless of their area of study and that many faculty and students are concerned about expressing a political view that could get them in trouble or cause further problems for the university.

*AAUP Member # 2*

21. Another AAUP and AFT member is a member of the faculty at Mailman School of Public Health. Their research focuses on developing biostatistical tools to improve environmental health science research.

22. This AAUP member is a principal investigator on an approximately $375,000 NIH K01 grant that was terminated as part of the government's announced $400 million termination. This grant funded research into advanced statistical and artificial intelligent methods to enhance the design of a heat warning system. The investigator will focus on evaluating and implementing heat warning systems to reduce health risks posed by extreme heat weather in the US. The investigator will study the impacts of heat alerts on daily health outcomes due to heat-related illnesses among US adults. Work on this grant had just begun – the grant is for a term of 3 years and had only been underway for approximately 2 months before the grant was terminated.

23. The grant provided the bulk of the salary support for this faculty member – $75,000 per year. Without that funding this member is uncertain how they will meet their obligations to secure funding to contribute to covering their salary.

24. The grant also provided $50,000 per year for research expenses. This member was planning to use a portion of this funding to hire a research assistant and recently hired someone to fill that position. Without grant funding that research assistant's employment is at risk as it is unclear where this member can secure additional funding to cover their wages.

25. In addition to the loss of funding, NIH K-grants provide critical career development support for early career researchers including this member. The loss of support for training programs, data access, seminars, travel to coordinate with other research institutions and professionals will have an immediate impact on this member's career. The investigator has

assembled an advisory team with experts from four US universities. These advisors bring specialized knowledge in environmental health, statistics, optimization, machine learning, and AI, forming a critical foundation of expertise for the investigator's research program development. A loss of support would disrupt coordination with advisory teams and significantly delay access to crucial knowledge and skills necessary to carry out the investigator's critical research responsibilities in present and in the future.

26. The loss of research funding and training support will have an immediate negative impact on this member's career. The researcher would immediately face hardship in securing salary support for himself and the research assistant and would be unable to fulfill essential research responsibilities due to the lack of funding, potentially resulting in termination of employment. Additionally, the loss of training support would jeopardize future recruitment opportunities by causing inadequate training in critical research areas identified in the grant proposal.

27. This member received a communication from NIH on March 25, 2025 informing them that the grant was in "closeout." There is an official grant letter on the NIH grant interface, eRA Commons, which reflects that the grant has been terminated and the award amount had been "revised" to $0 due to "unsafe antisemitic actions that suggest the institution lacks concern for the safety and wellbeing of Jewish students" at Columbia. They have not received any further communications from NIH.

28. It is this member's understanding that Title VI and its implementing regulations require the government to provide notice and opportunity for a hearing, followed by a finding on the record, before terminating federal funding to any program or part thereof based on a violation of Title VI. They were not provided any such notice, and are not aware of any such notice having

been provided or any such hearing occurring prior to the termination of $400 million in federal funding to Columbia.

29. None of the work funded by this grant was related to Israel, Palestine, Judaism, or any topic related in any way to antisemitism. The program and this member have never faced any investigation or complaint related to antisemitism.

### *AAUP Member # 3*

30. Another AAUP member is an assistant professor at the Columbia Irving Medical Center ("CUIMC"). Their research focuses on HIV prevention and sexually transmitted infections.

31. This member was the principal investigator on a U54 grant from the National Cancer Institute to improve cervical cancer prevention in low and middle-income countries. U54 grants support cross-organizational coordination to tackle a specific disease or biomedical problem. In this case, the grant supported an ongoing thirty-year relationship between researchers at CUIMC, the University of Cape Town, and the Khayelitsha Cervical Cancer Screening Program.

32. The grant was for a little more than $1 million per year, for a period of five years. The grant was cancelled about one and a half years into the grant period.

33. This member did not receive any official communication about the cancellation of the grant from NIH; notice of the cancellation came from Columbia.

34. In order to appeal the termination of the grant, Columbia asked this member to submit a statement concerning whether the grant could be rescoped to avoid "non-aligned areas," including DEI, gender ideology, climate environmental justice, vaccine research, COVID-19 research, and global collaborations.

35. Since the funding was withdrawn, research has been halted. The grant would have helped to fund a clinical trial, but that phase had not yet begun when the federal funding was revoked.

36. The grant funded two professors in the Mailman School of Public Health as well as one post-doctoral fellow and one program manager at CUIMC. Without this funding, all three Multiple Principal Investigators (MPIs) would experience a reduction on level of effort (LOE). The program manager and the post doctoral positions would not be viable without this funding, and this would severely undermine their career progression.

37. This grant also funded approximately 10 positions in South Africa, supporting roles at the University of Capetown and the Western Cape Department of Health. These colleagues will now have their employment terminated. Loss of the contact Principal Investigator, included among the colleagues who would be terminated, would set the project back tremendously given the loss of this unique clinical and research expertise in conducting cervical cancer screening and treatment clinical research in this community setting. Similarly, loss of the staff, each with unique experience in recruiting, data collection, entry and management of quantitative and qualitative cervical cancer prevention data as well clinical expertise in conducting procedures that will be newly introduced, will set back this project and lifesaving research to combat cervical cancer substantially.

38. A critical goal of the U54 program was to build local capacity. Without federal grant funding, this member will have to withdraw financial and academic support to the current fellows and renege on commitments made to future clinical and research capacity building. This abrupt termination would erode trust between the university research and ministry of health

implementing partners. Other critical components of effective stakeholder/partner engagement such as continuity, and transparency, would be damaged between partnering organizations.

39. This member was also a co-investigator on an NIH R56 grant concerning Doxycycline Post-Exposure Prophylaxis for men who have had sex with men and transgender women. That grant was also cancelled.

40. This member understands that Title VI and its implementing regulations require the government to provide notice and opportunity for a hearing, followed by a finding on the record, before terminating federal funding to any program or part thereof based on a violation of Title VI. They were not provided any such notice and are not aware of any such notice having been provided or any such hearing occurring prior to the termination of $400 million in federal funding to Columbia.

41. None of the work funded by either of these grants was related to Israel, Palestine, Judaism, or any topic related in any way to antisemitism. The program and this member have never faced any investigation or complaint related to antisemitism.

*AAUP Member # 4*

42. Another AAUP and AFT member is a member of the faculty at the Mailman School of Public Health.

43. This AAUP member is a principal investigator on an approximately $4.2 million NIH grant terminated as part of the government's announced $400 million cuts. This grant funded interdisciplinary research and collaboration into how exposure to environmental factors impacts human health. This was a large Center grant, covering a term of 3 years and involving approximately 20 researchers and multiple postdoctoral fellows and research assistants. At the

time it was cut, one postdoctoral fellow, one Associate Research Scientist, and three part-time research assistants were involved, in addition to the faculty involved as co-investigators.

44.     Work on this grant began in late September 2024. Researchers had begun downloading and harmonizing the environmental data, which they would then link public health data to determine if there are any links and to examine the factors contributing to negative health impacts.

45.     Cancellation of this grant will also have substantial impacts for the Mailman School's external partners for this work at two other major universities in the country.

46.     As a result of the grant termination, the work on this grant has stopped. Three masters students working part-time on the project as research assistants were laid off and lost their source of income.

47.     The grant would have provided opportunities for innovative collaborations among faculty from across the University to work on improving environmental health research to better understand these impacts on human health and guide policies, investments, and mitigation plans to equitably protect those most vulnerable to environmental exposures. It would also generate critical knowledge on the impacts of increasingly intense and frequent extreme weather events on aging; as the US population is aging, identifying factors that impact healthspan is crucial.

48.     Termination of this grant will delay the opportunity for Columbia University to truly become one of the leaders in environmental health research and the first institution to bring together expertise across numerous different disciplines from all across the campus to study the impacts of environmental insults on human health and develop preventive and adaptive strategies, thus potentially reshaping how we conduct environmental health research.

49. This AAUP member lost funding for 15 percent of their effort with just this one grant cancellation, with a large part of their salary also impacted by termination of other grants on which they were a co-investigator. It is uncertain how much longer Columbia University will continue paying salaries to research faculty.

50. This member received an official communication from NIH on March 17, 2025 in the form of a revised notice of award informing them that the grant was terminated, backdated to March 14th. According to the communication, the grant had been terminated due to unsafe conditions for Jewish students at Columbia.

51. The member understands that Title VI and its implementing regulations require the government to provide notice and opportunity for a hearing, followed by a finding on the record, before terminating federal funding to any program or part thereof based on a violation of Title VI. The member was not providing any such notice and is not aware of any such notice having been provided or any such hearing occurring prior to the termination of $400 million in federal funding to Columbia.

52. None of the work funded by this grant was related to Israel, Palestine, Judaism, or any topic related in any way to antisemitism. The program has never faced any investigation or complaint related to antisemitism.

### *AAUP Member # 5*

53. Another member of the AAUP and AFT is a faculty member in the Graduate School of Architecture, Planning, and Preservation.

54. This AAUP member has noticed that students and faculty are far more self-conscious in the classroom as a result of the recent federal pressure on the University. The AAUP member believes that in the classroom, it is important for robust discussions to have a

degree of spontaneity. That tendency has noticeably lessened now. This AAUP/AFT member also tends to pause more in the classroom themselves, often reflecting on how their words may be misrepresented or taken out of context. This member feels that the teaching environment is now akin to talking to a reporter, resulting in a learning environment that is substantially less honest and open.

55. This AAUP member, who also has substantial experience working in the humanities across campus, believes that it is crucial that people can openly dispute the meaning of certain facts. They believe that it is important to be able to look at a fact, an artwork, or a text and debate its meaning openly—a debate that is now severely constrained.

56. This AAUP member tries not to let their concerns affect their speech and their teaching, but they often find themselves hesitating in the classroom. For example, when they teach about Israeli architecture and urban planning, they find it much more difficult to fully explain how that planning has been interpreted differently across groups.

57. This AAUP member is concerned that feeling constrained in the classroom will harm teaching in the humanities well beyond the areas mentioned above. They believe in the mantra "teach, don't preach," and in the science of scholarly interpretation. They therefore believe that professors must be able to share challenging interpretations of controversial artworks, objects, processes, and facts, independent of outside influence.

58. This AAUP member also feels chilled in their speech while advising students. They are concerned about retaliation if they engage with students around ideas which are disfavored by the federal government or Columbia University.

59. This AAUP member believes that the March 7 funding withdrawal has contributed to the chilling of speech. They felt that the classroom environment, for example, has

become noticeably less open and more repressed than before. This learning environment is profoundly harmful to students, who are now challenged less frequently because they do not feel like they can think openly about difficult subjects.

60. There is also the case of students who propose to reflect on what is happening at Columbia University for their class assignments. This AAUP member wants to encourage them to work freely with their ideas, but they also are concerned that promoting that thinking would encourage students to be taking on a risk to themselves.

### *AAUP Member # 6*

61. Another AAUP and AFT member is a tenure-track professor at the Mailman School of Public Health who has an active, government-funded research program with the objective of improving public health.

62. This individual is very concerned about the cancellation of federal scientific funding and Columbia's concession to Defendants' demands in the March 13 letter. This member feels strongly that such actions are a threat to academic freedom in higher education and, more broadly, our democratic system.

63. In the past, this individual has felt comfortable speaking about contentious issues on campus. They have spoken up when they felt that the administration was headed in the wrong direction. They have supported their students in making their voices heard and thinking through difficult social and political issues.

64. But in the present moment, this member feels unable to step forward and speak freely.

65. This member was invited to speak at an AAUP rally in recent days. They had prepared a speech encouraging their fellow faculty and students to rally together and stand up for

14

academic freedom and independent scientific inquiry. However, this member ultimately decided it was not safe to participate in such a public forum because they are concerned about government retaliation against their vulnerable loved ones. Specifically, a close family member is a non-US citizen with permanent residence status. They felt that making their voice heard they would put the safety of their family at risk: that speaking out might result in revocation of the family member's permanent residence, with or without an excuse based on scrutiny of the family member's social media accounts for any statement that could be perceived as criticizing Trump or the current administration. A lawyer acquaintance was consulted, and failed to provide reassurance that the fear was ill-founded in the current political context. As a result, they withheld speech on issues where they had strong convictions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __2 April 2025_____          Signed: _____

                                                                                           Reinhold Martin

                                                                                          Professor of Architecture