ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> and <br><br> AMERICAN FEDERATION OF TEACHERS, <br><br>    Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE. et al., <br><br>    Defendants. | Case No.1:25-cv-02429-MKV |

### Declaration of Jennifer S. Hirsch

I, Jennifer S. Hirsch, declare as follows:

1. I am a Professor of Sociomedical Sciences at the Columbia University Mailman School of Public Health. I have been a member of the Columbia faculty since 2004.

2. I have an AB from Princeton University and a PhD from Johns Hopkins University. I was a 2012 Guggenheim Fellow, a 2014–2015 Columbia Public Voices Fellow, and a 2018–2019 visiting research scholar at Princeton University's Center for Health and Wellbeing. In 2020, I was coauthor of Sexual Citizens: A Landmark Study of Sex, Power, and Assault on Campus.

3. My research spans five intertwined domains: the anthropology of love; gender, sexuality and migration; sexual, reproductive and HIV risk practices; social scientific research on sexual assault and undergraduate well-being, and the intersections between anthropology and public health. From 2010-2024, I served as Director of the Doctoral Program in the Department of

1

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

Sociomedical Sciences. I am currently Co-Director of the Columbia Population Research Center (although while I am on sabbatical this year, the center is being led by a colleague), on the steering committee for the Institution for Research on Women, and a faculty affiliate of the Institute of Latin American Studies. For the 2024-2025 academic year, I am serving as a fellow at the Harvard Radcliffe Institute, where I am writing a book about social, cultural, and institutional constraints on marital, sexual, and reproductive self-determination among Orthodox Jews based on more than a year of intense research.

4. I am a member of the American Association of University Professors (AAUP) and American Federation of Teachers (AFT).

5. I am a practicing Jew and an active synagogue member.

6. I am aware that the current administration has taken a series of actions targeting Columbia. In particular, I am aware that on February 3, 2025, the U.S. Department of Education announced an investigation into Columbia. I am aware that on February 28, the federal Task Force to Combat Anti-Semitism announced that it would visit the Columbia campus. I am aware that on March 3, 2025, several federal agencies announced that they would review funding to Columbia. I am aware that on March 7, 2025, several federal agencies announced $400 million in grant cancellations to Columbia, and stated that "[t]hese cancellations represent the first round of action and additional cancellations are expected to follow." Most recently, I am aware that on March 13, 2025, officials from the General Services Administration (GSA), the Department of Health and Human Services (HHS), and the Department of Education (ED) sent a letter to Columbia that was made public, and demanded that Columbia immediately take a long list of actions as a precondition of further negotiations regarding federal funding. I am aware that Columbia adopted numerous of these policy demands on March 21, 2025.

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

7.   I am over the age of 18 and competent to testify as to the matters set forth in this declaration based on my own personal knowledge.

8.   I am the principal investigator on a 5-year training grant ("GSH Training Grant") from the National Institutions for Health ("NIH"). This grant funds a unique and highly successful predoctoral research training program currently in its 18th year. This program was the first in the nation to provide NIH support for predoctoral level training in gender, sexuality, and health within a school of public health. That training takes place in my department, Sociomedical Sciences, where students funded by the GSH Training Grant matriculate (alongside students funded by other mechanisms) in the nation's only combined PhD-level training in both public health and a specific social science discipline, preparing students to conduct rigorous, high-impact research on historical, social, cultural, and psychological dimensions of health. Matriculating students choose a specific discipline (anthropology, history, or sociology). Given the foci of the GSH training grant, our students focus on gender and sexuality as they impact reproductive and sexual health and the health of gender and sexual minorities, both nationally and globally. The NIH-funded GSH training grant which I direct has a strong track record of success in terms of trainee diversity, productivity, and post-graduate accomplishments.

9.   The GSH Training Grant provided $2.1 million in federal funding over 5 years. We are currently in year 3 of the 5-year GSH Training Grant term. Grant funding provides funding for about 45 percent of the expenses (stipend, tuition and fees, travel, training-related expenses, and childcare) for each of the 4 trainees currently enrolled in the program.

10.  Six of the current 15 students in our doctoral program are currently funded or were funded by the GSH Training Grant, and another five were or are currently funded by another NIH-funded training grant that was terminated. As someone who led the doctoral program for 14 years,

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

I can confidently say that the end of these two training grants puts the survival of the doctoral program as a whole in peril.

11. I learned that the GSH Training Grant was terminated in an email from the Columbia Executive Vice President for Research on March 10, 2025. I have not received any official communication from NIH.

12. In terms of the financial impact of the grant termination, Columbia has committed to providing salary coverage during this immediate period of uncertainty for personnel whose grants have been terminated, which will include continuing approximately $20,000 of my annual salary in recognition of the time I spend leading GSH. Beyond this initial period, I do not know whether they will continue to do so, nor do I know how I could in short order replace that salary coverage, as faculty in "soft money" positions are expected to do. Regarding the students, our matriculated PhD students are guaranteed five years of support for stipend, tuition, and fees, regardless of the source. Current trainees are experiencing harm as a result of the grant termination, as they are unable to submit reimbursements against the $1,310 in annual travel and training expenses that is budgeted for each trainee in the grant – in some cases, for expenses that they have already incurred.

13. One trainee's request for GSH support to attend and present at the World Psychological Association regional meeting was denied, as was another's request to attend the American Sociological Association conference, where she had a paper accepted for oral presentation (which is an extraordinary accomplishment for a third-year doctoral student). In both cases, the students secured alternative internal Mailman school funding to support travel to these meetings, but that funding is not unlimited. Moreover, students are unable to submit non-travel-related expenses such as hardware or software or other research-related expenses, as there are no

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

internal sources of support for those things. Even if the termination is temporary, it may have consequences, such as having them refrain from submitting future conference abstracts. Presentation at scientific meetings is a crucial part of their scientific and professional development, honing their scientific and presentation skills and creating irreplaceable opportunities for networking, all of which are vital for success in a very competitive academic job market.

14. If the grant is not reinstated expeditiously, we will not advertise this spring and summer for applicants to the program for the coming cycle, who would enter with support from the grant in its last year of funding (the 2026-27 academic year). Failing to do so would mean that even if the grant *is* reinstated at some point in the future, we will have funded slots which we cannot fill (because students will not have applied to the program); this delay would virtually guarantee that a competitive resubmission for a fifth funding cycle would fail, as having 'empty slots' is regarded by reviewers as not running a program that prospective trainees regard as desirable.

15. The magnitude of the sudden financial shock that the department has to manage, with eight faculty members whose grants were terminated, represents an enormous and potentially unmanageable financial burden of lost federal funding for the department. I am not privy to the department chair's planning in terms of where the funding will come from, but in a year where MPH applications are down, we are facing substantial precarity, and I imagine that we will see cuts from other places if it is not restored. This will certainly include limits to further faculty hiring, and will also limit resources for research assistants, infrastructure and supplies we need to conduct research effectively.

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

16. No faculty or students funded by the GSH Training Grant has ever worked on any topic related to Israel, Palestine, Judaism, or any topic related in any way to antisemitism. The program has never faced any investigation or complaint related to antisemitism.

17. I understand that Title VI and its implementing regulations require the government to provide notice and a hearing, followed by a finding on the record, before terminating federal funding to any program or part thereof based on a violation of Title VI. To the best of my knowledge, the government did not provide notice, or hold any hearing or provide any opportunity to be heard, before terminating $400 million in federal funding to Columbia or the GSH Training Grant in particular and did not provide notice, or hold any hearing or provide any opportunity to be heard, before announcing that Columbia's compliance with the demands in the government's March 13, 2025 letter was a "precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." If the government had provided notice and held a hearing as required, I would have sought to participate in that hearing directly or as an amicus curiae, as permitted by the applicable regulations, to protect the federal funding supporting my work.

18. I understand that Title VI requires federal agencies to provide a full report to Congress thirty days before terminating federal funds under Title VI. I am not aware of any federal agencies providing any such report to Congress regarding funding to Columbia. If any such report had been filed, I likely would have submitted testimony to my congressional representatives opposing termination of the federal funding that supports my work.

19. I am concerned that as a consequence of my work as a scholar (and more precisely my work as a scholar, in intersection with my decision to be a public declarant in this case, in combination with my own history of political activism), I will be doxxed or subject to harassment.

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

Already, because of my own political speech and my support for my students' political speech, I recently learned that I am listed on CanaryMission.org as antisemitic (an accusation with which I deeply disagree). I was chilled to see that that listing of me included tweets of mine from last spring which had been deleted *before* the listing was posted, suggesting that I have been subject to surveillance for some time.

20. I am currently working on a book about coercion and consent in sexual relationships within Orthodox Judaism. Looking ahead, I am concerned that excerpts from my book will be taken out of context to further this incorrect narrative of me as anti-Semitic, and that as a result I will face professional consequences or retaliation, which could include difficulty finding another academic position should I choose to seek one in the future.

21. While many of these issues have been contentious for years, the federal government's intervention at Columbia has greatly increased my level of concern. I am afraid that even participating in this case will have consequences for me, to the extent that I sought input both from my husband and from our young adult children, as I worry about exposing them to harm.

22. I am afraid that speaking out in these ways will lead to professional consequences beyond chastisement, to the extent that my husband and I are meeting soon with a financial planner to run through scenarios that include me losing my job.

23. I understand that much of my work does not align with the priorities of the current administration. It is of course entirely legitimate for Congress and NIH to shift funding priorities; when I began my career, NIH supported social science research on vulnerability to HIV in a way that is no longer the case, and so I have moved away from doing research in that area. NIH has substantially more funding available for topics like Alzheimer's and cancer than for child health or sexual and reproductive health, and so it has always been a struggle to secure federal funding

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

for my work. Despite that, I have received millions of dollars of research funding over the course of my career, reflecting the importance of my work as a scientist, as evaluated by my peers.

24. What I am facing now is entirely different: the intrusion of politics into grants that are already funded, or that might be funded in the future. I worry that speaking out in any way – in the media, through participating in this case, or on social media – will lead to me being blacklisted at NIH, so that regardless of how any future application fares in the peer review process, it will not lead to funds being awarded. This is a very near-term threat: I submitted a grant in October to do research on peer victimization in higher education (looking at sexual violence as well as anti-LGBTQ victimization and racist harassment). It was to be reviewed in February, but that study section was canceled, and is now listed as occurring in April. Whenever the grant is reviewed, if it is reviewed, I fear that regardless of the score it receives in peer review, at the NIH Council level there will be pressure not to fund it. This is a project that I have been working to develop since 2018, and the application that we submitted in October was the third time we have submitted it, each time seeking to be responsive to the prior round of scientific feedback. A widely cited study estimates the total US taxpayer burden incurred by sexual violence at $3.1 trillion, and I am trying to do research that will in some small measure prevent that sexual violence. So it is not just me as a researcher who is harmed by these clawbacks; it is the progress of science, and as a result the well-being of Americans.

25. The GSH grant that was terminated is a training grant, so beyond the impact on me as a scientist, in some ways the greater impact is on trainees' assessment of the viability of a career doing research on these topics. Our trainees work on questions that include sexual violence, gender diversity, and the experiences of immigrants and racial minorities. The termination of the grant sends a powerful message about the lack of support at the federal level for research on these topics.

ATTORNEY WORK PRODUCT – ATTORNEY CLIENT PRIVILEGED

26. I am scared to submit this testimony. However, I feel very strongly about both the importance of my programs and protecting academic freedom, and perhaps even more importantly I feel a particular responsibility as a tenured faculty member in a position of relative security to speak out. I know from conversations with my students and colleagues that others with less privilege are scared or unable to speak out for fear of retaliation against themselves or their loved ones.

27. Legend has it that my great grandfather escaped Russia in a garbage can. That's never fully made sense to me - was it a can just to get across the border? Did he spend the whole time on the ship in a garbage can? But I know why he came: so that he could live and raise his family in a country where he didn't have to fear violence from the government because of what he said or how he prayed. And it is in his blessed memory that I submit this testimony, in the hopes that we can continue to do our science, in the service of humanity, and not be silenced.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2 April 2025

Signed: _____
Jennifer S. Hirsch
Professor of Sociomedical Sciences