# EXHIBIT 51

Home  »  Report #1: Task Force on Antisemitism

# Report #1: Task Force on Antisemitism

# Columbia University's Rules on Demonstrations [1]

# March 2024



(1) *This report reflects the research and analysis of members of the Task Force's rules working group: David M. Schizer (Co-Chair, Law School), who drafted the report, as well as R. Glenn Hubbard (Business School), Magda Schaler-Haynes (Mailman School of Public Health), Matthew C. Waxman (Law School), and Gil Zussman (Fu Foundation School of Engineering and Applied Science). Extensive input also was provided by the other members of the Task Force: Clémence Boulouque (Department of Religion), Peter Coleman (Affiliate Co-Chair, Teachers College), Jeremy A. Dauber (Department of Germanic Languages), Ester Fuchs (Co-Chair, SIPA), Rebecca Kobrin (Department of History), Jennifer Lee (Department of Sociology), Nicholas Lemann (Co-Chair, Journalism School), Lisa Rosen-Metsch (General Studies), Nir Uriel (Columbia University Irving Medical Center), and Deborah Valenze (Affiliate Co-Chair, Barnard College).*

On November 1, 2023, Presidents Minouche Shafik (Columbia University), Laura Rosenbury (Barnard College), and Thomas Bailey (Teachers College) announced the formation of a Task Force on Antisemitism ("the Task Force") "as part of a commitment to ensuring that our campuses are safe, welcoming, and inclusive for Jewish students, faculty, and staff, and all of us." (2)

VIEW THE PDF VERSION

Report #1: Columbia University's Rules on Demonstrations

The Task Force is part of a broader series of campus-wide initiatives "to foster a community," as President Shafik put it, "where debates and disagreements are rooted in academic rigor and civil discourse." Another product of this "our community, our values" initiative is a pair of new interim policies for safe demonstrations (the "Interim Demonstration Policies") from Columbia University ("the University") and Barnard College, which were issued on February 19 and 20th, respectively. The Task Force was pleased to provide input on these policies and, as discussed below, we strongly endorse them.

In the course of its work, the Task Force has heard of the isolation and pain many Jewish and Israeli Columbia affiliates (3) have experienced in recent months. While mourning Hamas's unspeakable atrocities on October 7, some Jewish and Israeli Columbia affiliates have been the object of racist epithets and graffiti, antisemitic tropes, and confrontational and unwelcome questions, while others have found their participation in some student groups that have nothing to do with politics to be increasingly uncomfortable. Israeli Columbia affiliates have been criticized and stereotyped for serving in the military, something most Israelis are required to do. Some Jewish students have felt isolated in supporting Israel, while others have felt isolated in criticizing Israel. While there is strong support among Jewish and Israeli Columbia affiliates for the right to protest, as well as widespread heartbreak about the tragic loss of civilian life in Gaza, many have heard chants at protests like "Globalize the Intifada" and "Death to the Zionist State" as calls for violence against them and their families.

Across Columbia University, there also have been repeated violations of the rules on protests. Although peaceful demonstrations are permitted at Columbia and Barnard–and, indeed, are an indispensable element of civic life in a free society–the University has rules to keep them from interfering with our academic mission. Unfortunately, these rules often have been violated in recent months. Protesters have disrupted classes and events, taken over spaces in academic buildings, held unauthorized demonstrations, and used ugly language to berate individuals who were filming these protests or just walking by. There also have been reports of physical harm to students, including Columbia affiliates who were protesting against Hamas and Columbia affiliates who were protesting against Israel. Needless to say, the University must guarantee the physical safety of all Columbia affiliates, and a welcoming environment for everyone is essential.

In the coming months, the Task Force will issue a series of reports, examining various aspects of this difficult situation. We are conducting research on the experiences and views of members of the Columbia community and are analyzing a range of university policies and practices. This first report considers Columbia's rules on demonstrations. (4) We focus on Columbia's rules, since our work on Barnard and Teachers Colleges' rules is still at an early stage. (5)

Even though our charge is antisemitism, we know that Jews and Israelis are not the only ones targeted in this difficult time. Heartbreak, fear, and loss are widely shared experiences both on and off campus. Although our report focuses on antisemitism, our recommendations can also bolster efforts to combat Islamophobia, anti-Arab racism,

and other types of bigotry. We condemn all these toxic forms of hate and look forward to working with colleagues, and partnering on initiatives, to counter it across the University. Together, we must strengthen the fabric of our University community for all.

## ⌄ Footnotes

(2) [Announcing Task Force on Antisemitism](#), Nov. 1, 2023.

(3) The phrase "Columbia affiliate" in this report includes students, faculty, and staff of Columbia University (including Columbia University Medical Center), Barnard College and Teachers College.

(4) Columbia University defines "demonstrations" as "a group of people coming together in an event of public expression on campus." See the [Interim University Policy for Safe Demonstrations](#).

(5) Teachers College and Barnard College are affiliates of Columbia University and separate 501(c)(3) entities.

LEARN MORE

[About the Task Force on Antisemitism](#)

[About the Members of the Task Force on Antisemitism](#)

[About the Second Report](#)

# I. Executive Summary

The University's rules on demonstrations must accomplish three critical goals: first, safeguarding every Columbia affiliate's right to protest, regardless of their viewpoint; second, ensuring that protests do not interfere with the rights of other Columbia affiliates to speak, teach, research, and learn; and, third, combating discrimination and harassment, including antisemitic harassment.

To protect every Columbia affiliate's right to protest, while also ensuring that protests do not interfere with the free speech rights and academic freedom of others, the University must regulate the timing and location of protests. We support a "speaker's corner" approach that permits protests in designated areas like the Sundial, South Lawn, and Futter Field, but not in academic buildings, libraries, dining halls, or dormitories. Every Columbia affiliate should have the right to protest in these designated areas, regardless of their cause or viewpoint. This is the approach of the new Interim Demonstrations Policies, and we consider them a major step forward. We also recommend clearer limits on the use of noise amplification and banners, as well as a minimum distance between competing protests.

Although we generally agree with the language of the University's rules, we have serious concerns about their enforcement. The University generally has not tried to stop violations as they have occurred, and instead has focused on imposing discipline after the fact. The priority during protests has been to avoid violence and escalation. In our view, avoiding violence is necessary, but not sufficient. The University also needs to keep protests from interfering with the rights of others to speak, teach, research, and learn. So the University should do more to stop

unauthorized protests as they occur, using approaches that are effective but not confrontational. For example, if protesters gather in an academic building, they should be told that they are violating the rules and given the opportunity to leave within a specified period of time (e.g., ten minutes). Those who remain should be required to show IDs and given a warning, followed by discipline for subsequent violations.

In addition to doing more to stop rule violations as they occur, the University needs to be more effective at investigating and enforcing violations after the fact. We recommend a simpler process for filing complaints, more flexible deadlines for adjudicating them, more effective use of informal processes, and aggregate reporting on the results. Unlike most other universities, Columbia uses a separate disciplinary process for rules on protests, which is coordinated by the University Senate. Since this process has rarely been used, robust efforts are needed to make sure it works, including rigorous training, safeguards to ensure consistent treatment, and periodic reviews of the process.

In addition to free speech rights and free speech responsibilities, the University's rules ban discrimination and harassment, as required under Title VI (6) and other laws. Since the University's legal team is responsible for legal compliance, they should clarify what speech contributes to a hostile learning or working environment. Like in the [gender-based misconduct rules](), the University should offer "scenarios." These clear cases should illustrate what violates our rules and what does not, so adjudicators can consider whether a particular incident, which may be harder to classify, is more like the "good" or "bad" scenarios. These scenarios should be about all protected classes, not just Israelis and Jews.

Indeed, to comply with the law, the University must be consistent in its treatment of different protected classes. For example, if members of a protected class say that particular phrases or comments interfere with their ability to learn and work, should the University defer to them? Or should the University focus instead—not on how the protected class *hears* these words—but on what the speakers *intend* in saying them? In recent years, it has become increasingly common at Columbia to defer to a protected class's views. But when some Israeli and Jewish Columbia affiliates have complained about phrases or comments in recent months, the response has been different, defending the intentions and free speech rights of the speakers. While there are important reasons to value the perspective of both the speaker and the audience, the University must be consistent in its approach.

Finally, it is worth emphasizing that even when offensive words are permissible under the University's rules, they may still be disappointing or even reprehensible. In discussing difficult issues, we should always strive to state our position with civility and collegially.

Part II of this report identifies key principles the rules need to uphold. Part III emphasizes the critical role of content- and viewpoint-neutral "time, place, and manner" restrictions, and recommends ways to make them more effective. Part IV focuses on antidiscrimination rules, analyzing how the University can effectively combat harassment while also protecting free speech rights.

In writing this report, the Task Force has benefited enormously from repeated consultations with the Office of the President, the Office of the Provost, University Life, faculty members of the University Senate, the Kraft Center, and members of task forces at other universities, as well as deans, senior administrators, faculty members, alumni, staff, and students from across the University, including in listening sessions we have been holding across the campus. We are deeply grateful for the valuable insights so many have shared, and appreciate their staunch commitment to addressing the challenges considered in this report.

Before turning to our analysis, we should clarify its scope. This report discusses general issues of policy, not specific protests or other incidents from recent months. This focus reflects the Task Force's charge. We were convened to perform an important but limited task: to gain a deeper understanding of the situation on campus and to make

recommendations about how the University should respond. We do not have management authority, and we are not an adjudicative body. Therefore, we do not offer public comments "in real time." For the same reason, this report addresses broad challenges, instead of particular events.

A number of rules are not analyzed in this report, including those governing the recognition and discipline of student groups, classroom conduct, off-campus activity, and social media. In future reports, we will consider some of these other issues, as well as other issues.

## ⌄ Footnotes

(6) As the Department of Justice has explained, "Title VI, 42 U.S.C. § 2000d et seq., was enacted as part of the landmark Civil Rights Act of 1964. It prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance." Civil Rights Division U.S. Dep't of Justice, [Title VI of the Civil Rights Act of 1964](#).

## II. Three Fundamental Principles

Before turning to the specifics of our rules, we begin with basic principles. Our rules must embody an unshakeable commitment to three core ideas: first, the right to free speech and academic freedom; second, the responsibility to respect the free speech rights and academic freedom of others; and, third, our communal commitment to antidiscrimination.

### A. Free Speech Rights

The mission of a great university is to expand the frontiers of knowledge and to educate future generations. This mission requires uncompromising rigor in uncovering facts and analyzing ideas. Truth is found not by seeking to justify what we want to believe, but by constantly testing, and then updating, our knowledge and understanding.

This timeless process can function effectively only if our minds remain open. There can be no orthodoxies. The fact that an idea is widely accepted should not exempt it from scrutiny. The fact that an idea is controversial, or even offensive, should not render it off limits. "The right of members of our university to share views that may be unpopular or deemed offensive," observed the seventeen deans of our faculties and schools in a [recent statement](#), "is protected and fundamental to an academic community that depends on the free exchange of views and ideas." (7) In the words of Section 440 of the Senate's [Rules of University Conduct](#), "the University is a place for received wisdom and firmly held views to be tested, and tested again, so that members of the University community can listen, challenge each other, and be challenged in return." This bedrock principle of academic freedom must never be compromised.

### B. Free Speech Responsibilities

Just as we all have the right to speak our minds in pursuit of truth, we also have the responsibility to respect– indeed, to protect–this right for other Columbia affiliates. Needless to say, violence, threats, and intimidation also have no place at a great university.

Case 1:25-cv-02429-MKV   Document 52-1   Filed 04/04/25   Page 7 of 19

In addition, our right to speak must not come at the expense of the right of others to speak, teach, research, and learn. We must not use the "heckler's veto" to shout down other speakers, tear down or deface posters, disrupt classrooms, or impede other essential functions of the University. These "rules of the road," which are known as "time, place, and manner" restrictions, are essential to the academic enterprise. Intellectual inquiry cannot proceed without them.

These limits, which protect all of us, are not about *what* we say, but about *where*, *when,* and *how* we say it. Every Columbia affiliate has the right to explore and defend the causes they cherish. But no one has the right to drown out other voices or interfere with the University's teaching mission. As Section 440 of the Rules of University Conduct explains, "The right to demonstrate, for example, cannot come at the expense of the right of others to counter-demonstrate, to teach, or to engage in academic pursuits requiring uninterrupted attention."

These limits must be applied consistently and evenhandedly. It would be unacceptable for them to be invoked selectively to silence particular voices. Rather, time, place, and manner restrictions must be content- and viewpoint-neutral.

## C. Antidiscrimination

Just as we cherish and nurture the pursuit of truth, we also are committed to treating all members of our community with respect. Every Columbia affiliate deserves to feel safe. They must know that they belong here. The University must be a welcoming home to all students, faculty, and staff, regardless of their race, national origin, gender, religion, sexual orientation, age, disability, military service, or other legally protected status. This obligation flows not only from our values, but also from Title VI, Title IX, and other federal, state, and local laws.

To discharge this obligation, the University does not guarantee that others will always agree with us. This surely will not happen and, in a place of intellectual ferment, it *should not* happen. Each of us will encounter ideas and perspectives we reject–indeed, even ones we find offensive. This is part of the compact we make with each other: everyone can express their views.

But harassment and discrimination cannot be tolerated. Nor should anyone be free to engage in violence or to call for violence against members of our community or groups to which they belong. This reprehensible conduct denies members of our community the experience they deserve.

### ▼ Footnotes

(7) Deans' Message on Columbia and Community, Dec. 20, 2023.

---

# III. Enhancing the University's Time, Place, and Manner Restrictions

To operationalize these three essential commitments–free speech rights, free speech responsibilities, and antidiscrimination–the University needs effective rules of the road. These "time, place, and manner" restrictions are an essential protection for every member of our community, so the University has to ensure that they are effective.

## A. Timing & Location of Demonstrations

Every Columbia affiliate must have the right to engage in peaceful protests. But although this is a proud tradition at Columbia, it must not interfere with the rights of other Columbia affiliates to speak, teach, research, and learn. To protect this right for everyone, the University needs to specify when and where demonstrations are permitted.

In our view, demonstrations should not be allowed in academic buildings, libraries, dormitories, or dining halls, as well as too close to the entrances to these buildings. (8) Unfortunately, this has not always been the practice in recent months.

The right place for demonstrations is in outdoor spaces like the South Lawn and the Sundial in Columbia's Morningside campus, Futter Field in Barnard's campus, and comparable locations on other campuses. (9) The locations should be prominent. Our goal is not to consign demonstrations to remote locales where they will go unnoticed. Yet the location must ensure that demonstrations do not interfere with classroom learning and other essential functions of the University.

In this spirit, Section 443(14) of the [Rules of University Conduct](#) renders it a violation when someone "incident to a demonstration . . . disrupts a University function or renders its continuation impossible." This is the right principle.

To operationalize this principle more effectively, we recommend focusing more explicitly on location. After all, a standard based solely on "disruption" can be ambiguous, and can require more nuanced fact-finding. For example, some participants in a demonstration in an academic building might claim that, unlike others, they were speaking in a low voice and thus were not disruptive. Sorting out these facts is not always easy. In contrast, the question of *where* a protest was, and whether someone *actually attended it,* is easier to answer. (10)

As a result, we are pleased that Columbia and Barnard's new Interim Demonstrations Policies adopt this location-based approach, requiring demonstrations to be in "Demonstration Areas" (East South Lawn, West South Lawn, and the Sundial on Columbia's Morningside campus and Futter Field on Barnard's campus) at designated times, inviting members of the community to reserve these spaces, and guaranteeing access to them regardless of the views expressed in the demonstration. We consider this a major step forward in Columbia and Barnard's efforts to protect the free speech rights and academic freedom of every member of our community.

## B. Sound Enhancement

Keeping demonstrations outside academic buildings protects everyone's rights by putting distance between demonstrations and academic work. Yet sound amplification systems and megaphones can negate this distance. As a result, "a noise that substantially hinders others in their normal academic activities" is a violation under Section 443(12) of the [Rules of University Conduct](#), and rightly so.

More specific guidance should be offered about what sound enhancement (if any) is permitted. (11) While it can help protesters hear speakers, it also can disturb Columbia affiliates in nearby classrooms, dormitories, or libraries. For this reason, Barnard's Interim Demonstration Policy provides that "those participating in registered Demonstrations may not use noise amplification (e.g., megaphones, bull horns, etc.) or sound machines (e.g., pots, pans, instruments, etc.) during Demonstrations."

## C. Safety, Notice, and Physical Separation

The University's highest priority must always be physical safety. When members of our community exercise their right to protest, they must be free to do so in safety and without fear. Unfortunately, this has not always been the case in recent months, and this is not acceptable.

To be fully prepared to guarantee safety during demonstrations, the University requires notice of when they will take place. The new Interim Demonstrations Policies generally require two business days, which we think is reasonable.

The rules also must ensure a minimum distance between competing protests. While Section 443(18) of the [Rules of University Conduct](#) authorizes rules delegates to give reasonable orders to keep protests apart, we recommend also specifying a minimum distance and rigorously enforcing this rule.

## D. Banners

Like the location of protests, the location of signs and banners should be subject to viewpoint- and content-neutral time, place, and manner rules. In general, holding signs and banners in authorized demonstrations should be permitted. But hanging banners on any interior or exterior surface of a building should be prohibited unless the administration of the relevant school has approved it.

## E. Limiting Access to Campus

Columbia affiliates must be allowed to demonstrate on campus, as well as to invite speakers and a reasonable number of guests to participate in the demonstration. But aside from these invited guests, non-affiliates are not entitled to this privilege. Unfortunately, their participation can come at a cost, if only because they do not know the University's rules and have less reason to abide by them. We realize that the need to present IDs can be inconvenient for Columbia affiliates and can affect the atmosphere on campus, but on balance we think the University generally should limit demonstrations to affiliates.

## F. Enforcement During Demonstrations

While we generally agree with the *language* of the University's rules, we have serious concerns about their *enforcement*. To the University's credit, a senior team of administrators with different expertise and responsibilities has been meeting regularly to prepare for demonstrations, making daily (and at times even more frequent) judgments about staffing and other aspects of the University's response. This degree of coordination is impressive. It signals how seriously the University takes these issues.

Nevertheless, enforcement has fallen short in two ways. First, the University has regularly failed to stop violations of rules as they occur. Second, there also have been challenges in imposing discipline after the fact. We discuss these two issues in turn.

### 1. "Real Time" Efforts to Prevent Protests in Academic Buildings

First, when an unauthorized demonstration is taking place, representatives of the University should intervene more proactively "in real time." Obviously, these interventions are especially important to protect physical safety. In addition, we would prioritize interventions to prevent disruption of classes and other academic work, for instance, when there is an unauthorized demonstration in an academic building.

We recognize how challenging it can be for the University to manage and respond to demonstrations, and we truly appreciate the strenuous efforts of rules delegates and public safety officers in recent months. The volume of protests has spiked, and the campus climate is more tense than at any time in recent memory. Enforcing our rules, while also avoiding confrontation, is no easy task.

Even so, we urge these colleagues to be more ambitious. They should not be content just to "wait out" a demonstration and prevent violence. This sort of deescalatory posture is necessary, to be sure, but it is not sufficient. The University also has to prevent the disruption of classes and, more generally, to protect the academic freedom and free speech rights of the rest of the Columbia community.

## 2. Avoiding Physical Confrontation

To be clear, we are not recommending the forcible removal of protesters or routine reliance on the NYPD. On the contrary, the University should not repeat its overly aggressive response to protests over half a century ago in 1968. Physical interventions are appropriate only to break up fights and protect protesters and bystanders from violence. Our understanding is that this is the only circumstance in which public safety officers initiate physical contact, and we agree.

## 3. Better Nonconfrontational Approaches

Instead, the focus should be on developing better nonconfrontational options. We stand ready to offer input in analyzing alternatives. In that spirit, we recommend that rules delegates should tell demonstrators they are violating the rules, offer a card with the relevant rules, and ask them to disperse within a specified period of time (e.g., ten minutes). Protesters should also be told that names will have to be taken and disciplinary processes will have to be initiated for anyone who is still there after the specified time has elapsed. After this time has passed, if any protesters are still in the academic building, public safety officers should ask for their IDs. If the protesters refuse—a rule violation in and of itself—public safety officers should take their photos, a step that can help identify them even if they are masked.

Section 443(16)--(18) of the Rules of University Conduct authorize delegates of the University to regulate demonstrations in these and other ways. We understand that other universities have had some success with these sorts of steps. Fortunately, some of these steps are starting to be taken more frequently on our campus.

As long as this effort during a demonstration is paired with effective investigation and adjudication after it is over, as discussed below, we expect that most protesters will choose to comply with the rules. This should be all the more true because they can still hold demonstrations: these protests simply have to be during designated hours in authorized locations (e.g., on South Lawn or Futter Field), and not in academic buildings, libraries, dorms, and the like.

## 4. Expertise, Conflicts of Interest, and the Number of Rules Delegates

The steps suggested above should be assigned to professionals with the right expertise. In recent years, our rules delegates have been student affairs professionals. They are well suited to make an initial approach, gently reminding students of the rules, as well as of the prospect of discipline for protests in academic buildings. In contrast, public safety officers have a comparative advantage in the subsequent steps of asking for IDs and taking photographs.

In assigning roles, the University should consider how responsibilities at protests interact with a rules delegate's other responsibilities. For example, student affairs professionals may be wary of confronting student protesters, worrying that a negative encounter may undercut their effectiveness in other work with these students. Unfortunately, student affairs professionals also face another risk: *failure* to intervene—and, indeed, the perception that they implicitly endorse rules violations—can undermine their relationship with other students.

One way to address this challenge is to staff protests with rules delegates from other schools. For example, if there is an unauthorized protest at the law school, the rules delegates assigned to it could be from the business school, and vice versa. Our understanding is that this already is the University's practice.

Another solution is to broaden the pool of rules delegates, so they include colleagues whose other responsibilities do not create this potential tension. Another advantage of broadening the pool in this way is that rules delegates may benefit from having a wider range of expertise within their ranks.

The University should also invest more resources in this effort. Currently, the compensation for rules delegates is a modest stipend, so more may be warranted in the current climate. We also need more of them, at least in the current environment. The increased number of protests poses the risk of burnout for a small group. In addition, the more proactive approach recommended here may require a larger presence at unauthorized protests.

## 5. Communal Support for This Effort

While rules delegates and public safety officers play a central role in enforcing time, place, and manner restrictions, they cannot do this alone. The rest of our community must support them in this effort. Every Columbia affiliate has a stake in protecting the right to protest, while also ensuring that protests do not interfere with the free-speech rights and academic freedom of others.

Unfortunately, some faculty and administrators have failed to convey this message. When they speak at unauthorized demonstrations, or when they help shield the identity of students who are violating the University's rules, their apparent endorsement of unauthorized protests sends a confusing signal to students. In response, we encourage deans and department chairs to communicate the importance of time, place, and manner rules, while also discouraging colleagues from undercutting these rules.

## G. Enforcement After Demonstrations

In addition to intervening "in real time," the University also must take the right steps after the fact. The University must investigate incidents, initiate disciplinary processes, and impose sanctions when warranted. Yet unfortunately, we are concerned that these efforts after an incident are falling short in four ways, which we discuss in turn. We would be pleased to work with the Administration and the Senate to explore alternatives for addressing these problems.

### 1. Identifying Masked Demonstrators

First, our understanding is that investigating incidents has been a challenge in part because many demonstrators have been masked. A more proactive effort is needed to identify them during demonstrations, as noted above.

### 2. Deadlines

Second, Columbia's deadlines in the Rules of University Conduct are too tight. "Generally, . . . [i]nvestigation begins within five (5) business days after an incident" and is supposed to be "completed within fifteen (15) business days after the investigation begins." (12)

We understand why the drafters of this timetable did not want unnecessary delays. Speed ensures that memories are fresh, respondents are not subjected to a protracted process, and any necessary discipline is administered promptly.

However, the general timeline in the rules is too short. For one thing, this timeline implicitly assumes that complaints will be filed almost immediately, so investigations can begin within five days. But this is not realistic. For some potential complainants, the incident they need to report was upsetting, even traumatic. They need time to process what happened, and may simply not feel ready to file a report right away. In other cases, complainants do not even know that they are supposed to file or, for that matter, how to do so.

In addition, tight deadlines also create the wrong incentives for colleagues investigating these incidents. If they wait too long, they lose the ability to bring an action. In response, they may be tempted to initiate proceedings before they have all the facts. These facts are not always easy to gather, especially when potential respondents are masked. Indeed, just figuring out who they are can take time. Pushing for an immediate judgment, which is made merely to meet the relevant deadlines, is not in anyone's interest.

There are a number of ways to address this issue. At a minimum, the timeline in the rules should be treated as aspirational, not binding. This reading is plausible because the rules use the phrase "generally" to modify the timeline. But instead of merely relying on this interpretation, we recommend that the schedule should be adjusted. The Senate should coordinate with the Rules Administrator to determine what the new timeline should be.

We understand from members of the Senate Executive Committee that they expect reasonable extensions to be granted. While this is helpful, the process for granting extensions should be clarified. For example, the Rules Administrator should not have to wait until after the adjudication has begun. Otherwise, there is a possibility that the extension will be denied after the parties have invested significant effort to prepare. Rather, extensions should be granted (or denied) at an earlier stage. Our understanding is that this sort of process has been developed, but we think a more general (and nondiscretionary) adjustment to the deadlines would be a more transparent and administrable solution.

## 3. Informal Processes

While the rules provide for formal disciplinary processes, they also offer the option of informal resolutions. (13) Our understanding is that these informal processes have been by far the most common method of resolving issues over the years.

Yet unfortunately, a number of students have not participated in informal proceedings in recent months, a choice our rules currently allow them to make. (14) This is a missed opportunity. Informal proceedings let students learn the rules and commit to follow them in the future, while avoiding lasting reputational consequences. The University also avoids the burden of a formal proceeding. Given these mutual benefits, the rules should do more to encourage informal resolutions. We recommend that respondents should be required to meet with the Rules Administrator. To be clear, we would not require them to agree to an informal resolution, but to attend an informal meeting.

In addition, the rules should clarify that even when a respondent refuses to meet, the Rules Administrator still has authority to issue a formal warning, assuming the alleged violation is simple (not serious) and is the respondent's first violation. Otherwise, the Rules Administrator would be encouraged to proceed with formal charges even when she considers these steps unnecessary.

Likewise, the rules should clarify that even when a respondent refuses to meet, the Rules Administrator has the authority to keep records of the incident. We understand that some respondents have asserted that the Rules Administrator does not have authority to retain records in this situation. But these records are necessary: if the respondent is later involved in another incident, the Rules administrator needs to be able to take the informal resolution and the warning into account.

### 4. An Untested Process

Unlike most other universities, Columbia uses a separate process, coordinated by the University Senate, when individuals are charged with violating rules governing protests. Although a version of this process has existed for many years, it has been used only a handful of times since it was significantly modified in 2015, and not at all during the Fall Semester. In contrast, the University's other disciplinary processes are used much more regularly. (15)

Since this process is largely untested—with all the downsides that entails— strenuous efforts are needed to ensure that it is effective. For one thing, rigorous training is essential. After all, unlike the experienced decisionmakers in the University's other disciplinary processes, a number of the members of the Senate's Judicial Board—a body that includes faculty, students, and administrators—presumably have relatively little experience adjudicating disputes.

Clear delineation of institutional roles is also important. For example, the Senate Rules Committee is responsible for drafting and revising rules, while the Judicial Board is responsible for adjudicating matters under the rules. It is important not to blur the lines between legislative and adjudicatory functions.

Sharing information internally also is critical. Unlike in the U.S. court system, where outcomes are publicly available, student discipline generally is confidential under the Family Educational Rights Privacy Act ("FERPA"). (16) Since there are no reported precedents, respondents cannot confirm that they have been treated the same way as similarly situated respondents. This must not be the case with members of the Judicial Board. They must have access to the necessary information, and we have been told that they do. This is essential, so members of the Judicial Board will know how similar incidents have been treated and treat them the same way. Indeed, consistency is not just a moral imperative, but also a legal requirement (e.g., since singling out a protected class for different treatment can violate Title VI).

As the Judicial Board gains experience, it is essential to review their decisions and address any issues that are identified. For example, we endorse the Senate Executive Committee's commitment to conduct periodic reviews of Judicial Board decisions under Columbia's Interim Demonstrations Policy.

## H. Education About the Rules

To ensure that everyone complies with the rules, we need not just better enforcement, but also better education. A concerted effort is required to ensure that Columbia affiliates know the rules, as well as the rationale for them.

As we have emphasized, time, place, and manner restrictions are there to *protect* speech, not to *suppress* it. In a community where academic freedom and free speech are bedrock values, we should all comply with these restrictions not just to avoid discipline, but to honor our values and show respect for the rights of others.

Interim Provost Mitchell's January message, summarizing key features of the rules governing demonstrations, was a productive step. We recommend additional efforts within every school and department to educate members of our community about the right way (and the wrong way) to exercise their free speech rights.

## I. Simpler Process for Reporting

Under Columbia's rules, filing a report is a key way to initiate investigations and disciplinary processes. Yet although Columbia affiliates are supposed to file a report when they witness a rule violation, many are not doing so. The University has already taken productive steps to address this problem, but more should still be done.

First, many Columbia affiliates do not understand the function of these reports. For example, some mistakenly assume that there is no reason to report something that administrators also witnessed. The (understandable) assumption is that if these administrators already know about a situation, there is no need to report it. But reports should be filed not just to inform those administrators, but also to initiate an investigation of (and, potentially, discipline for) the relevant incident. Administrators can ask for an investigation, and we encourage them to do so when one is warranted. But every Columbia affiliate has this power—not just administrators—and we should all use it.

Second, in addition to knowing *why* they should file, Columbia affiliates also need to know *how* to do it. This process should be simplified. At the moment, different forms are required for different types of violations. There are separate links for academic violations, discrimination by students, discrimination by faculty and staff, gender-based misconduct by students, gender-based misconduct by faculty and staff, and general concerns (including violations of the rules governing protests).

To help Columbia affiliates navigate this maze of reporting requirements, the University has put all of these links on a [single webpage](). They also have introduced a helpline, as well as a help desk, to guide members of our community in this process.

While these are productive steps, we recommend something more ambitious: the University should consolidate the various links and forms to a single one. After affiliates fill it out, an administrator should review it and route it to the appropriate department. This administrator will know—far more readily than a student—which rules and policies are implicated, as well as who should investigate and adjudicate it. By relieving the complainant of this obligation, the University can make filing a report easier, faster, and less daunting.

Finally, the University also should help Columbia affiliates understand what happens after they file a report, including what else may be expected of them. This process is not well understood, and there has been only limited communication after reports are filed.

## J. Aggregate Reporting on Discipline

Another reason why some are not reporting violations is that they believe nothing will happen. This is problematic not only in discouraging reporting, but also in shaping perceptions of the University among important stakeholders, including current and potential students, faculty, staff, alumni, and parents. Even more importantly, this perception may induce students to violate rules. As a result, the University needs to share more information about the results of disciplinary processes.

Under FERPA, the University cannot share information about specific individuals. But there is no bar on aggregate reporting. On a regular basis, the University should share information about the number of disciplinary investigations underway, the number of adjudications, and the range of consequences administered, while also ensuring that this reporting is done in a way that respects the privacy of the individuals involved. Consistent with FERPA, the University also should communicate with those who have filed complaints, reassuring them that their concerns have been taken seriously.

## ⌄ Footnotes

(8) The University has legal obligations to ensure that entrances to these buildings are clear. For example, the University has to ensure that Columbia affiliates with disabilities have ready access to these entrances, as well as an obligation under Title VI to ensure that protected groups have access to educational opportunities, and thus to

these buildings.

(9) In choosing the right locations in the health sciences campus, the University must also account for the needs of patients.

(10) Some nondisruptive forms of expression should be permitted in an academic building, such as wearing a particular T-shirt or pin.

(11) This guidance could appear either in an updated version of the Demonstrations Policy or as an addition to Rule 443(12).

(12) Section 446, Rules of University Conduct.

(13) Rules of University Conduct, Sec. 445(a) (authorizing Rules Delegate to "organize informal settlements"); see also Sec. 447 (providing for informal resolutions).

(14) Rules of University Conduct, Sec. 446 ("A respondent may decline to participate in the investigative or adjudicative process.").

(15) Dean's discipline" is used for academic, behavioral, and other student misconduct (e.g., plagiarism, vandalism, discrimination, harassment, etc.). The University also has other processes for student gender-based misconduct. Misconduct, including discrimination, involving  faculty and other employees is addressed through a separate track.

(16) Department of Education, The Family Educational Rights Privacy Act.

---

# IV. Antidiscrimination

In addition to free speech rights and free speech responsibilities, our rules also advance a third principle: our collective opposition to discrimination and harassment. Columbia University's Non-discrimination Statement and Policy bans discrimination based on a number of protected statuses, including "citizenship status; . . .color; . . . disability; familial status; gender (sex); gender identity; . . . national origin; . . . race; religion; . . . sexual orientation; . . . veteran or active military status; or any other applicable, legally protected status."

## A. Discrimination and Harassment are Not Protected Speech

So although the University must protect speech vigorously, it does not do so absolutely. While we all pledge to tolerate speech that we consider misguided or even offensive–in a collective commitment to protect everyone's right to speak their minds and pursue the truth–the University does not tolerate speech that constitutes discrimination or harassment against protected classes. This commitment is grounded not only in our collective values, but also in the law.

Indeed, a key function of the University's antidiscriminaton rules is to comply with Title VI, as well as with other federal, state, and local laws. While the University has latitude to offer *more* protection against discrimination than the law requires, it cannot offer less.

So even as the Rules of University Conduct protect free speech rights, the Affirmative Statement in Rule 440 acknowledges that "the University may restrict expression that constitutes a genuine threat of harassment," recognizing that harassment does "little if anything to advance the University's truth-seeking function" and "impair[s] the ability of individuals at the University to participate in that function."

Under federal, state, and local law, discrimination and harassment can be caused not just by conduct, but also by speech. Applying these rules, the University defines "discriminatory harassment" to include "unwelcome conduct" that is "verbal" as well as "physical":

"Subjecting an individual to unwelcome conduct, whether *verbal* or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class is harassment which is a form of discrimination." (Emphasis added.) (17)

Applying Title VI and other applicable laws, University policies include speech of various kinds in their definition of harassment:

Harassment may include, but is not limited to: verbal abuse, epithets, or slurs; negative stereotyping; threatening, intimidating, and hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text; or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class. (18)

The University's antidiscrimination rules are administered by the University's general disciplinary processes ("dean's discipline" for students, and human resources processes for faculty and staff under the Equal Opportunity and Affirmative Action Office or "EOAA"), not the special rules for protests (such as the Senate's Rules of University Conduct and the new Interim Demonstrations Policy). This division of labor reflects the reality that antidiscrimination rules enforce federal, state, and local law, so the Office of the General Counsel and the Administration need to take the lead in drafting and administering them. The same is true of the University's rules policing gender-based misconduct under Title IX. As a result, the student conduct standards expressly provide that "behavior listed in this section [including discriminatory harassment] that occurs in conjunction with" alleged violations of rules governing protests "may be adjudicated" through dean's discipline. (19)

## B. Need for Guidance On What Constitutes Discriminatory Harassment

We urge the University to provide more guidance on the meaning of "discriminatory harassment," including antisemitic harassment. What kind of speech "creates an intimidating, hostile, or abusive working, learning or campus living environment" under Title VI?

The University's definition of harassment states that "epithets or slurs" clearly can contribute to a hostile learning and working environment. Obviously, it violates the rules to approach a Jewish student and say, "F*** the Jews," just as it would violate the rules to make this sort of offensive comment to a member of any protected class.

The definition of harassment also includes "negative stereotyping" and "insulting . . . comments." So when Jewish students walk by a group that is protesting against policies of the Israeli government, the rules are violated if the protesters heckle these students by attributing Israel's policies to them (e.g., "you bomb hospitals").

The same is true when assumptions are made about Israeli faculty members, students, and staff, including those in joint programs with Israeli universities, just because these Columbia affiliates have served in the military. Since most Israelis are required to serve in the military, calls to exclude Israeli veterans from campus apply to nearly all Israeli

Columbia affiliates. Making assumptions about Columbia affiliates based solely on their country of origin or military service can constitute discrimination based on national origin or military service under the University's rules.

The University also has said that calls for genocide, like other incitement to violence, violate the rules:

"Calls for genocide against the Jewish community or any other group are abhorrent, inconsistent with our values and against our rules. Incitement to violence against members of our community will not be tolerated." (20)

While we agree with this principle, the application of it should be clarified. Obviously, the chants "gas the Jews" and "Hitler was right" are calls to genocide, but fortunately no one at Columbia has been shouting these phrases (though there are reports that these chants were used at another university). (21) Rather, many of the chants at recent Columbia protests are viewed differently by different members of the Columbia community: some feel strongly that these are calls to genocide, while others feel strongly that they are not.

At some point, courts and the Department of Education are likely to offer additional guidance illuminating the Title VI implications of these chants, as well as other speech and conduct at protests. (22) This would be helpful. In the interim, the University's legal team should provide more guidance on this issue. Since this ultimately is a matter of legal compliance, we do not offer a detailed analysis here. Instead, we emphasize a few key points.

First, the University's commitments to ban discrimination and to protect free speech are both foundational, so managing potential tensions between these commitments is not easy. Even as the University strives to protect free speech rights, it must also ensure compliance with antidiscrimination laws.

In addition, in pursuing these critically important goals, the University should aim to make the lines it draws as clear as possible, while recognizing that perfect clarity about every conceivable circumstance is not always possible. Even so, efforts to provide greater clarity help to provide fair notice, so Columbia affiliates have more of a sense of what is permissible (even if offensive) and what is not. Clearer guidance also helps colleagues who investigate potential incidents, so they know when alleged facts violate the rules. Likewise, greater clarity helps ensure that different adjudicators treat similar conduct the same way.

Recognizing the importance of clarity, the University's rules on gender-based misconduct include "scenarios," which illustrate what is permitted and what is not. (23) While these scenarios cannot govern every conceivable circumstance, and focus on relatively clear cases, they still lend clarity by illustrating general principles and inviting decisionmakers to consider whether a particular incident is more like one scenario (e.g., that is permitted) than another (e.g., that is not). To ensure that members of our community are aware of these rules, the University requires periodic online training for all members of the community. We recommend a similar effort for other types of discrimination, including antisemitic harassment. In the coming weeks, we would be pleased to work with the General Counsel's office, University Life, and other colleagues to analyze these issues in more detail.

## C. Consistency in the Treatment of Protected Classes

Needless to say, Jews and Israelis are not the only groups that could experience discriminatory harassment. The rules must defend all protected classes.

In applying the rules to different groups, the University has to make consistent judgments. Indeed, consistency is necessary as a way not just to keep faith with our values, but also to comply with Title VI and other applicable laws. In general, the University must provide the same level of protection to different protected classes. By affording vigorous protection to some, but not others, the University would violate Title VI.

As a result, speech or conduct that would constitute harassment if directed against one protected class must also be treated as harassment if directed against another protected class. This must be true not only in the way rules are written, but also in the way they are enforced.

In this spirit, the University needs to use the same methodology when deciding whether speech constitutes harassment. Should the focus be on the audience or the speaker? If members of a protected class say that particular phrases or comments cause them pain, should the University defer to them? Or should the University focus instead—not on how the protected class *hears* these words—but on what the speakers *intend* in saying them?

In recent years, it has become increasingly common at Columbia to defer to protected classes in defining which statements are considered biased or hateful, prioritizing the concerns of the audience (i.e., the protected class) over the intentions of the speaker. This approach has been evident, for instance, in discussions of policing, affirmative action, sexual assault, transgender rights, and other important issues.

But a different norm has applied to many Jewish and Israeli Columbia affiliates in recent months. When they have complained about phrases and statements that cause them pain, some students, faculty members, and staff have not deferred to their concerns. Instead, they have responded that the speakers actually mean something else, which is not offensive, or that the speakers have the right to speak their minds.

This is a challenging issue, since there are important reasons to value the perspective of both the speaker and the audience. But regardless of how this issue is resolved, the University needs to be consistent in its approach.

## D. Consistency and Expertise in Investigation and Adjudication

The University has an office that investigates and adjudicates gender-based harassment and discrimination under Title IX (the Office of Gender-Based Misconduct), and different offices that investigate and adjudicate harassment and discrimination under Title VI (the EOAA process for faculty and staff and the dean's discipline process for students). It is important to ensure that comparably rigorous levels of training are provided to these colleagues, and that consistent standards are used for different protected classes.

In pursuing these goals, the University should draw on its experience in administering Title IX. For example, the University can consider using a similar structure (e.g., a separate office), as well as similar training and staffing strategies. There may also be synergies in closer coordination of these efforts.

## E. Values as Well as Rules

Finally, it is important to emphasize that the question of what *the rules allow* is not the same as the question of what members of our community actually *should say and do*. We all have the right to take controversial positions, and rightly so. We even have the right to say offensive things.

But with rights of free expression come responsibilities, including to consider the effects of our expression on others. We should never be indifferent to the pain and discomfort our words cause, regardless of the ideas we seek to advance. Indeed, whether we are passionate in defending the rights of Israelis, Palestinians, or anyone else, we should recognize that others have convictions that are just as heartfelt. Even as we disagree, we should still respect each other's feelings. An institution of higher learning is an appropriate place to learn these responsibilities.

Columbia affiliates must never shy away from the great issues of the day. Our University must always strive to shed the light of reason on the defining challenges of our time. To advance our mission, we must be willing to express strong views, follow evidence and arguments where they lead, and confront painful truths. As part of this process,

members of our community inevitably will disagree.

But even as we express competing views, the University is at its best when we all strive to state our position with civility and collegially. Making the case in this way shows not only skill as an advocate, but also human decency and respect for shared values. As Columbia's seventeen deans recently said, "the grace of compassionate engagement should be extended to all members of our community in equal measure."

## ⌄ Footnotes

(17) EOAA Discrimination and Harassment Policies, at 7.

(18) See id at 7.

(19) Standards & Discipline at 9 n.2.

(20) Event Policy and Campus Resources FAQs (What is Columbia doing to address antisemitism on campus, and what is Columbia's reaction to calls for genocide against Jews?).

(21) Reuters, NYU is sued by Jewish students who allege antisemitism on campus, Jerusalem Post, Nov. 15, 2023; see also Olivia Land, Reprehensible anti-Israel protesters chant 'Gas the Jews' outside Sydney Opera House: video, Oct. 10, 2023.

(22) The Department of Education has already indicated that even speech protected under the First Amendment can still create a hostile learning environment under Title VI. In these circumstances, if universities cannot stop this speech, they are expected to condemn it.

(23) Gender Based Misconduct Office, Gender-Based Misconduct and Interim Title IX Policies and Procedures for Students 23-26.