# EXHIBIT 53

Home   »   Report #2: Task Force on Antisemitism

# Report #2: Task Force on Antisemitism

Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion[1]

August 2024



## Executive Summary

The demonstrations that roiled our campuses during the past academic year uncovered deep disagreements about the mission of our University. During those months, consensus around the University's formal rules and informal norms of behavior broke down, interfering with our charge to educate students and engage in research.

In addition, the testimonies of hundreds of Jewish and Israeli students have made clear that the University community has not treated them with the standards of civility, respect, and fairness it promises to all its students.

VIEW THE FULL REPORT (PDF)

Report #2: Columbia University Student Experiences of Antisemitism and Recommen…

After October 7, many Jewish and Israeli students began to report multiple instances of harassment, verbal abuse and ostracism, and in some cases physical violence. Given the volume of these reports, the Task Force invited all students—not just Jewish and Israeli students—to tell us their stories. Over the course of the spring, nearly five hundred students offered testimonials, at over 20 listening sessions, which provided invaluable insights into the campus climate during these troubled times. These student stories are heartbreaking, and make clear that the University has an obligation to act.

This report recounts student experiences in a wide variety of venues—day-to-day encounters, including dorm life and social media; clubs; and the classroom. Unfortunately, some members of the Columbia community have been unwilling to acknowledge the antisemitism many students have experienced—the way repeated violations of University policy and norms have affected them, and the compliance issues this climate has created with respect to federal, state, and local anti-discrimination law. Many of the events reported in the testimonials took place well before the establishment of the encampments and the takeover of Hamilton Hall; the experiences reported during that period were even more extreme.

We heard about troubling incidents from a diverse group of Jewish students from across the political spectrum; and, even more pronouncedly, from Israeli students, whose national origin both make them members of a specifically protected class under federal law and frequently has caused them to be singled out for particularly terrible treatment.

Students also reported that their efforts to seek redress from the University for the hostility and bigotry they were encountering were often unsuccessful. Many students did not understand how to report these incidents. Although some faculty and staff responded with compassion and determination, others minimized the concerns of these students, reacting sluggishly and ineffectively even to the most clear-cut violations. Even students who had successfully reported an incident spoke of a recurring lack of enforcement of existing University rules and policies.

The experiences of these students demonstrated that there is an urgent need to reshape everyday social norms across the campuses of Columbia University. We need to promote a richer ethic of pluralism, which would encourage greater tolerance of and respect for differences in religion, culture, and national origin. If we were really to succeed in promoting tolerance, students would come to understand and value these differences.

But we are a long way from there. The problems we found are serious and pervasive. We recognize that the University is not monolithic, and the environment at some schools is especially challenging. A wide range of responses is needed—indeed, a broader range than we discuss in this report (which focuses on training, defining antisemitism, reporting, and rules for student groups) and in our last report (which focused on the rules governing protests). We do not want to give the impression that the recommendations here are all that is required. We will address other issues in future reports.

In this report we draw on the many accounts shared with us over the past several months to produce a working definition of antisemitism. Instead of relying on an existing definition, we crafted a working definition that is rooted in recent experiences at Columbia:

Antisemitism is prejudice, discrimination, hate, or violence directed at Jews, including Jewish Israelis. Antisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel.

LEARN MORE

[About the Task Force on Antisemitism](#)

[About the Members of the Task Force on Antisemitism](#)

[About the First Report](#)

This working definition draws on experiences of many Jewish and Israeli students, who were on the receiving end of ethnic slurs, stereotypes about supposedly dangerous Israeli veterans, antisemitic tropes about Jewish wealth and hidden power, threats and physical assaults, exclusion of Zionists from student groups, and inconsistent standards. We propose this definition for use in training and education, not for discipline or as a means for limiting free speech or academic freedom.

This report also identifies significant problems in university policy and practice and makes recommendations for fixing flawed administrative systems, improving campus climate, and building consensus for a more inclusive and pluralistic university. Specifically, we recommend anti-bias and inclusion trainings for students, resident advisers, resident assistants, teaching assistants, student-facing staff, and faculty. In a community dedicated to freedom of speech and pluralism, we must prepare students with different views and backgrounds to engage with each other. We must encourage mutual respect, tolerance, civility, and an open learning environment.

We also recommend in-person workshops about antisemitism and Islamophobia, as well as a range of optional training and workshops for others in our community, including on implicit bias and stereotypes, bystander interventions, and having difficult conversations.

Given the urgent need to train administrators who play critical roles in responding to student needs, we also suggest a range of trainings in dispute resolution.

As part of this effort, we recommend that the Interim President and Provost establish a Cross-School Committee that includes all schools at Columbia, along with Barnard College and Teachers College, to share information and establish a baseline standard for trainings, workshops, and website information for all schools. The Committee should aim to overcome the problem of decentralization within Columbia, which is a barrier to maintaining common objectives across the many spaces shared by undergraduate and graduate students.

We also recommend that the University establish a repository for best practices in anti-bias and inclusion trainings and that it develop a plan for evaluating these programs.

Customized trainings aimed at specific constituencies are particularly important, including first year orientation and new student orientation for graduate programs—a recent area of focus for University Life—and new faculty orientation at all Columbia schools, including affiliate schools, Barnard College, and Teachers College. We recognize that University Life has been working to update and improve its training for student orientation.

We call attention to the need to train teaching assistants (TAs) in sensitivity to bias, exclusion, and antisemitism. Currently, the online course required for all Columbia TAs, available through the Equal Opportunity and Affirmative Action (EOAA) website, lacks guidelines on diversity, inclusion, and bias. TAs need guidance on how to respond to classroom scenarios that stray into discrimination and bias; currently, they are told that no single best practice exists. We recommend giving attention to topics related to race, religion, and national origin in all their complexity. We point to several excellent models offered by other universities in guiding TAs and first-time instructors.

Resident assistants and advisers (RAs) are another group in need of customized training; we offer suggestions for how RAs can foster better attention to inclusion, identification of bias, and elimination of harmful behavior signaling derision and hatred. RAs must fully understand their role as leaders in inclusion: they need to be prepared to listen with respect and to mediate conflicts.

In place of the confusing multiplicity of reporting structures that currently exist, we suggest ways of revamping procedures so that students are not discouraged from speaking with advisors and administrators about prejudicial treatment. Transparency and consistency in how we handle student reports of bias and exclusion are of the utmost importance if we want students to share their experiences. Our aim is for students to engage with faculty or staff who can resolve conflicts before situations rise to the level of legal violations. Antisemitism complaints deserve careful attention from deans and administrators, alongside all forms of bigotry and discrimination.

We also recommend ways to ensure that student groups contribute to the University's pluralist mission and comply with anti-discrimination law. Unfortunately, we have heard from many Jewish and Israeli students who have been excluded from student groups because of their Zionist beliefs. This is not acceptable. Student groups must be inclusive, with membership limited only for reasons connected to their mission. Student groups generally should not issue statements unrelated to their missions, so they can welcome students with diverse views and backgrounds. Groups also should have a robust consultation process before issuing statements or joining coalitions. To be clear, there should not be any limits on the free speech rights of a group's *members*. They must be free to speak about any issue as long as they are speaking *for themselves*, not for the group.

---

1. This report reflects the research, analysis and drafting of members of the Task Force's policy working group: Ester Fuchs (Co-Chair, SIPA and Political Science), Clémence Boulouque (Department of Religion), Jeremy A. Dauber (Department of Germanic Languages), Rebecca Kobrin (Department of History). and Deborah Valenze (Affiliate Co-Chair, Barnard College). Extensive analysis and input also was provided by the other members of the Task Force: Nicholas Lemann (Co-Chair, Journalism School), David M. Schizer (Co-Chair, Law School), Peter Coleman (Affiliate Co-Chair, Teachers College), R. Glenn Hubbard (Business School), Magda Schaler-Haynes (Mailman School of Public Health), Nir Uriel (Columbia University Irving Medical Center), Matthew C. Waxman (Law School), and Gil Zussman (Fu Foundation School of Engineering and Applied Science).