UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, et al.,

                        *Plaintiffs*,

    -against-

U.S. DEPARTMENT OF JUSTICE, et al.,

                        *Defendants*.

Civil Action No. 1:25-cv-02429
(MKV)

**BRIEF OF LAW PROFESSORS AND FIRST AMENDMENT SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

INTEREST OF AMICI ...................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

ARGUMENT ..................................................................................................................... 4

     I.    THE FIRST AMENDMENT PROTECTS THE FREE SPEECH RIGHTS OF
           UNIVERSITIES, FACULTY, STUDENTS, AND STAFF AGAINST
           GOVERNMENTAL THREATS AND COERCION, AS WELL AS AGAINST
           OVERT CENSORSHIP ......................................................................................... 4

     II.    DEFENDANTS' ACTIONS VIOLATE THE FIRST AMENDMENT BY USING
           THE THREAT OF FEDERAL FUNDING CUTS TO COERCE THE
           SUPPRESSION OF PROTECTED EXPRESSION ................................................. 7

     III.    DEFENDANTS' ACTIONS VIOLATE THE UNCONSTITUTIONAL
           CONDITIONS DOCTRINE ................................................................................ 22

CONCLUSION ................................................................................................................. 26

TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013).................................................................. 22, 23, 24, 25

*Alexander v. Sandoval,*
532 U.S. 275 (2001)............................................................................... 3

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.,*
430 F. Supp. 2d 222 (S.D.N.Y. 2006)........................................... 22, 25

*Arkansas Ed. Television Comm'n v. Forbes,*
523 U.S. 666 (1998)............................................................................. 11

*Associated Press v. United States,*
326 U.S. 1 (1945)................................................................................... 4

*Backpage.com, LLC v. Dart,*
807 F.3d 229 (7th Cir. 2015) ................................................................ 8

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963)............................................................. 3, 18, 19, 20

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000)............................................................................. 14

*California Democratic Party v. Jones,*
530 U.S. 567 (2000)............................................................................. 15

*Carey v. Brown,*
447 U.S. 455 (1980)............................................................................. 10

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994)............................................................................... 10

*Clark v. Cmty. for Creative Non-Violence,*
468 U.S. 288 (1984)............................................................................. 10

*Cohen v. California,*
403 U.S. 15 (1971)................................................................................. 4

*Edwards v. South Carolina,*
372 U.S. 229 (1963)............................................................................. 10

*Eu v. San Francisco Cnty. Democratic Cent. Comm.,*
489 U.S. 214 (1989)............................................................................. 15

*FCC v. League of Women Voters*,
    468 U.S. 364 (1984)....................................................................................... 4, 23, 24, 25

*Gartenberg v. Cooper Union*,
    2025 WL 401109 (S.D.N.Y. Feb. 5, 2025)...................................................... 17

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)............................................................................................ 2

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995).......................................................................................... 11

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*,
    385 U.S. 589 (1967)........................................................................................ 6, 7

*LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999).......................................................................................... 21

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)............................................................................................ 6

*Manhattan Cmty. Access Corp. v. Halleck*,
    587 U.S. 802 (2019)............................................................................................ 1

*Members of City Council of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984).......................................................................................... 11

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)............................................................................... 4, 5, 11, 13

*Nat'l Ass'n for Advancement of Colored People v. Button*,
    371 U.S. 415 (1963).................................................................................. 10, 15, 18

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018).......................................................................................... 23

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)................................................................ 3, 6, 8, 13, 20, 22, 26

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)............................................................................................ 6

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003).............................................................................. 5, 8

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n*,
    475 U.S. 1 (1986).............................................................................................. 11

*Perry v. Sindermann,*
    408 U.S. 593 (1972)........................................................................... 5, 26

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)............................................................................... 18

*Red Lion Broad. v. FCC,*
    395 U.S. 367 (1969)................................................................................. 4

*Regents of Univ. of California v. Bakke,*
    438 U.S. 265 (1978)............................................................................... 17

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)........................................................................... 5, 14

*Rust v. Sullivan,*
    500 U.S. 173 (1991)............................................................................... 23

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001)...................................................... 17, 18, 21

*Smith v. California,*
    361 U.S. 147 (1959)............................................................................. 3, 6

*Speiser v. Randall,*
    357 U.S. 513 (1958)........................................................................... 18, 26

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957)........................................................................... 7, 16

*Thornhill v. Alabama,*
    310 U.S. 88 (1940)................................................................................. 2

*United States v. Am. Library Ass'n, Inc.,*
    539 U.S. 194 (2003)............................................................................... 23

*Univ. of Pennsylvania v. EEOC,*
    493 U.S. 182 (1990)........................................................................... 7, 16

*West Virginia State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)................................................................................. 4

*Whitney v. California,*
    274 U.S. 357 (1927)................................................................................. 1

## Statutes

42 U.S.C. § 2000d *et seq.*........................................................................ 3

**Other Authorities**

5 Writings of James Madison
    269 (G. Hunt ed.1901) ................................................................................................ 6

Amanda Shanor, *First Amendment Coverage*,
    93 NYU L. Rev. 318 (2018) ........................................................................................ 9

Columbia University Rules of University Conduct (2019),
    https://universitypolicies.columbia.edu/content/rules-university-conduct ..... 12, 14, 15, 16

Columbia University Senate, *Resolution Reconfirming Our Commitment to the Principles of
    Academic Freedom and Shared Governance* (Feb. 2, 2024),
    https://senate.columbia.edu/news/resolution-reconfirming-our-commitment-principles-
    academic-freedom-and-shared-governance ....................................................................... 15

Columbia University, Anti-Discrimination and Discriminatory Harassment Policy and
    Procedures for Students (2025),
    https://universitypolicies.columbia.edu/content/anti-discrimination-and-discriminatory-
    harassment-policy-and-procedures-students ..................................................................... 17

Columbia University, Guidelines to the Rules of University Conduct (2024),
    https://senate.columbia.edu/content/guidelines-rules-university-conduct ....................... 12

Dept. of Education, Office of Civil Rights, First Amendment: Dear Colleague Letter (July 28,
    2003),
    https://www.ed.gov/about/offices/list/ocr/firstamend.html [https://perma.cc/5EKU-
    GTSQ] ....................................................................................................................... 21

Genevieve Lakier, *Safeguarding the First Amendment in the Era of Jawboning*,
    93 U. Chicago L. Rev. (forthcoming 2026) ..................................................................... 13

Harriet Engelke and Spencer Davis, *NIH cancels $250 million in grants to Columbia as part of
    $400 million Trump administration cut,* Columbia Spectator (March 11, 2025),
    https://www.columbiaspectator.com/news/2025/03/11/nih-cancels-250-million-in-grants-
    to-columbia-as-part-of-400-million-trump-administration-cut/ ........................................ 25

Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., General Services
    Administration, et al., to Dr. Katrina Armstrong, Interim President, Columbia University,
    et al. (Mar. 13, 2025),
    https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-
    full.pdf [https://perma.cc/7DXL-986Y] ................................................. 3, 8, 9, 14, 16, 17

Letter from Mia Karvonides, Senior Legal Advisor to the Assistant Sec'y and Deputy Assistant
    Sec'y, Dep't of Ed., Office of Civil Rights, to Suresh V. Garimella, President, University
    of Vermont (Apr. 3, 2023),
    https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/01222002-a.pdf ...... 21

Press Release, Department of Education, DOJ, HHS, ED, and GSA Announce Initial
        Cancellation of Grants and Contracts (Mar. 7, 2025),
        https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-
        cancelation-of-grants-and-contracts-columbia-university-worth-400-million
        [https://perma.cc/H7GZ-5JF2] ........................................................................................ 8

Resolution Agreement, The University of California (Dec. 18, 2024),
        https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09222257-b.pdf ...... 22

U.S. Dep't of Ed. Office for Civil Rights, *Case Processing Manual, Section VI* (Feb. 19, 2025),
        https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf
        [https://perma.cc/V2PC-RBVL] ...................................................................................... 19

## INTEREST OF AMICI

*Amici* are First Amendment scholars who have taught courses on freedom of speech, published articles and books on First Amendment doctrine and history, and dedicated significant attention to the study of First Amendment protections. *Amici* submit this brief to assist the Court in deciding the significant First Amendment issues presented by this case.

## SUMMARY OF ARGUMENT

The First Amendment protects the independence of the marketplace of ideas from governmental control whether that control is imposed directly, through laws, regulations, or other governmental commands, or is instead effectuated indirectly, by means of threats, inducements, or the leveraging of federal benefits. By protecting private expressive autonomy against both blatant as well as subtle encroachments by government actors, the First Amendment helps to maintain the fundamental separation between the public and the private realms that is required in any democratic system. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 818 (2019) (noting that the "critical boundary between the government and the individual… protects a robust sphere of individual liberty"). It guarantees the "freedom to think as you will and to speak as you think" that is the foundation of democratic liberty. *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

Defendants' actions flagrantly violate this core principle of First Amendment law. By threatening Columbia University with the loss of federal funding, and by suspending $400 million in grants and contracts that the university or its members would otherwise receive, Defendants have attempted to coerce the university into changing how it manages the speech of its students and faculty, how it governs itself, who it admits to the university, and how it educates. Defendants have attempted, in other words, to dictate to Columbia University how it

should organize itself as a private expressive institution and how its students, faculty, and staff may speak and associate.

These are not changes that the government can command in our constitutional system. To the contrary: a long line of cases makes clear that, under the First Amendment, universities like Columbia possess extensive freedom to decide for themselves what kinds of messages, what kinds of speech, and what kinds of speakers they will permit on their property, as well as the governance processes that produce those decisions. *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."). Equally importantly, Columbia's students and faculty enjoy the right under the First Amendment to speak about "matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940).

Government defendants therefore could not directly order the punishment of Columbia's students, staff and faculty who engage in protected protest in a manner that the administration dislikes, or require Columbia to put one of its academic departments into receivership, or otherwise intrude upon the expressive autonomy of the institution, its faculty, staff or students. They also cannot indirectly achieve the same result by threatening the university with the loss of federal funds if it fails to comply with these "preconditions to negotiation." Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., General Services Administration, et al., to Dr. Katrina Armstrong, Interim President, Columbia University, et al. (Mar. 13, 2025),

https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf

[https://perma.cc/7DXL-986Y] [hereinafter GSA Letter]. As the Supreme Court unanimously affirmed only last term, a "government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Nor may government actors use the threat of legal or other penalties to pressure private actors into self-censoring. *Smith v. California*, 361 U.S. 147, 153–54 (1959) (private "self-censorship, [when] compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered").

This is not to say that government officials may never terminate the provision of federal funds to private institutions like Columbia when necessary to enforce the federal civil rights laws, or warn regulated parties that they are planning on terminating funds, so long as they do so in a manner that is consistent with the statutory requirements. Just as officials have a duty to respect the freedoms protected by the First Amendment, they have a duty to protect the equality rights guaranteed by the federal constitution, as well as by statutes like Title VI of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000d *et seq*; *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (Title VI "proscribes… those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment [to the U.S. Constitution]").

What government officials may not do is what they have attempted to do here: namely, attempt to create "a scheme of state censorship effectuated by extralegal sanctions," premised on an asserted goal of enforcing Title VI. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71–72 (1963) (noting that the First Amendment permits "private consultation between law enforcement officers and [private entities]" but that it does not permit informal communications that are intended "not to advise but to suppress"). Their actions consequently violate not only the

First Amendment rule against informal censorship but also the unconstitutional conditions

doctrine and should on that basis be enjoined.

**ARGUMENT**

**I.     THE FIRST AMENDMENT PROTECTS THE FREE SPEECH RIGHTS OF
        UNIVERSITIES, FACULTY, STUDENTS, AND STAFF AGAINST
        GOVERNMENTAL THREATS AND COERCION, AS WELL AS AGAINST
        OVERT CENSORSHIP**

The central purpose of the First Amendment is to "remove governmental

restraints from the arena of public discussion, putting the decision as to what views shall be

voiced largely into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971); *FCC v.*

*League of Women Voters*, 468 U.S. 364, 377 (1984) ("It is the purpose of the First Amendment

to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail" (quoting

*Red Lion Broad. v. FCC*, 395 U.S. 367, 390 (1969))). By protecting the independence of the

marketplace of ideas from governmental control, the First Amendment promotes the search for

truth. *Associated Press v. United States*, 326 U.S. 1, 28 (1945) (Frankfurter, J., concurring)

("[R]ight conclusions are more likely to be gathered out of a multitude of tongues, than through

any kind of authoritative selection."). It also protects the democratic character of the American

system, by ensuring that "authority is … controlled by public opinion, not public opinion by

authority." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

The First Amendment promotes these important aims by prohibiting the

government from directly interfering with the expressive choices made by private speakers and

the private institutions that host and disseminate much of the speech that makes up the

marketplace of ideas. Hence, the First Amendment by and large prevents the government from

telling private speakers or private institutions what messages they may permit on their property

or use their resources to promote. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731–33 (2024)

("[T]he First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude."). Similarly, the government may not dictate to private persons or institutions with whom they can associate, or how they may do so. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). As the Court affirmed just last term, when the government attempts to directly "overrid[e] a private party's expressive choices" in these ways, it "confronts the First Amendment." *Moody*, 603 U.S. at 732.

The First Amendment also protects the independence of the marketplace of ideas from governmental control by prohibiting government officials from more *indirectly* coercing or interfering with the expressive choices made by private speakers or institutions. Hence, government officials cannot use threats of economic or regulatory retaliation to pressure private entities into suppressing their own or other people's speech or disassociating from disfavored speakers. *Okwedy v. Molinari*, 333 F.3d 339, 340–41 (2d Cir. 2003) ("[A] public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights even if the public-official defendant lacks direct regulatory or decisionmaking authority over the plaintiff or a third party that facilitates the plaintiff's speech."). Government officials also cannot condition the receipt of government benefits on a private party's agreement to waive their First Amendment rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Courts have interpreted the First Amendment to prohibit these more subtle and sometimes informal efforts to restrict speech because they have recognized that any other

conclusion would allow the First Amendment to become a "simple semantic exercise[,]" *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 547 (2001), or a mere "parchment barrier[]" to government censorship, 5 Writings of James Madison 269, 272 (G. Hunt ed.1901). This is because, were it otherwise, the government could use the expansive economic and regulatory levers of the state to pressure private parties into censoring themselves even when they could not directly command it. And yet, as the Supreme Court recognized over sixty years ago, private "self-censorship, [when] compelled by the State" is "hardly less virulent for being privately administered." *Smith*, 361 U.S. at 154. It poses as great a threat to the independence of the marketplace of ideas as official state censorship does—and in some respects, poses a greater threat by obscuring the governmental source of the constraints on the "uninhibited, robust, and wide-open" public debate the First Amendment is supposed to enable. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Therefore, the Court has made clear that, under the First Amendment, a "government official cannot … coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190.

Defendants' actions violate this important and well-established principle of First Amendment law. And they do so in an attempt to override the expressive choices made by a kind of private institution—a university—that enjoys particularly strong constitutional protection against government interference and control. Safeguarding the expressive freedom of universities, as well as their faculty and students when they engage in research and teaching, is a "special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967). Courts show "special concern" for the expressive freedom of universities, their faculty and students because they recognize the particular importance that universities possess when it comes to the search for truth, as well as the fact that, as institutions

devoted to the development of new ideas, universities are particularly likely to host the unpopular or heterodox speech that tends to attract governmental ire. *Id* at 603 (noting that "[o]ur Nation is deeply committed to safeguarding academic freedom [because] of [its] transcendent value to all of us and not merely the teachers concerned"); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."). The First Amendment therefore requires government actors to defer to the "legitimate academic decisionmaking" of university decisionmakers wherever possible, *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 198 (1990), and to prohibit state actions that "cast a pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603.

By demanding that Columbia change how it governs itself, and how it regulates the expressive activity of its students, staff, and faculty if it wants to continue to receive federal funds, Defendants have attempted to use the power of the purse to violate these important and well-established constitutional principles by doing what the First Amendment forbids: namely "impos[ing] a[] strait jacket upon the intellectual leaders in our colleges and universities." *Sweezy,* 354 U.S. at 250. As such, their actions pose a profound threat to the independence of the academic marketplace of ideas and are unconstitutional in multiple respects.

## II.    DEFENDANTS' ACTIONS VIOLATE THE FIRST AMENDMENT BY USING THE THREAT OF FEDERAL FUNDING CUTS TO COERCE THE SUPPRESSION OF PROTECTED EXPRESSION

First, Defendants' actions violate the First Amendment by threatening Columbia University, and members of the university community, with financial and other penalties in an

effort to coerce the suppression of protected expression. As the Court recently reaffirmed, government officials "violat[e] the First Amendment" whenever they engage in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress… speech." *Vullo*, 602 U.S. at 191.

Here, there is no question that Defendants threatened Columbia with adverse government action. It is often the case that government officials who attempt to coerce private speakers or speech hosts into suppressing disfavored expression try to cloak the threatening nature of their actions in vague language, or to turn on the screws in private rather than public communiques. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (describing unconstitutional pressure campaign consisting of private letters and phone calls); *Okwedy*, 333 F.3d at 342 (describing vague but threatening letter borough president sent to billboard company in an effort to coerce it to take down disfavored billboards). In this case, however, the threatening nature of Defendants' actions could not be clearer. Defendants have insisted, in no uncertain terms, that if Columbia does not comply with their demands, it could lose up to $5 billion in federal grant commitments currently pledged to the university, as well as the opportunity to receive similar amounts of grant funding in the future. GSA Letter (threatening the end of Columbia's "financial relationship with the federal government"); *see also* Press Release, Department of Education, DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts (Mar. 7, 2025), https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million [https://perma.cc/H7GZ-5JF2]. This is a heavy stick to wield over Columbia. And it is a stick that Defendants use, quite overtly, to pressure Columbia to suppress its own speech, and that of its students, staff, and faculty.

Indeed, all the demands that Defendants have made of Columbia target, in one way or another, the kind of linguistic or symbolic conduct that counts as speech for purposes of the First Amendment. *See* Amanda Shanor, *First Amendment Coverage*, 93 NYU L. Rev. 318, 321 (2018) ("[S]ignificant amounts of activity we might colloquially call conduct (or at least not 'speech')—from paintings and music to flag displays, cross burning, and arm-band wearing—are constitutionally protected, and their regulation prompts swift constitutional challenge [under the First Amendment].").

For example, Defendants have demanded that the university change how it regulates protest on campus by, among other things, "implement[ing] permanent, comprehensive time, place, and manner rules to prevent disruption of teaching, research, and campus life," and banning students from wearing masks "except for religious and health reasons"—i.e., as part of a political demonstration. GSA Letter. Defendants have also demanded that the university impose "meaningful discipline" on students who participated in the takeover of the university's Hamilton Hall and in campus encampments by expelling them or suspending them for multiple years, *id.* (defining these sanctions as "meaningful discipline"), and that going forward, the university more rigorously discipline "recognized student groups and individuals [who] provid[e] support for, unrecognized groups engaged in violations of University policy." *Id.* (demanding that these groups and individuals "be held accountable through formal investigations, disciplinary proceedings, and expulsion as appropriate"); *see also id.* (demanding that the "University… ensure that Columbia security has full law enforcement authority [to] arrest and remov[e…] agitators who foster an unsafe or hostile work or study environment or otherwise interfere with classroom instruction or the functioning of the university").

These demands require Columbia to do more than it has done so far to suppress the political expression of its students, staff, and faculty by limiting when and how protest can occur, and by deterring protest by threatening protestors with more severe sanctions if they break the rules. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963) (noting that because "First Amendment freedoms … are delicate and vulnerable, as well as supremely precious in our society [t]he threat of sanctions may deter their exercise almost as potently as the actual application of sanctions"). And yet, protest is fully protected speech. More than that—it is the kind of speech on public matters that "rest[s] on the highest rung of the hierarchy of First Amendment values," and that involves the "exercise of basic constitutional rights in their most pristine and classic form." *Carey v. Brown*, 447 U.S. 455, 466–67 (1980) (cleaned up) (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)).

When the government regulates this kind of speech via the ordinary procedures of democratic lawmaking, its actions therefore trigger significant constitutional scrutiny. To justify laws that restrict the time, place and manner regulations of protest and other public speech, officials must demonstrate that those laws further a significant governmental interest by narrowly tailored means and leave open ample alternative channels of communication. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) . The Court has made clear, moreover, that satisfying this scrutiny will be particularly difficult when it comes to the regulation of public speech on privately-owned property like the Columbia campus because the government will often lack a sufficiently important reason to dictate the terms of use of property it does not own or control. *City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) (noting that "[w]hereas the government's need to mediate among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable," the government  has "much less

pressing" need to regulate speech on private property and on that basis striking down a law that restricted lawn signs); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 811 (1984) (acknowledging that "[t]he private citizen's interest in controlling the use of his own property" justifies different constitutional treatment). The government would face significant hurdles, in other words, if it were to attempt to do by statute what it now attempts to do by demand.

A law that formally required a private institution like Columbia to alter its own speech rules to comply with the government's idea of what protest activity was permissible on a college campus would trigger even more demanding scrutiny. This is because, as a long line of cases establish, the First Amendment strongly protects the right of private businesses or groups to decide for themselves the rules that govern speech on their property, when those rules communicate their own institutional values and commitments. *Moody*, 603 U.S. at 731 ("[T]he First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude…. An entity 'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" (quoting *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (the government may not require a private parade organizer to allow a disfavored group to march in the St. Patrick's Day Parade it organized because "like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day"); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n*, 475 U.S. 1, 4 (1986) (construing the First Amendment to prohibit the government from

"requir[ing] a privately owned utility company to include in its billing envelopes speech of a third party with which the utility disagrees").

These cases also mean that the government may not informally coerce Columbia into changing how it regulates protest speech on campus by threatening it with financial harm if it does not comply. This is because, as Columbia's speech polices make clear, the rules and procedures the university has adopted to regulate speech on its campus clearly express its institutional values and commitments, and, more specifically, the institution's core commitment, as an educational institution, to the importance of free and open expression. Columbia's Rules of University Conduct assert quite forthrightly, for example, that the university speech rules "are intended to ensure that all members of [the] community may engage in our cherished traditions of free expression and open debate" and reflect the view that "the University, as a forum for the pursuit and attainment of knowledge … has a special role in fostering free inquiry." Columbia University Rules of University Conduct (2019),

https://universitypolicies.columbia.edu/content/rules-university-conduct [hereinafter Columbia Rules], § 440 Affirmative Statement. The Rules also celebrate the institution's "long tradition of valuing dissent and controversy and … welcoming the clash of opinions onto the campus." *Id.* Similarly, the Guidelines to the Rules of University Conduct explain that disciplinary sanctions must be imposed in a manner that is "consistent with the University's educational mission" and that this requires a "range of sanctions [to be] offered in line with the severity of the violations of the Rules" and that informal, non-punitive resolution be encouraged wherever possible. Columbia University, Guidelines to the Rules of University Conduct (2024),

https://senate.columbia.edu/content/guidelines-rules-university-conduct, Sanctions.

As these policy statements make clear, the decisions that Columbia makes when drafting and enforcing its speech rules reflect its view of what kinds of speech and expression "are appropriate and which are not" for the community it wants to host. *Moody*, 603 U.S. at 738. They tell a story—sometimes one that commands national attention—about what kind of an expressive community the university is. Therefore, because the existing rules are intended to express (and as the furor over them make clear, succeed in expressing) a message about the value of protest and dissent on the university campus, Defendants cannot expressly command the university to change these rules without "confront[ing] the First Amendment." *Id*. at 732. They consequently also cannot use the threat of economic sanctions to indirectly achieve the same result. *Vullo*, 602 U.S. at 190.

This is for good reason. Any other rule would permit these and other government officials to evade the constraints the First Amendment otherwise imposes on their regulatory power by making private organizations like Columbia do their regulating for them. Defendants simply do not have the power under the First Amendment to aggrandize their own power in this way, by evading the demanding constitutional scrutiny that would apply to formal action. *Vullo*, 602 U.S. 197–98 (noting how tactics of informal coercion allow "government officials to "expand their regulatory jurisdiction" beyond what is permitted by law); *see also* Genevieve Lakier, *Safeguarding the First Amendment in the Era of Jawboning*, 93 U. Chicago L. Rev. (forthcoming 2026) ("[W]hat the First Amendment rule against informal censorship … prohibits is the practice of constitutional evasion: the purposeful use of informal governmental power to evade the constraints that the First Amendment imposes on the government's formal powers.").

For similar reasons, Defendants also cannot use the threat of economic sanctions to compel Columbia to change its internal governance processes by "abolish[ing] the University

Judicial Board (UJB)," the faculty-run entity that until now has had primary responsibility for enforcing violations of the university's speech code, and instead "centralize all disciplinary processes under the [university] Office of the President," as they have demanded. GSA Letter (demanding also that Columbia grant the president "[p]rimacy… in disciplinary matters," with the power to "suspend or expel students"); *see also* Columbia Rules §§ 444-445 (recognizing the central role of the Faculty-Senate UJB in disciplinary decisionmaking). Here too, Defendants are attempting to use the threat of adverse government action to coerce the suppression of expressive activity (or "speech") that the First Amendment protects.

Defendants cannot demand that the university make these changes because, among the rights that the First Amendment extends to expressive associations like Columbia— that is to say, to organizations that exist to further expressive ends, like the ends of research and teaching—is the right to make their own internal governance decisions when those decisions implicate their expressive ends. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984) (recognizing "as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends" and that "[g]overnment actions... may unconstitutionally infringe upon this freedom [by] interfer[ing] with the internal organization or affairs of the group… [by] impair[ing] the ability of the original members to express only those views that brought them together"). This principle explains why the government may not tell the Boy Scouts who it may select as its Scout Masters when doing so would make it more difficult for the organization to communicate its views to its Scouts and to the rest of the world. *Boy Scouts of America v. Dale*, 530 U.S. 640, 653 (2000). Similarly, it explains why the government may not tell political parties how they may choose the candidates who will represent them in the

14

general election. *California Democratic Party v. Jones,* 530 U.S. 567, 575 (2000) ("[O]ur cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences'" (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989)). And it explains why the government is strictly limited when it seeks to regulate the solicitation practices of advocacy organizations like the NAACP. *Button*, 371 U.S. at 434-37 (finding a state law restricting legal solicitation to "unduly inhibit[] protected freedoms of expression and association" by making it more difficult for lawyers associated with the NAACP to "acquaint 'persons with what they believe to be their legal rights and … (advise) them to assert their rights by commencing or further prosecuting a suit.'").

This principle of associational freedom means, in this case, that the decisions Columbia makes about who shall interpret and enforce its institutional speech rules are generally beyond the government's power to control. After all, the involvement of the UJA in disciplinary decisions is a primary means by which Columbia has traditionally attempted to vindicate and make meaningful the institutional values articulated in its Rules of University Conduct by ensuring that faculty—the members of the university community who are most likely to approach the regulation of speech with a pedagogical rather than a punitive attitude—play a significant role in the disciplinary process. *See, e.g.*, Columbia University Senate, *Resolution Reconfirming Our Commitment to the Principles of Academic Freedom and Shared Governance* (Feb. 2, 2024), https://senate.columbia.edu/news/resolution-reconfirming-our-commitment-principles-academic-freedom-and-shared-governance (declaring that "University policy in general should arise from mechanisms of shared governance" and "[t]he University Senate, as the representative body of all University constituencies… has an historic and vital role to play in

15

convening and fostering further discussion, articulation, and/or ratification of principles around academic freedom"); Columbia Rules § 445 (vesting the UJB with the power to "hear all charges of violations of [the] Rules" and further providing that "[t]he Executive Committee of the [faculty-run] University Senate shall… appoint or fill [all] vacancies [on the UJB]"). The government cannot now undermine Columbia's associational freedom by demanding that it reform the internal governance structures that shape the meaning of its speech rules or otherwise suffer significant financial harm.

Defendants also cannot use the threat of economic sanctions to compel Columbia to place the Middle East, South Asian, and African Studies Department (MESAAS) under academic receivership, as they demand it do "for a minimum of five years." GSA Letter. Nor can they demand that the university undertake "comprehensive admissions reform." *Id.* These demands also threaten the kinds of expressive conduct that constitute "speech" for First Amendment purposes. More specifically, they threaten all four of what Justice Frankfurter described in *Sweezy v. New Hampshire* as the "essential freedoms" of the university that the First Amendment protects against government interference and control—namely, the freedom of the university "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." 354 U.S. at 263 (Frankfurter, J., concurring). By demanding that Columbia install new leadership in MESAAS, Defendants clearly intend to pressure the university into changing how the department teaches, what it teaches, and potentially also, who its members are. As an attempt to "direct the content of speech at [a] private universit[y]," this demand creates what the Court described in *Univ. of Pennsylvania v. EEOC* as a very serious and a very "[o]bvious First Amendment problem[]." 493 U.S. at 198 n.6. The demand that Columbia enact comprehensive admissions reform meanwhile

threatens "[t]he freedom of [the] university to make its own judgments [about] the selection of its student body" that the First Amendment protects. *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 312 (1978) (Powell, J.).

Finally, Defendants may not threaten the university with financial harm in order to compel it to include in its institutional discriminatory conduct policy a definition of antisemitism that equates anti-Zionist speech with anti-Jewish racism. GSA Letter (Columbia must "[f]ormalize, adopt and promulgate a definition of antisemitism [that addresses] …. anti-Zionist discrimination against Jews in areas unrelated to Israel or the Middle East"); *see also* Columbia University, Anti-Discrimination and Discriminatory Harassment Policy and Procedures for Students (2025), https://universitypolicies.columbia.edu/content/anti-discrimination-and-discriminatory-harassment-policy-and-procedures-students.

This is because, depending on how it is defined, the category of "anti-Zionist discrimination" may include many instances of constitutionally protected speech. As then Judge Alito noted, during his time on the Third Circuit Court of Appeals, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001). Instead, "the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs." *Id.* at 206. It certainly includes critiques of the political philosophy of Zionism that are not intended to incite lawless action and/or not directed at any particular individuals—as in fact this Court has only recently held. *Gartenberg v. Cooper Union*, No. 24 CIV. 2669 (JPC), 2025 WL 401109, at *14–15 (S.D.N.Y. Feb. 5, 2025) (concluding that anti-Zionist fliers, speeches, and demonstrations identified in a Title VI complaint constituted "pure speech on matters of public concern"

17

protected by the First Amendment and were therefore "not a proper basis on which to impose civil liability").

The fact that anti-Zionist speech will be, in many instances, entitled to constitutional protection means that the government may regulate in this area only with "narrow specificity." *Button*, 371 U.S. at 433 ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). Defendants cannot now evade the requirement that they regulate with this kind of speech-protective specificity by making Columbia regulate in their stead. To permit otherwise would be to allow Defendants to create a "system of informal censorship" that provides no judicial "safeguards against the suppression" of "constitutionally protected material" and therefore poses "hazards to protected freedoms" that are "markedly greater than [even] those that attend reliance upon the criminal law." *Bantam Books*, 372 U.S. at 69-71, 77-78 (1963). The First Amendment does not permit government officials to threaten constitutional guarantees in this way. *Id* at 66 (noting that because "freedoms of expression must be ringed about with adequate bulwarks… [t]he separation of legitimate from illegitimate speech calls for… sensitive tools" (quoting *Speiser v. Randall*, 357 U.S. 513, 525 (1958))). The fact that Defendants cannot use the threat of funding terminations to coerce Columbia into making any of the changes outlined above does not, of course, mean that there are no circumstances in which Defendants could cut off funds to Columbia, or any other private entity regulated by Title VI.

To the contrary: courts have for decades now interpreted Title VI, including its funding termination provisions, as consistent with the First Amendment because what it targets is discriminatory conduct, not protected speech. *Saxe*, 240 F.3d at 209-210 (documenting this history); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) ("Where the government

does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."). Hence, Defendants may also, consistent with the First Amendment, warn Columbia about the *possibility* that funds will be terminated if it fails to comply with the statute. *See* U.S. Dep't of Ed. Office for Civil Rights, *Case Processing Manual, Section VI* (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf [https://perma.cc/V2PC-RBVL] (detailing the administrative process by which such warnings would typically occur).

But these actions must be genuinely intended to help Columbia come into compliance with Title VI, and do no more than that. As the Supreme Court explained in *Bantam Books*, regulators may informally communicate with the entities they regulate "prior to the institution of a judicial proceeding" and may warn them of the legal peril they face, when "such consultation is genuinely undertaken with the purpose of aiding the [regulated party] to comply with [the] laws and avoid prosecution under them." 372 U.S. at 71–72. When regulators go "far beyond advising [regulated parties] of their legal rights and liabilities" and act "as an agency not to advise but to suppress," their actions violate the First Amendment. *Id.* at 72.

This is the case, it is worth noting, even when officials sincerely believe that the speech they attempt to suppress is constitutionally unprotected, and even when they turn out to be correct in this belief. For example, in *Bantam Books*, the Court held that a legislatively created state commission violated the First Amendment when it threatened booksellers with the prospect of criminal prosecutions unless they immediately stopped selling books that members of the commission suggested were obscene. *Id.* at 72. In reaching this conclusion, the Court did not pause to consider whether commissioners credibly believed that the material in fact was obscene. Nor did it consider whether the books and magazines they targeted were in fact constitutionally

19

unprotected obscenity—as Justice Harlan pointed out in his dissent. *Id.* at 82 (Harlan, J., dissenting). These questions did not matter to the majority's analysis because, as the Court's opinion makes clear, the constitutional sin committed by the Commission was that it intentionally acted in a way that was *likely* to result in the suppression of protected expression, not that it actually did. *Id.* at 71 (enjoining the Commission's actions on the grounds that their "capacity for suppression of constitutionally protected publications [was] far in excess of that of the typical licensing scheme held constitutionally invalid by this Court"); *see also Vullo,* 602 U.S. at 196 (holding that threats of adverse action can violate the First Amendment even when they "target[] business practices and relationships, which qualify as 'nonexpressive activity'" so long as they are "aimed at punishing or suppressing speech"). *Bantam Books* thus establishes the principle that government actors may never use the threat of adverse action to coerce the suppression of speech that *may be* constitutionally protected, but is not definitively protected, because the "hazards" these kinds of actions pose to the system of free expression are simply too great to bear. 372 U.S. at 69-70.

In this instance, Defendants have clearly violated the *Bantam Books* principle by acting as "an agency not to advise but to suppress." Indeed, the demands they have made of Columbia go far beyond what Title VI either has been or could constitutionally be interpreted to require. As the agencies charged with its enforcement acknowledge, Title VI and the regulations that enforce it "are not intended to restrict the exercise of any expressive activities protected under the U.S. Constitution." Dept. of Education, Office of Civil Rights, First Amendment: Dear Colleague Letter (July 28, 2003), https://www.ed.gov/about/offices/list/ocr/firstamend.html [https://perma.cc/5EKU-GTSQ].

Hence, Title VI, like its companion statute, Title IX, only require universities or

other educational institutions to take steps to prevent behavior that is so "severe [and] pervasive,

and objectively offensive that it denies its victims [an] equal access to education." *LaShonda D.*

*v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999) (defining the test of discriminatory

harassment under Title IX); *Saxe*, 240 F.3d at 206 (noting that the same test applies to

discriminatory harassment claims under Title VI). They are not general regulations of campus

speech—nor could they be. *Saxe*, 240 F.3d at 210 ("No court or legislature has ever suggested

that unwelcome speech directed at another's 'values' may be prohibited under the rubric of anti-

discrimination.").

For that reason, Title VI has *never,* as far as we know, been interpreted to require

the kinds of broad changes to campus speech policy and internal governance mechanisms that

Defendants demand Columbia make. Even when it comes to cases involving rather extreme

examples of antisemitic harassment, the resolution agreements that universities have reached in

recent years with OCR have involved far less drastic changes than those on the table here. *See,*

*e.g.*, Letter from Mia Karvonides, Senior Legal Advisor to the Assistant Sec'y and Deputy

Assistant Sec'y, Dep't of Ed., Office of Civil Rights, to Suresh V. Garimella, President,

University of Vermont (Apr. 3, 2023), https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-

agreements/01222002-a.pdf (in response to allegations of antisemitic bullying, harassment and

rock throwing, university agrees to change how it responds to future allegations of

discrimination, provide training to relevant staff and administrators, issue a statement of

commitment to address discrimination based on shared ancestry, including antisemitism, and

submit future claims of antisemitic discrimination to OCR on an annual basis); Resolution

Agreement, The University of California (Dec. 18, 2024),

https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09222257-b.pdf (same).

Defendants' actions in this case cannot therefore be defended as simply a means of enforcing Title VI. Instead, they sweep far beyond what even a merely plausible interpretation of the statute's remedial provisions would require, or permit. As the Supreme Court made clear last term, the fact that officials possess the power to regulate the activities of private businesses and organizations does not mean that they can use that power to achieve ends foreclosed by the First Amendment by intruding upon the core expressive freedom of universities, their faculty, students and staff. Like the defendant in *Vullo*, Defendants "can pursue violations of [federal civil rights] law" but they "cannot do so *in order to* punish or suppress… expression." 602 U.S. at 196. And that is precisely what Defendants have tried to do in this case.

## III.  DEFENDANTS' ACTIONS VIOLATE THE UNCONSTITUTIONAL CONDITIONS DOCTRINE

By threatening to cut off federal funds unless Columbia University agrees, at a minimum, to the demands outlined above, Defendants have violated not only the First Amendment prohibition against informal censorship but also the unconstitutional conditions doctrine. That doctrine holds that the government "cannot place conditions on its granting of public benefits or subsidies that cause the recipient to surrender vital constitutional rights, even if the government has no obligation to provide the benefit and thus could withhold it altogether." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 252 (S.D.N.Y. 2006), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* [*AID*]*, 570 U.S. 205 (2013).

Government officials can impose conditions on the use of federal funds that limit the exercise of constitutional freedoms—including First Amendment freedoms—when those

conditions merely "define the limits of the Government spending program." *AID*, 570 U.S. at 214. Thus, for example, the Court has held that the government may require that doctors who are funded by a program intended to promote certain kinds of family planning not provide abortion-related advice or referrals when they use those federal funds, even though doctors otherwise have a First Amendment right to provide medical advice in accordance with professional standards. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018). Similarly, the Court has held that the government may require public libraries that receive federal subsidies to provide internet service to limit, as much as possible, their patrons' access to online pornography, even though pornography is in many instances protected speech. *United States v. Am. Library Ass'n, Inc.,* 539 U.S. 194, 211–12 (2003). In both these cases, the conditions limited the exercise of protected freedoms but because they did so only with respect to the activities that were actually paid for by the federal monies, and only as an effort to ensure that the federal subsidies were used for the purposes they were intended and not other aims. *Rust,* 500 U.S. at 195 n.4 ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.").

The same is not true, however, of conditions on the receipt of government benefits "that seek to leverage funding to regulate speech outside the contours of the [benefit] program itself." *AID*, 570 U.S. at 214-215. For example, in *FCC*, the Court held that Congress violated the unconstitutional conditions doctrine when it prohibited noncommercial educational broadcasting stations that received financial subsidies from the federal government from "engag[ing] in editorializing." 468 U.S. at 366. The prohibition against editorializing violated the doctrine, the Court explained, because it prevented broadcast stations from engaging in

23

editorializing at any time. The condition in effect prevented the recipients from using "even wholly private funds to finance [their] editorial activity." *Id.* at 400. It put broadcasters in the difficult position of having to choose whether to continue to receive a valuable federal subsidy or waive their First Amendment right to speak about the pressing matters of the day. This was not a choice, the Court held, that the First Amendment permits the government to force recipients of federal benefits to make. *Id.* at 402 (concluding that the spending conditions constituted a "substantial abridgment of important journalistic freedoms which the First Amendment jealously protects").

Similarly, in *AID*, the Court held that a federal law that authorized funding for non-governmental organizations that worked to combat the spread of HIV/AIDS and to provide treatment to those who suffered from the disease but limited access to those funds to organizations that had "a policy explicitly opposing prostitution and sex trafficking" violated the unconstitutional conditions doctrine because the law prevented NGOs from expressing positive views on prostitution and sex trafficking even when they were not utilizing the government's funds. 570 U.S. at 218 ("A recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime.").

In *AID*, the Court noted that it can be difficult to determine when a funding condition merely delimits the scope of a government spending program or leverages funding to restrict speech independent of that program. *Id.* at 215. In this case, however, it is quite clear that the conditions defendants seek to impose on the receipt of federal funds amount to unconstitutional leveraging. For one thing, few, if any, of the grants that Defendants have terminated or threaten to terminate have anything to do with those aspects of the university's

24

operations that Defendants demand Columbia reform. It is hard to understand, for example, how a demand that Columbia place the MESAAS department into receivership has anything to do with the decision to terminate funds for cancer or other medical research. And yet, this kind of medical funding appears to compose the bulk of the funds that have been terminated thus far. *See* Harriet Engelke and Spencer Davis, *NIH cancels $250 million in grants to Columbia as part of $400 million Trump administration cut,* Columbia Spectator (March 11, 2025), https://www.columbiaspectator.com/news/2025/03/11/nih-cancels-250-million-in-grants-to-columbia-as-part-of-400-million-trump-administration-cut/. The same is true of the demand that Columbia alter its internal governance processes, or how it regulates protest speech. The government here is clearly using the leverage it has over Columbia, and its faculty, to insist on institutional changes that have nothing to do with the purposes that Congress sought to achieve, when it set aside funding for medical and other kinds of scientific research. *AID*, 570 U.S. at 225 (Scalia, J., dissenting) (noting that one of the reasons why the ban on editorializing was struck down in *FCC* was "because it did not further a *relevant*, permissible policy of the Federal Communications Act").

In addition, much like the condition on broadcast stations' ability to editorialize struck down in the *FCC* case, and the requirement in *AID* that NGOs who received federal funds had to adopt a policy opposed to prostitution and sex-trafficking, the conditions that Defendants have imposed on Columbia in this case will inevitably impact the institution as a whole. These demands will prevent the university from making its own choices about how to regulate speech on campus, and will similarly prevent students and researchers from speaking, associating, researching and teaching as they desire even when they use "wholly private funds to finance" their activities. *FCC*, 468 U.S. at 400.

25

By demanding that Columbia, its faculty and students alter their expressive behavior even when they are not acting on the government's dime, Defendants seek to "produce a result which [they] could not command directly." *Sindermann*, 408 U.S. at 597. In this respect, also, they attempt to use the government's power of the purse to effectively control the expressive choices that private institution like Columbia, their faculty and students make. As such, their actions constitute a textbook violation of the unconstitutional conditions doctrine and for that reason also should be enjoined.

## CONCLUSION

By threatening the withdrawal of funds if Columbia does not suppress protected speech Defendants do not like, and by attaching unconstitutional conditions to the receipt of federal funds, Defendants are attempting to do what the Supreme Court has long insisted that they may not do: namely, use threats, or conditions on benefits, to "deter… speech which the Constitution makes free." *Speiser*, 357 U.S. at 526. As the Court unanimously reaffirmed last year, the First Amendment does not permit this kind of informal censorship of speech. *Vullo*, 602 U.S. at 190. *Amici* urge the Court to grant Plaintiffs' motion for a preliminary injunction.

Dated: April 24, 2025
      New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

          /s/
_____
Matthew D. Brinckerhoff
Sara Luz Estela

One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Amicus Curiae Law
Professors and First Amendment
Scholars*

## **WORD COUNT CERTIFICATION**

   I hereby certify that the portions of the foregoing memorandum of law that must be included in a word count pursuant to Local Civil Rule 7.1 contain 7,827 words, which complies with the word count limit.


Dated: New York, New York
   April 24, 2025

                 /s/
               Sara Luz Estela