**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS and AMERICAN FEDERATION of TEACHERS,<br><br>     *Plaintiffs*,<br><br>        v.<br><br>UNITED STATES DEPARTMENT of JUSTICE et al.,<br><br>     *Defendants*. | Case No. 1:25-cv-02429-MKV |

**BRIEF OF AMICI CURIAE OF CENTER FOR CONSTITUTIONAL RIGHTS AND PALESTINE LEGAL IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

Maria C. LaHood
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Radhika Sainath *
Dylan Saba *
Sabiya Ahamed *
PALESTINE LEGAL
55 Exchange Place
New York, NY 10005
(917) 200-2190

*\* Pro hac vice application pending*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................. ii

INTERESTS OF AMICI ................................................................................................................. 1

SUMMARY OF ARGUMENT ....................................................................................................... 2

ARGUMENT .................................................................................................................................... 6

I.    Speech Activity Critical of a Nation's Policies or Actions Does
Not Target a Protected Class ...................................................................................................... 6

    A.   The Gaza Encampments and the Occupation of Hamilton ........................................... 11
    Hall Targeted Israel's Policies Toward Palestinians. ............................................................ 11

II.    Title VI Does Not and Cannot Require Universities to Censor
and Punish Speech Activity Supporting Palestinian Rights. ..................................................... 15

    A.   Title VI Does Not and Cannot Require Establishment of a Task Force on Antisemitism
That Suppresses Speech Critical of Israel and Targets Jewish Students. ........................... 166

    B.   Title VI Does Not and Cannot Require Universities to Adopt Definitions of
Antisemitism that Conflate Antisemitism with Criticism of Israel. .................................... 19

    C.   Title VI Does Not and Cannot Require Universities to Create
Offices that Target Student Speech in support of Palestinian Rights. ............................... 211

    D.   Title VI Does Not and Cannot Require Universities to Issue Severe Disciplinary
Sanctions Against Students Who Protest in Support of Palestinian Rights. ....................... 233

CONCLUSION ............................................................................................................................. 244

CERTIFICATE OF COMPLIANCE ........................................................................................... 255

i

# **TABLE OF AUTHORITIES**

### CASES

*B.W. v. Austin Indep. Sch. Dist.*, 121 F.4th 1066 (5th Cir. 2024) ............................................. 5, 10

*Fair v. Guiding Eyes for the Blind, Inc.*, 742 F. Supp. 151 (S.D.N.Y. 1990) .......................... 6, 12

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (E.D. Cal. 2011) .................................................................. 9

*Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263 (1st Cir. 2022) ...................................................... 6

*Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008) ....................................................................... 6

*Kengerski v. Harper*, 6 F.4th 531 (3d Cir. 2021) ........................................................................... 6

*Landau v. Corp. of Haverford Coll.,* No. 24-2044, 2025 U.S. Dist. LEXIS 1402 (E.D. Pa. Jan. 6, 2025) ........................................................................................................................................ 12

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ................................................................. 7

*Reichman v. Bureau of Affirmative Action*, 536 F. Supp. 1149 (M.D. Pa. 1982) .................... 6, 12

*Singh v. Town of Mount Pleasant*, 172 F. App'x 675 (7th Cir. 2006) ...................................... 6, 12

*T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332 (S.D.N.Y. 2014) ...................................... 8

*Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655 (2d Cir. 2012) ........................................... 5, 8

### STATUTES

34 C.F.R. § 100.3(b)(1)(iv) ................................................................................................................ 6

34 C.F.R. § 100.3(b)(1)(vi) ................................................................................................................ 6

42 U.S.C. § 2000d ................................................................................................................... *passim*

### OTHER AUTHORITIES (SELECTED)

Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (*S. Afr. v. Isr.*), Order, ¶ 54 (Jan. 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf ............................ 3

Ctr. for Constitutional Rights & Palestine Legal, *The Palestine Exception to Free Speech: A Movement Under Attack in the US* (2015), https://ccrjustice.org/the-palestine-exception ......................................................... 11

*Legal Consequences Arising From the Policies and Practices of Israel in the Occupied Palestinian Territory, Including East Jerusalem*, Advisory Opinion (Jul. 19, 2024), https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf... 3

Palestine Legal, *A New Generation for Liberation: Historic Student Protests Defy University Crackdowns* (2025) https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/67fe79259066a5210ae06fad/1744730460662/Palestine+Legal+2024+Year+in+Review+Report ................................. 3

Palestine Legal, *Reverberations of October 7: Mobilization Against Genocide Undeterred by Peak Anti-Palestinian Repression* (2024), https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/664fbc07860df7037ba81300/1716501546613/Pal+Legal+Report+Reverberations+of+Oct+7th ................................. 3

## INTERESTS OF AMICI

The Center for Constitutional Rights ("CCR") is a non-profit legal advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international human rights law. Founded in 1966 by attorneys supporting civil rights activists in the South, CCR has long worked with oppressed communities seeking justice and liberation, including by litigating cases to protect their First Amendment rights, including *Texas v. Johnson*, 491 U.S. 397 (1989) and *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). CCR has represented numerous individuals and organizations facing repression because of their advocacy for Palestinian rights. *See, e.g., Salaita v. Kennedy*, 118 F. Supp. 3d 1068 (N.D. Ill. 2015); *Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 713 (2024); *Bronner v. Am. Studies Ass'n,* No. 2019 CA 001712 B (D.C. Super. Ct. Mar. 1, 2023); *Khalil v. Trump*, No. 25-cv-01963 (MEF-MAH) (D.N.J. filed Mar. 9, 2025); *Bedi v. U.S. House Comm. on Educ. & Workforce*, No. 1:25-cv-3837 (N.D. Ill. filed Apr. 9, 2025).

Palestine Legal (a project of Tides Center) is a non-profit legal and advocacy organization specifically dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal tracks incidents of censorship and efforts to suppress expression supporting Palestinian rights, including through the misuse of Title VI of the Civil Rights Act of 1964 to censor speech critical of Israel's treatment of Palestinians. Palestine Legal has represented students at Columbia University on issues relating to pro-Palestinian speech activity since 2014 and has successfully defended the First Amendment rights of students protesting Israel's treatment of Palestinians. *See, e.g., Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist LEXIS 178359 (D.

1

Md. Oct. 1, 2024). We write to situate Plaintiffs' lawsuit within the broader context of this suppression and the heightened threats to students engaging in political speech critical of Israel's actions in Gaza.

## SUMMARY OF ARGUMENT

Over the past 18 months, an increasing number of people have been protesting Israel's violations of Palestinian rights. Tens of thousands of students from universities across the United States[1] have engaged in protests, sit-ins, marches and calls for academic institutions to divest from corporations complicit in Israel's violations of international law[2] on the conviction that Israel is committing a genocide in Gaza and the United States is supporting this genocide.[3] They have done so in a manner that echoes past movements for social justice throughout history, from the Civil Rights Movement to opposition to the Vietnam War to the struggle against South African apartheid. This diverse, growing movement for Palestinian freedom and equality—which also

---

[1] Jay Ulfelder, *Crowd Counting Consortium: An Empirical Interview of Pro-Palestine Protests at U.S. Schools*, Harvard Kennedy School, Ash Center for Democratic Governance and Innovation, (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.

[2] The International Court of Justice (ICJ) has found that Israel's continued presence in the occupied Palestinian territory is illegal and affirmed the obligation of states "to take steps to prevent trade or investment relations that assist in the maintenance of the illegal situation created by Israel in the Occupied Palestinian Territory." *Legal Consequences Arising From the Policies and Practices of Israel in the Occupied Palestinian Territory, Including East Jerusalem*, Advisory Opinion (Jul. 19, 2024), https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf.

[3] Since October 7, 2023, Israel has killed at least 51,100 Palestinians in Gaza—including 15,613 children—and injured more than 116,000 people. U.N. Off. for Coordination of Humanitarian Affs. (OCHA), *Reported Impact Snapshot: Gaza Strip* (Apr. 22, 2025), https://www.ochaopt.org/content/reported-impact-snapshot-gaza-strip-22-april-2025. In January 2024, the International Court of Justice (ICJ) found that Israel's assault on the Palestinian people in Gaza plausibly constitutes genocide. Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (*S. Afr. v. Isr.*), Order, ¶ 54 (Jan. 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf. A U.S. District Court echoed that finding in a case brought to enjoin the then-U.S. President, Secretary of State, and Defense Secretary from aiding and abetting Israel's genocide, stating that evidence indicated "that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide," "implor[ing] Defendants to examine the results of their unflagging support of the military siege against the Palestinians in Gaza," and stating that "[i]t is every individual's obligation to confront the current siege in Gaza.". *Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160, 1163, 1167 (N.D. Cal. 2024), *aff'd,* 107 F.4th 926 (9th Cir. 2024) (dismissed on jurisdictional grounds).

includes a significant number of Jewish students[4]—has in turn been met aggressively by defenders of Israel, including government officials in both parties and the current presidential administration.[5]

The federal government claims that it has terminated $400 million in federal grants to Columbia University because the University failed to protect students from purported antisemitic harassment and other *alleged* violations of Title VI of the Civil Rights Act of 1964—and demands the university take a number of steps to punish and censor students who have engaged in speech activity critical of Israel's treatment of Palestinians, including the Gaza solidarity encampments (April 17-18 and April 18-30, 2024) and the takeover of Hamilton Hall (April 30, 2024). Amici submit that the Gaza solidarity encampments, the building takeover and other speech activities that criticize Israel's assault on Gaza do **not** create a hostile environment under Title VI of the Civil Rights Act of 1964, because this expression targets the policies of a foreign state—not students' protected status—and therefore falls outside the statute's reach while lying squarely within the First Amendment's core protections for political speech.

While many students who agree with Israel's policies towards Palestinians may disagree with or feel discomforted by contrary expression at these protests, which have drawn on findings by various courts, the United Nations and human rights organizations in including statements calling Israel's actions in Gaza a genocide, saying that Israel is an apartheid state, or chants calling for a Free Palestine, such language cannot form the basis for a hostile environment claim under

---

[4] Peter Beinart, *Trump Doesn't Want to Protect All Jewish Students -- Just Those on His Team*, N.Y. TIMES (Apr. 28, 2025), https://www.nytimes.com/2025/04/28/opinion/jewish-student-protesters-gaza.html.
[5] *See Reverberations of October 7: Mobilization Against Genocide Undeterred by Peak Anti-Palestinian Repression* PALESTINE LEGAL (2024), https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/664fbc07860df7037ba81300/1716501546613/Pal+Legal+Report+Reverberations+of+Oct+7th; *A New Generation for Liberation: Historic Student Protests Defy University Crackdowns*, PALESTINE LEGAL (2025) https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/67fe79259066a5210ae06fad/1744730460662/Palestine+Legal+2024+Year+in+Review+Report.

Title VI because the political expression at issue targets a state for its policies and does not target students for their Jewish identity. To express support for Palestinian human rights is not antisemitic; it is to engage in political speech on one of the key social justice issues of the day. Students who participate in such protests follow in the footsteps of college students who are now lauded for protesting war and injustice in decades past.

To establish a hostile environment claim under Title VI, the acts at issue must (i) target a protected class; (ii) be so "severe, pervasive, and objectively offensive" that they limit or deny a person's ability to access a school's education program or activity; and (iii) be met by institutional deliberate indifference. 42 U.S.C. § 2000d; *Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655 (2d Cir. 2012) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650–51 (1999)). Hostility alleged to be primarily based on political beliefs, rather than based on race, color, or national origin, cannot sustain a Title VI claim. *See, e.g., B.W. v. Austin Indep. Sch. Dist*., 121 F.4th 1066 (5th Cir. 2024) (en banc) (Richman, P., concurring).

Plaintiffs have laid out the numerous acts Columbia University has taken to censor and punish speech activity on campus critical of Israel's policies, including establishing a Task Force on Antisemitism that conflates antisemitism with criticism of Israel, creating the Office for Institutional Equity that has targeted students for speech activity critical of Israel, as well as expelling students for protest activity in support of Palestinian rights, including the right to be free from genocide. Plaintiffs point out that Defendants have not determined whether these actions "were or were not sufficient to comply with Title VI" (Compl. ¶ 167)—suggesting that the university could not plausibly be found to have been deliberately indifferent to charges of antisemitism when it did so much to suppress and punish students engaging in speech activity supporting Palestinian rights, purportedly to address claims of antisemitism. In effect, Plaintiffs

have jumped to the last prong of the hostile environment analysis, i.e., whether the University responded sufficiently to objectionable conduct.

But Title VI does not require universities to suppress views regarding a particular country's policies, nor could it.[6] This is for good reason: to require a university to punish students who engage in criticism of a foreign state's policies in order to avoid a finding of "deliberate indifference" when (as here) such criticism is falsely conflated with harassment of people who share that state's religion (or ethnicity) would, in fact, force universities to adopt censorious or even potentially discriminatory policies.[7] For example, universities would be compelled to investigate and possibly punish the writing of an op-ed critical of China's treatment of the Uyghurs lest it be found to allow anti-Chinese harassment or discrimination, or a protest of the Biden Administration's military aid to Ukraine as potentially creating an environment hostile to Ukrainian students, or a public lecture stating opposition to an independent state for Sikhs as discriminating against Sikhs. Moreover, such policies would violate the First Amendment if

---

[6] U.S. Dep't of Educ. Off. for Civ. Rts., First Amendment: Dear Colleague Letter (May 7, 2024), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf. ("Speech expressing views regarding a particular country's policies or practices is protected by the First Amendment and does not necessarily implicate federal civil rights laws." (citing *Singh v. Town of Mount Pleasant*, 172 F. App'x 675, 681 (7th Cir. 2006) (holding that a supervisor's insensitive comment about how the U.S. should handle a high-profile Cuban refugee was not national origin harassment of an employee under Title VII); *Fair v. Guiding Eyes for the Blind, Inc.*, 742 F. Supp. 151, 156 (S.D.N.Y. 1990) (finding that defendant's remarks "concerned his opinions on various political, moral and social issues" and were not based on plaintiff's gender, so those allegations could not constitute harassment based on sex); *Reichman v. Bureau of Affirmative Action*, 536 F. Supp. 1149, 1176 (M.D. Pa. 1982) (deeming "comments concerning the Arab-Israeli conflict and [the Israeli prime minister] to be political opinions rather than disparagements of Judaism" that would constitute unlawful religious harassment under Title VII)).

[7] Such policies, even if taken independently by private institutions, could give rise to a Title VI violation for direct discrimination if students are singled out with different treatment and harsher punishments for advocating on behalf of a specific group of people. First Amendment: Dear Colleague Letter, *supra* note 6. Most Federal Circuit Courts of Appeals have now recognized associational discrimination claims. *See Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 271-272 (1st Cir. 2022) (collecting cases, reasoning that association claims "are fundamentally consistent with . . . Title VII's plain language."); *Kengerski v. Harper*, 6 F.4th 531, 537-539 (3d Cir. 2021) (adopting theory of associational discrimination in case where plaintiff suffered discrimination as a result of his association with a biracial niece, discussing opinions from other circuits recognizing the theory); *Holcomb v. Iona Coll.*, 521 F.3d 130, 139-40 (2d Cir. 2008) (recognizing an associational discrimination claim brought by a white man who alleged he was fired because of his marriage to a Black woman).

implemented by a public university and for that reason the government may not compel their adoption by private institutions through coercion. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) (reaffirming *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)).

The encampments and Hamilton Hall were protest actions targeting Israel's genocide of Palestinians in Gaza. These actions were not based on the Jewish identity of any student and no Jewish students are alleged by the government to have been targeted by these actions – actions in which many Jewish students partook. These activities were in direct response to Israel's attacks on Gaza. Not only have Defendants failed to meet the stringent notice and other statutory requirements before terminating funding to a recipient, they have also failed to meet Title VI's requirement that the alleged harassment be based on a protected class.

The Court should grant Plaintiffs' Motion for a Preliminary Injunction.

## **ARGUMENT**

I.    **Speech Activity Critical of a Nation's Policies or Actions Does Not Target a Protected Class.**

Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color or national origin in programs or activities that receive federal funding, a protection which the U.S. Department of Education ("DOE") has asserted and courts have found also extends to actual or perceived shared ancestry or ethnic characteristics.[8] *See T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 353-55 (S.D.N.Y. 2014) (holding that discrimination based on shared ancestry and ethnic characteristics is prohibited by Title VI); see also 42 U.S.C. § 2000d; 34 C.F.R. § 100.3(b)(1)(iv) and (vi) To establish a hostile environment claim under Title VI, the acts at issue must (i) target a protected class; (ii) be so "severe, pervasive, and objectively offensive" that they

---

[8] U.S. Dep't of Educ., *supra* note 6, at 2 ("Title VI's protection from race, color, and national origin discrimination extends to students who experience discrimination, including harassment, based on . . . shared ancestry or ethnic characteristics . . . .").

limit or deny a person's ability to access a school's education program or activity; and (iii) be met by institutional deliberate indifference. 42 U.S.C. § 2000d; *Zeno*, 702 F.3d at 655 (citing *Davis*, 526 U.S. at 629).

The DOE Office for Civil Rights (OCR), which enforces Title VI, has long recognized that "to be prohibited by the statutes within OCR's jurisdiction, [harassment] must include something beyond the mere expression of views, words, symbols that some person finds offensive." [9] Title VI protects students from "prohibited discrimination" and does not "restrict the exercise of expressive activities or speech that are protected under the First Amendment," which is "particularly relevant in the university environment, where academic freedom fosters the robust exchange of ideas."[10] Thus, OCR and federal courts have found that speech activity criticizing Israel's treatment of Palestinians, like a film and panel discussion on Palestine, a teach-in on Gaza, a program on the costs of war on Israeli society, street theatre depicting Palestinians navigating Israeli army checkpoints, T-shirts encouraging students to support Palestine, debates concerning university divestment from companies that support Israel's human rights abuses, and a talk on divesting from companies complicit in Israel's human rights abuses to be "robust and discordant expression" that regularly takes place on college campuses, that does not constitute actionable harassment.[11] The expression of views critical of Israel—even where it personally offends—is not actionable harassment under Title VI.

---

[9] U.S. Dep't of Educ. Off. for C.R., *First Amendment: Dear Colleague [OCR-00028]* (Jul. 28, 2003), https://www.ed.gov/about/offices/list/ocr/firstamend html.
[10] Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Robert J. Birgeneau, Off. of Chancellor, Univ. of Cal. Berkeley (Aug. 19, 2013), https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf.
[11] *See* Peter Schmidt, *Education Dept. Investigates Complaint of Anti-Semitism at UC-Santa Cruz*, Chronicle of Higher Educ. (Mar. 14, 2011), http://www.chronicle.com/article/Education-Dept-Investigates/126742. The complaint alleged that UC Santa Cruz violated Title VI by allowing what it described as anti-Israel events to take place on campus. The events included a screening of the documentary *Occupation 101* and a talk by a former IDF soldier and a Holocaust survivor critical of Israel's policies. In March 2011, OCR opened an investigation in response to the 2009 complaint. After a two-year factual investigation, OCR dismissed the complaint, emphasizing that speech critical of Israel falls within the "robust and discordant expression" that regularly takes place on college

Defendants have not specifically alleged what actions took place on campus that they believe created a severe or pervasive hostile environment for Jewish students in violation of Title VI of the Civil Rights Act of 1964—or what educational programs or activities were limited or denied by such acts. However, from Defendants' March 13 letter[12] demanding Columbia take specific actions as a prerequisite to discussing reinstatement of its loss of $400 million in federal funding, it appears, from language directing Columbia to harshly punish students for "Hamilton Hall and encampments" and to "adopt…a definition of antisemitism" referencing the International Holocaust Remembrance Alliance (IHRA) definition[13], that they are asserting that it was student speech activity critical of Israel's policies toward Palestinians that purportedly created the "hostile environment" for Jewish students in violation of Title VI.

---

campuses. Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Carole E. Rossi, Chief Campus Counsel, Univ. of Cal. Santa Cruz (Aug. 19, 2013), https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/6810ec2cda1b7f2235bbcded/1745939588108/2013.08.19+OCR+Letter+to+UC+Santa+Cruz.pdf]; *see* Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Robert J. Birgeneau, Chancellor, Univ. of Cal. Berkeley (Aug. 19, 2013), https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf (dismissing Title VI complaint alleged that campus speech activities like advocacy for resolutions to divest from companies complicit in Israel's human rights abuses and street theatre depicting Israeli army mock checkpoints aimed at demonstrating one aspect of Palestinian life under Israeli occupation amounted to "robust and discordant expression" that regularly takes place on college campuses, and constituted protected speech. This complaint was filed after a federal Title VI lawsuit filed against UC Berkeley was dismissed because the alleged incidents, which included distributing leaflets critical of Israel were "pure political speech and expressive conduct" "regarding matters of public concern" and protected by the First Amendment. *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187-88 (E.D. Cal. 2011).

[12] Letter from Josh Gruenbaum, Comm'r Fed. Acquisition Serv., Gen. Servs. Admin., Sean R. Keveney, Acting General Counsel, U.S. Dep't of Health & Human Servs., & Thomas E. Wheeler, Acting General Counsel, U.S. Dep't of Educ., to Dr. Katrina Armstrong, Interim President, Columbia Univ., and David Greenwald & Claire Shipman, Co-Chairs, Columbia Bd. of Trs. (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

[13] The IHRA working definition of antisemitism refers to the International Holocaust Remembrance Alliance definition which conflates antisemitism with criticism of Israel. *See* Letter from American-Arab Anti-Discrimination Committee (ADC) et al., legal and civil rights organizations, to Hon. Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., U.S. Dep't of Educ. (Jan. 16, 2024), https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/65aaa8b70566f016b04683fc/1705683174095/01.16.2024_OCR+IHRA+Letter_final ("The use of the IHRA definition and the conflation of antisemitism and anti-Zionism that it emboldens creates just that: a zero-sum game wherein to be pro-Palestinian you must be anti-Jewish, and to be pro-Jewish necessarily means being anti-Palestinian. This false dichotomy has enabled the term antisemitism to be weaponized against Palestinians and their allies for expressing their desire for Palestinian freedom, opposition to the genocide of their people, and views on Israel and Zionism.").

This is an incorrect and unconstitutional interpretation of Title VI, which does not prohibit criticizing, as a matter of principle, the actions taken by national governments or even supporters of those actions. *See, e.g.*, *B.W*, 121 F.4th at 1068. This is because criticism of the Israeli government—including calls for an end to its genocide of Palestinians, for equal treatment of Palestinians, and for divestment from companies complicit in Israel's violations—is not discriminatory speech targeted at Jewish or Israeli students. Moreover, punishing such advocacy could instead discriminate against Palestinians and Palestinian Americans who are advocating for an end to Israeli apartheid and the genocide of family members in Palestine.[14]

Notably, criticism of Israel is a political viewpoint also held by many Jewish people, including Jewish students at Columbia. Indeed, a number of students who took part in the protests at Columbia and as a result were suspended, put through disciplinary proceedings and even expelled are themselves Jewish.[15] In May of last year, 38% of Jewish Americans under 44 agreed that Israel is committing a genocide of Palestinians in Gaza and over 51% of Jewish Americans agreed with President Biden's decision to withhold arms shipments to Israel.[16] In fact, Jewish people have taken up "a leading role in the protests against Israel's assault on Gaza . . . Eleven days after Oct. 7, 2023, progressive and anti-Zionist Jewish groups, including Jewish Voice for Peace, gathered roughly 400 protesters, many wearing shirts that said 'Not in Our Name,' and

---

[14] 42 U.S.C. § 2000d; First Amendment: Dear Colleague Letter, *supra* note 6 ("OCR may find that discrimination occurred where there is direct evidence that the school limited or denied educational services, benefits or opportunities to a student or group of students on the basis of race, color or national origin" citing examples of schools maintaining policies that subject student to different rules "on one or more of these bases" and will consider questions of whether schools "engaged in different treatment.").

[15] *Jewish Organizing at Columbia's Encampment*, JEWISH CURRENTS (Apr. 25, 2024), https://jewishcurrents.org/jewish-organizing-at-columbias-encampment; *see also* Peter Beinart, *The Great Rupture in American Jewish Life*, N.Y. TIMES (Mar. 22, 2024), https://www.nytimes.com/2024/03/22/opinion/israel-american-jews-zionism.html (Noting that "after Columbia suspended two anti-Zionist campus groups, the ADL thanked university leaders for acting "'to protect Jewish students' — even though one of the suspended groups was [Columbia] Jewish Voice for Peace.").

[16] *Survey Among American Jews: Over 51% Support for Biden's Decision to Withhold Arms Shipments to Israel*, JERUSALEM CTR. FOR SEC. & FOREIGN AFFS. (May 31, 2024), https://jcpa.org/survey-among-american-jews-over-51-support-for-bidens-decision-to-withhold-arms-shipments-to-israel/.

occupied a congressional building. Later that month, Jewish Voice for Peace and its allies led a takeover of New York's Grand Central Terminal. At Brown University, the first sit-in demanding divestment from companies affiliated with Israel compromised solely Jewish students."[17] And earlier this month at Columbia University, Jewish students chained themselves to the gates in protest of the abduction of Mahmoud Khalil by Immigration and Customs Enforcement (ICE) on March 8 over his role in Columbia's Gaza Solidarity Encampment.[18]

Speech criticizing Israel's policies and actions is political speech, not harassment based on membership in a protected group, and cannot give rise to a Title VI violation. U.S. Dep't of Educ. Off. for Civ. Rts., First Amendment: Dear Colleague Letter at 16 (May 7, 2024), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf (noting that "OCR similarly interprets Title VI to not be implicated by conduct based solely on political views");[19] *see also Landau v. Corp. of Haverford Coll.*, No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *3 (E.D. Pa. Jan. 6, 2025) (finding Title VI allegations that "attire that signified [] support for Palestinians" created a hostile antisemitic environment were a "classic example of First Amendment expression" and "reject[ing] Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith

---

[17] Peter Beinart, *Trump Doesn't Want to Protect All Jewish Students – Just Those on His Team*, N.Y. TIMES (Apr. 28, 2025), https://www.nytimes.com/2025/04/28/opinion/jewish-student-protesters-gaza.html.

[18] Joseph Zuloaga, Spencer Davis & Daksha Pillai, *Jewish Pro-Palestinian Protestors Chain Themselves to Gates Outside St. Paul's Chapel and Earl Hall*, COLUMBIA SPECTATOR (Apr. 3, 2025, 3:12 PM), https://www.columbiaspectator.com/news/2025/04/02/jewish-pro-palestinian-protesters-chain-themselves-to-st-pauls-chapel-campus-gates/.

[19] In a lengthy footnote, OCR notes that "Such distinctions have been drawn in Title VII cases to distinguish offensive political remarks from discriminatory harassment based on race, color, national origin, religion, and sex. See Singh v. Town of Mount Pleasant, 172 F. App'x 675 (7th Cir. 2006) (holding that a supervisor's insensitive comment about how the U.S. should handle a high-profile Cuban refugee was not national origin harassment of an employee under Title VII); *Fair v. Guiding Eyes for the Blind, Inc*., 742 F. Supp. 151, 156 (S.D.N.Y. 1990) (finding that defendant's remarks 'concerned his opinions on various political, moral and social issues' and were not based on plaintiff's gender, so those allegations could not constitute harassment based on sex); *Reichman v. Bureau of Affirmative Action*, 536 F. Supp. 1149, 1176 (M.D. Pa. 1982) (deeming 'comments concerning the Arab-Israeli conflict and [the Israeli prime minister] to be political opinions rather than disparagements of Judaism' that would constitute unlawful religious harassment under Title VII)."

can challenge decisions of the Israeli government without harboring antisemitic views."). There is, unfortunately, a long and troubled history of Israel advocacy groups leveraging false claims of antisemitism to silence criticism of Israel's policies and undermine advocacy for Palestinian rights.[20] And now the Trump Administration is using the guise of fighting antisemitism as a pretext to suppress such advocacy and to control institutions of higher education.[21]

>   A.    **The Gaza Encampments and the Occupation of Hamilton Hall Targeted Israel's Policies Toward Palestinians.**

Defendants' March 13 letter to Columbia states that "the University must complete disciplinary proceedings for Hamilton Hall and encampments" and states that "meaningful discipline means expulsion or multi-year suspension" (emphasis in the original). The letter does not explain or provide any notice to Columbia as to what specifically about the encampments or the April 30 occupation of Hamilton Hall possibly violated Title VI—notice that Title VI requires, along with other steps, before a university loses its federal funding.[22] The viewpoints expressed in the encampments and the occupation of Hamilton Hall—while challenging the ideology of the Trump administration and those on campus who hold views in support of Israel—do not give rise to Title VI liability as they constituted criticism of Israel's killing of Palestinians in Gaza, not harassment on the basis of shared ethnicity or ancestry.

The "Gaza Solidarity Encampment" began on Wednesday, April 17, 2024, as hundreds of student protestors occupied Columbia's South Lawn to demand Columbia divest from companies

---

[20] *See* Ctr. for Const. Rts. & Palestine Legal, The Palestine Exception to Free Speech: A Movement Under Attack in the US (2015), https://ccrjustice.org/the-palestine-exception.

[21] *See, e.g.,* Press Release, Rep. Jerry Nadler, Nadler Condemns Trump's Continued Assault on Higher Education (Apr. 1, 2025), https://nadler.house.gov/news/documentsingle.aspx?DocumentID=396306; Michael S. Roth, *Trump is Selling Jews a Dangerous Lie*, N.Y. Times (Apr. 7, 2025), https://www.nytimes.com/2025/04/07/opinion/trump-jewish-antisemitism-wesleyan.html; Michelle Goldberg, *I Can't Believe Anyone Thinks Trump Actually Cares About Antisemitism*, N.Y. Times (Apr. 28, 2025), https://www.nytimes.com/2025/04/28/opinion/trump-antisemitism-jews-israel.html.

[22] 42 U.S.C. § 2000d-1 (2025).

"that profit from Israeli apartheid, genocide, and occupation in Palestine"[23], setting up tents along with signs and placards.[24] The demand for divestment was not new: for years, student organizers at Columbia and across the country have lobbied for divestment from Israel because of Israel's apartheid system, occupation of Palestinian land, and violence against and mistreatment of Palestinians. This campaign, modeled after the successful divestment campaigns against Apartheid South Africa, has accelerated dramatically since the onset of Israel's more recent assault on Gaza.[25] Columbia students were protesting Israel's ongoing genocide in Gaza, which at the time of the encampment had killed over 33,000 Palestinians.[26] On Thursday, April 18, at the request of Columbia then-president Minouche Shafik, members of New York Police Department's (NYPD) Strategic Response Group entered campus and arrested over 100 students while university employees cleared the encampment.[27] According to Police Chief John Chell, students "were peaceful, offered no resistance whatsoever, and were saying what they wanted to say in a peaceful manner."[28] Many of the arrested students were Jewish.[29]

---

[23] Columbia University Apartheid Divest (CUAD), *The Barricade*, SUBSTACK (Apr. 1, 2024), https://cuapartheiddivest.substack.com/p/the-barricade-9d7.

[24] Isha Banerjee, *Timeline: The 'Gaza Solidarity Encampment'*, COLUMBIA SPECTATOR (May 2, 2024), https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/. Some of the students' demands also included financial transparency about the university's investments and an academic boycott. CUAD, *supra* note 23

[25] AMNESTY INTERNATIONAL, 'YOU FEEL LIKE YOU ARE SUBHUMAN': ISRAEL'S GENOCIDE AGAINST PALESTINIANS IN GAZA, Index. No. MDE 15/8668/2024 (Dec. 4, 2024), https://www.amnesty.org/en/documents/mde15/8668/2024/en/; GAZA: MEDECINS SANS FRONTIERES, LIFE IN A DEATH TRAP (Dec. 19, 2024), https://www.msf.org/sites/default/files/2024-12/20241229_REPORT_Gaza%20Life%20in%20a%20death%20trap%20Report_FINAL.pdf.

[26] *Israel's War on Gaza: List of Key Events, Day 194*, AL JAZEERA (Apr. 17, 2024) https://www.aljazeera.com/news/2024/4/17/israels-war-on-gaza-list-of-key-events-day-194.

[27] Sharon Otterman, *Columbia Sends in the N.Y.P.D. to Arrest Protestors in Tent City*, N.Y. TIMES (Apr. 18, 2024), https://www.nytimes.com/2024/04/18/nyregion/columbia-university-tent-city-palestinian-protest.html.

[28] Maya Stahl, *Shafik authorizes NYPD to sweep 'Gaza Solidarity Encampment,' officers in riot gear arrest over 100*, COLUMBIA SPECTATOR (Apr. 18, 2024), https://www.columbiaspectator.com/news/2024/04/18/shafik-authorizes-nypd-to-sweep-gaza-solidarity-encampment-officers-in-riot-gear-arrest-over-100/.

[29] *Supra* note 15 ("After the Seder at the encampment on Monday night, we walked across the street to Union Theological Seminary, where another group of Jewish Barnard students were holding their Seder. These students were suspended, barred from campus, and evicted from their dorms after they were arrested at the encampment with 108 others last week, following Columbia President Minouche Shafik's decision to call in the NYPD on students

Despite the arrests, students continued to sleep on the lawn and eventually reestablished tents on Sunday, April 21.[30] Negotiations between student representatives from the encampment and the university failed to produce an agreement around divestment, and on April 29 President Shafik announced that the university would not divest from Israel. That evening, dozens of students entered Hamilton Hall, barricading themselves inside.[31] They draped banners from the building windows, including one reading "Hind's Hall," a reference to Hind Rajab, a five-year-old Palestinian girl in Gaza who was killed by Israeli forces after they had killed all of the relatives she was travelling with, leaving her trapped in a car with her dead family members.[32] Other signs included a banner reading "Intifada," a transliteration of the Arabic word for "uprising," and the Palestinian flag.[33] On the evening of April 30, President Shafik once again summoned the NYPD to campus to clear both Hamilton Hall and the encampment, which it proceeded to do, arresting 109 protestors.[34]

Throughout the encampments and the occupation of Hamilton Hall, student protestors of a wide variety of faiths and backgrounds expressed criticism of Israel's policies, particularly Israel's ongoing assault on Palestinians in Gaza. Posters with statements such as "Stop the Genocide" fall squarely within the realm of political expression. Grant Miner, a Jewish student protestor with the encampment, explained: "We are totally opposed to any sort of antisemitic speech… We are

---

that even the police themselves admitted were calm and cooperative. At the end of the night, they began singing the song that the student movement sang while the arrests were taking place, a song taken from the book of Ruth.").

[30] *Supra* note 21.

[31] Amira McKee, Sarah Huddleson, Esha Karam, Shea Vance, Manuela Silva & Claire Cleary, *Dozens Occupy Hamilton Hall as Pro-Palestinian Protests Spread Across Campus*, COLUMBIA SPECTATOR (Apr. 30, 2024 6:27 AM), https://www.columbiaspectator.com/news/2024/04/30/dozens-occupy-hamilton-hall-as-pro-palestinian-protests-spread-across-campus/.

[32] Press Release, U.N. Off. of High Comm'r on Hum. Rts., Gaza: Killing of Hind Rajab and Her Family – A War Crime Too Many, Warn Experts (Jul. 19, 2024), https://www.ohchr.org/en/press-releases/2024/07/gaza-killing-hind-rajab-and-her-family-war-crime-too-many-warn-experts.

[33] *Supra* note 28.

[34] *Supra* note 21.

here…standing in solidarity with Palestine. And we refuse – our Jewish members refuse – to equate that with antisemitism."[35] While there were some reported incidents of antisemitic comments made at Jewish students around the time of the encampments, these were reported to have been from individuals gathered outside the university on a public sidewalk on Broadway and on Amsterdam, not from student participants in the encampment or building occupation.[36]

In fact, Jewish students made up a significant portion of students speaking out against Israel's killing of Palestinians.[37] Two Jewish student groups, Columbia Jewish Voice for Peace and CU Jews for a Ceasefire, held highly publicized Shabbat services as well as a Passover seder at the Gaza Encampment, which was prepared in the Jewish Theological Seminary kosher kitchen.[38] There are extensive media accounts from individuals who attended or observed the encampment that spoke of its peaceful nature.[39]

Though the takeover of Hamilton Hall may have broken school rules, that does not create a hostile environment in violation of Title VI any more than the 1968 takeover over of Hamilton Hall in protest of the United States' war in Vietnam created a hostile environment for American students or on-campus marches in protest of South African apartheid created a hostile environment for white Afrikaners. In each case, the underlying speech acts amounted to political criticism of a nation's policies and were not targeted at members of a protected class. Because conduct and

---

[35] Luis Ferre-Sadurni, Colbi Edmonds & Liset Cruz, *Some Jewish Students Are Targeted as Protests Continue at Columbia,* N.Y. TIMES (Apr. 21, 2024), https://www.nytimes.com/2024/04/21/nyregion/columbia-protests-antisemitism.html.

[36] *Supra* note 32.

[37] *Supra* note 4.

[38] Amira McKee & Sarah Huddleson, *'Gaza Solidarity Encampment' Approaches One-Week Mark on South Lawn*, COLUMBIA SPECTATOR (Apr. 23, 2024 3:04 AM), https://www.columbiaspectator.com/news/2024/04/23/gaza-solidarity-encampment-approaches-one-week-mark-on-south-lawn/; *see also supra* note 15 (noting "Frankly, I found the scene heartening, and wholesome, and welcoming.").

[39] *See, e.g.,* Sharon Otterman, Eliza Fawcett & Liset Cruz, *A Night Different From Others as Campus Protests Break for Seder,* N.Y. TIMES (Apr. 24, 2024), https://www.nytimes.com/2024/04/22/us/campus-protest-seders.html; Gabriella Gregor Splaver & Daksha Pillai, *Jin Focus: 72 hours and counting in the 'Gaza Solidarity Encampment'*, COLUMBIA SPECTATOR (Apr. 20, 2024, 3:27 PM), https://www.columbiaspectator.com/main/2024/04/20/in-focus-72-hours-and-counting-in-the-gaza-solidarity-encampment/.

speech activities based solely on political views do not implicate Title VI, the student actions at issue did not give rise to any obligations on the part of the university under the statute.

## II.     Title VI Does Not and Cannot Require Universities to Censor and Punish Speech Activity Supporting Palestinian Rights.

Plaintiffs' complaint cites the multitude of ways Columbia University has responded to complaints of speech activity critical of Israel's policies, including 1) establishing a Task Force on Antisemitism which recommended a definition of antisemitism that includes speech activity critical of Israel, 2) creating a new office that "serves as a central point for discrimination complaints—including alleged violations of Title VI", and 3) expelling students for protesting in support of Palestine.[40] While Columbia certainly has done all of these things to silence speech supporting Palestinian rights—and more[41]—there is no need to reach the "deliberate indifference" prong of the hostile environment test for antisemitism where the underlying speech complained about *was not based on Jewish identity* but the actions of a foreign nation. Title VI does not and cannot require universities to punish expression critical of Israel's treatment of Palestinians. Doing so would not only violate the First Amendment, but could lead universities to incur Title VI liability by directly discriminating *against Palestinians*, who are also protected by Title VI.

---

[40] Compl. at ¶¶ 167–179.

[41] Title VI Complaint from Palestine Legal, legal services organization, to Miguel Cardona, Secretary, U.S. Dep't of Educ. Off. for Civ. Rts., Catherine E. Lhamon, Assistant Secretary, U.S. Dep't of Educ. Off. for Civ. Rts., Re: Title VI Complaint Against Columbia University (National Origin – Palestinian, Race – Arab, Shared Ancestry or Ethnic Characteristics – Muslim) (Apr. 25, 2024), https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/662ab1fbe670b111f6bb75ea/1714074108256/2024.04.25+-+Title+VI+Complaint+Against+Columbia+University.pdf.

**A.**    **Title VI Does Not and Cannot Require Establishment of a Task Force on Antisemitism That Suppresses Speech Critical of Israel and Targets Jewish Students.**

On November 1, 2023, Columbia announced the creation of a Columbia Task Force on Antisemitism ("Task Force").[42] Given the makeup of the faculty and language surrounding its announcement, many Jewish students grew concerned that the Task Force—ostensibly formed to protect them—would falsely conflate antisemitism with criticism of Israel, and thus *target* Jewish students, among others, merely for engaging in political expression.[43]

Approximately 40 professors were invited to a one-hour listening session hosted by the Task Force. In response to that invitation, Columbia Professor and award-winning screenwriter James Schamus (who is himself Jewish), asked, in a series of emails starting January 24, what definition of antisemitism the Task Force would be using, and in particular how the Task Force viewed the IHRA working definition.[44] In particular, Schamus expressed concern that the Task Force would conflate criticism of Israel and the political ideology of Zionism[45] with antisemitism

---

[42] Minouche Shafik, Laura Ann Rosenbury & Thomas R. Bailey, *Announcing Task Force on Antisemitism*, Columbia Univ. Off. of President (Nov. 1, 2023), https://president.columbia.edu/news/announcing-task-force-antisemitism.

[43] Joseph A. Howley, *A Year Under the Palestine Exception at Columbia University*, The Nation (May 7, 2024), https://www.thenation.com/article/society/columbia-barnard-palestine-protests-gaza/ ("Meanwhile, the university's Task Force on Antisemitism could only manage to hold 'listening sessions' and then, in March, to issue a report calling for more law-and-order policing of protests and speech on campus (its wish being granted effusively in recent weeks). One of the Task Force's cochairs sat next to Columbia President Minouche Shafik in front of Congress on April 17 and affirmed the conflation of criticism of Israel with antisemitism.").

[44] *Internal Emails Reveal Columbia's Task Force on Antisemitism Is Causing Ruptures in Faculty,* LitHub (Feb. 26, 2024), https://lithub.com/internal-emails-reveal-columbias-task-force-on-antisemitism-is-causing-ruptures-in-its-faculty/ ("Given the passionate advocacy for Israel the leadership of the Task Force and many members of the Task Force are known for … the conflation of antisemitism with criticism of Zionism and of Israel that the ADL, AIPAC, et al label as 'crossing the line' is not just, as you put it, 'highly contentious'—it is the contention being experienced by those targeted with these smears.").

[45] Opposition to the political ideology of Zionism—whether voiced by Palestinians, Jews, or anyone else—is the call for equal rights for all residents of historic Palestine currently living under Israeli rule, and an end to the occupation and other forms of demographic control. It is a fundamentally political message that does not discriminate on the basis of religious or ethnic identity, but rather calls for equal rights and justice. Palestinians, like any other ethnic or national origin group, believe they are entitled to equal treatment under the law – both here in the United States and in Palestine (where they live under apartheid). They, and those who support equal rights for all, see that requiring Palestinians to live under a different system of laws and denying their human rights is discriminatory.").

16

and that those invited to the listening session (i.e. himself) could be considered to be "the very antisemites" the Task Force has been asked to combat.[46]

Not receiving a direct response to his question, Schamus wrote a follow-up email on January 29, highlighting that many Jewish students on campus feel discomfort by "pro-Israel" political views being attributed to Jews as whole:

> Just one example: The Task Force has made it clear it wants to talk to Jewish students who claim to have been made to feel uncomfortable by certain utterances and slogans they may have heard on campus. But it is not at all clear that "Jewish students" as a category works here, given the overwhelming evidence that a very large percentage—indeed, at this point, maybe even a majority!—of Jewish students on campus would express a great deal of discomfort with a great deal of the political speech uttered and disseminated by people presuming to speak in their name, in that the false ascribing, for example, of "pro-Israel" political beliefs and affects to them simply because they are Jews could be construed as itself a form of antisemitism. While I doubt we have up to date and precise figures for Columbia and Barnard's Jewish student populations, we can certainly reference recent polling and trends, such as the Brookings Institute's November 2023 round up, "The generation gap in opinions toward Israel." Among a plethora of studies, one from the Jewish Electorate Institute stands out: it shows that, at the time the survey was taken, fully 33% of Jews under 40 agreed that "Israel is committing genocide against the Palestinians," and 38% that "Israel is an apartheid state." These are claims that are often described as "antisemitic," and yet, well, here we are. Even more interesting, these responses were gathered *before* the current assault on "Amelek." I have more than a hunch the percentages today might well be significantly higher.

> My question is: How will the Task Force appropriately weight its eventual representations of "Jewish student" discomfort, given that, for many if not most of those students, their discomfort may well be coming from the political speech of many of the members of the Task Force itself.[47]

> Schamus never got a straight answer.[48]

As a result of the Task Force's refusal to state whether it was using the IHRA definition of Antisemitism and its contemporary examples, Jewish students at Columbia have feared that they

---

[46] Literary Hub, *supra* note 44.

[47] *Id.*

[48] *See, e.g.,* Prem Thakker, *Columbia's New "Antisemitism Task Force" Won't Say What It Thinks Antisemitism Is,"* THE INTERCEPT (Mar. 7, 2024), https://theintercept.com/2024/03/07/israel-gaza-protests-columbia-antisemitism/.

would be disciplined if they engaged in speech for Palestinian rights, as documented by The Intercept, which reported on the Task Force meeting with students on March 1, 2024:

> Multiple Jewish students spoke up in that meeting, saying they were worried that their anti-Zionism could be conflated with antisemitism. One Jewish student, who said their grandmother was a Holocaust survivor, described feeling like their Judaism was being erased and worried that the task force wasn't taking their perspective seriously. They said that they didn't feel comfortable being on campus if other students could feel comfortable calling them a Nazi simply because they didn't agree with what is happening in Palestine.
>
> Much of the conversation centered on the lack of an agreed-upon definition for antisemitism. After Fuchs invoked the "I know it when I see it" line, a Jewish student said they were "extremely alarmed" over the task force not defining antisemitism. That led to a tense exchange in which Fuchs repeatedly interrupted the student and briskly reminded the room that the meeting was confidential. When the student pushed back, the task force co-chair called out the student for taking notes and beginning their question "in a very provocative, antagonistic tone."
>
> For several minutes, Fuchs continued to interrupt the student as they expressed concern about how the group was put together and about how faculty and student dissent is being disregarded.
>
> Fuchs at one point responded that it was "not appropriate" for the student to suggest that she had spoken over them.
>
> Later, a student asked whether criticism of Israel is antisemitic, prompting Fuchs to escalate further. "You think you're so clever," she said to the student, accusing them of trying to back her into a corner. She told the student they were being disruptive and invited the student to leave. The student walked out.[49]

The mandate of the Task Force suggested that it would make recommendations regarding student protests and discipline, raising concerns that the university would investigate or prosecute students who affiliate with Palestinians or speak in favor of Palestinian equality, including Jewish students, who face the dual risk of being disciplined for speaking out for Palestinian rights *and* of being stereotyped as being the impetus behind the discipline ostensibly carried out on their behalf.

---

[49] *See, e.g.,* Prem Thakker, *supra* note 48.

In fact, the Task Force dedicated its first report to formulating recommendations for rules enforcement in an effort to punish protests and speech activity in support of Palestine on campus.[50] The Task Force's second report focuses on incorporating a definition of antisemitism that conflates antisemitism and speech critical of Israel into university trainings and workshops, and even suggests enshrining this conflation within the university antidiscrimination policy in an attempt to police student groups.[51]

The creation of a Task Force that pushes for students, including Jewish students, to be punished for protest and speech activity in support of Palestinian rights and that aims to silence criticism of Israel cannot be required by Title VI.

### B.    Title VI Does Not and Cannot Require Universities to Adopt Definitions of Antisemitism that Conflate Antisemitism with Criticism of Israel.

In its August 2024 report, the Task Force recommended its own "working definition of antisemitism" that it specified was "not intended to be used in disciplinary procedures."[52] The definition states that:

> Antisemitism is prejudice, discrimination, hate, or violence directed at Jews, including Jewish Israelis. Antisemitism can manifest in a range of ways, including as ethnic slurs, epithets, and caricatures; stereotypes; antisemitic tropes and symbols; Holocaust denial; targeting Jews or Israelis for violence or celebrating violence against them; exclusion or discrimination based on Jewish identity or ancestry or real or perceived ties to Israel; and certain double standards applied to Israel.[53]

---

[50] Task Force on Antisemitism, *Report #1: Columbia University's Rules on Demonstrations,* Columbia Univ. (Mar. 2024), https://www.columbia.edu/content/sites/default/files/content/about/Task%20Force%20on%20Antisemitism/Report_1_Columbia_University's_Rules_on_Demonstrations_March_04_2024.pdf.

[51] Task Force on Antisemitism, *Report #2: Columbia University Student Experiences of Antisemitism and Recommendations for Promoting Shared Values and Inclusion,* Columbia Univ. (Aug. 2024), https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

[52] Task Force on Antisemitism, *supra* note 51, at 44.

[53] Task Force on Antisemitism, *supra* note 51, at 44.

Universities, including Columbia, that receive federal funding are already bound by Title VI and therefore have an obligation not to discriminate against their own students or allow a hostile environment based on race, color, or national origin. This has *already* been interpreted to include Jewish students, based on shared ancestry. Furthermore, requiring universities to adopt a definition of antisemitism in order to comply with Title VI that lists examples that focus on Israel, such as "certain double standards applied to Israel," would unconstitutionally silence student speech activity in support of Palestinian rights.

Despite the Task Force's stated intention that this definition *not* to be used for disciplinary procedures, Columbia confirmed that it would incorporate this definition into its overall approach and into "relevant policies."[54] As noted below, the Office of Institutional Equity ("OIE") has already been operating as though antisemitism and anti-Zionism are one and the same.

The Task Force's August 2024 report acknowledges that "[i]n fact, Title VI requires all protected classes to receive the same treatment. The statute does not permit a university to offer some protected classes more protection than others."[55] But by singling out Israel as having more protection from criticism than any other state, that is exactly what the university, under coercion from the government, is seeking to do. If universities are required to adopt a definition of antisemitism that equates antisemitism with criticism of Israel, they would not only be silencing their own students' speech, but they would also be at risk of discriminating against their own Palestinian students, thereby violating the very basic tenet of Title VI, which requires all protected classes to receive the same treatment.

---

[54] *Fulfilling Our Commitments,* Columbia Univ. Off. of President, https://president.columbia.edu/content/fulfilling-our-commitments (last visited Apr. 29, 2025).
[55] Task Force on Antisemitism, *supra* note 52, at 45.

### C. Title VI Does Not and Cannot Require Universities to Create Offices that Target Student Speech in support of Palestinian Rights.

Columbia created the OIE in the summer of 2024,[56] following the 2023-2024 school year that saw a rise in speech activity supporting Palestinian rights. The OIE describes itself as "a centralized resource for addressing all reports of discrimination and discriminatory harassment[.]"[57] Columbia's anti-discrimination policy, which the OIE is meant to enforce, states that it is designed to "meet relevant legal requirements, including Title VI of the Civil Rights Act of 1964."[58]

In response to the administration's March 13 letter to Columbia demanding policy changes to address "antisemitic violence and harassment" in exchange for its continued financial relationship with the U.S. government, interim president Katrina Armstrong stated that the OIE "substantially revised the University's antidiscrimination and discriminatory harassment policy for students and groups, including the ability to sanction groups" and declared that "[t]he University's approach and relevant policies will incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce in August 2024."[59] In its statement on "Combatting Antisemitism," Columbia notes that the OIE "clarified . . . that antizionism can be antisemitism."[60]

---

[56] *Office of Institutional Equity*, Columbia Univ., https://institutionalequity.columbia.edu/ (last visited Apr. 29, 2025).
[57] *Office of Institutional Equity*, *supra* note 56.
[58] *Anti-Discrimination and Discriminatory Harassment Policy and Procedures for Students*, Columbia Univ.: Univ. Policies, https://universitypolicies.columbia.edu/content/anti-discrimination-and-discriminatory-harassment-policy-and-procedures-students (last visited Apr. 29, 2025).
[59] *Fulfilling Our Commitments*, Columbia Univ. Off. of President, https://president.columbia.edu/content/fulfilling-our-commitments (last visited Apr. 29, 2025).
[60] *Combatting Antisemitism*, Columbia Univ. Off. of President, https://president.columbia.edu/content/combatting-antisemitism (last visited Apr. 29, 2025).

By conflating antisemitism—discrimination against Jewish people—with anti-Zionism and criticism of Israel, Columbia is wholesale attempting to silence those who speak out against Israel's actions and in support of Palestinian rights. Columbia and OIE are effectively saying to their Palestinian students that they cannot speak out about the oppression that they face at the hands of Israel because it would be discriminatory to do so. In practice, this is exactly how the OIE has operated—to silence speech activity in support of Palestinian rights and to target Palestinian students who advocate for their own humanity. One Columbia student, who is Palestinian, received correspondence from the OIE stating she "may have" engaged in "discriminatory harassment" for an op-ed in the student newspaper calling on Columbia to divest from Israel.[61] Another student received a notice from the OIE accusing of him of putting up posters that criticized Israel. The student noted, "'In my meeting I made the point that it seems that I am free to criticize the U.S. government at Columbia, but not Israel, and they had no answer for this.'"[62]

The OIE has sent notices to students for activities like distributing posters on campus or criticizing Israel's conduct as genocidal.[63] In the midst of sending such notices to students, the OIE has also operated with "'few due process protections and little to no transparency.'"[64]

Requiring universities to utilize offices that operate like the OIE would not only misconstrue Title VI entirely by targeting political speech rather than discrimination, but could also lead those universities to discriminate against Palestinian students who are speaking out about

---

[61] Jake Offenhartz, *Facing Trump's threats, Columbia investigates students sritical of Israel*, ASSOCIATED PRESS (Mar. 6, 2025), https://apnews.com/article/columbia-university-campus-protests-trump-congress-ba0eddec4679d70287202831c52ebed6; Columbia Palestine Solidarity Coalition, *Recentering Palestine, reclaiming the movement*, Columbia Spectator (Oct. 19, 2024), https://www.columbiaspectator.com/opinion/2024/10/19/recentering-palestine-reclaiming-the-movement/.
[62] Murtaza Hussain, *Columbia University's Secret Disciplinary Process for Students Critical of Israel*, DROP SITE NEWS (Mar. 4, 2025), https://www.dropsitenews.com/p/columbia-university-gaza-student-disclinary-office.
[63] Murtaza Hussain, *supra* note 61.
[64] Murtaza Hussain, *supra* note 61.

Israel's systems of inequality and violence that they and their families live under by treating them differently from other students.

### D. Title VI Does Not and Cannot Require Universities to Issue Severe Disciplinary Sanctions Against Students Who Protest in Support of Palestinian Rights.

On March 13, 2025, the same day as the administration's letter, Columbia made an announcement that it had issued "sanctions to students ranging from multi-year suspensions, temporary degree revocations, and expulsions related to the occupation of Hamilton Hall last spring."[65] These sanctions were in response to student protest activity last spring that called on Columbia to divest from companies complicit in Israel's violations,[66] during which Columbia called in the NYPD to arrest students, breaking "with an informal settlement that had been in place for more than a half-century."[67] AAUP's president Todd Wolfson condemned the sanctions as "an outrageous assault on freedom of speech, student and faculty safety, shared governance, and academic freedom."[68] Included in these expulsions was Grant Miner, a Jewish student who is president of the student worker union at Columbia. Miner was expelled just one day before contract negotiations were to begin.[69]

---

[65] *University Statement Regarding UJB Determinations*, Columbia Univ.: Off. of Pub. Affs. (Mar. 13, 2025), https://communications.news.columbia.edu/news/university-statement-regarding-ujb-determinations.

[66] Gabriella Gregor Splaver et al., *In Focus: When Hamilton Hall became 'Hind's Hall'*, Columbia Spectator (May 12, 2024), https://www.columbiaspectator.com/main/2024/05/12/in-focus-when-hamilton-hall-became-hinds-hall/.

[67] David Pozen, *Norm Breaking at Columbia*, Balkinization (Apr. 19, 2024), https://balkin.blogspot.com/2024/04/norm-breaking-at-columbia.html ("Since 1968, student protesters have repeatedly occupied Low Library, blockaded Hamilton Hall, held sit-ins in administrative offices, waged hunger strikes, staged walkouts, and more. Some of these protests led to disciplinary code charges. None elicited a criminal law enforcement response.").

[68] *Cowardice and Capitulation: Columbia Has Sacrificed Its Own Students to Authoritarianism*, Am. Ass'n of Univ. Professors (Mar. 14, 2025), https://www.aaup.org/news/cowardice-and-capitulation-columbia-has-sacrificed-its-own-students-authoritarianism.

[69] *Cowardice and Capitulation: Columbia Has Sacrificed Its Own Students to Authoritarianism*, *supra* at 67; @grantdminer, Twitter (Mar. 17, 2025, 11:31 AM), https://x.com/grantdminer/status/1901657622731751625 ("I am Jewish, I work in Jewish studies, and I am not alone in opposing the ongoing genocide. The Jewish people know what genocide is. That's why so many of us, alongside people of all backgrounds, are standing up against what's happening in Palestine.").

A university cannot constitutionally be required to respond to student protest critical of Israel with such severe sanctions in order to satisfy Title VI. Doing so would force schools to target speech and could also put schools at risk of violating Title VI with regard to Palestinian students.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: April 29, 2025

Respectfully submitted,

*/s/Maria C. LaHood*
Maria C. LaHood
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
mlahood@ccrjustice.org

Radhika Sainath *
Dylan Saba *
Sabiya Ahamed *
PALESTINE LEGAL
55 Exchange Place
New York, NY 10005
(917) 200-2190
radhika@palestinelegal.org
dsaba@palestinelegal.org
sahamed@palestinelegal.org

*\* Pro hac vice application pending*

*Counsel for Amici Curiae Center for Constitutional Rights and Palestine Legal*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Brief of Amici Curiae complies with the type-volume limitation of Local Civil Rule 7.1(c) because it contains 8,585 words exclusive of those items excluded from length limits.