UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, *et al.*,<br><br>                    Plaintiffs,<br><br>              v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>                    Defendants. | No. 25 Civ. 2429 (MKV) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2695
*Attorney for Defendants*

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JEFFREY OESTERICHER
ALLISON M. ROVNER
*Assistant United States Attorneys*
      - Of Counsel -

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND....................................................................................................................... 2

    I.    The Federal Government's Grants and Contracts with Columbia ........................... 2

    II.   Communications with Columbia Regarding Federal Funding.................................. 3

    III.  The Current Action............................................................................................... 5

ARGUMENT............................................................................................................................ 6

    I.    Legal Standard ..................................................................................................... 6

    II.   Plaintiffs Are Unlikely to Succeed on Any of Their Claims ..................................... 6

        A.  This Court Lacks Subject Matter Jurisdiction ...................................................... 6

            1.  Plaintiffs Do Not Have Standing............................................................. 6

                a.  Plaintiffs Lack Article III Standing .............................................. 7

                b.  Plaintiffs Lack Standing to Enforce Payments to a Nonparty ................ 10

            2.  The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiffs' Claims....................................................................................11

            3.  Plaintiffs' APA Claims Are Unreviewable Because the Decision to Withdraw Funding Is Committed to the Agencies' Discretion ..................................... 17

        B.  Plaintiffs' Claims Also Fail on the Merits.......................................................... 19

            1.  Plaintiffs Are Unlikely to Prevail on Their First Amendment Claims ........... 19

            2.  The Grant Terminations Complied with the APA ......................................... 23

            3.  Plaintiffs Are Unlikely to Prevail on Their Remaining Claims.................... 26

    III.  Plaintiffs Fail to Demonstrate Irreparable Harm..................................................... 27

    IV.  The Balance of the Equities and the Public Interest Weight in Favor of the Government .............................................................................................................. 29

CONCLUSION...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Pataki*,
    278 F.3d 93 (2d Cir. 2002) ................................................................................................. 27

*Agency for Int'l Dev. v. All For Open Soc'y Int'l Inc.*,
    570 U.S. 205 (2013) ........................................................................................................... 23

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) ............................................................................................... 28

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ............................................................................................. 12

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
    766 F.2d 715 (2d Cir. 1985) ............................................................................................... 28

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
    821 F.3d 352 (2d Cir. 2016) ............................................................................................... 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................... 21

*Atari Interactive, Inc. v. Printify, Inc.*,
    714 F. Supp. 3d 225 (S.D.N.Y. 2024) ................................................................................ 29

*Atterbury v. U.S. Marshals Serv.*,
    805 F.3d 398 (2d Cir. 2015) ................................................................................... 13, 16, 17

*B.K. Instrument, Inc. v. United States*,
    715 F.2d 713 (2d Cir.1983) ................................................................................................ 16

*B&L Prods., Inc. v. Newsom*,
    104 F.4th 108 (9th Cir. 2024) ............................................................................................. 20

*Bantham Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ............................................................................................................. 22

*Bd. Of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) ........................................................................................................... 27

*Bennet v. New Jersey*,
    470 U.S. 632 (1985) ........................................................................................................... 14

*Bloch v. Bouchey*,
  No. 23 Civ. 209 (CR), 2023 WL 9058377 (D. Vt. Dec. 28, 2023)..........................................28

*Boaz Hous. Auth. v. United States*,
  141 Fed. Cl. 74 (2018) ..........................................................................................................26

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)...............................................................................................................17

*Brooks v. Giuliani*,
  84 F.3d 1454 (2d Cir. 1996)....................................................................................................30

*Califano v. Sanders*,
  430 U.S. 99 (1977)..................................................................................................................23

*Cameron v. Johnson*,
  390 U.S. 611 (1968)................................................................................................................21

*Cantor Fitzgerald Inc. v. Lutnick*,
  313 F.3d 704 (2d Cir. 2002)....................................................................................................26

*Church of American Knights of the Ku Klux Klan v. Kerik*,
  356 F.3d 197 (2d Cir. 2004)....................................................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)...........................................................................................................23, 24

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..............................................................................................................8, 9

*Columbus Reg. Hosp. v. United States*,
  990 F.3d 1330 (Fed. Cir. 2021) ..............................................................................................12

*Consol. Edison Co. of New York v. U.S., Dep't of Energy*,
  247 F.3d 1378 (Fed. Cir. 2001) ..............................................................................................15

*Ctr. for Auto Safety v. Dole*,
  846 F.2d 1532 (D.C. Cir. 1988) ..............................................................................................18

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022)................................................................................................................26

*Department of Commerce v. New York*,
  588 U.S. 752 (2019)................................................................................................................25

*Dep't of Educ. v. California*,
  145 S. Ct. 966 (2025)....................................................................................................11, 12, 17

*Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008)............................................................................28

*Estate of Landers v. Leavitt*,
    545 F.3d 98 (2d Cir. 2009)............................................................................22

*Falls Riverway Realty, Inc. v. City of Niagara Falls*,
    754 F.2d 49 (2d Cir. 1985)............................................................................13

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)......................................................................................23

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)......................................................................................24

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024)................................................................................7, 8, 9

*G.L. Christian & Assocs. v. United States*,
    312 F.2d 418 (Ct. Cl. 1963).........................................................................14

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007)..............................................................................6

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)................................................................................12, 17

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*,
    77 F.3d 26 (2d Cir. 1996)..............................................................................21

*Hankard v. Town of Avon*,
    126 F.3d 418 (2d Cir. 1997).....................................................................22, 29

*Heckler v. Chaney*,
    470 U.S. 821 (1985)......................................................................................17

*Henke v. U.S. Dep't of Com.*,
    83 F.3d 1445 (D.C. Cir. 1996)......................................................................12

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*,
    747 F.3d 44 (2d Cir. 2014)............................................................................11

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)........................................................................................7

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)..................................................................12, 14

*Jermosen v. Coughlin,*
   878 F. Supp. 444 (N.D.N.Y. 1995) ............................................................................. 22

*Kalderon v. Finkelstein,*
   495 Fed. App'x 103 (2d Cir. 2012) ............................................................................ 27

*Keepers, Inc. v. City of Milford,*
   807 F.3d 24 (2d Cir. 2015) .................................................................................. 10, 11

*Kuklachev v. Gelfman,*
   629 F. Supp. 2d 236 (E.D.N.Y. 2008) ....................................................................... 28

*Laird v. Tatum,*
   408 U.S. 1 (1972) ......................................................................................................... 8, 9

*Lewis v. Wash. State Univ.,*
   586 F. App'x 271 (9th Cir. 2014) ............................................................................. 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) .................................................................................................... 10

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) .................................................................................................... 18

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................................ 6, 7

*Luney v. United States,*
   319 F. 3d 550 (2d Cir. 2003) ..................................................................................... 19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) .................................................................................................... 11

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ............................................................................ 12, 13

*Metadure Corp. v. United States,*
   490 F. Supp. 1368 (S.D.N.Y. 1980) ......................................................................... 15

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ................................................................................... 18

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ............................................................................................. 6, 8, 9

*Nachshen v. E. 14 Realty, LLC,*
   18 Civ. 8304 (AJN), 2019 WL 5460787 (S.D.N.Y. Oct. 9, 2019) .......................... 29

*National Rifle Association v. Vullo*,
    602 U.S. 175 (2024)..................................................................................... 20

*New Mexico v. Musk*,
    No. 25 Civ. 429 (TSC), 2025 WL 520583 (D.D.C. Feb. 18, 2025) ....................................... 29

*New York v. Scalia*,
    464 F. Supp. 3d 528 (S.D.N.Y. 2020)..................................................................... 10

*New York v. United States Dep't of Health & Hum. Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019)..................................................................... 24

*New York v. United States Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)............................................................................... 28

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)..................................................................................... 21

*Nokia Corp. v. InterDigital, Inc.*,
    645 F.3d 553 (2d Cir. 2011)............................................................................. 30

*Overview Books, LLC v. United States*,
    755 F. Supp. 2d 409 (E.D.N.Y. 2010)..................................................................... 15

*Pennhurst State School and Hospital v. Halderman*,
    451 U.S. 1 (1981)....................................................................................... 26

*Penthouse Intern., Ltd. v. McAuliffe*,
    702 F.2d 925 (11th Cir. 1983)........................................................................... 20

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) .......................................................................... 12

*Phoenix Light SF Ltd. v. Bank of New York Mellon*,
    No. 14 Civ. 10104 (VEC), 2022 WL 92213 (S.D.N.Y. Jan. 7, 2022)...................................... 10

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*,
    175 F.3d 132 (2d Cir. 1999).................................................................... 12, 16, 17

*Raines v. Byrd*,
    521 U.S. 811 (1997)...................................................................................... 7

*Robbins v. U.S. Bureau of Land Mgmt.*,
    438 F.3d 1074 (10th Cir. 2006).......................................................................... 16

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)............................................................................. 28

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004)................................................................................29

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    772 F.2d 1043 (2d Cir. 1985)..............................................................................23

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
    709 F. Supp. 3d 118 (S.D.N.Y. 2024)..........................................................6, 30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)..............................................................................................7

*Synder v. Phelps*,
    562 U.S. 443 (2011)............................................................................................19

*Tennessee v. Becerra*,
    131 F.4th 350 (6th Cir. 2025)............................................................................24

*Thompson v. Cnty. of Franklin*,
    15 F.3d 245 (2d Cir. 1994)................................................................................10

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992)...........................................................................16

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................................6, 8

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998).............................................................................15

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*,
    No. 25 Civ. 465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025)...................16

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999).........................................................................13, 14

*USA Network v. Jones Intercable, Inc.*,
    704 F. Supp. 488 (S.D.N.Y. 1989).....................................................................29

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021)............................................................................6, 29

*Winter v. Nat. Res. Def. Council*, Inc.,
    555 U.S. 7 (2008).................................................................................................6

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)...........................................................................29

*Xie v. University of Texas M.D. Anderson Cancer Ctr.*,
  No. 20-20622, 2021 WL 5968648 (5th Cir. Dec. 15, 2021)................................................27

*Younger v. Harris*,
  401 U.S. 37 (1971)..........................................................................................21, 22

**Regulations**

2 C.F.R. § 200.1..................................................................................................2

2 C.F.R. § 200.340.............................................................................2, 4, 13, 18

42 C.F.R. § 52.2..................................................................................................2

42 C.F.R. § 52.6(a).............................................................................................2

48 C.F.R. § 2.101.........................................................................................14, 18

48 C.F.R. § 49.101.............................................................................................14

**Rules**

Federal Rule of Civil Procedure 65(c) ..............................................................30

**Statutes**

5 U.S.C. § 701(a)(2) ..........................................................................................17

5 U.S.C. § 702..............................................................................................11, 17

28 U.S.C. § 1491(a)(1)........................................................................................12

## PRELIMINARY STATEMENT

In light of numerous well-publicized incidents of antisemitism at Columbia University ("Columbia" or "University") since October 2023, several Federal agencies have been reviewing Columbia's Federal grants and contracts for potential termination. Consistent with the agencies' priorities to keep students safe on campus, the agencies terminated certain funding to Columbia as unaligned with their priorities and interests in combatting antisemitism. The Government and Columbia have been engaged in ongoing discussions regarding steps the University must take to combat antisemitism and allow for the potential restoration of funding. The Plaintiffs here—two labor organizations whose members include University faculty—have tried to insert themselves into the discussion by filing this action and seeking a preliminary injunction to restore the funding and prevent potential termination of additional funding. Though none of the money at issue was directly allocated to Plaintiffs or their members, Plaintiffs assert various claims under the Administrative Procedure Act ("APA"), First Amendment, and other provisions of the Constitution. These claims lack merit.

This Court should deny Plaintiffs' motion for a preliminary injunction for several independent reasons. As a threshold matter, Plaintiffs are unlikely to succeed on their claims because the Court lacks subject matter jurisdiction. Specifically, Plaintiffs lack standing, as they have not shown sufficient harm to themselves or their members resulting from the Government's actions, bring claims that properly sound in contract and therefore belong in the Court of Federal Claims, and challenge unreviewable action committed to the agencies' discretion. Plaintiffs' claims also fail on the merits. First, the Government's termination of funding complied with both the substantive and procedural requirements of the APA. Likewise, Plaintiffs' constitutional claims fail because they have not established that the Government violated the First Amendment, separation of powers, spending clause, or due process. Plaintiffs have also failed to show irreparable harm or

that an injunction—particularly the significantly overbroad injunction they are seeking—would be in the public interest. Accordingly, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I. The Federal Government's Grants and Contracts with Columbia

The Government, through various agencies, provides funding to institutions of higher learning, including Columbia, using contracts and grants that are subject to specified terms and conditions. For example, the National Institute of Health ("NIH"), an agency within the U.S. Department of Health and Human Services ("HHS"), awards grants to institutions that designate a principal investigator to lead the scientific and technical direction of research projects funded under the grant. 2 C.F.R. § 200.1, 42 C.F.R. § 52.2; Declaration of Jon Lorsch ("Lorsch Decl."), ¶ 8. NIH exercises broad discretion in awarding and administering grants. Lorsch Decl. ¶¶ 1, 8. The Secretary awards grants "to those applicants whose approved projects will in the Secretary's judgment best promote the purposes of the statute authorizing the grant and the regulations of this part." 42 C.F.R. § 52.6(a); Lorsch Decl. ¶ 8.

When NIH awards a grant, it agrees to support the recipient with a specified level of funding for a specific period. *Id.* ¶ 10. The award document requires recipients of NIH grant funds to comply with all Federal statutes, regulations, policies, and the terms and conditions stated in the Notice of Award. *Id.* NIH's Grants Policy Statement ("GPS") is a term and condition applicable to all NIH awards. *Id.* ¶ 11. The GPS, in turn, incorporates 2 C.F.R. § 200.340, which therefore is a term and condition of the notice of award. *Id.* As incorporated, that regulation permits NIH to terminate a grant if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Other agencies, such as the Department of Education ("ED"), similarly awarded grants directly to Columbia University or the University's Teachers College, *see* Declaration of Allison M. Rovner ("Rovner Decl.") Exs. A-B, and various Government agencies also contract

with Columbia, Declaration of Josh Gruenbaum ("Gruenbaum Decl.") ¶ 7.

## II.    Communications with Columbia Regarding Federal Funding

On February 3, 2025, the United States Department of Justice ("DOJ") announced the formation of a multi-agency Task Force to Combat Anti-Semitism. *See* ECF No. 48-8; Gruenbaum Decl. ¶ 5. On March 3, 2025, the General Services Administration ("GSA") sent a memorandum to Columbia, stating that it was "leading a Task Force comprehensive review of its Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Columbia University." *See* Gruenbaum Decl. ¶ 6 & Ex. A. GSA attached a schedule of contracts for which it was "ready to work with each appropriate contracting agency on the potential issuance of Stop Work Orders," and advised that "alongside our fellow agencies, we will also be reviewing the greater than $5 billion of active grants between Columbia University, its affiliates and the Federal Government for potential compliance concerns, false claims or other infractions." *Id*.[1]

On March 7, 2025, DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students." ECF No. 49-3; Gruenbaum Decl. ¶ 9. That same day, HHS placed a hard funds restriction on all Columbia grant awards to prevent Columbia from drawing down funds. Lorsch Decl. ¶ 16. On March 10, 2025, NIH notified Columbia that 396 grants had been terminated for nonalignment with agency priorities to fund safe research environments. *Id*. ¶ 17 & Ex. D. Similarly, on March 7, 2025, the Department of Education terminated awards for grants to Columbia. Rovner Decl. Exs. A-B. ED's

---

[1] HHS, ED, and GSA publicly announced "a comprehensive review of Columbia University's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act." ECF No. 49-1.

grant terminations were pursuant to the terms and conditions of each award, which incorporate the Office of Management and Budget ("OMB") regulation, 2 C.F.R. § 200.340(a)(4). *Id.* Finally, the Government terminated certain federal contracts pursuant to the Federal Acquisition Regulation ("FAR"), which allows the Government to terminate contracts for convenience when it is in the Government's interest to do so. Gruenbaum Decl. ¶¶ 10-11. The termination notices generally provided Columbia (the fund recipient) with appeal rights, and the time for Columbia to appeal has been extended. *See* Lorsch Decl. ¶ 20; Rovner Decl. Exs. A-B. That process is ongoing, as are negotiations between the Government and Columbia to restore funding. *See* Gruenbaum Decl. ¶ 12; Lorsch Decl. ¶ 19.

On March 13, 2025, GSA, HHS, and ED sent a letter to Columbia outlining the "steps that [the Government] regard[s] as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government." ECF No. 49-6 ("March 13 Letter" or "Mar. 13 Ltr."). The nine steps enumerated in the letter included, among ]other actions, enforcement of existing disciplinary policies; abolition of the University Judicial Board ("UBJ"); banning of masks intended to conceal identity or intimidate others (with exceptions for religious and health reasons); adoption of a definition of antisemitism (though the letter did not mandate any particular definition); and placement of the Middle East, South Asian, and African Studies ("MESAAS") department under academic receivership. Mar. 13 Ltr. at 1-2.

On March 21, 2025, Columbia released a memorandum entitled, "Advancing Our Work to Combat Discrimination, Harassment and Antisemitism at Columbia." ECF No. 49-7 (the "March 21 Memo"). It announced various actions, many of which align with the steps in the March 13 memo. For example, Columbia stated that relevant policies will "incorporate the definition of antisemitism recommended by Columbia's Antisemitism Taskforce in August 2024." *Id.* at 2. But

certain actions announced in the March 21 Memo differ from the requirements in the March 13 Letter. For example, with respect to mask restrictions, the March 21 Memo stated that masks would be prohibited "for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws." *Id.* at 2.

Columbia has explained that the actions it announced on March 21 were underway in advance of the March 13 Letter. At a March 25 hearing in *Khalil v. Trustees of Columbia University*, 25 Civ. 2079, counsel for the University represented that "all of the 18 actions that were announced on March 21 were . . . under review and work and development for many months. . . . [The March 13 Letter] essentially crystallized those lines of effort and affected timing. But all of those lines of efforts were in play and were ongoing for some significant periods of time before the March 13 letter and ultimate March 21 announcement." Rovner Decl. Ex. C, *Khalil v. Trustees of Columbia University*, 25 Civ. 2079, March 25, 2025, Tr. at 65:1-8 ("*Khalil* Tr.").

## III. The Current Action

Plaintiffs filed the Complaint in this matter on March 25, 2025. *See* ECF No. 1. The Complaint asserts ten claims against the Government, including: alleged violation of First Amendment freedom of speech, *id.* ¶¶ 286-297; imposition of "unconstitutional conditions" on federal funding, *id.* ¶¶ 298-303; failure to follow procedural requirements, in violation of the APA, with respect to the March 7, 2025, funding withdrawal and March 13 Letter, *id.* ¶¶ 304-318, 334-341; substantive violations of the APA with respect to the March 7 funding withdrawal and March 13 Letter, *id.* ¶¶ 319-33, 342-51; action that is ultra vires, in excess of Executive Branch authority, *id.* ¶¶ 352-363; violation of the Fifth Amendment Due Process Clause, *id.* ¶¶ 371-377; and violation of the Tenth Amendment, *id.* ¶¶ 378-385. On April 3, 2025, Plaintiffs filed their motion for a Preliminary Injunction. Plaintiffs' Proposed Order requests declaratory and injunctive relief

aimed at restoring the terminated funding to Columbia and barring future termination of funding absent certain procedural requirements. *See* ECF No. 25 ("Proposed Order").

## ARGUMENT

### I. Legal Standard

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

### II. Plaintiffs Are Unlikely to Succeed on Any of Their Claims

#### A. This Court Lacks Subject Matter Jurisdiction

Plaintiffs bear the burden of demonstrating subject matter jurisdiction, including Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs are unlikely to succeed on their claims because they cannot overcome the threshold hurdle that this Court lacks jurisdiction for a multitude of reasons.

##### 1. Plaintiffs Do Not Have Standing

Because "'standing is not dispensed in gross,'" "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413,

431 (2021)). The "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

### a.  Plaintiffs Lack Article III Standing

As an initial matter, the Court should deny Plaintiffs' request for a preliminary injunction because they lack Article III standing. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Plaintiffs appear to assert standing both on the basis of direct injury to themselves and "as the representative of [their] members," *i.e.* "representational or organizational standing." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). But Plaintiffs' allegations are insufficient under either theory.

Representational standing requires Plaintiffs to establish "that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id*. (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Plaintiffs' allegations do not establish that their members would have standing to pursue all the claims in this action in their own right.

To establish injury-in-fact, Plaintiffs must allege harm that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "*certainly impending*"; "allegations of *possible* future injury are not

sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and alterations omitted). And it must be "concrete—that is, real, and not abstract." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted); *see also Murthy*, 603 U.S. at 43, 58 ("because the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury" (internal quotation marks omitted)). Plaintiffs have failed to meet that burden here.

Plaintiffs assert that they themselves have suffered harm through interference with their "core business activities" and necessary diversion of resources from other activities. *See* Plaintiffs' Preliminary Injunction Brief, ECF No. 26 ("PI Br.") 9-10. But "an organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance for Hippocratic Med*., 602 U.S. at 394. Nor is diversion of organizational resources sufficient to convey standing, at least where those resources are spent opposing the very Government determinations at issue, *id*. at 395, as appears to be the case here, PI Br. 10 (claiming that Plaintiffs have diverted resources to "assist members responding to Columbia's demands; respond to a surge of inquiries . . . ; hold weekly meetings and calls . . . to coordinate responses in real time; draft and provide sample contract and policy language for affiliates to address the ramification of federal funding cancelation; and provide increased financial support for members defending themselves . . . .").

Nor do Plaintiffs sufficiently allege injury to their members to support the claims flowing from potential future loss of funding, which they claim has chilled protected First Amendment activity. It is well-settled that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *cf. Murthy*, 603 U.S. at 73 ("[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is

not certainly impending.'" (quoting *Clapper*, 568 U.S. at 416)). In the absence of allegations of specific present or future First Amendment harm, Plaintiffs cannot satisfy Article III standing for claims premised on the threat of future funding withdrawal. *Laird*, 408 U.S. at 13-14.[2]

Plaintiffs also fail to establish another element of standing—causation—for their claims relating to the conditions in the March 13 Letter. *See Alliance*, 602 U.S. at 380. Plaintiffs' allegations that their members' speech has been or will be chilled are at least partly contingent on Columbia's independent actions, which to date have differed from the Government's demands. *See Murthy*, 603 U.S. at 57-58 (holding that plaintiffs alleging that Government officials pressured social media platforms to suppress protected speech were required to show the platforms' likely response to establish standing). For example, Plaintiffs assert that their "members fear that their speech and scholarship . . . could trigger . . . further demands by Defendants that their academic departments, too, be placed in academic receivership." PI Br. 9. But no Columbia Department has been placed in receivership in connection with the Government's March 2025 demands. *See* March 21 Memo (announcing review of all regional departments). Further, the steps that the University has actually taken, as outlined in the March 21 Memo, were in "development for many months" before the March 13 Letter. *Khalil* Tr. at 65:1-8. They were therefore not caused by the Government. Moreover, Plaintiffs' ostensible concerns that their speech could trigger additional funding freezes or other retribution is speculative and therefore insufficient. *See Clapper*, 568 U.S.

---

[2] Plaintiffs' allegations are also vague with respect to the harm actually suffered by their members, as opposed to students, partner organizations, and the public generally. And Plaintiffs acknowledge that some of the terminated funding has been covered by other sources. *See, e.g.*, ECF No. 32, Hirsch Decl. ¶ 12 ("Columbia has committed to providing salary coverage during this immediate period of uncertainty for personnel whose grants have been terminated"; ¶ 13 ("the students secured alternative . . . funding").

at 414 (a "speculative chain of possibilities does not establish that injury based on potential future [action] is certainly impending or is fairly traceable").

**b. Plaintiffs Lack Standing to Enforce Payments to a Nonparty**

Plaintiffs additionally lack prudential standing to enforce the rights of Columbia, a nonparty, to recover funding on grants and contracts. Prudential standing, which must be satisfied in addition to constitutional standing, "embodies judicially self-imposed limits on the exercise of federal jurisdiction" and "includes, *inter alia*, the general prohibition on a litigant's raising another person's legal rights and the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches of government." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015) (internal quotation marks and alterations omitted). These limits are "closely related to Article III concerns" and "founded in concern about the proper—and properly limited— role of the courts in a democratic society." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc*., 821 F.3d 352, 358 (2d Cir. 2016) (internal quotation marks omitted).[3]

Here, Plaintiffs seek an order forcing the Government to make payments on agreements with Columbia—claims that properly sound in contract, *see infra* at Argument II.A.2, and cannot be brought by entities that have no legal right to the disputed funds. Plaintiffs do not allege that they or their individual members were parties to the terminated contracts, nor do they argue that they are intended third party beneficiaries. And it is the University, not Plaintiffs, that is the direct

---

[3] Although some courts in this district have treated prudential standing as jurisdictional, others have treated it as a failure to state a cause of action. *Compare, e.g.*, *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14 Civ. 10104 (VEC), 2022 WL 92213, at *4 (S.D.N.Y. Jan. 7, 2022) ("[T]he Second Circuit considers prudential standing to be part of subject-matter jurisdiction . . . .") (citing *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994)), *aff'd by* 66 F.4th 365 (2d Cir. 2023), *with New York v. Scalia*, 464 F. Supp. 3d 528, 548 n.13 (S.D.N.Y. 2020) ("*Lexmark* is clear that prudential standing doctrine does not implicate the Court's subject-matter jurisdiction but whether the plaintiff has a valid cause of action.") (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). The Court need not decide this issue for purposes of deciding the instant motion.

recipient of the grant funding at issue. *See, e.g.*, Lorsch Decl. ¶¶ 8, 12. Plaintiffs therefore lack prudential standing to enforce the terms of these contracts and funding arrangements. *See Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"). Plaintiffs' attempt to manufacture standing by repackaging these claims as implicating the APA or constitutional considerations should be rejected, as they have "offered no reason to depart from the normal rule that a litigant must assert its own rights, not those of a third party," *Keepers, Inc.,* 807 F.3d at 42, and, as discussed below, Plaintiffs' claims sound in contract.

### 2.  The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiffs' Claims

Putting aside Plaintiffs' lack of standing, this Court lacks subject matter jurisdiction for an additional reason: Plaintiffs' claims—which seek payment of funds to Columbia pursuant to agreements between the Government and the University—are in essence contract claims that can only be brought in the Court of Federal Claims.

Plaintiffs primarily rely on the APA to challenge the Government's grant and contract terminations. *See, e.g.*, PI Br. 11-21; Compl. ¶¶ 114-84, 304-51. Although the APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages," 5 U.S.C. § 702, that waiver of sovereign immunity does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 215 (2012).

"[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" as Plaintiffs seek here. *See California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)); *see also Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Where a claim arises out of a contract with the United States, the Tucker Act 'impliedly forbids' relief other than the remedy provided by the Court of Federal Claims."). This jurisdictional divide ensures that contract claims against the Government are channeled to the court that has "unique expertise" in that area. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). In *California*, the Supreme Court recently applied these principles and concluded that the Government was likely to succeed in showing that the district court lacked jurisdiction over a challenge to the Government's termination of education-related grants with similar termination provisions to those at issue here. *See California*, 145 S. Ct. at 968.[4]

Accordingly, regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). "Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source

---

[4] Particularly in light of *California*, there can be no dispute that the grants here are in essence contracts. *See also, e.g.*, *Columbus Reg. Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("grant agreements [are] contracts when the standard conditions for a contract are satisfied"); *Henke* v. *U.S. Dep't of Com.*, 83 F.3d 1445, 1450-51 (D.C. Cir. 1996) (federal grant had the "essential elements of a contract"); Lorsch Decl. ¶¶ 10-11.

of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) and *Megapulse*, 672 F.2d at 968). Here, both prongs establish that Plaintiffs' claims for payment of the terminated grants are contractual.

First, the source of the rights Plaintiffs assert are the grant and contract agreements themselves, and "stem[] from no independent, non-contractual source." *Up State Fed. Credit Union*, 198 F.3d at 376. Plaintiffs challenge "the summary termination of $400 million in federal grants and contracts to Columbia University," and though they argue that concern over loss of funding impacts academic freedom and speech, what they are seeking is payment on grants and contracts. *See, e.g.*, PI Br. 1-2; *see generally* Compl. In the absence of the awards and agreements, "'it is likely that no cause of action would exist at all.'" *Up State Fed. Credit Union*, 198 F.3d at 377 (quoting *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 55 (2d Cir. 1985)).

Plaintiffs' near singular focus on Title VI with respect to their APA claims is misplaced. *See* PI Br. 11-19; Compl. ¶¶ 114-84, 304-51. The grants and contracts with Columbia were not terminated pursuant to Title VI, which is therefore inapplicable.[5] Lorsch Decl. ¶¶ 11, 17; Gruenbaum Decl. ¶ 10; Rovner Decl. Exs. A-B. Rather, the Government terminated the grants and contracts with Columbia pursuant to the terms and conditions of their award. *Id*. With respect to grants, the terms governing termination are contained in OMB regulation, 2 C.F.R. § 200.340. NIH, for example, incorporated this regulation by reference into the awards. Lorsch Decl. ¶ 11. The 2020 version of the regulation allowed the Government to terminate a grant "pursuant to termination provisions included in the Federal award." The version of the regulation effective

---

[5] Although the agencies' communications with Columbia regarding termination of the grants and contracts referenced potential Title VI violations, they did not cite or rely on Title VI as the mechanism for termination.

October 1, 2024, allowed the Government to terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Which version of the regulation applied generally depended on which version was in effect at the time the grant award was made, *see Bennet v. New Jersey*, 470 U.S. 632, 638 (1985), but the NIH grants that represent much of the stopped funding were terminated under the 2024 version as no longer aligning with agency priorities, *see* Lorsch Decl. ¶ 17. In any event, both versions of the regulation reinforce the contractual nature of the terminations by referencing the terms and conditions of the award.

Similarly, the Government terminated the contracts with Columbia pursuant to express or implied contract provisions, included pursuant to the FAR, that broadly allow the Government to terminate contracts for convenience whenever it is in the Government's interest to do so. *See* Gruenbaum Decl. ¶¶ 10-11; 48 C.F.R. § 2.101 (defining "termination for convenience" as "the exercise of the Government's right to completely or partially terminate performance of work under a contract when it is in the Government's interest"); 48 C.F.R. §§ 49.101, 49.501 -05, 52.249-1-5 (requiring agencies to include clauses in contracts regarding termination for convenience); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963) (reading termination clause into contract as a matter of law); Congressional Research Service, "Terminating Contracts for the Government's Convenience: Answers to Frequently Asked Questions" (Dec. 18, 2015), at 1-6, *available at* https://www.everycrsreport.com/files/20151218_R43055_4eb3d254b 321283211d130864b6a688c33852dc8.pdf (indicating that "[t]erminations in almost any . . . circumstance[] could . . . be found to be in the government's interest"). Although the grant and contract provisions incorporate OMB and FAR regulations, that "does not transform the action into one based solely on those regulations." *Ingersoll-Rand Co.*, 780 F.2d at 78; *see also Up State*

*Fed. Credit Union*, 198 F.3d at 377 (rejecting attempt "to characterize . . . action as an APA challenge rather than a contract dispute" by citing to a regulation where "the source of the right at issue" was contract).

Plaintiffs' constitutional claims are also premised on the notion that the Government has a contractual obligation to provide funding. *See, e.g.*, PI Br. 21-27; Compl. ¶¶ 3, 7, 185-263, 291-92, 300, 302, 332, 373-77 (alleging First Amendment "impacts" and due process violations from funding termination to Columbia). If the Government has no such obligation, it owes no duty to Columbia (or to the Plaintiffs) giving rise to an alleged constitutional violation. In short, "[b]ecause the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over due process claim because it was contractually based); *see also, e.g.*, *Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court in this District to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract because "the Court of Federal Claims can supply an 'adequate remedy' to prevent the constitutional wrongs alleged by [plaintiff]"); *Metadure Corp. v. United States*, 490 F. Supp. 1368, 1370, 1373 (S.D.N.Y. 1980) (in finding a lack of jurisdiction over plaintiff's due process claims, stating: "[Plaintiff] may not, by the simple expedient of lumping its contract claims together and denominating them a constitutional violation, escape the procedural limitations of the Tucker Act."); *cf. Overview Books, LLC v. United States*, 755 F. Supp. 2d 409, 416 (E.D.N.Y. 2010) ("[I]f the Court of Federal Claims finds a basis independent of the First Amendment for bringing a monetary claim (e.g., the Takings Clause of the Fifth Amendment), the court then has collateral jurisdiction to consider a plaintiff's

First Amendment claim within the context of considering the independent claim."), *aff'd*, 438 F. App'x 31 (2d Cir. 2011).[6] The Court should not allow Plaintiffs to invoke its jurisdiction by disguising contract claims as constitutional.

Second, the remedies Plaintiffs seek also plainly sound in contract. Plaintiffs ask the Court to enjoin the Government from "[t]erminating. . . any grants or contracts with Columbia University or with any Columbia faculty." *See* Pls.' Proposed Order, ECF No. 25 at 3-6; *see also* Compl. Prayer for Relief (requesting injunctive and declaratory relief regarding the funding and damages). However, the Tucker Act "specifically bar[s] . . . any 'injunctive, mandatory or declaratory relief against government officials when the result would be the equivalent of obtaining money damages.'" *Presidential Gardens Assocs.*, 175 F.3d at 143 (quoting *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983)). Where, as here, "the prime objective of the plaintiff is to obtain money from the Government," this Court lacks jurisdiction. *See id.* (quoting *B.K. Instrument, Inc.,* 715 F.2d at 727); *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25 Civ. 465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025), *appeal docketed,* No. 25-5066 (D.C. Cir. Mar. 14, 2025) (where government terminated funding pursuant to an agreement, concluding court lacked jurisdiction, in part, because "this Court cannot order the Government to pay money due on a contract"); *Presidential Gardens Assocs.*, 175 F.3d at 143 ("Actions seeking

---

[6] *Atterbury v. U.S. Marshals Service, et al.*, 805 F.3d 398 (2d Cir. 2015), is not to the contrary. In *Atterbury*, the court held that a contract between the court security officer plaintiff and a contractor who employed him provided the plaintiff with a protected property interest and due process rights relating to his employment independent from a contract his employer had with the government. *Id.* at 406-09. Here, by contrast, Plaintiffs' claims are grounded in Columbia's contracts and grants *with the Government*. Without these grants and contracts providing funding, Plaintiffs would not be able to assert APA or constitutional violations. *But cf., e.g.*, *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610-11 (D.C. Cir. 1992); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083-84 (10th Cir. 2006) (both concluding that district court had jurisdiction over constitutional claims relating to a contract).

specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States.").[7]

### 3. Plaintiffs' APA Claims Are Unreviewable Because the Decision to Withdraw Funding Is Committed to the Agencies' Discretion

Even assuming Plaintiffs could establish standing and jurisdiction (which they cannot), withdrawal of funding is quintessential agency action "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of sovereign immunity is limited. It does not apply in circumstances where "agency action is committed to agency discretion by law," *id.* § 701(a)(2). Review under the APA therefore is unavailable "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where the statute does not provide any judicially manageable standard, "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide

---

[7] To the extent *Atterbury* suggested that a ruling regarding a Government decision made discretionary by contract would not result in a court impermissibly requiring specific performance of a contract, 805 F.3d at 408, *Atterbury* is distinguishable because it involved employment termination rather than the money at issue in *Presidential Gardens Assocs.*, 175 F.3d at 143, which therefore makes the latter more apt in prohibiting the district court from in essence ordering specific performance of a contract. Moreover, the Supreme Court's recent decision in *California*, 145 S. Ct. at 968, makes clear that grant-based APA claims are contract claims that cannot be brought in district court pursuant to the Tucker Act. *Bowen v. Massachusetts*, 487 U.S. 879 (1988), also does not help Plaintiffs here. That case concerned states' entitlement to federal funding under a statute and addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages," *see* 5 U.S.C. § 702. As the Supreme Court has explained, its jurisprudence addressing that distinct carve-out from the APA's waiver of sovereign immunity "has no bearing" on the ability of private parties to obtain injunctions to enforce contractual obligations against the federal government. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002).

standards for judicial review." *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

The Supreme Court has long recognized that an agency's determination of how to allocate appropriated funds among competing priorities and recipients—precisely what Plaintiffs challenge here—is classic discretionary agency action. *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citations and internal quotation marks omitted). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* As long as the agency abides by the relevant statutes (and whatever obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*[8]

Here, the decision to terminate funding was peculiarly within the agencies' expertise and discretion. The Government generally stopped grant payments as inconsistent with agency priorities, *see* 2 C.F.R. § 200.340, and terminated contracts for convenience for not being in the Government's interest, *see* 48 C.F.R. §§ 2.101, 49.101, 49.501-505, 52.249-1-5. These regulations are broadly drawn and provide the Court with no meaningful standards by which to evaluate the

---

[8] Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions— like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted).

agencies' decisions. Therefore, the Court lacks jurisdiction over Plaintiffs' APA claims. *See Luney v. United States*, 319 F. 3d 550, 557-58 (2d Cir. 2003).

## B.    Plaintiffs' Claims Also Fail on the Merits

### 1.    Plaintiffs Are Unlikely to Prevail on Their First Amendment Claims

The Government did not violate the First Amendment by exercising its authority to terminate Government grants and contracts or by issuing the March 13 Letter. Plaintiffs put forth two theories: (1) that these actions impermissibly coerce the University to restrict or suppress their members' speech; and (2) that the March 13 Letter imposes unconstitutional conditions on the receipt of funding. PI Br. 21-25. Both theories fail.

As an initial matter, both theories start from the false premise that the Government is targeting expression and speech rather than conduct. Pls' Br. 21-25. Plaintiffs cite *Synder v. Phelps*, 562 U.S. 443, 458 (2011), for the proposition that the "government may not prohibit the expression of an idea simply because society finds the idea itself offensive." PI Br. 25 (quoting *Synder*, 562 U.S. at 458). But the Government has not restricted protected speech or expression on the basis of viewpoint. Rather, the March 13 Letter, for example, asks the University, among other things, to institute "[t]ime, place, and manner rules" in order to "prevent disruption of teaching, research, and campus life." ECF No. 49-6. As held in *Synder*, this type of time, place, and manner regulation is "not beyond the Government's regulatory reach." *Synder*, 562 U.S. at 456-57.[9]

_____

[9] Further, with respect to Plaintiff's allegation that the March 13 Letter "prohibit[s] anonymous speech through a ban on facial coverings," PI Br. 22, "the Supreme Court has never held that freedom of association or the right to engage in anonymous speech entails a right to conceal one's appearance in a public demonstration. Nor has any Circuit found such a right." *Church of American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) (upholding a New York law banning the use of face masks even if it makes "a member of a politically unpopular group [ ] less willing to exercise his or her free speech rights" because "[w]hile the First Amendment protects the rights of citizens to express their viewpoints, however unpopular, it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against

Further, Columbia University was not coerced by the March 13 Letter to take action. According to the University, "all [ ] 18 actions that were announced [by it] on March 21 were actions that were under review and work and development for many months," and the Government's actions, including the March 13 Letter and funding decisions, only "crystallized those lines of effort and affected timing." *Khalil* Tr. 64:25-65:8. Moreover, the University's March 21 announced actions "don't match up one to one" with the Government's March 13 Letter requests. *Khalil* Tr. 64:3-6. In other words, the University was planning to act for months to combat antisemitism and harassment on its campus and was not coerced by the Government to comply with the March 13 Letter.

Plaintiffs' coercion theory principally relies on *National Rifle Association v. Vullo*, 602 U.S. 175, 198 (2024), *see* PI Br. 21-23, but that case is different in kind. *Vullo* stands for the proposition that the government may not take an "adverse . . . action in order to punish or suppress [a] plaintiff's speech." *Id.* at 191. There, as alleged, the government (among other things) offered to drop "unrelated" infractions against an insurance company, in exchange for it cutting ties with gun groups, because of their speech. *Id.* at 192–93. But this case, unlike *Vullo*, does not involve the government threatening coercive action against one party to get at the protected speech of a third; instead, the government is using its enforcement authority to act directly upon a regulated entity because of *that entity's* own conduct. In other words, the actions taken here – unlike in *Vullo* – relate to the University's own malfeasance (*i.e.*, failing to take sufficient action to combat antisemitism). *See Penthouse Intern., Ltd. v. McAuliffe*, 702 F.2d 925, 927–28 & n.6 (11th Cir. 1983); *cf. B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 n.16 (9th Cir. 2024) (instructing that

---

the state's interest in safety, and its right to regulate conduct that it legitimately considers potentially dangerous.").

*Vullo* was inapplicable to First Amendment claim because in *Vullo* the government "did not have the authority to accomplish the result it sought by direct regulation"). As both the Supreme Court and the Second Circuit have held, "governmental entities may act properly in furtherance of legitimate state interests" even where there is an incidental effect on speech. *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (citing *Younger v. Harris*, 401 U.S. 37, 51 (1971) and *Cameron v. Johnson*, 390 U.S. 611, 619 (1968)).

Unlike in *Vullo*, there are no plausible allegations here that any of the actions taken by the Government were done "in order to" suppress or punish protected speech, rather than to pursue a legitimate interest. Plaintiffs offer little more than *ipse dixit* assertions that facially legitimate actions were in fact prompted by improper censorious motives when no such motives are indicated in the documents terminating funding, press releases regarding the funding, or the March 13 Letter. Such assertions not only run headlong into the presumption of regularity, *see Nieves v. Bartlett*, 587 U.S. 391, 400–02 (2019), but also they also fail to satisfy the basic requirements of pleading, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (plaintiff must marshal allegations that "invidious discrimination" was more plausible than "obvious alternative explanation[s]").

This is especially so because all of the available information supports that the Government had—and still has—a legitimate basis for taking the actions at issue here, acting properly to ensure that taxpayer dollars are not used to support research at an institution that has demonstrated a lack of concern for the wellbeing of Jewish students. In fact, Columbia *itself* has acknowledged issues on its campus following the Hamas terrorist attacks on Israel on October 7, 2023. Gruenbaum Decl. Ex. A at 1. For example, a Columbia task force found that Israeli students were frequently targeted on the basis of their national origin, and "[v]isibly observant [Jewish] students, like ones

21

who wear traditional head coverings, have been frequently met with extreme hostility," *id*. at 2 n.1 (alterations in original). Requiring Columbia to take steps to ensure that students are not subjected to disruptive and antisemitic speech is entirely appropriate. *Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2009). To the extent Plaintiffs allege any effect on their speech rights, they allege only an incidental chill pursuant to the government's legitimate interest in ensuring that taxpayer funds are not used to support an institution that has failed to protect Jewish students. *Younger v. Harris*, 401 U.S. 37, 51 (1971) ("Moreover, the existence of a chilling effect even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.") (internal citations omitted).  Indeed, Plaintiffs fail to identify any *actually* protected speech allegedly being targeted here. *See Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997). Antisemitic harassment is not shielded by the First Amendment. *See, e.g.*, *Jermosen v. Coughlin*, 878 F. Supp. 444, 450–51 (N.D.N.Y. 1995) ("[T]hreatening and abusive language . . . finds little protection under the [F]irst [A]mendment. Furthermore, threats of violence fall within a category of speech unprotected by the First Amendment." (citation omitted)).[10]

Plaintiffs' unconstitutional conditions theory likewise fails because, as discussed *supra*, nothing in the March 13 Letter requires the University, or by implication, Plaintiffs or their members, to adopt a specific view or otherwise unconstitutionally burdens First Amendment rights. ECF No. 49-6. And the unconstitutional conditions theory, as the name implies, only applies

---

[10] Plaintiffs argue that the Government's actions to protect students and faculty from antisemitic violence and harassment are akin to the behavior found unconstitutional in *Bantham Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). PI Br. 23. But *Bantham Books* involved the creation of a commission to review publications for obscenity and to make recommendations for criminal prosecution of publishers that did not follow the commissions' guidance. *Bantham Books*, 372 U.S. at 62. Here, in contrast, the Government is demanding lawful conduct from an entity that it directly funds (the University); it is not subjecting others, such as faculty and students, to "prior administrative restraints." *Id*. at 70 (internal citations omitted).

if the conditions imposed are actually unconstitutional, which, here, they are not. *Agency for Int'l Dev. v. All For Open Soc'y Int'l Inc.*, 570 U.S. 205, 214 (2013) ("[W]e have held that the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit.") (cleaned up) (internal citations omitted). Otherwise, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* In short, Plaintiffs' suit rests on conflating an effort to combat unlawful discrimination with one to suppress protected expression; that foundation is fundamentally mistaken, and once removed, their claims collapse.

### 2.     The Grant Terminations Complied with the APA

Even if the Court were to find that the March 7 grant terminations and March 13 letter are reviewable under the APA, Plaintiffs are not likely to succeed on their APA claims because the Government acted reasonably and followed proper procedures. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir. 1985). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The funding termination here meets this standard, particularly in the context of discretionary grants, where the Government unquestionably enjoys wide latitude to determine how best to implement the program.

As NIH explained in the termination notice letters that it sent, supporting research at an institution that had demonstrated a lack of concern for the wellbeing of Jewish students was inconsistent with agency priorities to support research in a safe environment and the agency

determined that taxpayer dollars should not be used in this regard. *See* PI Br. 15-16; Lorsch Decl. ¶ 17 & Ex. D.[11] NIH also explained in the letter that there was no alternative because Columbia's actions were inconsistent with agency priorities. *Id.* ED similarly explained in its termination letter that it found the grants to be inconsistent with agency priorities to eliminate discrimination in education. Rovner Decl. Exs. A-B. Similarly, the Government terminated the contracts for convenience in light of the University's insufficient response to antisemitism. Gruenbaum Decl. ¶ 10. Plaintiffs will therefore be unable to show that the termination decisions were arbitrary and capricious. Indeed, Columbia has acknowledged that the Government had "legitimate concerns." *See* ECF No. 49-5.

Regarding Plaintiffs' allegation that the Government never considered their members' reliance interests, Plaintiffs have not explained how they could develop such interests in grants to a third party (Columbia) that could expressly be terminated in the Government's discretion. *See* PI Br. 16-17; *see also, e.g.*, *Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. 2025) ("Tennessee likely has no legally cognizable reliance interest in the receipt of a *discretionary* funding award on the conditions that it prefers.") (emphasis in original). *But see, e.g.*, *New York v. United States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 553 (S.D.N.Y. 2019) (finding reliance interests in HHS grants). Further, GSA's March 7, 2025, press release, for example, indicates that the Government considered reliance interests, noting that "[d]oing business with the Federal Government is a privilege," and "Columbia cannot expect to retain the privilege of receiving

---

[11] When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420). The Government has submitted declarations in order to provide the Court with information that may be useful for deciding Plaintiffs' motion for a preliminary injunction. However, these declarations are not part of the administrative record, which has not yet been compiled.

federal taxpayer dollars if they will not fulfill their civil rights responsibilities . . . ." *See* ECF No. 49-3. In sum, the Government's termination of Columbia's grants and contracts based on the Administration's priorities and interests was regular and lawful. *See Department of Commerce v. New York*, 588 U.S. 752, 781 (2019).

Further, the March 13 Letter—which was on its face provided as a preliminary step in negotiations—was not arbitrary and capricious, as Plaintiffs allege only in passing. PI Br. 19. Indeed, as noted above, Columbia acknowledged the Government had legitimate concerns and, in fact, on March 21 announced similar changes on which Columbia had been working for months. *See supra* at Background II; ECF No. 49-5; ECF No. 49-7.[12]

Finally, Plaintiffs' APA procedural arguments fail because they are based on Title VI, when the Government did not terminate funding pursuant to this statute and therefore need not comply with its procedural requirements. *See* PI Br. 11-15, 17-19; Compl. ¶¶ 116-61, 304-18, 334-41; Gruenbaum Decl. ¶¶ 10, 11; Lorsch Decl. ¶ 17 & Ex. D; Rovner Decl. Exs. A-B. In a footnote in their brief, Plaintiffs make a cursory assertion—not alleged in their Complaint—that the

---

[12] The negotiation process is ongoing. *See* ECF No. 49-5 (Columbia letter from interim president, dated March 7, 2025, to community stating "we are committed to working with the federal government to address their legitimate concerns"); ECF No. 49-6 (March 13 letter from Government stating that Columbia's counsel had contacted the Government to discuss "next steps" and that "this letter outlines immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government"); ECF No. 49-8 (Government press release, dated March 28, 2025, indicating that the Government "look[ed] forward to a lasting resolution" with Columbia); "Listening, Learning, and Starting the Conversation," *available at* https://president.columbia.edu/news/listening-learning-and-starting-conversation (Columbia letter from acting president, dated April 4, 2025, stating that "we are proceeding, with integrity and care, in our discussions with the federal government about restoring our research funding"); "Sustaining Columbia's Vital Mission," *available at* https://president.columbia.edu/news/sustaining-columbias-vital-mission (Columbia letter from acting president, dated April 14, 2025, stating regarding restoration of funding that "the University has been engaged in what we continue to believe to be good faith discussions" with the Government and "[t]hose discussions have not concluded").

Government failed to incorporate binding legal requirements into the terms and conditions of the federal grant award. *See* PI Opp. 18 n.5. Although the Court should not countenance such a conclusory and unsupported statement, as explained above, the grant requirements were incorporated into the terms and conditions of the grant award. Lorsch Decl. ¶ 11; *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) (a court need not give "credence to [a] plaintiff's conclusory allegations"). Accordingly, Plaintiffs' APA procedural arguments also fail.

### 3. Plaintiffs Are Unlikely to Prevail on Their Remaining Claims

Plaintiffs' remaining constitutional claims for (1) separation of powers/ultra vires (Count VII and VIII); (2) due process (Count IX); and (3) Tenth Amendment and spending clause (Count X) fail because they are merely repackaged statutory claims under Title VI. Plaintiffs' argument is predicated on an alleged lack of statutory authority to cancel grants and funds and on an alleged violation of Title VI's procedural and substantive requirements for terminating funds. *See* PI Br. 19-21, 25-27. However, as discussed *supra*, the Government's actions were pursuant to the terms of the contracts and grants at issue and not taken under Title VI, and therefore permissible.

In addition, as to the separation of powers/ultra vires claim and the spending clause claim, the Government's cancellation of funding due to concerns regarding compliance with antidiscrimination laws is entirely proper. "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds. '[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). If Columbia itself took issue with the Government's funding revocation, it could bring suit in the Court of Federal Claims, *see supra* at Argument II.A.2; *Boaz Hous. Auth. v. United States*, 141 Fed. Cl. 74, 81 (2018), *aff'd*, 994 F.3d 1359 (Fed. Cir. 2021), but

it has not done so.

Finally, Plaintiffs' due process claim fails for the additional reason that they do not have a constitutionally protected interest in the grants and contracts at issue. In order to state a due process claim, Plaintiffs must, as an initial step, "allege the deprivation of a constitutionally protected interest." *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002). To have a constitutionally protected interest in a particular benefit "a person clearly must have more than an abstract need or desire for it. He must have more than unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Plaintiffs allege a constitutionally protected interest in the grants and contracts between the federal government, primarily NIH, and Columbia University. Compl. ¶¶ 92, 373. But researchers, such as Plaintiffs' members, do not have a property interest in grants between the federal government and the grantee institution. *Kalderon v. Finkelstein*, 495 Fed. App'x 103, 106-107 (2d Cir. 2012) (dismissing plaintiff's Fifth Amendment due process claim because plaintiff, a researcher, did not have a property interest in a grant between NIH and plaintiff's employer, a university); *see also Xie v. University of Texas M.D. Anderson Cancer Ctr.*, No. 20-20622, 2021 WL 5968648, at *4 (5th Cir. Dec. 15, 2021) (holding that faculty at an institution receiving a federal grant do not have a property interest in the grant and noting that "other circuits have rejected arguments that faculty have a property interest in research grants.") (citing *Lewis v. Wash. State Univ.*, 586 F. App'x 271, 271 (9th Cir. 2014)). Here, as in *Kalderon*, Plaintiffs fail to identify any statutory source that entitles them—rather than the University—to a property interest in the grants and contracts at issue. As such, their due process claim must be dismissed.

## III.    Plaintiffs Fail to Demonstrate Irreparable Harm

As to the second preliminary injunction requirement, Plaintiffs have not shown irreparable harm absent the requested injunction. "Irreparable harm is injury that is neither remote nor

speculative," *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020), but rather is "actual and imminent," *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). Plaintiffs cannot meet that burden.

Plaintiffs allege that absent a preliminary injunction, their members' academic freedom and "faculty and student speech" will be chilled at universities around the country, and that termination of grant funding will also cause irreparable harm, PI Br. 27-28. On the first point, while "[t]he loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury," *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (internal quotation marks omitted), Plaintiffs cannot satisfy the irreparable harm requirement merely by invoking the First Amendment, *see Bloch v. Bouchey*, No. 23 Civ. 209 (CR), 2023 WL 9058377, at *19 (D. Vt. Dec. 28, 2023) ("'[E]ven when a complaint alleges First Amendment injuries, . . . irreparable harm is not presumed and must still be shown.'" (quoting *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008))). Plaintiffs must still demonstrate that the alleged loss of First Amendment freedoms is actual and imminent. *See Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985) (holding that appellees failed to establish irreparable harm because they "failed to allege a clearcut infringement of first amendment rights which, absent preliminary injunctive relief, either has occurred or will occur in the future"). And they must make that demonstration as to each defendant they seek to temporarily restrain. *See, e.g.*, *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 250–53 (E.D.N.Y. 2008), *aff'd*, 361 F. App'x 161 (2d Cir. 2009).

Here, as discussed above, Plaintiffs have failed to demonstrate irreparable harm in the form of an actual or imminent loss of First Amendment freedoms caused by the Government. Further, Plaintiffs do not sufficiently tie their vague allegations of chilled speech to the relief they actually seek through this preliminary injunction, restoration of federal funding. Plaintiffs' allegations are

"simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Nachshen v. E. 14 Realty, LLC*, 18 Civ. 8304 (AJN), 2019 WL 5460787, at *2 (S.D.N.Y. Oct. 9, 2019) (citing *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004)); *see also Hankard*, 126 F.3d at 424 ("The chilling effect alleged by the plaintiffs is speculative, indirect and remote."); *New Mexico v. Musk*, No. 25 Civ. 429 (TSC), 2025 WL 520583, at *3 (D.D.C. Feb. 18, 2025) (declining to issue preliminary injunction because "the possibility that Defendants *may* take actions that irreparably harm Plaintiffs is not enough.") (emphasis in original) (internal quotation marks omitted)).

As to the alleged harm caused by the termination of funding that has already occurred, Plaintiffs assert a number of concerns, but ultimately fail to show that they or their members have suffered irreparable harm. "[E]conomic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) ("[m]ere disruptions in business" do not constitute irreparable harm). And "adverse employment consequences are not the type of harm that usually warrants injunctive relief because economic harm resulting from employment actions is typically compensable with money damages." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021). Further, Plaintiffs' invocation of reputational harm, PI Br. 28, is speculative. *See, e.g.*, *Atari Interactive, Inc. v. Printify, Inc.*, 714 F. Supp. 3d 225, 238 (S.D.N.Y. 2024) ("conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm") (citation and internal quotation marks omitted).

## IV. The Balance of the Equities and the Public Interest Weigh in Favor of the Government

The equities and public interest also weigh strongly against issuing a preliminary

injunction. "Under the last injunction factor, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Students for Fair Admissions*, 709 F. Supp. 3d at 137-38 (internal quotation marks and brackets omitted). Plaintiffs assert that "the public interest favors requiring the government to comply with the law," PI Br. 29 (internal quotation marks omitted), but for the reasons discussed above, Plaintiffs will be unable to show that the Government has not done so. Rather, Plaintiffs are seeking to hamstring the executive branch from lawfully effectuating policy decisions with respect to funding, contracting, and civil rights law. Plaintiffs' further argument that the public has an interest in "continuance of robust scientific and medical research," PI Br. 29, similarly falls flat; there is no public interest in forcing federal agencies to make certain discretionary funding decisions, particularly where the requested injunction would restrain the Government from promoting lawful and important priorities. *See Brooks v. Giuliani*, 84 F.3d 1454, 1467 (2d Cir. 1996) ("Injunctive relief should be narrowly tailored to address specific harms and not impose unnecessary burdens on lawful activity." (internal quotation marks omitted)).[13]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

---

[13] If the Court grants Plaintiffs' motion for a preliminary injunction, it should require Plaintiffs to post a bond. Federal Rule of Civil Procedure 65(c) provides that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557-58 (2d Cir. 2011). Here, should the Government ultimately prevail in this action, it will potentially be at the cost of hundreds of millions of dollars in grant and contract money that it has limited ability to recoup. The Court should therefore require Plaintiffs to post a substantial bond.

Dated: New York, New York
     May 1, 2025

                     Respectfully submitted,

                     JAY CLAYTON
                     United States Attorney for the
                     Southern District of New York
                     *Attorney for Defendants*

By:     */s/ Allison M. Rovner*
                     JEFFREY OESTERICHER
                     ALLISON M. ROVNER
                     Assistant United States Attorneys
                     86 Chambers Street, 3rd Floor
                     New York, New York 10007
                     Tel: (212) 637-2695/2691

                     YAAKOV M. ROTH
                     Acting Assistant Attorney General
                     Civil Division

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count and page limitation enlargement granted by the Court. *See* ECF No. 57. As measured by the word processing system used to prepare it, this memorandum contains 10,457 words.

*/s/ Allison Rovner*
Assistant United States Attorney
