**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> and <br><br> AMERICAN FEDERATION OF TEACHERS, <br><br>                     Plaintiffs, <br><br>                v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, <br><br>                     Defendants. | Case No. 1:25-cv-02429-MKV |

# Declaration of Andrew Geneslaw (Witness K)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,<br><br>and<br><br>AMERICAN FEDERATION OF TEACHERS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE. *et al.*,<br><br>Defendants. | Case No. 1:25-cv-02429-MKV |

## **DECLARATION OF ANDREW GENESLAW**

I, Andrew Geneslaw, hereby declare as follows:

1. I am an Assistant Professor of Pediatrics at the Columbia University Irving Medical Center (CUIMC), where I also serve as the Program Director for the Pediatric Critical Care Medicine Fellowship. I have been a member of the Columbia faculty since 2019.

2. I have an Sc.B. in neuroscience from Brown University, an M.D. from Tufts University School of Medicine, and an M.S. in patient-oriented research from Columbia's Mailman School of Public Health.

3. I am a member of the American Association of University Professors (AAUP).

4. I have personal knowledge of the facts set forth in this declaration, and if called as a witness in this action, I could and would testify competently to these facts.

5. As a specialist in pediatric critical care medicine, I care for children of all ages who need advanced levels of care and monitoring in the intensive care unit. My patients can include children with lung disease bad enough to need a ventilator, heart failure, severe

infections that cause dangerously low blood pressure, or organs that no longer work and need to be supported until a transplant can be found. My job is to treat these diseases directly, and to support and coordinate among families, nurses, nutritionists, physical therapists, and other specialist doctors, so that the entire team can maintain the body's delicate balance and allow it to function during a critical illness.

6. In addition to my clinical work, I am the director of the Pediatric Critical Care Medicine fellowship training program at CUIMC. This is a three-year program for doctors who have completed their medical residency in pediatrics and seek additional training in the subspecialty of pediatric critical care. The program accepts 3-4 trainees per year and maintains 11 trainees at any given time.

7. Although it is a clinical training program, all of our trainees are expected to engage in academic research as well. We routinely accept trainees who are interested in becoming physician-scientists—in other words, devoting a significant amount of their career to scientific research in addition to clinical practice. Trainees interested in this career path can apply for grant funding to support their research during and after fellowship training.

8. Trainees in my program have been directly affected by the termination of grants to Columbia. One trainee was supposed to have been funded by a two-year T32 training grant. This grant would have allowed the trainee to study vascular biology and the origins of congenital heart disease in children, working with talented researchers in the fields of cardiology, embryology, and obstetrics and gynecology. That grant has now been terminated.

9. Another trainee will be funded by a T32 training grant from the Agency for Healthcare Research and Quality. That training grant has not been terminated. However, the NIH R01 grant funding the research project that the trainee expected to work on has been canceled. The project involved integrating an artificial intelligence system into the electronic health record throughout the adult hospital to prevent adverse patient outcomes; a recent clinical trial on adult patients showed a 36% decrease in the risk of death across hospital units that used this system. The terminated grant would have extended this research to the pediatric hospital

context. Although my trainee's grant has not been terminated, the trainee will no longer be able to conduct this important and promising research under the mentorship of the person whose R01 grant was canceled.

10. These grant terminations directly harm the Pediatric Critical Care fellowship program. The grant funding generally is used to support the salary of the trainee during their time dedicated to research activity. By terminating this funding source, the Department of Pediatrics has less funding than it otherwise would have, which leaves fewer resources for other activities.

11. The grant terminations will also jeopardize our program's ability to recruit excellent trainees in the field of pediatric critical care, particularly those interested in pursuing academic careers. One of the main reasons that fellows choose our program is that Columbia is a major academic center engaged in important scientific research. Trainees are altruistically motivated to do this important work because it will help children survive and live longer, healthier lives. For physician-scientists, the ability to earn grants to fund that research is a major determinant of career trajectory. It will be much more difficult to recruit talented physician-scientists to Columbia if federal grants to our institution are at risk of being canceled with virtually no notice, to the detriment of our trainees' careers.

12. I am aware from public reporting of several other grant terminations that are affecting research in pediatric medicine at CUIMC. For example, NIH terminated the Clinical and Translational Science Award (CTSA), which has funded the Irving Institute for Clinical and Translational Research at the medical center since 2006. The purpose of the CTSA is to support the translation of research discovery into improved patient care. It provides an enormous amount of direct support for researchers, including statistical analysis, administrative support, assistance with clinical trials, and advice on all aspects of the research process. These services enable researchers to develop new treatments faster and to deliver those treatments to patients more efficiently, effectively, and safely.

13. The CTSA provided funding and support for my previous research grant, which examined severe respiratory failure in infants and children and subsequent problems with their neurodevelopment and mental health. I continue to use CTSA resources to support research in this area. I have previously relied on CTSA expertise to aid research on multisystem inflammatory syndrome in children (a life-threatening post-infectious complication of COVID-19). That support helped to advance our understanding of the most effective treatments for this illness. I have also used CTSA services to provide advice on projects centered on neurodevelopment after premature birth and care in a neonatal ICU. In general, the CTSA has been the backbone for my own research support, and the loss of its services would be devastating for funded and unfunded research projects across the institution.

14. NIH has terminated several other grants related to pediatric research. For example, one terminated project sought to develop antiviral medications to inhibit SARS-CoV-2 (the virus responsible for COVID-19) from entering and infecting cells. This would have been a non-vaccine method for preventing spread of the disease, particularly useful in vulnerable or immunocompromised populations. Another terminated project was the COVID-19 Mother Baby Outcomes (COMBO) initiative, which has been studying the impact of COVID-19 infections during pregnancy on the developing fetus and the future health of both the mother and child. The cancellation of these projects will deprive the field of pediatric medicine of critical insights that could be applied to save lives, improve patient care, and help children throughout the United States.

15. I understand the government claims to have terminated these grants because of Columbia's "continued inaction in the face of persistent harassment of Jewish students." It is abhorrent to me as a physician, scientist, teacher—and as a Jew—that the administration would claim that halting scientific research funding is somehow an appropriate response to antisemitism. The administration's actions do not make Jews on Columbia's campus safer. Instead, their actions compromise our ability to do vital work caring for patients (in my case, very sick children), training the next generation of physicians and scientists, and conducting the

research that will enable us to better understand, prevent, and treat the causes of our patients' suffering.

16. I am greatly concerned that the government's actual motivation is to suppress free speech on campus and punish ideas and viewpoints that it does not like—including, for example, support for diversity, equity, and inclusion. I strongly believe in the importance of diversity in the medical profession, given the evidence that a more representative workforce leads to improved health outcomes for patients, particularly those in marginalized communities. But the government's actions have had a significant chilling effect on the way that my colleagues and I discuss the issue of diversity in medicine, as well as other topics the government would consider controversial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this __8__ day of May 2025.

Andrew Geneslaw