IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, and AMERICAN FEDERATION OF TEACHERS, *Plaintiffs*, v. UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, *Defendants*. | Civil Action No. 25-cv-02429-MKV |

**DECLARATION OF FELICE B. ROSAN**

I, Felice B. Rosan, declare:

1. I am the General Counsel at Columbia University ("Columbia" or "University"). I have held this position since January 2023, after serving in other roles in the Office of the General Counsel ("OGC") since 1999. As Columbia's General Counsel, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Columbia personnel, and could testify thereto.

2. OGC provides legal advice and representation to Columbia University, including all of its departments and schools. In that capacity, OGC attorneys advise the Trustees, Officers, Faculty, and Staff, all in their official capacities, on various issues impacting the University.

3. OGC has overall responsibility for representing the legal interests of the University across the range of legal matters Columbia confronts, from financings, contracts, and trusts and estates, to real estate and tax matters, labor and employment, and litigation.

1

4. OGC also provides advice with respect to the many hundreds of federal grants and contracts awarded to Columbia each year. When such awards are issued, the University, not the principal investigator ("PI") conducting the research, is the recipient.

5. Upon taking office, President Trump issued a series of executive orders related to diversity, equity, and inclusion ("DEI"), climate, and transgender healthcare, which indicated that the Administration would reconsider financial support for research projects in those and other areas.

6. On March 7, 2025, the Departments of Justice, Education, and Health and Human Services, and the U.S. General Services Administration announced the immediate cancellation of hundreds of millions of dollars in federal grants and contracts to Columbia, stating those cancellations were due to "the school's inaction in the face of continuing harassment of Jewish students."

7. In the weeks that followed, Columbia received termination notices related to hundreds of its awards, most of which were issued by the National Institutes of Health ("NIH"). Those notices indicated that an appeal could be taken within 30 days.

8. Since the March 7 announcement, OGC (in consultation with outside counsel expert in this area) has advised the University as to strategies to restore the terminated grants and contracts and to protect its federal-award portfolio. Among the options under consideration is individual administrative appeals of the terminated awards.

9. Such appeals could not be filed by the PIs working on the research. Rather, they would need to be filed by the University and under the University's signature. Only the "Authorized Organization Representative" can sign an appeal, and NIH's Grants Policy Statement defines that term to mean an "[i]ndividual . . . named by the applicant organization, who is authorized to act for the applicant and to assume the obligations imposed by the Federal laws,

regulations, requirements, and conditions that apply to grant applications or grant awards."[1] That authority does not extend to PIs, who the same guidance describes as "individual(s) designated by the applicant organization/recipient to have the appropriate level of authority and responsibility to direct the project or program to be supported by the award."[2]

10.     In connection with the need to gather information to support legal advice to the University and after consultation with outside counsel, I directed an OGC lawyer responsible for grants ("OGC lawyer") to request information from Columbia faculty members listed as PIs on the terminated awards.

11.     Accordingly, on March 24, 2025, the OGC lawyer sent out a communication requesting that the PIs indicate whether or not—if the University were to determine that appeals of terminated awards were part of its strategy—they wished to appeal cancellation of the award supporting their project. If so, the OGC lawyer requested that the PIs provide information about what, if any, part of their proposals covered issues or subjects the Trump Administration in executive orders and other communications indicated it might not fund, and whether such content could be removed without affecting the research. The OGC lawyer explained that the request was made because PIs are best positioned to articulate the factual basis underlying the terminated awards, which would be a critical component of any administrative appeal filed if the University opted to pursue that strategy. Based on assessment of the Trump Administration's public statements, the OGC lawyer explained that the success of a potential appeal might turn on the extent to which a project could be rescoped to exclude or eliminate focus on the non-aligned areas.

---

[1] *See* NIH Grants Policy Statement, § 1.2 (2024), *available at* https://grants.nih.gov/grants/policy/nihgps/html5/section_1/1.2_definition_of_terms.htm.

[2] *Id.*

3

12. Recognizing that the PIs might instinctually respond to the antisemitism rationale in the Administration's March 7 announcement regarding Columbia's funding (which is a legal issue divorced from the details of any particular award), rather than the award-specific factual information OGC needed to advise the University as to administrative appeals, the OGC lawyer informed the PIs that a response on the topic of antisemitism was unnecessary and they should focus on the information requested that was specific to their project.

13. The OGC lawyer sent the communication to only those faculty members whose awards had been terminated, as well as to three senior research administrators working directly with PIs and funding agencies in managing the termination process. The email stated at the top—in bold, all capital letters—that it was "Confidential; pursuant to attorney-client privilege."

14. When PIs asked OGC's position on disclosure of the information to others, OGC did not indicate that it would be acceptable to disclose the communication outside of the University.

15. Over the next week, OGC received surveys from PIs wishing to have their research included if the University moved forward with appeals of its terminated awards.

16. Working with outside counsel, OGC has continued to analyze those responses as we provide advice to the University on administrative appeals and related strategic decision-making. OGC has used the project-specific information supplied by the PIs to prepare draft appeals in case the University decides to take that approach with respect to some or all of its terminated awards.

17. On or about April 4, 2025, I learned that the communication to the PIs was disclosed to counsel for the American Association of University Professors. No PI was authorized to disclose the communication to anyone outside of Columbia. The PIs also were not authorized to waive the University's privilege.

18. As the General Counsel for Columbia, I consider the OGC lawyer's communication to the PIs to be a privileged attorney-client communication made in the course of OGC's effort to gather information needed to provide legal advice to the University.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4/8/25, at 7:15 PM.

_____

Felice B. Rosan