**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> and <br><br> AMERICAN FEDERATION OF TEACHERS, <br><br>                    Plaintiffs, <br><br>          v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, <br><br>                    Defendants. | Case No. 1:25-cv-02429-MKV |

# Declaration of Teresa Janevic (Witness O)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> and <br><br> AMERICAN FEDERATION OF TEACHERS, <br><br>        Plaintiffs, <br><br>     v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE. *et al.*, <br><br>        Defendants. | Case No. 1:25-cv-02429-MKV |

## DECLARATION OF TERESA JANEVIC

I, Teresa Janevic, hereby declare as follows:

1.      I am an Associate Professor of Epidemiology at Columbia University's Mailman School of Public Health.  I have been a member of the Columbia faculty since 2023.

2.      I have a bachelor's degree in social sciences from the University of Michigan, a Master of Public Health degree in epidemiology and biostatistics from the University of California, Berkeley, and a Ph.D. in epidemiology from Columbia University.  Prior to joining the Columbia faculty, I was an associate professor at the Icahn School of Medicine at Mount Sinai.  I will be under review for tenure this coming year.

3.      I am a member of the American Association of University Professors (AAUP).

4.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness in this action, I could and would testify competently to these facts.

5.      I am a perinatal epidemiologist with a focus on the social and structural determinants of health and health care.  My research examines the influence of various

factors—including government policies, racial discrimination, and stress—on perinatal and reproductive health and health care outcomes.

6.      I lead the enVironmental Impact on Birth Equity (VIBE) Research Lab at Columbia, which studies maternal and infant health equity.  Our lab is currently studying a range of issues related to perinatal and reproductive health.

7.      On March 10, 2025, I received notice from Columbia that the National Institutes of Health (NIH) had terminated two of the R01 grants that fund my research.  I am a principal investigator on both of those grants.  I still have not received a revised notice of award reflecting that either grant has been terminated.  However, I understand that both grants were on the list that the government sent to Columbia of grants that NIH had terminated, and that both the government and Columbia consider the grants terminated.

8.      The first terminated R01 grant funded a research project studying the impact of extending Medicaid coverage in the postpartum period.  Under longstanding federal law, pregnancy-related Medicaid coverage is only guaranteed for the first 60 days postpartum. Postpartum Medicaid extensions have been passed in 49 states and are a key feature of recent policy attempts to address the maternal mortality and morbidity crisis in the United States, which is particularly acute for Black women.  Our project is among the first to evaluate if access to health care improved for women after implementation of postpartum Medicaid extensions.  Our research sought to provide concrete evidence about the impact of these changes on maternal health equity.  The project employed a mixed methods approach, using both quantitative data analysis and, importantly, qualitative interviews with postpartum women, healthcare providers, community-based organizations, and policymakers.

9.      This grant was expected to last five years and provide approximately $800,000 of funding per year.  We had just begun our third year of research.  If the grant is not reinstated, two full years of work on this project will be effectively wasted.  For example, we had spent much of year two working together with data centers at the University of Texas and New York University to create and harmonize the necessary datasets for analysis, and were soon to start analyses that

would have provided answers to policymakers about the effectiveness of the Medicaid extension policies. That work will be wasted if funding for the project is not restored.

10.     This grant was also the result of a tremendous amount of pre-award work. I began working on the grant application in 2021 and spent two years on the grant-writing and submission process before receiving the award in 2023.

11.     The termination of this project is causing considerable immediate harm. The grant provided at least some salary support for approximately 10 faculty and staff members at Columbia and our partner institutions, as well as three students. My understanding is that the university has agreed to pay the Columbia staff on terminated grants through the new NIH appeal deadline of May 23, 2025, but there is no continued salary support after that date. Two student part-time research assistants were immediately asked to stop reporting hours after March 10, and we are in the highly stressful process of trying to find funding for other staff so that they will not lose their jobs.

12.     Columbia is not providing any financial support to faculty or staff at our partner/subaward institutions who were collaborating on the project and are no longer receiving grant funds. Because they are no longer receiving funds, the subaward institutions, including the University of Texas, New York University, and Mount Sinai, have reassigned their researchers and staff to other projects. I worry that the abrupt termination of the grant will damage our relationships with external partner institutions like these, making them less willing to work with Columbia researchers or submit grants with Columbia as the prime awardee.

13.     The project also involved a collaboration with community-based organizations in Texas and New York, who have been working to identify individuals for qualitative interviews. Building those relationships and bringing organizations together to work with us took an entire year, and those organizations have now had to stop work as well. I am very concerned that the abrupt termination of the project has caused significant damage to our reputation with these external collaborators and will make it harder to conduct this type of work in the future.

14.     If the funding is not restored until several months from now, it would be extraordinarily difficult to restart this project. Our external partners will either have moved on to other projects or will be hesitant to work with us again.

15.     The second terminated R01 grant funded a research project on the relationship between gestational diabetes (a common pregnancy complication) and subsequent development of type 2 diabetes. Prior research shows that the risk of progressing to type 2 diabetes after gestational diabetes is 2 to 4.5 times higher for Black, Latina, and South Asian women compared to non-Latina White women, but very little is known about the causes of these disparities. Most research focuses on individual risk factors. By contrast, our project focuses on structural and neighborhood-level risk factors, with the goal of identifying policy interventions during the postpartum period that could help prevent progression to type 2 diabetes and reduce racial and ethnic inequities. This project is also a mixed methods study, involving quantitative data analysis, qualitative interviews with postpartum women, and an innovative modeling approach to assess policy scenarios.

16.     This project was also funded for five years, with approximately $800,000 in funding per year, and we had just started our third year of work. This grant was also the result of an approximately two-year grant writing process.

17.     The grant provided at least some salary support for approximately eight faculty and staff members at Columbia and the Icahn School of Medicine at Mount Sinai, as well as two students. Again, Columbia is not providing any financial support to our collaborators and is only temporarily supporting the Columbia staff members on this grant. One Columbia postdoctoral researcher supported by the project received a Letter of Non-Renewal on May 7, 2025, terminating her position in three months.

18.     This project primarily involved collaborating with the New York City Department of Health and Mental Hygiene (NYC DOHMH), which is an important partner for Columbia's Mailman School of Public Health. The staff at NYC DOHMH working on this project had

already spent years creating the database to be used in this study. I am concerned that the abrupt termination of the project will damage this important relationship.

19.     The termination of both these grants at the same time has been devastating for my lab, particularly in the context of the overall depletion of resources for research at Columbia. These two grants provided the vast majority of my grant funding. And the sum in this case is worse than its parts: Columbia's research funding has taken a severe hit overall, the Mailman School of Public Health has been among the hardest-hit, and Columbia has put immediate cost-saving measures in place in response to the mass termination of funding (e.g., by prohibiting faculty from using their start-up funds). As a result, not only is my federal funding gone, but I also cannot use my start-up funds to run my lab, fund salaries, buy equipment, software, and books, and support career development. The large immediate hit to not only my grants but a huge portion of the School of Public Health means that my budget has been reduced to near zero.

20.     This environment has made it particularly difficult to save the jobs of researchers in my lab. For example, the postdoctoral researcher who has now received a Letter of Non-Renewal ordinarily would have been likely to find another postdoc position at Columbia, but the government's mass termination of federal grants to Columbia has made that possibility much less likely. In addition, academic jobs are usually advertised and filled six to ten months in advance, and her position will now end in three months. The application process for private research grants is also lengthy and unlikely to be complete before her position ends. The unexpected grant termination thus puts her career at risk.

21.     Other mentees in my lab have been harmed as well, including from the loss of important career development opportunities that would have been funded by the terminated grants. For example, one staff person is early in her career and submitted her first abstract to a conference in June. These conferences are excellent opportunities to network and advance one's career, particularly early on. Because the grant has been terminated, it can no longer pay for this staff member's travel to attend the conference, and there are no alternative sources of funding that can cover the costs.

22.    The amount of effort required to try to save people's jobs and scramble to find new funding has detracted from the mentorship time I can spend with students and the time I can spend focusing on teaching. I was planning on making major improvements to an upcoming course, but now I will not have the time. I also would normally have summer interns, but I do not have any money to fund them or any time to devote to them.

23.    The government's actions also affect my own career options. The grant terminations make it near-impossible for me to change jobs if needed, effectively making me powerless to leave Columbia. I would not want to abandon my research projects, but I also would not be able to transfer the grants in their current terminated state. It would be very difficult for me to find a job under these circumstances, since it is a prerequisite for hiring at most research-focused universities to be the principal investigator of large federal grants. As my terminated grants demonstrate, developing research proposals and applying for these types of grants is a significant undertaking that can take years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this ___8___ day of May 2025.

Teresa Janevic