**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS,

 and

AMERICAN FEDERATION OF
TEACHERS,

                Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
JUSTICE, *et al.*,

              Defendants.

Case No. 1:25-cv-02429-MKV

# Amended Declaration of Safia Southey (Witness E)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> and <br><br> AMERICAN FEDERATION OF TEACHERS, <br><br>         Plaintiffs, <br><br>             v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE. *et al.*, <br><br>         Defendants. | Case No. 1:25-cv-02429-MKV |

<u>**AMENDED DECLARATION OF SAFIA SOUTHEY**</u>

I, Safia Southey, declare as follows:

1.      I am a J.D. candidate at Columbia Law School, where I serve as Co-President of the Human Rights Association, Professional Development Chair of the International Law Society, and a member of the Philip C. Jessup International Law Moot Court team. I submit this declaration in support of the plaintiffs in the above-captioned case.

2.      I am over the age of 18 and competent to testify as to the matters set forth in this affidavit based on my own personal knowledge.

3.      My academic work and professional training center on international law, transitional justice, and human rights. Through Columbia's Human Rights Clinic, I work under the supervision of clinical faculty on legal advocacy and research, including environmental accountability in transitional justice processes and international humanitarian law.

4.      My legal education and professional development depend on an academic environment that protects intellectual freedom, open inquiry, and rigorous debate. The sudden withdrawal of federal funding and the threat of further financial penalties have directly harmed that environment. Projects that once benefited from cross-institutional collaboration have slowed down, and the loss of support for interdisciplinary work has had a noticeable impact.

5.      More damaging than the loss of funding, however, is the climate of fear and self-censorship that has followed the federal government's punitive measures. I have witnessed peers and faculty grow increasingly reluctant to participate in academic discussions that touch on contested legal or policy issues. In my own experience, I have faced subtle but clear signals that my legal research—despite its grounding in international law—is now seen as risky or politically charged. Faculty have hesitated to support projects they once encouraged, and students have withdrawn from conversations that previously would have been commonplace in classrooms and working groups.

6.      As a Jewish student, I have also found myself afraid to voice my opinions, even in spaces that should be open to nuanced discussion. The current climate has made it difficult for me to speak openly as a liberal Jew—especially when my views do not fit neatly into dominant narratives. I fear professional consequences, alienation, or backlash for expressing perspectives that do not align with institutional responses or government rhetoric. Instead of fostering open dialogue, Columbia's handling of these issues has deepened divisions and left many Jewish students, including myself, feeling isolated in conversations about identity, justice, and human rights.

7.      This chilling effect undermines not only our ability to engage in free academic inquiry but also our capacity to be trained as lawyers in a global legal landscape that demands exposure to controversial and politically sensitive topics. I have felt compelled to alter the framing of my work, remove references in public presentations, and self-censor in academic settings out of concern for institutional or reputational consequences. I now routinely consider whether my speech could result in administrative scrutiny or jeopardize opportunities I've worked hard to earn.

8.      The fear of retribution is especially acute for students like me who are visible leaders in human rights and international law spaces. The pressure to appear apolitical, even when engaging in legal analysis grounded in precedent and treaty law, has distorted what should be a space of critical learning. That pressure is compounded by the uncertainty surrounding what kinds of speech or academic work might provoke administrative attention, especially when institutional responses appear to be shaped by federal directives.

9.      The federal government's approach—demanding sweeping changes to university policy under threat of continued funding withdrawal—has not only chilled expression but has also encouraged institutional behavior that prioritizes risk-aversion over academic freedom. I have experienced a heightened sense of scrutiny and professional isolation, despite working within well-established legal frameworks. In spaces that once encouraged difficult questions and honest disagreement, many students and faculty now speak in guarded terms or choose silence.

10.     The constitutional harm here is not abstract. It has altered how I approach my education, how I participate in legal scholarship, and how I imagine my role as an advocate. That harm is ongoing—and, unless remedied, it will fundamentally reshape higher education into a space defined by compliance with political orthodoxy rather than academic inquiry and intellectual courage.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed: _____

Date: _____5/23/25_____