UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS., et al. | * | |
| Plaintiffs | * | Civil Case No. 25-cv-02429 (MKV) |
| v. | * | |
| U.S. DEPARTMENT OF JUSTICE, et al. | * | |
| | * | |
| Defendants | | |
| | * | |

* * * * * * * * *

**AMENDED DECLARATION OF JON LORSCH, Ph.D.**

I, Jon Lorsch, Ph.D., hereby declare that my testimony below is true and correct to the best of my knowledge and belief and is given under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am the Acting Deputy Director for Extramural Research at the National Institutes of Health (NIH), an operating division of the U.S. Department of Health and Human Services (HHS). I have held this position since April 7, 2025.

2. In addition to my current role, I am the Director of the National Institute of General Medical Sciences (NIGMS), a position I have held since 2013, where I oversee NIGMS's mission-related activities, supporting basic research that increases understanding of biological processes and lays the foundation for advances in disease diagnosis, treatment, and prevention. I am also a Senior Investigator in the Eunice Kennedy Shriver National Institute of Child Health and Human Development (NICHD), a position I have held since 2014.

3. As Acting Deputy Director for Extramural Research, I am the principal scientific

1

advisor to the NIH Director on all matters relating to the substance, quality, and effectiveness of the NIH extramural research program. I am responsible for overseeing the Office of Extramural Research under the Office of the NIH Director. The Office of Extramural Research "provides the corporate framework for the NIH research administration and works to ensure the scientific integrity, public accountability, and effective stewardship of the NIH research grant portfolio." Office of the Director, NIH, https://www.nih.gov/about-nih/what-we-do/nih-almanac/office-director-nih (last visited April 22, 2025).

4. I make this declaration based on personal knowledge acquired by me in the course of performing my official duties, information contained in the records of the relevant HHS components, and information supplied to me by current employees of the relevant HHS components.

5. The NIH funds biomedical and behavioral research. Its mission is "to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability." *See* https://www.nih.gov/about-nih/what-we-do/mission-goals (last accessed April 28, 2025). As one of eight agencies of the U.S. Public Health Service, 42 U.S.C. 281(b), the NIH is an operating division of HHS. The NIH's authority to conduct and sponsor research and set research priorities arises from the Public Health Services Act (PHSA), 42 U.S.C. § 241, et seq.

6. Section 301 of the PHSA, 42 U.S.C. § 241, sets forth the general authority of the Secretary of Health and Human Services to conduct and support "research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man. . . ." This authority has been

delegated to the Director of the NIH, and further delegated to the Directors of each institute within the NIH.

7. Section 402 of the PHSA, 42 U.S.C. § 282, is the foundational authority of the NIH Director which includes authority to conduct "priority-setting reviews," "assess research priorities," and "ensure that the resources of the [NIH] are sufficiently allocated . . . ." *See, e.g.,* Section 402(b)(4),(5), and (6). This is consistent with the NIH's inherent authority to determine funding priorities in awarding discretionary grants within a finite amount of appropriations.

8. The NIH exercises broad discretion in awarding and administering grants. The Secretary awards grants "to those applicants whose approved projects will in the Secretary's judgment best promote the purposes of the statute authorizing the grant and the regulations of this part." 42 CFR § 52(a). The applicants for and recipients of NIH grant awards are institutions, which designate a principal investigator to lead the scientific and technical direction of research projects funded under the grant. 2 CFR § 200.1, 42 CFR § 52.2.

9. Consistent with the discretionary nature of NIH grants, and the finite amount of the NIH's appropriations, the process of selecting and awarding grants is highly competitive. Due to finite resources, the NIH is only able to fund approximately 20% of grant applications. *See* https://report.nih.gov/nihdatabook/category/10 (last accessed April 28, 2025). Accordingly, one of the NIH's core functions is to serve as an effective steward of the extramural research portfolio by ensuring that the limited available funding is directed to only the most promising science consistent with agency priorities.

10. Through the NIH grant award, the NIH agrees to support the recipient with a specified level of funding for a specific period. The award document, in turn requires recipients

3

of NIH grant funds to comply with all Federal statutes, regulations, policies, and terms and conditions stated in the Notice of Award (NOA). The NOA is the governing legal document.

11. The NIH Grants Policy Statement (GPS) is a term and condition applicable to all NIH grant awards. Since 2021, the NIH GPS has stated that its grant terms and conditions, including terms and conditions in 2 CFR Part 200, are incorporated into NIH NOAs. A copy of the relevant sections of the current NIH GPS are attached as Exhibit A. Recipients accept the terms of the NOAs when they draw down funds from the Payment Management System (PMS). One term and condition of the NOA is therefore 2 CFR § 200.340, which allows the Government to terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 CFR § 200.340; *see also* GPS 8.5.2 (stating "NIH may also terminate the grant in whole or in part as outlined in 2 CFR Part 200.340").

12. As a grantee, Columbia University was subject to the above laws, regulations, policies, and terms and conditions.

13. On January 29, 2025, President Trump issued Executive Order 14188, entitled "Additional Measures to Combat Anti-Semitism," which instructed agencies to combat antisemitism vigorously. In February 2025, a multi-agency task force was created for purposes of combatting antisemitism.

14. On February 10, 2025, Dorothy A. Fink, M.D., HHS Acting Secretary, issued a Secretarial Directive on DEI-Related Funding (Secretarial Directive). Exhibit B. This Secretarial Directive was issued pursuant to HHS authorities "to ensure that taxpayer dollars are used to advance the best interests of the government . . . [which] includes avoiding expenditure of federal funds on programs . . . . that discriminate on the basis of race, color, religion, sex,

national origin, or another protected characteristic." *Id.* The Secretarial Directive directed the "review of. . . grants to determine whether those . . . grants are in the best interest of the government and consistent with current policy priorities." *Id.*

15. Consistent with the Secretarial Directive, on February 21, 2025, the Acting Director for the NIH issued a Directive on NIH Priorities, Restoring Scientific Integrity and Protecting the Public Investment in NIH Awards ("Directive"). Exhibit C. This Directive expressed that the NIH is "committed to promoting only the highest level of scientific integrity, public accountability, and social responsibility in the programs it funds." *Id.* The Directive stated, "[g]rants, contracts, cooperative agreements, and other transactions deemed inconsistent with the NIH's mission may, where permitted by applicable law, be subject to funding restrictions, terminated or partially terminated, paused, and/or not continued or renewed, in compliance with all procedural requirements." *Id.*

16. On March 7, 2025, HHS placed a hard funds restriction on all Columbia awards HHS-wide. A "hard funds restriction" means that if Columbia tried to draw down funds from the PMS for expenses incurred after the restriction was put in place, they would not be able to do so without further approval. The payment restriction is an operational mechanism and does not terminate or otherwise cancel grant awards.

17. On March 10, 2025, the NIH Director of the Office of Policy for Extramural Research Administration (OPERA) sent Columbia University correspondence notifying the University that approximately 233 grants would be terminated for nonalignment with agency priorities of funding safe research environments. The NIH sent a second letter on March 14, 2025, regarding an additional 29 grants. The grants in the letters were identified as inconsistent with NIH policy and requirements, as outlined in the NIH GPS and 2 CFR § 200.340(a)(4), which provides for

5

termination "if any award no longer effectuates the program goals or agency priorities." A copy of the March 10 correspondence to Columbia University is attached as Exhibit D, and a copy of the March 14 correspondence is attached as Exhibit E. Each letter stated that the identified awards no longer effectuated agency priorities and failed to satisfy NIH stewardship obligations and criteria to ensure taxpayer funds are used in ways "that benefit the American people and improve their quality of life." *Id.* The letters further stated that it is the NIH's policy that funded institutions should foster "safe, equal, and healthy working and learning conditions conducive to high-quality research and free inquiry." *Id.* Recent events, including antisemitism and actions concerning the safety and wellbeing of Jewish students taking place at Columbia University and Columbia University's inaction, contradict that policy. *Id.* The letters also indicated that the NIH considered alternatives to terminating the funding but concluded that there were no viable alternatives. *See id* at. 2. The NIH did not terminate the grants pursuant to Title VI of the Civil Rights Act.

18.   The NIH is the only division or sub-agency within HHS to terminate grant awards with Columbia University due to antisemitic conduct on Columbia's campus.

19.   To effectuate the March 10, 2025 and March 14, 2025 termination letters, the NIH began the process of issuing a revised NOA for each grant. Of the grants listed on the spreadsheets attached to the NIH's March 10 and March 14 letters, the NIH issued revised NOAs for approximately 148 before pausing that process pending negotiations with Columbia University about restoring the funding. On April 11, 2025, the NIH notified Columbia University that a number of the grants referenced in the March 10 and March 14 letters would be reinstated because of progress made in the negotiations. Seven of these had already had termination NOAs

sent out; the NIH sent further revised NOAs reinstating those seven. Negotiations regarding restoring the grant funding are ongoing.

20. The NIH has established a first-level grant appeal procedure for Columbia University and its affiliate institutional grant recipients to challenge these terminations. As reflected in the March 10, 2025 and March 14, 2025 letters, NIH policy provides for an administrative appeal to object and provide information and documentation challenging the terminations. Though the letters stated that appeals had to be submitted to the NIH as directed "no later than 30 days after" the letters were received, *id,* the deadline for appeals submission has been extended until June 23, 2025, with the potential for further extensions.

21. Additionally, on or after March 7, 2025, HHS components, including NIH, terminated contracts with Columbia for convenience. A copy of a sample termination notice is attached as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of May, 2025.

_____
JON LORSCH