UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS and
AMERICAN FEDERATION OF
TEACHERS,

                    Plaintiffs,

         -against-

UNITED STATES DEPARTMENT OF
JUSTICE, PAMELA BONDI, LEO
TERRELL, UNITED STATES
DEPARTMENT OF EDUCATION,
LINDA MCMAHON,
THOMAS E. WHEELER, UNITED
STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, ROBERT F.
KENNEDY, JR., SEAN R. KEVENEY,
NATIONAL INSTITUTES OF HEALTH,
MATTHEW J. MEMOLI, UNITED
STATES GENERAL SERVICES
ADMINISTRATION, STEPHEN
EHIKIAN, and JOSH GRUENBAUM,

                Defendants.

---

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/16/2025__
```

25-cv-2429 (MKV)

OPINION & ORDER DENYING
MOTION FOR
PRELIMINARY INJUNCTION
AND DISMISSING
FOR LACK OF STANDING

MARY KAY VYSKOCIL, United States District Judge:

      Plaintiffs, the American Association of University Professors ("AAUP") and the American

Federation of Teachers ("AFT"), are labor unions for "faculty and academic professionals," among

other professionals, with headquarters in Washington, D.C. [ECF No. 1 ("Cmpl.") ¶¶ 13, 15; ECF

No. 27 ¶ 5; ECF No. 28 ¶ 3]. These plaintiffs seek a preliminary injunction requiring Defendants

to pay out to non-party The Trustees of Columbia University in the City of New York ("Columbia")

"approximately $400 million in federal grants and contracts to Columbia," funded by the American

taxpayers, which several executive agencies recently terminated because, among other reasons,

the grants and contracts "no longer effectuate[d] . . . agency priorities" and "for the convenience

of the Government" [ECF No. 25 ("Proposed PI") ¶ 1(a); ECF Nos. 142-5, 142-7].  Plaintiffs further seek to prospectively enjoin Defendants from terminating, "pausing," "or otherwise interfering with" more than $5 billion in active taxpayer-funded grants and contracts to Columbia. Proposed PI ¶ 1(b).  Conspicuously, Columbia, whose grants and contracts were terminated and whose funding is the subject of the relief Plaintiffs seek, is not a plaintiff.

With no apparent sense of irony, lawyers for an organization called "Protect Democracy" insist that a district court judge should order the Executive Branch immediately to restore the flow of taxpayer dollars to an elite university, which funding Defendants represent is inconsistent with the priorities of the duly elected President of the United States.  Our democracy cannot very well function if individual judges issue extraordinary relief to every plaintiff who clamors to object to executive action.  Neither the Executive Branch nor the Legislature ever awarded the grants and contracts at issue to Plaintiffs or any of their members.  The funding that Plaintiffs ask this Court to commandeer was awarded to Columbia, which is conspicuously absent from this case.  If any funds have been wrongfully withheld, such funds may be recovered at the end of a successful lawsuit by the appropriate plaintiff in an appropriate forum. *See Dep't of Educ. v. California*, 604 U.S. __, 145 S. Ct. 966, 969 (2025).

For the reasons set forth below, the motion for a preliminary injunction is DENIED, and this case is DISMISSED, without prejudice, for lack of standing.

## I.    PROCEDURAL HISTORY

Plaintiffs the American Association of University Professors ("AAUP") and the American Federation of Teachers ("AFT") initiated this case by filing a 385-paragraph complaint on March 25, 2025 [ECF No. 1 (the "Complaint" or "Cmpl.")].  The first several paragraphs of the Complaint are devoted to sensational rhetoric about the "transcendent value" of academic freedom, and "the

Trump administration's" effort to "control the thought" of "faculty and students" (though Plaintiffs do not purport to represent any students) by placing a "gun to the head" of non-party Columbia University. Cmpl. ¶¶ 1–3 (internal quotation marks and citations omitted). Specifically, according to the Complaint, "the administration (1) announced it was commencing an investigation of Columbia for its asserted . . . failure to address antisemitism on campus, (2) summarily canceled approximately $400 million" in federal funding to Columbia, and, thereafter, "(3) demanded that the University adopt a list of sweeping programmatic and structural changes . . . as 'a precondition' for the University's 'continued financial relationship with the United States government,' valued at approximately $5 billion." Cmpl. ¶ 3.

The Complaint alleges that non-party "Columbia . . . acceded to the Trump administration's demands."[1] Cmpl. ¶ 7; *see id.* ¶ 81. Plaintiffs interceded. Their Complaint asserts ten claims. First, the Complaint asserts a claim under the First Amendment for violation of "Plaintiffs' and Plaintiffs' members' right to free speech and academic freedom." Cmpl. ¶ 287; *see id.* ¶¶ 286–97 ("Count I"). Second, Plaintiffs assert a claim "[p]ursuant to the 'unconstitutional conditions' doctrine," which prohibits the government from placing "a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights." Cmpl. ¶ 299 (quoting

---

[1] As explained below, evidence demonstrates that, on March 21, 2025, Columbia announced a list of actions that it had been planning for months before any funding was terminated, and that list of actions does not entirely match up with the reforms the defendant executive agencies demanded. *See infra* at 14–18. Both sides agree, however, that non-party Columbia has chosen to negotiate with the government, rather than litigate against it [ECF No. 26 ("Pl. Mem.") at 6; ECF No. 91 ("Opp.") at 4]. As noted above, Columbia, which is the entity whose funding was terminated and would be restored if Plaintiffs' motion were granted, is not a party to this case. Indeed, Columbia has appeared in this action only for the limited purpose of opposing the public disclosure of a communication that Columbia's Office of the General Counsel sent to members of the Columbia faculty who, in turn, forwarded the communication to the General Counsel of the AAUP [ECF No. 121]. In the course of that limited appearance, Columbia stressed that it is "actively engaged in negotiations with Defendants about the terminated awards" and is "harm[ed]" by the public disclosure of its internal communications by virtue of this lawsuit, adding that Columbia personnel have been "*drawn in*" to this litigation "*solely through the actions of others*" [ECF No. 59 at 3 (emphasis added)].

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011)); *see id.* ¶¶ 298–303 ("Count II").

The Complaint next asserts four claims under the Administrative Procedure Act ("APA"). *See* Cmpl. ¶¶ 304–318 ("Count III"); *id.* ¶¶ 319–333 ("Count IV"); *id.* ¶¶ 334–341 ("Count V"); *id.* ¶¶ 342–351 ("Count VI"). The premise of each of these claims is that the termination of Columbia's federal grants and contracts and the subsequent demand for numerous reforms were enforcement actions based on Columbia's alleged noncompliance with Title VI of the Civil Rights Act ("Title VI"). Plaintiffs allege that Defendants failed to follow procedural requirements for the enforcement of Title VI and that their actions were arbitrary and capricious.

In Count VII and Count VIII of the Complaint, Plaintiffs allege that the termination of Columbia's funding and subsequent demand for reforms by Columbia were *ultra vires* executive actions that violated the constitutional separation of powers. *See* Cmpl. ¶¶ 351–363 ("Count VII"); *id.* ¶¶ 364–370 ("Count VIII"). Next, the Complaint asserts a claim for violation of the Due Process Clause of the Fifth Amendment based on allegations that "Plaintiffs' members have constitutionally protected property interests in [Columbia's] grant . . . funding," and they were not given notice and an opportunity to be heard before the grants were terminated. Cmpl. ¶ 373; *see id.* ¶¶ 317–377 ("Count IX"). Finally, Plaintiffs allege that, by terminating Columbia's funding, the federal government exceeded its constitutional scope in violation of both the Tenth Amendment and the Spending Clause. *See* Cmpl. ¶¶ 378–385 ("Count X").

In their Complaint, Plaintiffs request for relief "a preliminary and permanent injunction requiring Defendants to immediately reinstate or restore all grants and contracts to Columbia," among other relief. Cmpl. at 85. However, Plaintiffs did not simultaneously file a motion for a preliminary injunction, let alone seek a temporary restraining order, when they filed the Complaint.

Rather, when Plaintiffs filed the Complaint, the plaintiffs in an earlier-filed case (Columbia students) had moved, before another judge, for a temporary restraining order that would restore Columbia's terminated grants. *See Khalil v. Trs. of Columbia Univ. in City of New York*, No. 25-cv-2079 (AS), 2025 WL 1019425, at *1 (S.D.N.Y. Apr. 4, 2025). The judge in *Khalil* held a hearing at which the student plaintiffs "all but conceded" that they had "fail[ed] to address some threshold requirements" to obtain relief, including standing. *Id.* Only thereafter did Plaintiffs file a motion for a preliminary injunction in this case [ECF No. 24].[2]

Although Plaintiffs contend that they will suffer irreparable harm without preliminary relief, they did not move for a temporary restraining order or request expedited briefing of their motion for a preliminary injunction. Rather, approximately a month after the announcement of the termination of the $400 million in federal funding to Columbia, Plaintiffs filed their motion for a preliminary injunction accompanied by a memorandum of law, a proposed preliminary injunction, and numerous declarations and exhibits [ECF Nos. 24, 25 ("Proposed PI"), 26 ("Pl. Mem."), 27 ("Wolfson Decl."), 28 ("Schmid Decl."), 29 ("Martin Decl."), 30 ("Witte Decl."), 31 ("Frye Decl."), 32 ("Hirsch Decl."), 34–43, 47–51 ("Rosenthal Decl.")].[3]

Defendants filed a memorandum of law in opposition to Plaintiffs' motion supported by declarations and exhibits [ECF No. 91 ("Opp."); ECF No. 92; ECF No. 93 ("Gruenbaum Decl."); ECF No. 94 ("Rovner Decl.")]. Plaintiffs thereafter filed a reply brief in further support of their motion [ECF No. 98]. In the interim, the Court received five amicus briefs urging the Court to

---

[2] After the hearing in *Khalil* and the filing of this case, the court in *Khalil* issued an order denying the motion for a temporary restraining order in its entirety, citing lack of standing and other issues. *See Khalil*, 2025 WL 1019425, at *1 [25-cv-2079 (AS), ECF No. 54]. Thereafter, the plaintiffs in that case amended their complaint, but did not renew their request for emergency relief, and the defendants, including Columbia, moved to dismiss [25-cv-2079 (AS), ECF Nos. 62, 80, 83, 85].

[3] Plaintiffs requested leave to file a number of declarations under seal [ECF No. 33]. The Court later denied that request [ECF No. 121]. Plaintiffs ultimately filed many declarations on the public docket and withdrew others [ECF Nos. 125, 126, 128–134, 136–141].

issue a preliminary injunction [ECF Nos. 70-1 ("FIRE Br."), 74-1 ("The Center Br."), 78-1 ("Unions Br."), 82-1 ("1A Br."), 87-2 ("CCR Br.")].

In their briefing, Plaintiffs and amici contend that Defendants purported to terminate Columbia's funding to enforce Title VI but failed to comply with "the procedural requirements set forth in the statute and its implementing regulations" for terminating funding pursuant to Title VI. Pl. Mem. at 1; *see* FIRE Br. at 8; CCR Br. at 3.   Defendants, however, submit that executive agencies exercised discretion, consistent with the President's Executive Orders, to terminate grants and contracts because such funding "no longer effectuate[d] . . . agency priorities" and "for convenience" based on the government's interests. Opp. at 2–3, 13–14 (quoting 2 C.F.R. § 200.340(a)(4) and 48 C.F.R. § 2.101).   Put simply, the agencies informed Columbia that it was inconsistent with Executive Branch priorities and no longer convenient to give hundreds of millions of taxpayer dollars to an institution that, in the agencies' assessments, had displayed "a disturbing lack of concern for the safety and wellbeing of Jewish students" and had "*otherwise* fail[ed] to serve the best interests of the United States" in its uses of Americans' money [ECF No. 142-5 at 1; ECF No. 94-1 at 1 (emphasis added)].

Defendants also argue that Plaintiffs lack standing to assert their claims and this Court lacks jurisdiction to grant the relief they request.   With respect to Plaintiffs' First Amendment claim, Defendants argue that Plaintiffs fail to establish a causal connection between any alleged injury and Defendants' challenged conduct.   Specifically, Defendants argue that "Plaintiffs' allegations that their members' speech has been or will be chilled" involve "Columbia's independent actions," which, the evidence demonstrates, Columbia had been planning long before the Executive Branch demanded reforms.   Opp. at 9.   Defendants also cite a recent decision by the Supreme Court to stay preliminary relief, which the district court had "styled as a temporary restraining order," that

"enjoin[ed] the Government from terminating various education-related grants." *Dep't of Educ. v. California*, 604 U.S. __, 145 S. Ct. 966, 968 (2025). The Supreme Court concluded that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," since "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

After the close of briefing, Plaintiffs filed a notice of supplemental authority alerting the Court to a number of recent out-of-circuit decisions unfavorable to executive agencies [ECF No. 122]. Plaintiffs also filed what they described as newly-available evidence purporting to demonstrate that "Defendants' actions terminating and freezing federal funding and imposing demands on Columbia for continued federal funding based on alleged antisemitism are subject to Title VI" and that the Defendants violated the procedural requirements for terminating funding pursuant to Title VI [ECF No. 123 at 2; ECF No. 124].

Defendants filed an amended version of an earlier-filed declaration to correct minor factual inaccuracies [ECF Nos. 142, 142-1 ("Lorsch Decl.")].

## II.    FINDINGS OF FACT[4]

### A.  Plaintiffs Are Labor Unions.

Plaintiff the AAUP is a "labor union" for "faculty and academic professionals" at colleges

---

[4] As the Second Circuit recently reaffirmed, "[t]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 108 (2d Cir. 2025) (brackets in original) (quoting *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997)). Indeed, a "hearing is not required for a preliminary injunction 'when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record.'" *Id.* (quoting *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998)). The Court concludes that a hearing is not required to dispose of Plaintiffs' motion for a preliminary injunction. Plaintiffs submitted numerous declarations and exhibits in support of their motion, and the Court has carefully reviewed those submissions and Defendants' submissions. Plaintiffs' motion is amenable to complete resolution on the voluminous paper record before the Court.

and universities.  Wolfson Decl. ¶ 4.  Plaintiffs offer evidence that the AAUP is also a "membership association" with a "mission" to "advance academic freedom."  *Id.* ¶¶ 4, 7.

Plaintiff the AFT is "a national labor organization" with more than "1.8 million members," including, among others, "pre-K through 12th-grade teachers" and paraprofessionals, "higher education faculty and . . . staff," and even "nurses and other healthcare professionals."  Schmid Decl. ¶ 3.  The AAUP is an affiliate of the AFT, and, "[a]s a result of that affiliation, all AAUP members are also AFT members."  Wolfson Decl. ¶ 6.

B.  Some of Plaintiffs' Members Used Federal Grants to Columbia.

The AAUP has, and therefore the AFT has, "members at Columbia University."  Wolfson Decl. ¶ 9.  Some of these members had "rel[ied] on federal grants [to Columbia] to support their research, scholarship, and teaching activities" and have "lost funding" since the "government's cancelation of $400 million in federal funding to Columbia."  *Id.* ¶¶ 9, 10.

For example, Susan Witte is a professor at Columbia's School of Social Work.  Witte Decl. ¶ 1.  She is a member of the AAUP and, as such, the AFT.  *Id.* ¶ 5.  Witte is "a researcher on a team that has had multiple grants terminated as a result of the $400 million in funding cuts" to Columbia.  *Id.* ¶ 6.  "One of the grants was an approximately $3.5 million [National Institutes of Health ('NIH')][5] grant categorized as a P20, a 3-year center grant.  Another was an over $370,000 NIH grant categorized as an R21, a research grant."  *Id.* ¶ 7.  These two grants, funded by American taxpayers, "support[ed] research on how extreme weather and climate change influence health, mental health, and well-being among women in East Africa."  *Id.* ¶ 9.

Professor Witte attests that "[n]one of the work funded by either of these two grants were related to Israel or Palestine" or "antisemitism."  *Id.* ¶ 27.  The professor herself, however, does

---

[5] Defendant the National Institutes of Health ("NIH") is an agency within Defendant the United States Department of Health and Human Services ("HHS").

"join with other professors and students to promote Palestinian freedom," which she considers "very different from antisemitism." *Id.* ¶ 30. She attests that she "feel[s] chilled in [her] speech" and "academic freedom." *Id.* ¶¶ 29, 36. However, Professor Witte also feels a "responsibility" to "publicly speak out," *id.* ¶ 37, which, clearly, she is doing.

C.  Executive Agencies Awarded Grants to Non-Party Columbia, Not Plaintiffs' Members, Based on Agency Priorities and Pursuant to Terms and Conditions.

As Plaintiffs' own evidence and Defendants' evidence make clear, the grants and contracts at issue in this case were awarded to non-party Columbia. Defendants never awarded any grants to, or entered into any contracts with, Plaintiffs or their members.

According to Plaintiffs, "$250 million of th[e] funding [Columbia lost] consists of grants from Defendant NIH." Cmpl. ¶ 92; *see* Rosenthal Decl., Ex 29. Defendants offer evidence that the "recipients of NIH grant awards are institutions," such as Columbia, which, in turn, "designate a principal investigator to lead the scientific and technical direction of research projects funded under the grant." Lorsch Decl. ¶ 8; *see id.* ¶ 12 (describing "Columbia" as the "grantee"). In other words, the NIH categorically does not award grants to individual professors or other academic staff, such as Plaintiffs' members.

Defendants further submit evidence of the terms on which the NIH awards grants to institutions. *See* Lorsch Decl. ¶¶ 5–12. The NIH exercises broad discretion to allocate funding to "biomedical and behavioral research," pursuant to authority that Congress delegated to the Secretary of Health and Human Services ("HHS") to "assess research priorities," among other authority, which the Secretary of HHS further delegated to the Director of the NIH. *Id.* 5–8; *see* 42 U.S.C. §§ 241, 282. When the NIH decides to "support [an institutional] recipient with a specified level of funding for a specific period," it issues a "Notice of Award (NOA)." *Id.* ¶ 10.

The NOA "requires recipients of NIH grant funds to comply with all Federal statutes, regulations, policies, and terms and conditions stated in the Notice of Award." *Id.*

"The NIH Grants Policy Statement (GPS) is a term and condition applicable to all NIH grant awards." *Id.* ¶ 11. The GPS, in turn, expressly "incorporate[s] . . . 2 CFR Part 200" as a term and condition of the NOA [ECF No. 142-2 at 3 (the "GPS")]. *See* Lorsch Decl. ¶ 11. "One term and condition of [each] NOA is therefore 2 CFR § 200.340, which allows the Government to terminate a grant 'pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" Lorsch Decl. ¶ 11 (citing 2 CFR § 200.340 and GPS 8.5.2 (stating "NIH may also terminate the grant in whole or in part as outlined in 2 CFR Part 200.340")).

Plaintiffs' evidence offers insight into non-party Columbia's use of NIH grants. For example, Plaintiffs submit the Declaration of Jennifer S. Hirch, a "Professor of Sociomedical Sciences at the Columbia University Mailman School of Public Health." Hirsch Decl. ¶ 1. Hirsch was "the principal investigator on a 5-year training grant" from the NIH, "currently in year 3," that was being used to fund a "predoctoral research training program currently in its 18th year." *Id.* ¶ 8. In other words, the Columbia program long predated this NIH grant.

According to Hirsh, this Columbia program "was the first in the nation" to obtain "NIH support for predoctoral level training in gender, sexuality, and health," with a "focus on gender and sexuality as they impact reproductive and sexual health and the health of gender and sexual minorities, both nationally and globally." *Id.* ¶ 8. The grant, which "provided $2.1 million in federal funding" to Columbia, "provide[d] funding for about 45 percent of the expenses (stipend, tuition and fees, travel, training-related expenses, and childcare) for each of the 4 [predoctoral]

trainees . . . in the program." *Id.* ¶ 9.  The grant also "funded" 6 doctoral students, although Hirsch does not explain the details of the latter use of the funds.  *Id.* ¶ 10.

Reflecting the lack of direct relationship between the defendant executive agencies and Plaintiffs' members, Hirsch attests that *Columbia* informed her of the termination of the grant on which she had been designated the principal investigator. *Id.* ¶ 11.  The NIH did not contact Hirsch. *Id.*  Indeed, Plaintiffs' evidence reflects that all communication about the termination of grants has been either between an executive agency and Columbia, or between Columbia and its faculty [ECF No. 104 ¶ 12; ECF No. 105 ¶ 9; ECF No. 128 ¶ 10; ECF No. 136 ¶ 7].

Pertinent to the standing inquiry in this case, Hirsch attests that "Columbia has committed to providing salary coverage" for the portion of her salary that comes from leading the gender and sexuality program.  *Id.* ¶ 12.  Hirsch further attests that the doctoral "students are guaranteed five years of support for stipend, tuition, and fees *regardless of the source*."  *Id.* (emphasis added). According to Hirsch, the 4 predoctoral trainees "are unable to submit reimbursements against the $1,310 in annual travel and training expenses that is budgeted for each trainee in the grant."  *Id.* However, Plaintiffs submit other evidence that Columbia has created "a new University fund . . . to assist students who need help managing unanticipated expenses," which will be funded in part by "generous alumni" [ECF No. 99-5].

Plaintiffs do not provide a full accounting of the terminated grants.  *See* Cmpl. ¶ 92.  But evidence in the record, supplied by Defendants, demonstrates that Defendant the United States Department of Education ("DOE") terminated at least two grants to Columbia.  *See* Rovner Decl. ¶¶ 2, 3.  The exhibits concerning the termination of the DOE grants make clear that, as with the NIH grants, the defendant executive agency had awarded the grants to Columbia, not to Plaintiffs or any of Plaintiffs' members [ECF Nos. 94-1, 94-2].

D.  Defendant Executive Agencies Terminated Grants and Contracts
for being Inconsistent with Agency Priorities and Convenience.

On January 29, 2025, shortly after President Trump assumed office, he issued an Executive Order directing Executive Branch agencies to use "all available appropriate legal tools" to "combat anti-Semitism," including the well-publicized "harassment" of Jewish students "on university and college campuses" [ECF No. 48-7 ("EO")].  Gruenbaum Decl. ¶ 4.

On March 3, 2025, Defendant the General Services Administration (the "GSA") sent a memorandum to the interim president of Columbia stating that the GSA was leading a review of "Federal contracts" with "certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Columbia University" [ECF No. 93-1 ("March 3, 2025 Memo") at 1].  Notably, the memorandum warned Columbia that the GSA and other agencies would "also," separately, "be reviewing the greater than $5 billion of active [federal] grants" to Columbia "for potential compliance concerns, false claims or other infractions."  March 3, 2025 Memo at 2.  The memorandum further warned: "**The Federal Government reserves the right to terminate for convenience any contracts it has with your institution at any time during the period of performance**.  **Additionally, the Federal Government reserves the right to take any relevant administrative action it deems necessary in response to any wrongdoing identified during the pendency of the investigations.**"  *Id.* (emphasis added).

On March 7, 2025, Defendants the Department of Justice ("DOJ"), HHS, the DOE, and the GSA publicly announced the "cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students."  Rosenthal Decl., Ex. 23.

The same day, the DOE sent two letters notifying Columbia of the termination of two grants [ECF Nos. 94-1, 94-2]. In both letters, the DOE stated that it was terminating the grant because it was "inconsistent with, and no longer effectuates, Department priorities" and specifically cited 2 C.F.R. § 200.340(a)(4) [ECF Nos. 94-1 at 2, 94-2 at 2], which regulation provides for termination where "an award no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4). Without going into detail, the letters stated that the grants were being used to fund "programs that promote or take part in initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; *or that otherwise fail to serve the best interests of the United States*" [ECF Nos. 94-1 at 2 (emphasis added), 94-2 at 2 (emphasis added)]. The DOE letters described the process for an administrative appeal of the termination decision [ECF Nos. 94-1 at 3, 94-2 at 3].

HHS also sent Columbia a letter with the subject line "Notification of Termination of Multiple Task Orders" [ECF No. 142-7 (the "HHS Letter")]. The HHS Letter, which is addressed to Columbia as a "Contractor," simply states: "Pursuant to FAR Clause 52.249-5, Termination for Convenience of the Government (Educational and Other Nonprofit Institutions) (AUG 2016), the task orders listed below are hereby terminated for the convenience of the Government, effective immediately." HHS Letter at 1. The HHS Letter lists four items that appear to be clinical trials and studies related to female contraception. *See id.*

On March 10, 2025, the NIH sent Columbia a letter "providing notice" of the termination of approximately 233 grants "terminated pursuant to the National Institutes of Health ('NIH') Grants Policy Statement (GPS), and 2 C.F.R. § 200.340(a)(4)" [ECF No. 142-5 (the "NIH Letter")

at 1 (footnote superscript omitted)].  *See* Lorsch Decl. ¶ 17.  The NIH stated: "These awards no longer effectuate agency priorities."  NIH Letter at 1.  The NIH explained that it "is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life" and the terminated grants were being used in ways that do "not satisfy these criteria."  *Id.*

The NIH further observed that "Columbia's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students" had not only "deprived Jewish students of learning and research opportunities" but also "brought shame upon the University and our nation." *Id.*  As such, the NIH had concluded, "[s]upporting research in such an environment" was "plainly inconsistent with NIH's priorities."  *Id.* at 1–2.  The letter also described the process for an administrative appeal.  *Id.* at 2.  Shortly thereafter, the NIH sent Columbia a substantially identical letter stating that it was terminating an additional 29 grants "pursuant to [the GPS] and 2 C.F.R. § 200.340(a)(4)" [ECF No. 142-6].  Lorsch Decl. ¶ 17.

   E.   <u>After Defendant Executive Agencies Demanded Reforms, Columbia
        Announced Reforms Columbia Had Been Planning for Many Months.</u>

On March 13, 2025, the GSA, HHS, and DOE jointly sent a letter to the then interim president of Columbia [ECF No. 49-6 (the "March 13 Letter")].  The March 13 Letter begins by explaining that, after the government informed Columbia that it "would be pausing or terminating federal funding," Columbia's counsel "asked to discuss 'next steps.'"  March 13 Letter at 1.  The March 13 Letter proceeds: "U.S. taxpayers invest enormously in U.S. colleges and universities, including Columbia University, and it is the responsibility of the federal government to ensure that all recipients are responsible stewards of federal funds."  *Id.*  The March 13 Letter further observes that Columbia "has fundamentally failed to protect American students and faculty from antisemitic

violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964." *Id.*

The March 13 Letter then lists the "immediate next steps" the government "regard[s] as a precondition" for negotiations "regarding Columbia University's continued financial relationship with the United States government." *Id.* The first of the nine steps listed in the March 13 Letter is the enforcement of Columbia's "existing disciplinary policies" in response to "Hamilton Hall and encampments." *Id.* The citation to Hamilton Hall refers to the protracted "occupation" of an academic building by protestors [ECF No. 52-5 at 1]. *See* Rosenthal Decl., Ex. 53 at 2 (August 2024 report by Columbia "Task Force on Antisemitism" noting that Jews affiliated with Columbia reported experiencing "extreme" antisemitism during "the takeover of Hamilton Hall"). The term "encampments" refers to tents that protestors erected on the Columbia campus and that Columbia permitted to remain on campus undisturbed for months despite reports that Jewish passersby were being threatened with violence and otherwise harassed. Rosenthal Decl., Ex. 53 at 2; *see id.*, Ex. 51 at 2 (March 2024 Columbia Task Force on Antisemitism report acknowledging that protestors had "taken over" campus spaces, there were "reports of physical harm to students," and protestors were "berat[ing] individuals who were . . . just walking by").

As Plaintiffs' own evidence demonstrates, the encampments and occupation of Hamilton Hall in the spring of 2024 were escalations of anti-Israel and anti-Jewish demonstrations that began immediately after the October 7, 2023 terrorist attacks in Israel and that Columbia long declined to restrain. *See* Rosenthal Decl., Ex. 53 at 2. In a statement dated October 18, 2023, the president of Columbia explained that she felt "duty-bound to ensure" that protesters could continue to "gather," even though "some [were] using th[e] moment to spread antisemitism," and encouraged students who were "concerned about their safety" to use Columbia's "existing [public safety]

hotline and escort service." *Id.*, Ex. 46 at 1. Shortly thereafter, in a statement dated October 27, 2023, Columbia's president expressed "shock[] to hear of several antisemitic incidents in just the last couple of days" since her prior statement. *Id.*, Ex. 47 at 1. On November 1, 2023, Columbia's president acknowledged "a series of antisemitic incidents on campus" and announced the creation of the Columbia "Task Force on Antisemitism." *Id.*, Ex. 49 at 1. Thereafter, in March 2024, the Columbia Task Force on Antisemitism issued its first report, which identified reports of violence and harassment, observed that many Jews and Israelis on campus "have heard chants at protests like 'Globalize the Intifada' and 'Death to the Zionist State' as calls for violence against them and their families," and expressed "serious concerns" that Columbia was not enforcing its own rules. *Id.*, Ex. 51 at 2, 8. In August 2024, a second report explained that while many antisemitic incidents "took place well before the establishment of the encampments and the takeover of Hamilton Hall" in the spring of 2024, "the experiences reported during that period were even more extreme." *Id.*, Ex. 53 at 2. The second report pointed out Columbia's "recurring lack of enforcement of existing University rules and policies" in the face of "even the most clear-cut violations." *Id.*

The second step listed in the March 13 Letter from executive agencies to Columbia, in response to Columbia's request to discuss next steps, is "empower[ing] the Office of the President to suspend or expel students" and "[a]bolish[ing] the University Judicial Board ('UBJ')." March 13 Letter at 1–2. The third step is implementing "time, place, and manner rules" for protests "to prevent disruption of teaching, research, and campus life." *Id.* at 2. The fourth step is banning "masks that are intended to conceal identity or intimidate others, with exceptions for religious and health reasons." *Id.* The fifth step is conducting "investigations" and "disciplinary proceedings" for any "student groups and individuals" who were "operating" on behalf of outside "groups" and "engaged in violations of University policy." *Id.*

The sixth step listed in the March 13 Letter is: "Formalize, adopt, and promulgate *a* definition of antisemitism." *Id.* (emphasis altered). The March 13 Letter states that "President Trump's Executive Order . . . uses the [International Holocaust Remembrance Alliance ('IHRA')] definition," but the executive agencies did not demand that Columbia adopt that definition. *Id.* Rather, the March 13 Letter asserts that Columbia must "address[]" the issue of supposedly "Anti-'*Zionist*' discrimination against Jews . . . unrelated to Israel." *Id.* (emphasis added).

The seventh step listed in the March 13 Letter is empowering "Columbia security" to arrest or remove "agitators who foster an unsafe or hostile work or study environment, or otherwise interfere with classroom instruction or the functioning of the university." *Id.* The eighth step is to "[b]egin the process of placing the Middle East, South Asian, and African Studies [("MESAAS")] department under academic receivership for a minimum of five years." *Id.* The ninth and final step listed in the March 13 Letter is "to reform undergraduate admissions, international recruiting, and graduate admissions practices to conform with federal law and policy." *Id.*

On March 21, 2025, non-party Columbia released a memorandum entitled "Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia." Rosenthal Decl., Ex. 27 (the "March 21 Memo"). In that memorandum, Columbia announced eighteen actions in response to "the discrimination, harassment, and antisemitic acts [its] Jewish community has faced in the wake of October 7, 2023." March 21 Memo at 1. Many of the actions Columbia announced in its March 21 Memo align with the steps listed in the government's March 13 Letter, while others do not. *Compare* March 21 Memo, *with* March 13 Letter.

Defendants submit evidence that, in the *Khalil* case mentioned above (where, unlike here, Columbia was a party), Columbia represented that "all of the 18 actions that were announced on March 21 were actions that were under review and work and development for many months"

before Columbia received the March 13 Letter.  Rovner Decl., Ex. C ("*Khalil* Tr.") at 65:1–8.[6]
According to Columbia, the March 13 Letter "affected [the] timing" of the release of the March
21 Memo.  *Khalil* Tr. at 65:5.  Consistent with these representations, the March 21 Memo describes
itself as the product of "hav[ing] worked hard" to develop "a comprehensive strategy" in response
to antisemitism since October 7, 2023.  March 21 Memo at 1.  Moreover, as noted above, Columbia
first announced the creation of a Task Force on Antisemitism in November 2023, and that Task
Force issued reports in March 2024 and August 2024.

The substance of the March 21 Memo reflects that Columbia did not simply implement the
demands in the March 13 Letter.  For example, Columbia declined to "[a]bolish" the University
Judicial Board.  March 13 Letter at 2; *see* March 21 Memo at 1.  While the March 13 Letter
demanded a ban on all "masks that are intended to conceal identity or intimidate others, with
exceptions [only] for religious and health reasons," March 13 Letter at 2, Columbia announced a
more narrow prohibition on masks used "for the purpose of concealing one's identity in the
commission of violations of University policies or state, municipal, or federal laws," March 21
Memo at 2.  With respect to the demand that Columbia adopt a definition of antisemitism, *see*
March 13 Letter at 2, Columbia announced that its relevant policies "will incorporate the definition
of antisemitism [that was previously] recommended by Columbia's Antisemitism Taskforce in
August 2024," March 21 Memo at 2.

Columbia did not place the MESAAS department under academic receivership.  *See* March
21 Memo at 3.  Rather, Columbia announced that it would appoint a "new Senior Vice Provost" to

---

[6] On a motion to dismiss, a "court may take judicial notice of a document filed in another court" but "not for the truth
of the matters asserted in the other litigation."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157
(2d Cir. 2006).  This is not a motion to dismiss, and it is well-established that "that hearsay evidence may be considered
by a district court in determining whether to grant a preliminary injunction."  *Mullins v. City of New York*, 626 F.3d
47, 52 (2d Cir. 2010).

review Columbia's "portfolio of programs in regional areas," starting with the Middle East, whose

goals would include "promoting excellence" and "intellectual diversity." *Id.*

    F.   <u>Columbia Informed Some of Plaintiffs' Members their Research
Is Not Aligned with the New Administration's Executive Orders.</u>

Plaintiffs submit evidence that, on March 24, 2025, Columbia emailed some number of

Columbia faculty and staff who were affected by the terminations of federal grants about potential

appeals [ECF Nos. 126, 126-1 ("CGC Email")]. In that email, Columbia wrote: "*Earlier this year*,

the *University conducted a risk analysis of its federal portfolio* in relation to the new

administration's Executive Orders concerning *DEI, gender ideology and climate/environmental

justice*. Through AI and human review, your award was identified as containing some content in

one or more of these areas. Since the risk assessments were completed, the government has also

identified additional 'non-aligned' areas, including vaccine research, research on COVID-19, and

research involving global collaborations with countries such as China and South Africa." CGC

Email at 1 (emphases added). Columbia explained that it was considering how best to "protect

and restore the University's federal research portfolio" and might "need [the email recipients']

help to be prepared to file [any] appeals on time." *Id.* Columbia went on to explain its view that

the "success of a potential appeal" of a termination of a grant "may turn on the ability to persuade

the government that your proposal can be rescoped to address any potential concern, by eliminating

or revising those areas in such a way that does not affect the science being proposed." *Id.* at 2. In

its email, Columbia stressed that it was "*not* asking" recipients "to address" any "notifications that

cited 'unsafe antisemitic actions' or other similar statements." *Id.* at 2 (emphasis in original).

### III.    LEGAL STANDARDS

A. Standing

"Federal courts do not possess a roving commission to publicly opine on every legal question" that makes news. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Further, and pertinent here, "[f]ederal courts do not exercise general legal oversight of the . . . Executive Branch[.]" *Id.* at 424.  As the Supreme Court has recently reaffirmed, "the courts have no business deciding . . . a dispute [that] is not a proper case or controversy" between the parties to the action before the court.  *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

"A proper case or controversy exists only when at least one plaintiff 'establishes'" standing. *Id.* (brackets omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  "That, in turn, requires a plaintiff to demonstrate that it has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  As the Supreme Court has explained, the "standing inquiry [must be] especially rigorous" where, as here, plaintiffs ask a court "to decide [that] an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20.

B. Preliminary Injunction

A preliminary injunction "is an extraordinary and drastic remedy," which a district court should not grant "unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005); *see Hanson Tr. PLC v. SCM Corp.*, 774

F.2d 47, 60 (2d Cir. 1985). Where, as here "the movant is seeking to modify the status quo by virtue of a *mandatory* preliminary injunction (as opposed to seeking a *prohibitory* preliminary injunction to maintain the status quo)," the movant has an even higher burden. *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (emphasis in original) (internal quotation marks and citations omitted). To obtain a preliminary injunction, the movant must carry the heavy burden of clearly showing: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of equities tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *See* Fed. R. Civ. P. 65(a). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

## IV.    CONCLUSIONS OF LAW

Plaintiffs lack standing to assert the claims they purport to allege in this case. They are inserting themselves into a quarrel between the Executive Branch and non-party Columbia, which, Plaintiffs' own submissions make clear, Columbia wishes to resolve cooperatively, and perhaps through administrative appeals, without resorting to litigation that might further imperil Columbia's resources and reputation. *See supra* n.1; CGC Email; Pl. Mem. at 6. Indeed, Plaintiffs' and Columbia's different assessments of the litigation risks simply underscores that non-party Columbia is the party with "the personal stake in the litigation." *Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018). This Court has no authority to opine on the legality of Executive Branch actions against an entity that is not a party to this case. *See TransUnion*, 594 U.S. at 423–424; *Murthy*, 603 U.S. at 57.

As the Supreme Court has stressed, "plaintiffs must demonstrate standing for each claim

that they press against each defendant, and for each form of relief that they seek." *Murthy*, 603 U.S. at 44 (internal quotation marks and citation omitted). The principal relief Plaintiffs seek is a judicial order commanding executive agencies to pay out money to non-party Columbia pursuant to grants and contracts that were previously awarded by executive agencies to non-party Columbia. *See* Proposed PI ¶ 1(a)–(b). However, as set forth above, neither Plaintiffs nor their members were ever the recipients of those grants and contracts. *See, e.g.*, Lorsch Decl. ¶¶ 8, 12; *see also* Rovner Decl. ¶¶ 2, 3. "Absent a contractual relationship there can be no contractual remedy." *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) (brackets and citation omitted) (holding that a party lacks prudential standing to enforce a contract "to which it is neither a party nor a third-party beneficiary"); *see also California*, 604 U.S. at __, 145 S. Ct. at 968 (characterizing DOE "grants" as a "contractual obligation to pay money").[7] Plaintiffs, who have the burden, fail to demonstrate that they have standing to demand payments to a non-party. *See Murthy*, 603 U.S. at 57.[8]

Furthermore, with respect to each of their numerous claims, Plaintiffs fail to show any cognizable injury to themselves and fail to show injuries to their members that are fairly traceable

---

[7] As discussed above and below, Plaintiffs' members may have benefited from federal funds, but "[p]roving third-party beneficiary status requires that the contract terms clearly evidence an intent to permit enforcement by the third party in question." *Hillside Metro Assocs., LLC*, 747 F.3d at 49 (internal quotation marks and citations omitted). Here, Plaintiffs offer no evidence that their members were third-party beneficiaries to any grants or contracts. Rather, the relevant evidence demonstrates that, for example, the NIH awarded grants to Columbia alone (which, in turn, designated the principal investigator on the grant from among its faculty). *See* Lorsch Decl. ¶¶ 8, 12. With respect to enforcement, Plaintiffs' own evidence suggests that *Columbia* had to conduct "appeals" of "the *University's* federal research portfolio" and was merely enlisting "help to be prepared to file such appeals" from Plaintiffs' members. CGC Email at 1 (emphasis added). This evidence suggests that non-party Columbia's grants and contracts did not contemplate enforcement by Plaintiffs' members. *See Hillside Metro Assocs., LLC*, 747 F.3d at 49.

[8] Relatedly, Plaintiffs purport to assert a claim pursuant to the "unconstitutional conditions" doctrine but, as Plaintiffs themselves quote the Second Circuit explaining, that doctrine prohibits the government from placing "a condition on the receipt of a benefit or subsidy that infringes upon *the recipient's* constitutionally protected rights." Cmpl. ¶ 299 (quoting *All. for Open Soc'y Int'l, Inc.*, 651 F.3d at 231). Neither Plaintiffs nor their members are "the recipient" of any of the grants or contracts at issue in this case.

to any defendant.  Organizations, such as Plaintiffs, may assert standing in two ways.  First, an organization may assert "standing in its own right to seek judicial relief from injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *see NY Civil Liberties Union v. NYC Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2014).  Second, an organization may "assert 'standing solely as the representative of its members.'"  *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quoting *Warth*, 422 U.S. at 511).  The second "approach is known as representational . . . standing."  *Id.* To establish representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Id.* (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs unconvincingly assert that "[e]ach Plaintiff independently has" standing in its own right "because Defendants' actions have 'directly affected and interfered with [Plaintiffs'] core business activities,' not merely their 'abstract social interests.'"  Pl. Mem. at 9–10 (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394–395 (2024)).  Plaintiffs' core business is to be labor unions.  *See* Wolfson Decl. ¶ 4; Schmid Decl. ¶ 3.  Query how many of the "1.8 million" dues-paying members of the AFT, including nurses and paraprofessionals, believe its core functions include paying a cavalry of lawyers to argue the "transcendent" importance of taxpayer funding for an elite university.[9]  Schmid Decl. ¶ 3; Cmpl. ¶¶ 1–3.

To be sure, Plaintiffs submit evidence that the AAUP is not only a labor union but also a "membership association" with a "mission" to "advance academic freedom."  Wolfson Decl. ¶ 7. Nevertheless, Article III standing requires "far more" than an alleged "setback" to the AAUP's

---

[9] According to the docket sheet, at least eleven attorneys represent Plaintiffs in this case.

interest in academic freedom. *All. for Hippocratic Med.*, 602 U.S. at 394. To establish an injury-in-fact to itself, the AAUP must show a concrete harm that has actually occurred or is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (internal quotation marks and citation omitted). The AAUP submits that it has suffered an injury because it has "diverted internal resources of staff time and expenses to assist Columbia members in the [Middle East, South Asian, and African Studies, *i.e.*,] MESAAS Department and other departments *prepare* to respond to the Trump Administration's demand[] that the MESAAS Department be put under academic receivership, and to respond to the internal governance steps *Columbia* has announced." Wolfson Decl. ¶ 20 (emphases added).

Fatally for Plaintiffs, the Supreme Court has held that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. The AAUP cannot establish an injury-in-fact merely because it elected to expend resources *preparing* to respond to a potential development that has not occurred and is not "certainly impending." *Clapper*, 568 U.S. at 401. The Columbia MESAAS Department is not under academic receivership. *See* March 21 Memo at 3. As discussed further below, any resources Plaintiffs expended "respond[ing] to the internal governance steps *Columbia* has announced," Wolfson Decl. ¶ 20 (emphases added), are not injuries traceable to *Defendants*. Neither the ATF nor the AAUP has demonstrated a cognizable injury to itself.

Turning to representational standing, Plaintiffs fail to establish that any injuries their members may have suffered are fairly traceable to Defendants. As noted above, the Court does find that some of Plaintiffs members used federal grants to Columbia for their academic work. *See, e.g.*, Witte Decl. ¶ 6; Hirsch Decl. ¶¶ 8, 11. The loss of professional opportunities or income

may certainly constitute an injury in some cases. *See Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 232 (S.D.N.Y. 2019). However, here, Plaintiffs have not demonstrated that it makes a difference to their members whether the funding for their research and salaries comes from American taxpayers, non-party Columbia's multi-billion-dollar endowment, the largess of Columbia's donors, or the eye-popping tuition bills paid by Columbia students, including the Jewish students who apparently paid for the privilege of being threatened with violence on their way to class. *See* Rosenthal Decl., Ex. 51 at 2.

Indeed, Plaintiffs' own evidence demonstrates that "Columbia has committed to providing salary coverage during this immediate period of uncertainty for personnel whose grants have been terminated." Hirsch ¶ 12. Plaintiffs' own evidence also demonstrates that Columbia has relied on "generous alumni" to alleviate certain "unanticipated expenses" [ECF No. 99-5 at 3]. Insofar as Columbia elects not to use its various private resources to fund specific research and personnel, Plaintiffs' members' quarrel is with Columbia.

Plaintiffs likewise fail to establish representational standing based on the alleged chilling of their members' speech and academic freedom. The numerous declarations in which Plaintiffs' members (and other individuals affiliated with Columbia with whom Plaintiffs appear to have no relationship whatsoever) attest to their "subjective" feelings of being chilled are not sufficient for standing. *Laird v. Tatum*, 408 U.S. 1, 13 (1972). Plaintiffs have not demonstrated that Defendants have harmed them because of their protected First Amendment activities or threatened a specific, imminent future harm for such protected activities. *See id.*

Plaintiffs contend that their "members fear that their speech and scholarship, if not aligned with the Trump administration, could trigger additional *punitive* funding freezes" and "demands by Defendants that their academic departments, too, be placed in academic receivership." Pl.

Mem. at 9 (emphasis added). Plaintiffs also contend that Columbia's announced reforms reflect Columbia simply "acquiesc[ing] to" Defendants' "demands." *Id.* at 21. Plaintiffs' contentions about their members' fears, Defendants' possible future actions (and the purportedly punitive nature of such actions), and Columbia's actions are all purely subjective and speculative. Evidence in the record, including Plaintiffs' own evidence, contradicts Plaintiffs' account.

As discussed above, Defendants submit evidence that they have terminated funding to Columbia because such funding was used in ways that was no longer consistent with agency priorities and for the convenience of the government. *See, e.g.*, March 3, 2025 Memo; NIH Letter; HHS Letter. Plaintiffs posit that any "reasonable person would understand that Defendants' actions" were "directed squarely at suppressing speech, association, and academic freedom rights." Pl. Mem. at 22. According to Plaintiffs, Defendants acted to punish "any support for Palestinian freedom and an anti-war perspective." Cmpl. ¶ 244. However, evidence submitted by both sides supports finding that the defendant executive agencies were responding to incidents other than protected speech and activities.

Indeed, Executive Branch communications about the termination of funding to Columbia expressly cited Columbia's protracted failure to respond to the occupation of an academic building, "Hamilton Hall," and other "disruption[s] of [the] teaching, research, and campus life" that the taxpayers were supposedly funding. March 13 Letter at 1–2; *see* NIH Letter at 1–2 ("Columbia's ongoing inaction in the face of repeated and severe harassment of Jewish students has ground day-to-day campus operations to a halt" and "deprived Jewish students" and others "of learning and research opportunities"). Columbia's own reports, which Plaintiffs put into evidence, identified incidents of "physical harm to students." Rosenthal Decl., Ex. 51 at 2; *see id.*, Ex. 53 at 2–3 (reporting that Jewish students "were on the receiving end of . . . physical assaults," and there was

"a recurring lack of enforcement of existing University rules and policies"). This evidence does not support the subjective feelings of Plaintiffs' members that funding has been or will be cut to punish protected speech and scholarship. *See Laird*, 408 U.S. at 13. Thus, in light of the Supreme Court's instruction to perform an "especially rigorous" standing inquiry before proceeding to the merits of a claim that "an action taken by one of the other two branches of the Federal Government was unconstitutional," the Court concludes that Plaintiffs fall short of demonstrating that their members have experienced more than a subjective feeling of chill in response to actions by any defendant. *Raines*, 521 U.S. at 819–20; *see Laird*, 408 U.S. at 13.

Relatedly, as noted above, Plaintiffs fall short with respect to traceability. *See Murthy*, 603 U.S. at 57–58. Based on Plaintiffs' own evidence, it was Columbia, not any of the defendants, that reached out to Plaintiffs' members to advise them that their scholarship was not aligned with the funding priorities of the Executive Branch based on Columbia's own "analysis," which analysis Columbia had performed "[e]arlier [in the] year," before the termination of any funding and before the March 13 Letter. CGC Email at 1. That email expressly was unrelated to any "notifications" about "antisemitic actions." *Id.* at 2.

Crucially, Columbia had been planning the reforms it announced in its March 21 Memo, which was about antisemitism on campus, for "many months" before any of the defendants made any demands. *Khalil* Tr. at 65:1–8. Moreover, Columbia did not merely implement the steps listed in the March 13 Letter from executive agencies, but rather exercised independent judgment. *See supra* at 17–18. For example, as noted above, Columbia did not comply with the demand to place the MESAAS Department under academic receivership but, instead, appointed a "new Senior Vice Provost" to review Columbia's whole "portfolio of programs in regional areas," starting with the Middle East, with goals to "promot[e] excellence" and "intellectual diversity." March 21 Memo

at 3. Such "independent action of [a] third party not before the court" breaks the causal chain between Defendants and any alleged injury. *Murthy*, 603 U.S. at 57 (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 42 (1976)). Insofar as Plaintiffs' members feel chilled by any actual changes that have taken place at Columbia, such as the review of the MESAAS Department, Plaintiffs have not shown that Columbia's actions were merely the "predictable" response to the demands of the executive agency defendants. *Murthy*, 603 U.S. at 58; *see Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Furthermore, Plaintiffs stress that "[d]espite Columbia's compliance," funding has not been restored. Pl. Mem. at 6. Yet Plaintiffs apparently fail to grasp that one possible inference from this state of affairs is that funding cuts were made and maintained not to punish speech but because, for example, it is not consistent with the priorities of the NIH under the current, democratically-elected President, to continue to fund Columbia's research into the impact of climate change on the mental health of women in East Africa. *See* Witte Decl. ¶ 9. Declining to fund such research is not a First Amendment injury.

Despite submitting voluminous evidence, Plaintiffs fail to establish standing in their own right and fail to establish representational standing.[10] As such, this case must be dismissed without prejudice for lack of subject matter jurisdiction. *See Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 121 (2d Cir. 2025). As such "the court *cannot* consider the merits of the preliminary injunction motion." *Id.* (emphasis in original).

The Court simply notes that the Supreme Court's recent, albeit brief, opinion in *Department of Education v. California*, 604 U.S. __, 145 S. Ct. 966 (2025), raises several additional hurdles

---

[10] Plaintiffs were on notice that they needed to address standing, not only because it is a constitutional prerequisite for bringing any case in federal court, but also because the judge in *Khalil* raised the issue with the plaintiffs in that case immediately before Plaintiffs here filed their motion for a preliminary injunction. *See supra* at 4–5.

for Plaintiffs.  As noted above, the Supreme Court characterized DOE "grants" as contracts and ruled that, as such, the district court in that case likely lacked jurisdiction to order relief because "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money," and "the Tucker Act grants the Court of Federal Claims [exclusive] jurisdiction over suits based on . . . contract[s] with the United States."  *California*, 604 U.S. at __, 145 S. Ct. at 968.  In all events, the principal relief Plaintiffs seek is money, and it is well-established that a party cannot show the irreparable harm required to obtain a preliminary injunction where "money damages" can provide redress.  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002); *see Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995).

The Court also notes, with respect to the merits, that Plaintiffs posit, without citation to any authority, that the Executive Branch may not count repudiating antisemitism among "agency priorities" within the meaning of 2 C.F.R. § 200.340(a)(4).  The Court is not aware of authority for that particular limitation on agency priorities.  Rather, all of Plaintiffs' arguments that Defendants violated the APA (and the separation of powers) by failing to comply with procedural requirements for cutting funding pursuant to Title VI simply presuppose that Title VI is the exclusive vehicle by which the Executive Branch may withdraw financial support for an institution that allows religious discrimination.

The Court urges Plaintiffs, and the amici who decry Defendants' alleged failure to follow Title VI to the letter, to review the text of that statute.  Title VI does not mention religion.  *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of *race*, *color*, or *national origin*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.") (emphases added); *see also Kajoshaj v. New York City Dep't of Educ.*, 543 F. App'x 11, 13 & n.2 (2d Cir.

2013) (noting that "Title VI does not, by its terms, proscribe religious discrimination"). As such, it strikes this Court as unlikely that Title VI is the sole and exclusive "legal tool[]" available to a President who instructs executive agencies to prioritize "combat[ting] anti-Semitism . . . on university and college campuses" [ECF No. 48-7 ("EO")].

Plaintiffs blithely assert that the balance of equities and the public interest "strongly favor preliminary relief" and that "[n]o public interest is served by allowing continued violations of Title VI, the APA, and the Constitution." Pl. Mem. at 28, 29. However, it is not the role of a district court judge to direct the policies of the Executive Branch first and ask questions later. Plaintiffs have not established their standing to litigate this case, let alone any violation of any law.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction [ECF No. 24] is DENIED, and this case is DISMISSED without prejudice.

The Clerk of Court respectfully is requested to terminate the motion pending at docket entry 24 and to close this case.

**SO ORDERED.**

**Date:  June 16, 2025**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**